**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
Lisa J. Rodriguez (LR6767)
Donna Siegel Moffa (DSM4634)
8 Kings Highway West
Haddonfield, NJ 08022
Telephone: (856) 795-9002
Facsimile: (856) 795-9887

**Attorney for Plaintiff**
**(Additional Counsel on Signature Page)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DENISE AGOSTINO, ROCCO AGOSTINO, JENNIFER HALEY, CHRISTINE RANIERI, RICHARD RANIERI, ARIA MCKENNA, ERIC GUNTHER and DENISE CASSESE, individually and on behalf of all others similarly situated, | CIVIL ACTION No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| QUEST DIAGNOSTICS, INC., AMERICAN MEDICAL COLLECTION AGENCY and Does 1 to 50, | JURY TRIAL REQUESTED |
| Defendants. | |

Plaintiffs Denise Agostino, Rocco Agostino, Jennifer Haley, Christine Ranieri, Richard Ranieri and Denise Cassese (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, for their complaint against Quest Diagnostics, Inc. ("Quest"), American Medical Collection Agency ("AMCA") and Does 1 to 50 (collectively "Defendants"), allege upon information and belief, except as to the allegations which pertain to Plaintiffs and their counsel which claims are based on personal knowledge, as follows:

1

## INTRODUCTION

1.      Quest is engaged in the business of providing laboratory testing services to or on behalf of individuals, doctors, hospitals, health insurers, and other health care facilities nationwide. Quest is far and away the industry leader in this field with operations in every major metropolitan city in the United States. Last year, Quest reported revenues from their laboratory testing business exceeding $4.5 billion, as a result of having conducted over 250 million tests for over 100 million patients.

2.      Many of the tests performed by Quest are done for patients covered by private health insurance, as set forth in employee welfare benefit plans ("Benefit Plans"). In accordance with those Benefit Plans, private health insurers, employee organizations and others sign agreements with Quest to provide laboratory testing and other health-related services to participants and beneficiaries of their Benefit Plans. Quest also performs medical testing on patients covered by Medicare and Medicaid, a federal and state governmental insurance programs designed to provide health insurance to seniors, the disabled and the economically disadvantaged.

3.      The agreements between Quest and private health insurance providers dictate the prices and terms of the services provided by Quest to Benefit Plan participants and beneficiaries. Those agreements almost always place two restrictions on Quest:  1) that Quest invoice and collect fees for covered services exclusively from the Benefit Plans, or their designated fiduciaries, affiliates, administrators or agents; and 2) Quest must accept the negotiated prices listed in the agreements as full payment for the services provided by Quest and paid by the

Benefit Plan, without seeking any additional monies from individual consumers covered by the Benefit Plans.

4.      Quest routinely violates both of those restrictions on its billing practices concerning persons covered by private insurance.   Although an express violation of its agreements, Quest sends invoices and collects monies for laboratory testing and other covered services to individual participants and beneficiaries of private Benefit Plans.

5.      In those invoices Quest sends to insured individuals, Quest engages in "Balance Billing" and "Double Billing."  Both practices are violations of the Benefit Plans, and also false, misleading, deceptive, unfair, unconscionable and contrary to federal and state laws.

6.      Balance Billing occurs when Quest sends duplicative invoices to both the Benefit Plan and the insured individual, demanding the entire amount in each invoice.  Worse still, the invoices mailed by Quest to individuals demand payment at Quest's normal rates, rather than the lower rates negotiated between Quest and the Benefit Plans, conduct that constitutes "Over Billing."  As a result of its Over Billing, Quest demands, attempts to collect and often receives payment from insured individuals far in excess of the amount actually owed.

7.      In others instances, Quest continues to send invoices to insured individuals after the Benefit Plan has already paid Quest for the services incurred by Benefit Plan participants and beneficiaries.  This practice is known as "Double Billing."  In furtherance of its efforts to Double Bill individuals, Quest falsely represents to the individuals on Quest's invoices that the individual's insurer had denied coverage and/or Quest did not have the correct address of the individual's insurance company.

3

8. Although Quest is not entitled to any payment or debt from the insured individuals, Quest often aggressively pursues, collects and attempts to collect unearned and un-owed debts from consumers. These deceptive and unconscionable acts constitute "False Billing" by Quest. To assist in the collection of these unearned and un-owed debts, Quest often employs the services of debt collection agencies, including AMCA. These debt collection agencies, aided and abetted by Quest, use false, deceptive, misleading, unfair and unconscionable means to collect and attempt to collect these unearned and un-owed debts.

9. As a result of its false, deceptive, misleading, unfair, unconscionable and unlawful billing practices, Quest was investigated by the New York Attorney General for the precise practices complained of in this action, namely Balance Billing and Double Billing. As a result of that investigation, the New York Attorney General concluded that Quest engaged in deceptive and misleading practices by engaging in Balance Billing and Double Billing in violation of private health insurance contracts and New York consumer protection laws. In June 2003, Quest settled that case with the New York Attorney General, agreeing to cease its deceptive acts and practices that violate the New York consumer protection laws, refund monies to some New York consumers, pay a fine and the costs of the action - remedial actions Quest has still not accomplished. These same practices have injured and continue to injure consumers, participants and their beneficiaries nationwide.

10. Quest also improperly invoices patients covered by Medicare Part B by routinely and deceptively engaging in the Balance Billing of patients covered by Medicare Part B.

11. Plaintiffs and the Class (defined in ¶79) seek damages and equitable relief for Defendant's past and continuing violations of the Employee Retirement Income Security Act of

1974 ("ERISA"), §§ 29 U.S.C. 1001, *et seq.*, the Fair Debt Collection Practices Act ("FDCPA"), §§ 15 U.S.C. 1692, *et seq.*, the New Jersey Insurance Fraud Prevention Act ("NJIFPA"), N.J.S.A. §§ 17:33A-1, *et seq.* and the similar insurance laws of other states, the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. §§ 56:8-1, *et seq.* and the similar consumer protection laws of other states, breach of contract, common law fraud and unjust enrichment.

## JURISDICTION AND VENUE

12.     Plaintiffs invoke the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §1331, which confers original jurisdiction upon this Court for all civil actions arising under the laws of the United States, and pursuant to 15 U.S.C. §1692k(d) and 29 U.S.C. §1003 and §1132. This Court has supplemental jurisdiction over Plaintiffs' State law and common law claims pursuant to 28 U.S.C. §1367(a).

13.     This Court possesses personal jurisdiction over each Defendant based on each Defendant's residence, presence, transaction of business and contacts within the United States, New Jersey and/or this District.

14.     In addition, this Court has personal jurisdiction over each Defendant as a co-conspirator as a result of the acts of any of the co-conspirators occurring in the United States in connection with Defendants' violations of federal laws, state laws and/or the common law of the fifty States and United States territories.

15.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Quest maintains its principal place of business in this District and at all times conducted substantial business in this District.

## TRADE AND COMMERCE

16.    In connection with Defendants' participation of their business, industry and activities, monies as well as contracts, bills and other forms of business communications and transactions were transmitted in a continuous and uninterrupted flow across state lines.

17.    Various means and devices were used to effectuate the violations of law and conspiracy alleged herein, including the United States mail, interstate travel, interstate telephone commerce and other forms of interstate electronic communications.  Defendants' activities alleged herein were within the flow of, and have substantially affected, interstate commerce.

## PARTIES

### Plaintiffs

18.    Denise Agostino and Rocco Agostino are a husband and wife residing in New York.  During the relevant time period they were "participants" or "beneficiaries," as those terms are defined by ERISA and applicable regulations, in an ERISA Benefit Plan or Plans that provided them with health insurance, including the Pavers and Road Builders District Counsel Welfare Fund.  Quest has or had contracted to provide laboratory testing services to participants and beneficiaries of Plaintiffs' health care Benefit Plan(s), which Benefit Plan requires Quest to invoice Plaintiffs' health plan (or its fiduciaries, affiliates, administrators or agents) for laboratory testing received by Plaintiffs, and to accept the billing rates and terms set forth in the contract and/or benefit plan(s) as full payment.  In violation of Plaintiffs' health care Benefit Plan(s), Plaintiffs have been injured by Defendants' unfair, deceptive, misleading and unconscionable practices of Balance Billing, Double Billing, Over Billing and/or False Billing.

19.     Christine Ranieri and Richard Ranieri are a husband and wife residing in New York. During the relevant time period they were "participants" or "beneficiaries," as those terms are defined by ERISA and applicable regulations, in an ERISA Benefit Plan or Plans that provided them with health insurance. Quest has or had contracted to provide laboratory testing services to participants and beneficiaries of Plaintiffs' health care Benefit Plan(s), which Benefit Plan requires Quest to invoice Plaintiffs' health plan (or its fiduciaries, affiliates, administrators or agents) for laboratory testing received by Plaintiffs, and to accept the billing rates and terms set forth in the contract and/or Benefit Plan(s) as full payment. In violation of Plaintiffs' health care Benefit Plan(s), Plaintiffs have been injured by Defendants' unfair, deceptive, misleading and unconscionable practices of Balance Billing, Double Billing, Over Billing and/or False Billing.

20.     Jennifer Haley resides in Nevada. During the relevant time period she was a "participant," as that term is defined by ERISA and applicable regulations, in an ERISA Benefit Plan or Plans that provided her with health insurance, including Sierra Health and Life Insurance Company, Inc. and Health Plan of Nevada, Inc. Quest has or had contracted to provide laboratory testing services to participants and beneficiaries of Plaintiff's health care Benefit Plan(s), which Benefit Plan(s) requires Quest to invoice Plaintiff's health plan (or its fiduciaries, affiliates, administrators or agents) for laboratory testing received by Plaintiffs, and to accept the billing rates and terms set forth in the contract and/or Benefit Plan(s) as full payment. In violation of Plaintiff's health care benefit plan, Plaintiff has been injured by Defendants' unfair, deceptive, misleading and unconscionable practices of Balance Billing, Double Billing, Over Billing and/or False Billing.

21.     Aria McKenna and Eric Gunther are fiancée and fiancée residing in New York and who previously resided in Florida.  At various times during the relevant time period they were "participants" or "beneficiaries," as those terms are defined by ERISA and applicable regulations, in an ERISA Benefit Plan or Plans that provided one or both of them with health insurance, including Union Labor Life, Empire Blue Cross and Blue Shield of New York and Blue Cross and Blue Shield of Florida.  Quest has or had contracted to provide laboratory testing services to participants and beneficiaries of Plaintiffs' health care Benefit Plan(s) which Benefit Plan(s) requires Quest to invoice Plaintiffs' health plan (or its fiduciaries, affiliates, administrators or agents) for laboratory testing received by Plaintiffs, and to accept the billing rates and terms set forth in the contract and/or Benefit Plan as full payment.  In violation of Plaintiffs' health care benefit plan(s), Plaintiffs have been injured by Defendants' unfair, deceptive, misleading and unconscionable practices of Balance Billing, Double Billing, Over Billing and/or False Billing.

22.     Denise Cassese is a resident of New York and a Medicare recipient.  In violation of the Medicare laws and regulations concerning Medicare Part B, Plaintiff has been injured by Defendants' unfair, deceptive, misleading and unconscionable practices of Balance Billing, Double Billing, Over Billing and/or False Billing.

**Defendants**

23.     Quest is a Delaware corporation with its principle place of business and headquarters located at One Malcolm Avenue, Teterboro, New Jersey.  Quest is the largest provider of diagnostic and clinical testing in the nation.  Quest owns and/or operates over 2000 laboratories throughout the United States.  Quest's revenues in 2003 alone were $4.7 billion.

24.     Quest is the parent company of numerous subsidiaries that provide laboratory testing, patient billing and related services.  Included among those subsidiaries of Quest are the following companies, each intended to be a defendant in this action to the extent any has participated or profited in any of activities alleged herein, or aided or abetted Quest to participate or profit in such activities:  Quest Diagnostics Holdings Inc. (a Delaware corporation), Quest Diagnostics Clinical Laboratories, Inc. f/k/a SmithKline Beecham Clinical Laboratories, Inc. (a Delaware corporation), Quest Diagnostics Inc. (a California corporation), Quest Diagnostics Inc. (a Maryland corporation), Quest Diagnostics Inc. (a Michigan corporation),  Quest Diagnostics of Pennsylvania, Inc. (a Pennsylvania corporation), Quest Diagnostics Inc. (a Nevada corporation), Metwest Inc. (a Delaware corporation), Diagnostic Path Lab Inc. (a Texas corporation), Nichols Institute Diagnostics (a California corporation), Nichols Institute Sales Corp. (a United States Virgin Islands corporation), DPD Holdings, Inc. (a Delaware corporation), Diagnostics Reference Services Inc. (a Maryland corporation), American Medical Laboratories, Inc. (a Delaware corporation), AML Inc. (a Delaware corporation), Quest Diagnostics Nichols Institute, Inc. f/k/a Medical Laboratories Corp. (a Virginia corporation), Quest Diagnostics LLC (an Illinois limited liability company), Quest Diagnostics LLC (a Connecticut limited liability company), Quest Diagnostics LLC (a Massachusetts limited liability company), APL Properties Limited Liability Company (a Nevada limited liability company), Unilab Acquisition Corp. d/b/a FNA Clinics of America (a Delaware corporation), Unilab Corp. (a Delaware corporation), Quest Diagnostics Investments Inc. (a Delaware corporation), Quest Diagnostics Finance Inc. (a Delaware corporation), Pathology Building Partnership (a Maryland general partnership), Quest Diagnostics of Puerto Rico Inc., Quest Diagnostics Receivables Inc.

9

(a Delaware corporation), Quest Diagnostics Ventures LLC (a Delaware limited liability company), Lab Portal Inc. (a Delaware Corporation), LifePoint Medical Corp. (a Delaware corporation), CSClinical Laboratory Inc. d/b/a Clinical Diagnostic Services (a New Jersey corporation), MedPlus, Inc. (an Ohio corporation), Worktiviti, Inc. f/k/a Universal Document Systems, Inc. (an Ohio corporation), Valcor Associates Inc. (a Pennsylvania corporation) and Associated Pathologists Chartered (a Nevada company).

25.     For each of the companies listed in the previous paragraph, Quest owns (directly or indirectly) at least 50% of the equity or voting interest in each of those companies, controls those companies, their management and operations, and shares officers and/or directors with those companies.  For example, Joseph Manory is the Vice President and Treasurer of all or most of those companies, while holding the position of Vice President and Treasurer of Quest.  The revenues and profits for each of those companies are included and consolidated in Quest's financial statements.

26.     AMCA is a debt collection agency with offices located at 2269 Saw Mill River Road, Building 3, Elmsford, New York and 1261 Broadway, New York, New York.  AMCA is regularly retained by Quest to collect monies from consumers in New York, and potentially elsewhere, who have had laboratory testing performed by Quest.  AMCA and Quest know, or should reasonably know, that many of the so-called "debts" claimed by AMCA and Quest to be owed by consumers to Quest are not owed.  Nevertheless, AMCA engages in unfair, deceptive and unconscionable methods, acts and practices to collect, or attempt to collect, these unearned and un-owed debts.  AMCA is an affiliate of Retrieval Masters Credit Bureau Inc.

27.     AMCA was founded in 1977.  AMCA operates its debt collection efforts strictly on a contingency basis, meaning that AMCA does not get paid from Quest unless it recovers money from consumers.  According to an AMCA advertisement:  "What's more, we work on a contingency basis, which means NO up-front fees.  You pay for results – not for promises." (Emphasis in original).

28.     Does 1 to 50, the identities of whom are not presently known but discoverable from the records of Quest, are other debt collection agencies retained by Quest to collect unearned and un-owed monies from consumers and who engage in unfair, deceptive and unconscionable methods, acts and practices to collect or attempt to collect those false debts.

29.     During all relevant times, in connection with the activities giving rise to this action, Quest conspired with remaining Defendants to engage in the various activities set forth herein, and all Defendants agreed to participate in a conspiracy to defraud and deceive Plaintiffs and the Class and aided and abetted one another in furtherance of that conspiracy.

## FACTUAL ALLEGATIONS

*Quest's Laboratory Testing Business:*

30.     Quest is the nation's leading provider of diagnostic and clinical testing, information and services.  Quest owns and/or operates a nationwide network of laboratories and patient service centers where it provides testing and patient consulting services.  Quest claims to provide its testing services to physicians, hospitals, managed care organizations, employers, governmental institutions, individual patients and other independent clinical laboratories.

31.     Quest was originally formed under the name Metpath Inc., a New York corporation, in 1967.  From 1982 until 1996, Quest was known as Corning Clinical Laboratories

11

Inc., a subsidiary of Corning Inc. It changed it name to Quest in September 1996, after being spun-off from Corning.

32.     Quest has become the largest laboratory testing company in the country primarily as a result of mergers and acquisitions. In September 1999, Quest acquired SmithKline Beecham Clinical Laboratories, Inc. ("SBCL") to become the dominant company in the laboratory industry.

33.     Other acquisitions include Quest's acquisition of Unilab Corporation in February 2003, the leading independent clinical laboratory in California, and Quest's acquisition of American Medical Laboratories, Inc. and LabPortal Inc. in April 2002.

34.     Quest categorizes the testing it provides into 3 categories: i) Routine testing; ii) Esoteric and Gene-Based testing; iii) Clinical Trials test. Routine testing accounts for approximately 80% of Quest's revenues, Esoteric/Gene-Based testing approximately 16% of Quest's revenues and Clinical Trial testing approximately 3% of Quest's revenues. Routine tests include such common tests as blood cholesterol level tests, complete blood cell counts, Pap tests, HIV-related tests, urinalyses, pregnancy and pre-natal tests and alcohol and substance abuse tests.

35.     According to Quest's public filings, individual patients account for 5-10% of Quest's revenues, Medicare and Medicaid account for 15-20% of Quest's revenues, Monthly-Billed Payers (such as physicians, hospitals and employers) account for 20-25% of Quest's revenues, Managed Care and Third Party Fee-For-Service (*i.e.* private insurance) providers account for 40-45% of Quest's revenues and Capitated Managed Care (*i.e.* private insurance) providers account for 5-10% of Quest's revenues.

36.     For 2003, Quest reported revenues of $4.7 billion and net income of $437 million. For 2002, Quest reported revenues of $4.1 billion and net income of $322 million. For 2001, Quest reported revenues in excess of 3.6 billion and net income of $162 million.

***Quest's Revenues and Profits Were Hurt by Medicaid, Medicare and Managed Care:***

37.     Although immensely profitable, Quest's public filings admit that Quest has been adversely affected by reductions in Medicaid and Medicare reimbursement rates and the growth of managed care and its efforts to curtail health care costs in the United States.

38.     As explained in Quest's 2003 Form 10-K, "health insurers demand that clinical laboratory service providers accept discounted fee structures or assume all or a portion of the financial risk associated with providing testing services to their members through capitated payment contracts."

39.     To offset these reduced revenues, Quest has become more aggressive in collecting debts from individual patents.

40.     Quest's zeal to increase revenues has resulted in its use of Balance Billing, Double Billing, Over Billing and False Billing of insured consumers, in violation of Quest's agreements with Benefit Plan providers, applicable laws and regulations.

***Quest's Use of Balance Billing, Double Billing, False Billing and Over Billing:***

41.     More than half of Quest's revenues are derived from laboratory tests performed on individuals covered by private health insurance Benefit Plans.

42.     Quest contracts with the providers of most private health insurance Benefit Plans to provide their insured participants and beneficiaries with use of Quest's laboratory testing and other services. These agreements require Quest to bill only the Benefit Plan providers, or their

fiduciaries, affiliates, administrators or agents, for laboratory testing or other services preformed by Quest for insured individuals.

43.    Certain state laws and regulations similarly preclude Quest from directly billing insured individuals for services included in a Benefit Plan for which Quest is a participating or included provider of health care services.

44.    Quest's agreements with Benefit Plan providers also dictate the prices that Quest can charge for services provided, which are almost always lower than the prices normally charged by Quest for the same or similar services.  Quest's agreements require them to accept the stated contract price as full payment for all covered services, and preclude Quest for seeking any additional payment from either the insurance provider or insured individual.

45.    Quest has routinely violated their Benefit Plan agreements by billing and collecting or attempting to collect monies from insured individuals and their insurance providers for the entire amount of the same services ("Balance Billing"), billing and collecting or attempting to collect monies from both the Benefit Plan providers and insured individuals ("Double Billing"), billing and collecting or attempting to collect monies from insured individuals for services in an amount above the rates and prices agreed in the Benefit Plan agreements ("Over Billing") and billing and collecting or attempting to collect monies not owed by insured individuals ("False Billing").

46.    Not only does Quest wrongfully engage in Balance Billing, Double Billing, Over Billing and False Billing, it mails multiple copies of invoices and threatening letters to insured consumers over a period of months demanding payment, wrongly claiming delinquency,

14

threatening to add the individuals to delinquency lists, threatening debt collection, and threatening legal action and liability for costs and expenses.

47.    To further promote its Double Billing, Quest's invoices to insured consumers contain a host of deceptive, misleading and false statements, such as stating that the individual's insurance company has denied coverage for the services performed by Quest, and/or that Quest does not have access to the correct billing address of the individual's insurance provider or administrator.

48.    The duplicate bills mailed by Quest to insured individuals are routinely and intentionally overstated, whereby Quest invoices the individuals at prices higher than agreed upon in Quest's Benefit Plan agreements.

49.    Quest follows through on its threats to use outside debt collection agencies, including AMCA, to collect and attempt to collect debts from insured individuals, even though such so-called "debts" are fictitious, not properly collected from insured individuals and/or were previously paid by the insurance providers.  Worse still, Quest often imposes a "collection fee" of approximately $10 for each invoice Quest employs the use of outside debt collectors.

50.    Although it collects debts it knows or should reasonably know are not owed by consumers, AMCA unfairly, deceptively and unconscionably abuses and harasses individuals to pay monies purportedly owed to Quest, but which in fact are not owed.  AMCA achieves its illicit goals by repeatedly calling and sending letters to consumers demanding payment to Quest. AMCA's efforts are expressly approved by Quest.  According the AMCA: "We find the most effective collection method is a combination of letters and telephone calls ('telecollection').  At AMCA, we have had success mailing up to nine letters to slow payers.  Letters are tailored to

15

your specific situation and approved by you before we mail." (Emphasis in original). AMCA promises: "If you want your money, we will collect it for you."

51.     Quest provides knowingly and/or recklessly false information to debt collection agencies employed and retained by Quest to wrongfully, deceptively and unconscionably collect and attempt to collect non-existent debts from insured consumers.

**Quest's Unfair, Deceptive, Misleading and Unconscionable**
**Conduct In Violation of the Medicare Laws and Regulations**

52.     The Medicare laws and regulations provide health insurance to qualifying persons, primarily consisting of seniors over the age of 65 and the disabled. Medicare Part A generally provides coverage for inpatient hospital expenses, while Medicare Part B typically covers outpatient health care expenses.

53.     Quest has sought and been approved to be a Medicare provider. Quest is, therefore, obligated to comply with all Medicare laws and regulations with respect to its billing for laboratory testing.

54.     Persons covered under Medicare Part B receive health insurance for some services subject to an annual deductible and a 20% co-payment. However, outpatient clinical and diagnostic laboratory testing is covered by Medicare Part B in its entirety, without the individual being responsible for paying any deductible or co-payment. The Medicare laws and regulations also prohibit Balance Billing of Medicare recipients.

55.     Even though contrary to the Medicare laws and regulations, Quest engages in Balance Billing of persons covered by Medicare Part B. These methods, acts and practices are unfair, deceptive, misleading and unconscionable.

16

56.     It is also believed that Quest engages in Double Billing, Over Billing, False Billing and charging co-payments to Medicare Part B recipients.

***The New York Attorney General Investigated, Confirmed and Fined Quest for the Same Unlawful and Deceptive Laboratory Billing Practices Described in this Complaint:***

57.     In June 2003, after an extensive investigation, the New York Attorney General and its Health Care Bureau concluded that Quest had been engaging in improper and deceptive laboratory billing practices by Balance Billing and Double Billing insured individuals throughout New York State.

58.     The results of the Attorney General's investigation are contained in an "Assurance of Discontinuance" signed by the Attorney General and representatives of Quest. According to the Assurance of Discontinuance, the Attorney General focused its investigation on Quest's practice of billing for "diagnostic testing services, including testing of blood and urine, pap smears and generic testing, through a network of regional and local laboratories located in various states, including New York State."

59.     The Attorney General found that Quest maintains contracts with many, if not most, health insurance providers, which contracts forbid Quest from billing individuals who are properly enrolled as members of a health plan (other than for deductibles, co-insurance or other charges explicitly authorized by the Quest/insurer contract).   These contractual provisions are referred to as "hold harmless provisions" in the Attorney General's Assurance of Discontinuance.

60.     "If such a provider's [*i.e.* Quest] participating provider contract with a Health Plan contains a hold harmless provision, the provider cannot bill a consumer who is properly enrolled as a member of the Health Plan (other than applicable deductibles, co-insurance or

17

amounts designated by the HMO as the consumers' responsibility in his/her certificate of coverage) if the services rendered by the provider are covered benefits under the consumer's certificate of coverage. If this condition is met, the provider must seek payment for covered services (other than applicable deductibles, co-insurance or amounts designated by the HMO as the consumers' responsibility in his/her certificate of coverage) solely from the Health Plan, not the consumer." Billing the consumer in a contrary manner, according to the Attorney General, is a deceptive practice in violation of laws prohibiting such conduct contained in New York General Business Law, Article 22-A.

61.    The Attorney General and its Health Care Bureau concluded that Quest routinely engaged in deceptive billing practices that violate the New York consumer protection laws and other regulations.

62.    Quest's representations in the Assurance of Discontinuance admit that Quest sent bills to consumers even after consumers' insurance providers remit payments to a Quest-owned and controlled billing facility.  Quest also admits that Quest-owned and controlled billing facilities and billing systems were not adequately designed to recognize all the health insurance providers with whom Quest has contracts to provide health benefits and testing services.

63.    The Attorney General rejected Quest's contentions and defenses that the billing improprieties discovered by the Attorney General's investigation were lawful due to Quest's claims that consumers' health insurance providers remit payment to a Quest-owned and controlled billing facility when Quest would have preferred payment be sent to a different Quest-owned and controlled billing facility.  The Attorney General properly concluded that Quest and

its billing practices and systems "has resulted in instances of improper balance billing or double billing of consumers" in violation of New York consumer protection laws and regulations.

64.     The Attorney General also concluded that Quest includes deceptive, misleading and confusing statements on the face of its bills to induce consumers to pay monies that are not owed and that were paid by consumers' insurance providers. "[Quest's] [b]illing messages include limited information concerning, among other things, denials or partial payments by the HMO or Health Plan." The Attorney General found these same deficiencies in the dunning letters send by Quest and its outside debt collection agencies. "Accordingly, the Attorney General finds that the billing messages were potentially misleading and confusing" in violation of New York consumer protection laws.

65.     The Attorney General also found that "boilerplate" statements on the back of Quest's bills failed to adequately inform consumers of their obligation, or lack thereof, to pay the monies demanded by Quest when the consumer was properly enrolled in a health plan that contracts with Quest for testing services and benefits. The Attorney General also found these Quest practices "potentially misleading, confusing, and contradictory" in violation of New York consumer protection laws and regulations.

66.     According to a June 25, 2003 press release discussing the investigation, Attorney General Elliot "Spitzer's office determined that Quest improperly:

- 'Balance Billed' some consumers by billing them for the entire balance of the bill when it had submitted a claim to the consumer's health plan but receive no response from the health plan; and

- 'Double Billed' some consumers for amounts their health plan had already paid Quest."

19

67.    Commenting on his Office's action against Quest in that same press release, Attorney General Spitzer commented that: "Consumers' out-of-pocket health care costs are high enough without being subject to bills for procedures that are covered by their health plans" and that "[h]ealth care providers should not put consumers in the middle of their disputes with health plans or force consumers to pay for their bureaucratic mistakes."

68.    A spokesman for Attorney General Spitzer stated that the number of individuals in New York affected by Quest's deceptive and unlawful billing practices "could reach in the thousands."

69.    Quest agreed to settle the Attorney General's claims in June 2003 – in New York only – by providing restitution to some aggrieved New York insured consumers, promising to cease its Balance Billing and Double Billing (something Quest still has not yet done in New York), agreeing to fix problems in its computer systems that caused or assisted the Balance Billing and Double Billing, taking other remedial measures and agreeing to pay a fine and the costs of the Attorney's General's investigation.

70.    As part of that settlement, Quest was required to inform New York physicians and consumers that it improperly billed them. In these disclosures, Quest admits, among other things, that it "billed insured patients … where an HMO or health plan had already paid the bill."

71.    None of the named Plaintiffs have received any monies from Quest as a result of its settlement with the New York Attorney General.

72.    The Assurance of Discontinuance provides: "Nothing herein shall be construed to deprive any consumer or other person or entity of any private right under the law."

73.     The Assurance of Discontinuance further provides that the remedial measures contained therein "shall not be deemed or construed as an approval by the Attorney General of any of the activities of Quest Diagnostics, its successors, agents or assigns, and none of them shall make any representation to the contrary."

***Quest Has A History of Fraudulent Laboratory Billing:***

74.     The New York Attorney General's action and the resulting settlement was not the first or last time Quest and its subsidiaries were accused of fraudulent laboratory billing practices.

75.     In the mid-1990's, Quest and SBCL (acquired by Quest in 1999), paid $500 million to settle claims brought by government regulators accusing Quest and/or SBCL of fraud and massive patient over-billing related to their lab testing business.  That settlement resolved claims by the government that SBCL routinely engaged in at least 5 types of fraudulent billing practices:  i) billing of tests not ordered by physicians; ii) separately billing of labs tests that should have billed at a lower combined rate; iii) Double Billing for the same tests; iv) billing for more expensive tests than the tests actually ordered; and v) fabricating diagnosis codes to obtain reimbursements from managed care and insurance providers.

76.     SBCL paid millions more to settle other billing related class action claims brought by patients and insurers, including settlement payments of $30 million and $31 million to settle cases in 2001.  The plaintiffs in those actions alleged fraud and other violations in connection with improper billing practices for medical and laboratory testing.

77.    Metpath (the original name of Quest) and Unilab Corporation paid an additional $38.9 million to the federal government to settle claims they also participated in fraudulent laboratory billing practices.

78.    More recently, in March 2004, Quest paid the federal government $11.35 million to settle a *qui tam* lawsuit claiming that Quest was violating the Medicare laws by billing the federal government for tests that were not ordered and that were not medically necessary.  The case was commenced by a former Unilab employee, who accused Quest and its subsidiaries and/or predecessors, Unilab, Metpath and Damon Corporation, of engaging in fraudulent billing practices.  The Department of Justice intervened and participated in the lawsuit and settlement.

## CLASS ACTION ALLEGATIONS

79.    Plaintiffs bring this action on behalf of themselves and on behalf of all others similarly situated in the United States who were targets of Defendants' practices of Balanced Billing, Double Billing, Over Billing and/or False Billing and on behalf of entities that provide health insurance and/or Benefit Plans to any person who was the target of Defendants' practices of Balanced Billing, Double Billing, Over Billing and/or False Billing (the "Class").

80.    The United States is defined as any State within the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American  Samoa, Guam, Wake Island, the Canal Zone and the "Outer Continental Shelf lands" defined in the Outer Continental Shelf Lands Act (43 U.S.C. §§ 1331-1343).

81.    Excluded from the Class are Defendants, their parents, subsidiaries, officers, directors, employees, partners and co-venturers.

22

82.     This action is brought as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, sub-sections 23(a) and 23(b)(2) and/or (b)(3). The Class satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23

83.     The members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members can be determined only by appropriate discovery, Plaintiffs believe that there are thousands of class members residing throughout the United States. Quest claims to have performed 250 million laboratory tests for 100 million patients in 2003 alone.

84.     Because of the geographic dispersion of class members, there is judicial economy arising from the avoidance of a multiplicity of actions in trying this matter as a class action.

85.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs have no interests that are adverse or antagonistic to those of the Class. Plaintiffs' interests are to obtain relief for themselves and the Class for the harm arising out of the violations of law set forth herein.

86.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in complex and consumer class action litigation.

87.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by the members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible

for Plaintiffs and members of the Class to individually seek redress for the wrongful conduct alleged.

88.     In addition, Defendants have acted and refused to act, as alleged herein, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

89.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

>  (a)     Whether Defendants violated the FDCPA;
>
>  (b)     Whether Defendants violated ERISA;
>
>  (c)     Whether Defendants violated the NJIFPA and/or the similar insurance fraud statutes of other States;
>
>  (d)     Whether Defendants violated the NJCFA and/or the similar consumer practice statutes of other States;
>
>  (e)     Whether Defendants' acts and practices were unconscionable, false, unfair, misleading and/or deceptive;
>
>  (f)     Whether Quest breached its contractual obligations to Plaintiffs and the Class;
>
>  (g)     Whether Defendants acted willfully or recklessly in failing to abide by the terms of their agreements with Plaintiffs and the Class;
>
>  (h)     The proper measure of damages to be paid to Plaintiffs and the Class;

(i)     Whether Plaintiffs and the Class are entitled to injunctive or other equitable relief to remedy Defendants' continuing violations of law alleged herein; and

(j)     Whether Defendants have been unjustly enriched by their inequitable and unlawful conduct, and if so, whether Defendants should be forced to disgorge inequitably obtained revenues or provide restitution.

90.     The Class is readily definable, and prosecution of this action as a class action will reduce the possibility of repetitious litigation.

91.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## FRAUDLENT CONCEALMENT AND EQUITABLE TOLLING

92.     Defendants have engaged in fraudulent, misleading and deceptive efforts to conceal the true nature of their unlawful conduct from Plaintiffs and the Class.  Defendants intended to and have in fact accomplished its concealment both by its active misrepresentations and omissions, as described herein.

93.     Due to Defendants' fraudulent concealment, Plaintiffs have only recently learned of the existence of their claims against Defendants.

94.     Plaintiffs' lack of knowledge as to their claims against Defendants were not due to any fault or lack of diligence on their part, but rather due entirely or substantially to the acts of Defendants designed to conceal and hide the true and complete nature of their unlawful and inequitable conduct.

## COUNT I

### (Violations of ERISA)

95.     Plaintiffs repeat and reallege Paragraphs 1 through 94 as though set forth herein.

96.     Plaintiffs are each a participant or beneficiary of an ERISA-qualifying employee welfare Benefit Plan, as those terms are defined in 29 U.S.C. §1002 and applicable regulations.

97.     Quest has contracted to provide services to Plaintiffs in accordance with ERISA-qualifying employee welfare Benefit Plans.

98.     As alleged herein and above, Quest has failed to comply and is still failing to comply with the terms of the ERISA-qualifying employee welfare Benefit Plans to which it is a party, as a result of its Balance Billing, Double Billing, Over Billing and False Billing of ERISA Benefit Plan participants and beneficiaries.

99.     Plaintiffs and the Class have been and continue to be injured by Quest's violations of ERISA.  As a result of Defendants' ongoing ERISA violations, Class members have been and are continuing to be coerced to pay monies not owed to Quest, as a result of Quest's and the remaining Defendants' demands and efforts to collect monies from insured individuals in violation of Benefit Plan agreements.  Even Class members who have not paid monies to Quest or AMCA have been and continue to be injured by Quest's and AMCA's violations of Benefit Plans, attempts to wrongfully collect monies not owed, abuse, harassment, false debt collection efforts and Defendants' false, misleading, deceptive and inequitable acts and practices.

100.    Plaintiffs' injuries have been caused as a direct and proximate result of the unlawful and inequitable conduct of Quest, AMCA and other debt collectors retained by Quest, as alleged throughout this Complaint.

101.   Plaintiffs are entitled to pursue a claim against Defendant pursuant to 29 U.S.C. §1132(a).

102.   Plaintiffs seek equitable relief, including injunctive relief, restitution and disgorgement, declaratory relief and other remedies permitted by ERISA to remedy Defendants' past and continuing ERISA violations.

## COUNT II

### (Violations of FDCPA)

103.   Plaintiffs repeat and reallege Paragraphs 1 through 94 as though set forth herein.

104.   Plaintiffs and similarly situated class members, are "consumers" as that term is defined in 15 U.S.C. §1692a(3).

105.   Defendants are "debt collectors" as that term is defined in 15 U.S.C. §1692a(6), insofar as Defendants and their employees, agents and representatives collect and attempt to collect false debts and inflated debts from consumers.

106.   15 U.S.C. §1692e states as follows:  "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."

107.   15 U.S.C. §1692f states as follows: "A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt."

108.   As alleged herein, Defendants use false, deceptive and misleading representations to induce consumers to pay fees, charges and debts not owed and in excess of fees and prices agreed in Benefit Plan agreements to which Quest is a party.    Such conduct violates 15 U.S.C. §1692e.

27

109.  As alleged herein, Defendants employ unfair and unconscionable means to induce consumers to pay fees, charges and debts not owed and in excess of fees and prices agreed in Benefit Plan agreements to which Quest is a party.  Such conduct violates 15 U.S.C. §1692f.

110.  Plaintiffs and Class member "consumers," as defined by the FDCPA, have been injured as a result of Defendants' violations of 15 U.S.C. §§ 1692e and 1692f.

111.  Plaintiffs and class member "consumers," as defined by the FDCPA, are entitled to pursue a claim against Defendant pursuant to 15 U.S.C. §1692k to redress Defendants' violations of 15 U.S.C. §§ 1692e and 1692f.

112.  Plaintiffs and class member "consumers" as defined by the FDCPA seek actual damages, additional statutory damages up to $1,000 for each Class member, costs and attorney's fees to remedy Defendants' FDCPA violations.

## COUNT III

### (Violations of the NJIFPA and Similar Laws of Other States)

113.  Plaintiffs repeat and reallege Paragraphs 1 through 94 as though set forth herein.

114.  Defendants are "persons" as defined by N.J.S.A. §17:33A-3.

115.  Members of the Class are "insurance companies" as defined by N.J.S.A. §17:33A-3.

116.  N.J.S.A. §17:33A-4 states in pertinent part:

a. A person or a practitioner violates this act if he:

(1) Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy or the "Unsatisfied Claim and Judgment Fund Law," P.L. 1952, c. 174 (C. 39:6-61 et seq.), knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

28

(2) Prepares or makes any written or oral statement that is intended to be presented to any insurance company, the Unsatisfied Claim and Judgment Fund or any claimant thereof in connection with, or in support of or opposition to any claim for payment or other benefit pursuant to an insurance policy or the "Unsatisfied Claim and Judgment Fund Law," P.L. 1952, c. 174 (C. 39:6-61 et seq.), knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

(3) Conceals or knowingly fails to disclose the occurrence of an event which affects any person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled;

\* \* \*

b. A person or practitioner violates this act if he knowingly assists, conspires with, or urges any person or practitioner to violate any of the provisions of this act.

c. A person or practitioner violates this act if, due to the assistance, conspiracy or urging of any person or practitioner, he knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act.

\* \* \*

117.    As a result of the acts, practices and unlawful conduct alleged herein, Defendants have and continue to violate N.J.S.A. §17:33A-4.

118.    Members of the Class that are "insurance companies," as defined by the NJIFPA, were and continue to be injured as a direct and proximate result of Defendants' violations of N.J.S.A. §17:33A-4.

119.    Members of the Class that are "insurance companies," as defined by the NJIFPA are entitled to pursue a claim against Defendants pursuant to N.J.S.A. §17:33A-7.

120.    To remedy Defendants' violations of the NJIFPA, Plaintiffs seek compensatory damages, costs, expenses and attorneys' fees, pursuant to N.J.S.A. §17:33A-7(a).

121.    Since Defendants have engaged in a "pattern" of violating the NJIFPA, as defined by N.J.S.A. §17:33A-4, Plaintiffs are entitled to treble damages pursuant to N.J.S.A. §17:33A-7(b).

122.    Defendants' deceptive, misleading and/or unfair trade practices have also violated the insurance fraud statutes in states other than New Jersey.

## COUNT IV

### (Violations of the NJCFA and Similar Laws of Other States)

123.    Plaintiffs repeat and reallege paragraphs 1 through 94 as though set forth herein.

124.    Defendants are "persons" as defined in N.J.S.A. §56:8-1(d).

125.    N.J.S.A. §56:8-2 states in pertinent part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been mislead, deceived or damaged thereby, is declared to be an unlawful practice; provided, however, that nothing herein contained shall apply to the owner or publisher of newspapers, magazines, publications or printed matter wherein such advertisement appears, or should the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher, or operator has no knowledge of the intent, design or purpose of the advertiser.

126.    As alleged herein and above, Defendants have engaged in unconscionable commercial practices, deception, and fraud in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of Balance Billing, Double Billing, Over Billing and False Billing of individual insured consumers. These acts and practices violate N.J.S.A. §56:8-2.

30

127.    Plaintiffs have been and continue to be injured as a direct and proximate result of Defendants' violations of N.J.S.A. §56:8-2.

128.    Plaintiffs are entitled to pursue a claim against Defendants pursuant to N.J.S.A. §§ 56:8-2.11, 56:8-2.12 and/or 56:8-19 for damages, treble damages, equitable relief, costs and attorney's fees to remedy Defendant's violations of the NJCFA.

129.    Defendants' deceptive, misleading and/or unfair trade practices have also violated the consumer protection statutes in states other than New Jersey.

## COUNT V

### (Breach of Contract)

130.    Plaintiffs repeat and reallege paragraphs 1 through 94 as though set forth herein.

131.    Quest entered into contracts with private insurance and Benefit Fund providers, which contracts were intended to provide health insurance and other benefits to participating individuals and their beneficiaries, including the consumer members of the Class.

132.    In these contracts, Quest agreed to invoice and collect monies for covered services only from the insurance and Benefit Fund providers, and only to invoice and collect fees and prices for covered services at the rates included in those agreements.

133.    As alleged herein, Quest has breached its contracts with the insurance and Benefit Fund providers, which breaches were aided and abetted by AMCA and other debt collectors retained by Quest.

134.    By reason of Quest's breaches, and the conduct of the other Defendants who assisted in Quest's breaches, Plaintiffs and the Class suffered financial injuries.

## COUNT VI

### (Common Law Unjust Enrichment)

135.    Plaintiffs repeat and reallege paragraphs 1 through 94 as though set forth herein.

136.    As alleged herein, Defendants have unjustly benefited from their unlawful and inequitable acts resulting in the payment of monies by insured individuals and similarly situated Class members.

137.    Defendants have and are continuing to derive profits and revenues resulting from their false, misleading, deceptive, unfair, inequitable and unconscionable conduct.

138.    It would be inequitable for Defendants to be permitted to retain any of the proceeds derived as a result of their unlawful and deceitful conduct.

139.    Defendants should be compelled to provide restitution and to disgorge into a common fund or constructive trust for the benefit of Plaintiffs and the Class, all proceeds received by Defendants from Plaintiffs and/or the Class as a result any unlawful or inequitable act described in this Complaint which has inured and continues to inure to the unjust enrichment of Defendants or any one of them.

140.    Defendants should also be enjoined from continuing to engage in any unlawful or inequitable methods, acts and/or practices alleged in this Complaint.

141.    Plaintiffs and the Class have no adequate remedy at law for their irreparable injuries caused by Defendants' inequitable conduct.

## COUNT VII

### (Common Law Fraud)

142.    Plaintiffs repeat and reallege paragraphs 1 through 94 as though set forth herein.

143.    As alleged herein, Defendants intentionally, knowingly, willfully and recklessly charged and collected fees for laboratory billing and other services that Quest's contracts and Benefit Plan agreements unambiguously stated would not be charged to insured individuals.

144.    Defendants misused their position of superior knowledge and financial strength to defraud and deceive insured individual consumers into paying fees and costs Defendants knew were not owed.

145.    Plaintiffs and the other members of the Class paid these fees in reliance upon the various statements, representations, and omissions of material fact made by Defendants.  Those statements, representations, and omissions were made for the purpose of inducing reliance thereon by Plaintiffs and the Class to pay fees not due to Defendants.

146.    Plaintiffs and the other members of the Class had a right to rely on, and did reasonably rely on, Defendants' statements, misrepresentations, and omissions.  Each of Defendants' misrepresentations, and omissions were material, in that Plaintiffs and the Class would not have paid the improper fees and charges if they had known that the statements and representations of Defendants were false, misleading, incomplete, unfair and untrue.

147.    Each of the above misrepresentations, misleading statements, and omissions made by Defendants were false, misleading, incomplete, and untrue, and were known or should have been known by Defendants to be false, misleading, incomplete, and untrue when made.   Each misrepresentation, misleading statement, and omission was made with intent to deceive and defraud, or to conceal the truth about Defendants' deceptive billing practices or with disregard for its truth or completeness, or in spite of the fact that it was untrue.  Each misrepresentation,

misleading statement, and omission was made to induce Plaintiffs and the Class to pay fees and charges not due Defendants.

148.    Plaintiffs and the other members of the Class had no knowledge of the falsity, incompleteness, or untruth of the statements and representations of Defendants when they paid these fees and charges to Defendants.

149.    By reason of Defendants' misrepresentations, misleading statements, and omissions, Plaintiffs and the other members of the Class suffered financial injuries.

150.    The conduct of Defendants in perpetrating the fraud described above was malicious, willful, wanton, and oppressive, or in reckless disregard of the rights of Plaintiffs and the other members of the Class, thereby warranting the imposition of punitive damages against Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

(1)    Certifying the Class pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as representatives of the Class and designating their counsel as counsel for the Class;

(2)    Awarding Plaintiffs and the Class damages for their non-ERISA claims;

(3)    Awarding Plaintiffs equitable relief for their ERISA claims, including injunctive relief, restitution and disgorgement;

(4)    Awarding Plaintiffs and the Class statutory and exemplary damages where permitted;

(5)     Awarding Plaintiffs punitive damages;

(6)     Permanently enjoining Defendants from continuing to engage in the unlawful and inequitable conduct alleged herein;

(7)     Declaring that Defendants have engaged in the unlawful and inequitable conduct  alleged herein;

(8)     Ordering Defendants to disgorge into a common fund or a constructive trust all monies paid by Plaintiffs and the Class to the full extent to which Defendants or any one of them were unjustly enriched by their unlawful and inequitable conduct alleged herein;

(9)     Granting Plaintiffs and the Class the costs of prosecuting this action and reasonable attorney's fees; and

(10)    Granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the Class demand a trial by jury on all issues so triable.

Dated: September 3, 2004                    Respectfully Submitted,

**TRUJILLO RODRIGUEZ & RICHARDS, LLC**

By:

Lisa J. Rodriguez (LR6767)
Donna Siegel Moffa (DSM4634)
8 Kings Highway West
Haddonfield, NJ 08033
Tel. (856) 795-9002
Fax. (856) 795-9887

**WHALEN & TUSA, P.C.**
Joseph S. Tusa
Paul C. Whalen
90 Park Avenue
New York, NY  10016
Tel. (212) 786-7377
Fax. (212) 658-9685

**GISKIN & SOLOTAROFF**
Oren Gisken
Catherine Anderson
203 W. 25th Street, 4th Fl.
New York, NY  10001
Tel. (212) 847-8315
Fax. (212) 473-8096

**MILLER FAUCHER
  AND CAFFERTY LLP**
William R. Kane
One Logan Square
18th & Cherry Streets
Philadelphia, PA   19103
Tel. (215) 864-2800
Fax. (215) 864-2810

- and -

36

Patrick E. Cafferty
101 North Main Street
Ann Arbor, MI 48104
Tel. (734) 769-2144
Fax. (734) 769-1207

**WHATLEY DRAKE, L.L.C.**
Glen M. Connor
Richard S. Frankowski
2323 2nd Avenue North
Birmingham, AL 35203
Tel. (205) 328-9576
Fax. (205) 328-9669

*Attorneys for Plaintiffs*