**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
Lisa J. Rodriguez (LR6767)
Donna Siegel Moffa (DSM4634)
8 Kings Highway West
Haddonfield, NJ 08022
Telephone: (856) 795-9002
Facsimile: (856) 795-9887

**Attorneys for Plaintiffs**
**(Additional Counsel on Signature Page)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DENISE AGOSTINO, ROCCO AGOSTINO, JENNIFER HALEY, CHRISTINE RANIERI, RICHARD RANIERI, ARIA MCKENNA, ERIC GUNTHER, DENISE CASSESE, MARK SMALLER, MICHAEL HOECHER, SUELLEN HOECHER, ERIC BREUER, DANIELLE AUCLAIR, RONALD SMUCKER, KATHLEEN SMUCKER, ELIZABETH CRUTHERS, RICHARD GRANDALSKI and JANET GRANDALSKI, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> QUEST DIAGNOSTICS, INC., RETRIEVAL MASTERS CREDIT BUREAU, INC. d/b/a AMERICAN MEDICAL COLLECTION AGENCY, CREDIT COLLECTION SERVICES, RUSSELL COLLECTION AGENCY, INC., CREDIT BUREAU CENTRAL, QUANTUM COLLECTIONS, SEATTLE SERVICE BUREAU, INC. and Does 1 to 50, <br><br> Defendants. | Civil Acton No. 04-4362 (JWB) (GDH) <br><br> John W. Bissell, USDJ <br> G. Donald Haneke, UDMJ <br><br><br> **FIRST AMENDED** <br> **CLASS ACTION COMPLAINT** <br><br><br> JURY TRIAL REQUESTED |

Plaintiffs Denise Agostino, Rocco Agostino, Jennifer Haley, Christine Ranieri, Richard

Ranieri, Denise Cassese, Mark Smaller, Michael Hoecher, Suellen Hoecher, Eric Breuer, Danielle Auclair, Ronald Smucker, Kathleen Smucker, Elizabeth Cruthers, Richard Grandalski and Janet Grandalski (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, for their complaint against Quest Diagnostics, Inc. ("Quest"), Retrieval Masters Credit Bureau, Inc. d/b/a American Medical Collection Agency ("AMCA"), Credit Collection Services ("CCS"), Russell Collection Agency, Inc. ("RCA"), Credit Bureau Central ("CBC"), Quantum Collections ("Quantum"), Seattle Service Bureau, Inc. ("SSB") and Does 1 to 50 (collectively "Defendants"), allege upon information and belief, except as to the allegations which pertain to Plaintiffs and their counsel which claims are based on personal knowledge, as follows:

## INTRODUCTION

1.      Quest is engaged in the business of providing laboratory testing services to or on behalf of individuals, doctors, hospitals, health insurers, and other health care facilities nationwide. Quest is far and away the industry leader in this field with operations in every major metropolitan city in the United States. For 2003, Quest reported revenues from their laboratory testing business exceeding $4.5 billion, as a result of having conducted over 250 million tests for over 100 million patients.  Its revenues increased to $5.1 billion in 2004, with net income of $507 million.

2.      Many of the tests performed by Quest are done for patients covered by private health insurance, as set forth in employee welfare benefit plans ("Benefit Plans").  In accordance with those Benefit Plans, private health insurers, employee organizations and others sign agreements with Quest to provide laboratory testing and other health-related services to participants and beneficiaries of their Benefit Plans. Quest also performs medical testing on non-

2

insured patients and patients covered by Medicare and Medicaid, federal and state governmental insurance programs designed to provide health insurance to seniors, the disabled and the economically disadvantaged.

3.     The agreements between Quest and private health insurance providers dictate the prices and terms of the services provided by Quest to Benefit Plan participants and beneficiaries. Those agreements almost always place two restrictions on Quest:  1) that Quest invoice and collect fees for covered services exclusively from the Benefit Plans or their designated fiduciaries, affiliates, administrators or agents; and 2) Quest must accept the negotiated prices listed in the agreements as full payment for the services provided by Quest and paid by the Benefit Plan, without seeking any additional monies from individual consumers covered by the Benefit Plans.

4.     Quest routinely violates both of those restrictions when billing consumers covered by private insurance.  Although an express violation of its agreements, Quest sends invoices and collects monies for laboratory testing and other covered services to individual participants and beneficiaries of private Benefit Plans.

5.     In invoices Quest sends to insured individuals seeking full payment for laboratory testing, Quest engages in "Balance Billing" and "Double Billing."  Both practices are violations of the Benefit Plans and Quest's contracts with health insurance providers, and are also false, misleading, deceptive, unfair, unconscionable and contrary to federal and state laws.

6.     Balance Billing occurs when Quest sends duplicative invoices to both the Benefit Plan and the insured individual, demanding the entire amount in each invoice.  Worse still, the invoices mailed by Quest to individuals demand payment at Quest's normal rates, rather than the

3

lower rates negotiated between Quest and health insurance providers for their members, conduct that constitutes "Over Billing."  As a result of its Over Billing, Quest demands, attempts to collect and often receives payment from insured individuals far in excess of the amount actually owed.

7.    In others instances, Quest continues to send invoices to insured individuals after their insurance provider or its agents or administrators have already paid Quest for the services incurred by the insured consumer.  This practice is known as "Double Billing."  In furtherance of its efforts to Double Bill individuals, Quest falsely represents to the individuals on Quest's invoices that the individual's insurer had denied coverage and/or Quest did not have the correct address of the individual's insurance company.

8.    Although Quest is not entitled to any payment from the insured individuals (save for allowed co-payments and deductibles), Quest often aggressively pursues, collects and attempts to collect unearned and non-existent debts from consumers.  These deceptive and unconscionable acts constitute "False Billing" by Quest.  To assist in the collection of these unearned and un-owed debts, Quest conspires with and employs the services of debt collection agencies, including AMCA, CCS, RCA, CBC, Quantum, SSB and Does 1-50 (the "Debt Collector Defendants").  These debt collection agencies, aided and abetted by Quest, use false, deceptive, misleading, unfair, abusive and unconscionable means to collect and attempt to collect these unearned and non-existent debts.  Among the deceptive and unlawful practices employed by Quest and the Debt Collector Defendants are threats of harming consumer credit ratings, records, scores and reports.

9.    As a result of its false, deceptive, misleading, unfair, unconscionable and

unlawful billing practices, Quest was investigated by the New York Attorney General for the precise practices complained of in this action, namely Balance Billing and Double Billing. As a result of that investigation, the New York Attorney General concluded that Quest engaged in deceptive and misleading practices by engaging in Balance Billing and Double Billing in violation of private health insurance contracts and New York consumer protection laws. In June 2003, Quest settled that case with the New York Attorney General, agreeing to cease its deceptive acts and practices that violate the New York consumer protection laws, refund monies to some New York consumers, pay a fine and the costs of the action - remedial actions Quest has still not accomplished. These same practices have injured and continue to injure consumers, participants and their beneficiaries nationwide.

10.     Quest also improperly invoices patients covered by Medicare by routinely and deceptively engaging in the billing and Balance Billing of patients covered by Medicare Part B, even though federal laws do not permit Quest to bill Medicare Part B patients for any portion of the cost of laboratory testing. Quest also employs the services of the co-conspirator Debt Collector Defendants to collect these unlawful debts.

11.     As a result of Defendants' unlawful conduct, Plaintiffs and the Class are injured in at least three ways. First, Plaintiffs and Class members are subjected to Defendants' unlawful and repetitive demands to pay debts for laboratory testing not owed or in amounts above the actual amount owed. Second, Plaintiffs and Class members are forced to endure deceptive, misleading, abusive and fraudulent debt collection practices and threats to their credit ratings, records, scores and reports by Quest and/or the Debt Collector Defendants. Third, some Plaintiffs and many Class members have paid monies demanded by Quest and/or the Debt

Collector Defendants that were not owed or in amounts above the amount owed.

12.     Plaintiffs and the Class (defined in ¶121) allege claims collectively and alternatively and seek damages and equitable relief for Defendants' past and continuing violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §§ 1961 *et seq.*, Fair Debt Collection Practices Act ("FDCPA"), §§ 15 U.S.C. 1692, *et seq.*, Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. §§ 56:8-1, *et seq.* and the similar consumer protection laws of other states, breach of contract, common law fraud and unjust enrichment.

## JURISDICTION AND VENUE

13.     Plaintiffs invoke the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §1331, which confers original jurisdiction upon this Court for all civil actions arising under the laws of the United States, pursuant to 28 U.S.C. §1332(d), pursuant to 15 U.S.C. §1692k(d), pursuant to 29 U.S.C. §1003 and §1132 and pursuant to 18 U.S.C. §1964. This Court has original and supplemental jurisdiction over Plaintiffs' State law and common law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367(a).

14.     This Court possesses personal jurisdiction over each Defendant based on each Defendant's residence, presence, transaction of business and contacts within the United States, New Jersey and/or this District.

15.     In addition, this Court has personal jurisdiction over each Defendant as a co-conspirator as a result of the acts of any of the co-conspirators occurring in the United States in connection with Defendants' violations of federal laws, state laws and/or the common law of the

fifty States and United States territories.

16.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Quest maintains its principal place of business in this District and at all times conducted substantial business in this District.

## TRADE AND COMMERCE

17.     In connection with Defendants' enterprise, conspiracy, business, industry and activities, monies as well as contracts, bills and other forms of business communications and transactions were transmitted in a continuous and uninterrupted flow across state lines.

18.     Various means and devices were used to effectuate the violations of law and conspiracy alleged herein, including the United States mail, wires, interstate travel, interstate telephone commerce and other forms of interstate electronic communications.   Defendants' activities alleged herein were within the flow of, and have substantially affected, interstate commerce.

## PARTIES

### Plaintiffs

19.     (a)     Denise Agostino and Rocco Agostino are husband and wife residing in New York.  During the relevant time period they were "participants" or "beneficiaries," as those terms are defined by ERISA and applicable regulations, in an ERISA Benefit Plan or Plans that provided them with health insurance, including the Pavers and Road Builders District Counsel Welfare Fund.  Quest has or had contracted to provide laboratory testing services to participants and beneficiaries of Plaintiffs' health care Benefit Plan(s), which contract(s) require Quest to invoice Plaintiffs' health plan (or its fiduciaries, affiliates, administrators or agents) for

7

laboratory testing received by Plaintiffs, and to accept the billing rates and terms set forth in the contract as full payment.   Plaintiffs have been injured as a result of Defendants' unfair, deceptive, misleading, unconscionable and fraudulent practices of Balance Billing, Double Billing, Over Billing and/or False Billing in violation of Quest's contractual and legal obligations.

(b)     On at least two occasions, July 12, 1997 and September 27, 1997, Denise Agostino had laboratory testing done at or by a Quest facility.  In 2004 and/or 2005, one or more of Denise and Rocco Agostino's minor children had laboratory testing done at or by a Quest facility.   On each occasion, Denise Agostino or her doctor's office provided her and her children's insurance coverage information to Quest, which was thereafter on file with Quest. Following each of those occasions, Quest and AMCA repeatedly engaged in Balance Billing, Over Billing and False Billing of Mr. and Mrs. Agostino and/or their minor children by demanding payment of bills for laboratory testing covered by their insurance carrier, or demanding amounts in excess of amounts owed and allowed to be charged by Quest.  Quest and AMCA also engaged in Double Billing, by inducing Mr. and Mrs. Agostino to pay money not owed for laboratory testing done on July 12, 1997 and September 27, 1997.

20.     (a)     Christine Ranieri and Richard Ranieri are husband and wife residing in New York.  During the relevant time period they were "participants" or "beneficiaries," as those terms are defined by ERISA and applicable regulations, in an ERISA Benefit Plan or Plans that provided them with health insurance, including Empire Blue Cross and Blue Shield and Aetna. Quest has or had contracted to provide laboratory testing services to participants and beneficiaries of Plaintiffs' health care Benefit Plan(s), which contract(s) require Quest to invoice

8

Plaintiffs' health plan (or its fiduciaries, affiliates, administrators or agents) for laboratory testing received by Plaintiffs, and to accept the billing rates and terms set forth in the contract(s) as full payment. Plaintiffs have been injured as a result of Defendants' unfair, deceptive, misleading, unconscionable and fraudulent practices of Balance Billing, Double Billing, Over Billing and/or False Billing in violation of Quest's contractual and legal obligations.

(b) On at least two occasions, July 30, 2003 and July 21, 2004, Richard Ranieri and Christine Ranieri, respectively, had laboratory testing done at or by a Quest facility. On each occasion, they or their doctor's office provided their insurance coverage information to Quest, which was thereafter on file with Quest. Following each of those occasions, Quest repeatedly engaged in Balance Billing, Over Billing and False Billing of Mr. and Mrs. Ranieri by demanding payment of bills for laboratory testing covered by their insurance carrier, or demanding amounts in excess of amounts owed and allowed to be charged by Quest.

21. (a) Jennifer Haley resides in Nevada. During the relevant time period she was a "participant" as that term is defined by ERISA and applicable regulations, in an ERISA Benefit Plan or Plans that provided her with health insurance, including Sierra Health and Life Insurance Company, Inc., Health Plan of Nevada, Inc. and Aetna. Quest has or had contracted to provide laboratory testing services to participants and beneficiaries of Plaintiff's health care Benefit Plan(s), which contract(s) require Quest to invoice Plaintiff's health plan (or its fiduciaries, affiliates, administrators or agents) for laboratory testing received by Plaintiff, and to accept the billing rates and terms set forth in the contracts as full payment. Plaintiff has been injured as a result of Defendants' unfair, deceptive, misleading, unconscionable and fraudulent practices of Balance Billing, Double Billing, Over Billing and/or False Billing in violation of Quest's

contractual and legal obligations.

(b)    On at least seven occasions, April 18, 2003, June 20, 2004, July 15, 2004, August 25, 2004 and November 23, 2004, January 10, 2005 and January 20, 2005, Jennifer Haley had laboratory testing done at or by a Quest facility.  On March 1, 2005, her infant son had laboratory testing done at or by a Quest facility.  On each occasion, she or her doctor's office provided her and her son's insurance coverage information to Quest, which was thereafter on file with Quest.  Following at least certain of those occasions, Quest engaged in Balance Billing, Over Billing and False Billing of Mrs. Haley and/or her infant son by demanding payment of bills for laboratory testing covered by her insurance carrier, or demanding amounts in excess of amounts owed and allowed to be charged by Quest.

22.    (a)    Aria McKenna and Eric Gunther are fiancées residing in New York and who previously resided in Florida.  At various times during the relevant time period they were "participants" or "beneficiaries," as those terms are defined by ERISA and applicable regulations, in an ERISA Benefit Plan or Plans that provided one or both of them with health insurance, including Union Labor Life, Empire Blue Cross and Blue Shield and Blue Cross and Blue Shield of Florida.  Quest has or had contracted to provide laboratory testing services to participants and beneficiaries of Plaintiffs' health care Benefit Plan(s) which contract(s) require Quest to invoice Plaintiffs' health plan (or its fiduciaries, affiliates, administrators or agents) for laboratory testing received by Plaintiffs, and to accept the billing rates and terms set forth in the contract(s) as full payment.  Plaintiffs have been injured as a result of Defendants' unfair, deceptive, misleading, unconscionable and fraudulent practices of Balance Billing, Double Billing, Over Billing and/or False Billing in violation of Quest's contractual and legal

obligations.

(b)     On at least three occasions, April 17, 2002, October 30, 2003 and December 18, 2003, Aria McKenna had laboratory testing done at or by a Quest facility. On each occasion, Aria McKenna or her doctor's office provided her insurance coverage information to Quest, which was thereafter on file with Quest. Following each of those occasions, Quest repeatedly engaged in Balance Billing, Over Billing and False Billing of Ms. McKenna and Mr. Gunther by demanding payment of bills for laboratory testing covered by their insurance carrier, or demanding amounts in excess of amounts owed and allowed to be charged by Quest.

23.     (a)     Denise Cassese is a resident of New York and a Medicare recipient. Denise Cassese has been covered by Medicare and Medicare Part B continually since September 1, 1983. In violation of the Medicare laws and regulations concerning Medicare Part B, Plaintiff has been injured by Defendants' unfair, deceptive, misleading and unconscionable practices of Balance Billing, Double Billing, Over Billing and/or False Billing.

(b)     On at least two occasions, September 26, 2003 and October 2, 2003, Denise Cassese had laboratory testing done at a Quest facility. On each occasion, she provided her Medicare coverage information to Quest, which was thereafter on file with Quest. Following each of those occasions, Quest repeatedly engaged in Balance Billing, Over Billing and False Filling of Ms. Cassese by demanding payment of bills for laboratory testing covered fully by Medicare.

24.     Mark Smaller is a resident of Vermont. He has been injured as a result of Defendants' unfair, deceptive, misleading, unconscionable and fraudulent practices of Double

Billing and False Billing.   In 1998, Mr. Smaller's minor daughter had laboratory testing done at or by a Quest facility.  She did not have insurance to cover the procedure.  Upon being billed by Quest for his daughter's tests, Mr. Smaller paid the invoice in its entirety.  Afterwards, Quest and CCS engaged in Double Billing and False Billing of Mr. Smaller, demanding payment of bills for laboratory testing previously paid in full.

25.     (a)     Michael Hoecker and Suellen Hoecker are husband and wife residing in Ohio.  During the relevant time period they were "participants" or "beneficiaries," as those terms are defined by ERISA and applicable regulations, in an ERISA Benefit Plan provided by Mr. Heocker's self-insured employer, Alcoa, Inc.  Quest has or had contracted to provide laboratory testing services to participants and beneficiaries of Plaintiffs' health care Benefit Plan(s), which contract(s) require Quest to invoice Plaintiffs' health plan (or its fiduciaries, affiliates, administrators or agents) for laboratory testing received by Plaintiffs, and to accept the billing rates and terms set forth in the contracts as full payment.  Plaintiffs have been injured as a result of Defendants' unfair, deceptive, misleading, unconscionable and fraudulent practices of Balance Billing, Double Billing, Over Billing and/or False Billing in violation of Quest's contractual and legal obligations.

(b)     On multiple occasions, including January 29, 2001, Michael Hoecker had laboratory testing done at or by a Quest facility.  On each occasion, Mr. or Mrs. Hoecker or their doctor's office provided their insurance coverage information to Quest, which was thereafter on file with Quest.  Following each of those occasions, Quest engaged in Balance Billing, Over Billing and False Billing of Mr. and Mrs. Hoecker by demanding payment of bills for laboratory testing covered by their insurance carrier, or demanding amounts in excess of amounts owed and

allowed to be charged by Quest.

26    (a)    Eric Breuer and Danielle Auclair are husband and wife residing in Florida. During the relevant time period they were "participants" or "beneficiaries," as those terms are defined by ERISA and applicable regulations, in an ERISA Benefit Plan provided by Anthem Blue Cross and Blue Shield.   Quest has or had contracted to provide laboratory testing services to participants and beneficiaries of Plaintiffs' health care Benefit Plan(s), which contract(s) require Quest to invoice Plaintiffs' health plan (or its fiduciaries, affiliates, administrators or agents) for laboratory testing received by Plaintiffs, and to accept the billing rates and terms set forth in the contracts as full payment.   Plaintiffs have been injured as a result of Defendants' unfair, deceptive, misleading, unconscionable and fraudulent practices of Balance Billing, Double Billing, Over Billing and/or False Billing in violation of Quest's contractual and legal obligations.

(b)    On at least one occasion, February 12, 2004, Eric Breuer had laboratory testing done at or by a Quest facility.   On each occasion, Mr. Breuer or Mrs. Auclair or their doctor's office provided her insurance coverage information to Quest, which was thereafter on file with Quest.   Following each of those occasions, Quest engaged in Balance Billing, Over Billing and False Billing of Mr. Breuer and Mrs. Auclair by demanding payment of bills for laboratory testing covered by their insurance carrier, or demanding amounts in excess of amounts owed and allowed to be charged by Quest.

27.    (a)    Ronald Smucker and Kathleen Smucker are residents of Ohio.   During the relevant time period they were "participants" or "beneficiaries," as those terms are defined by ERISA and applicable regulations, in an ERISA Benefit Plan provided by HealthOhio, Inc. d/b/a

HealthFirst. Quest has or had contracted to provide laboratory testing services to participants and beneficiaries of Plaintiffs' health care Benefit Plan(s), which contract(s) require Quest to invoice Plaintiffs' health plan (or its fiduciaries, affiliates, administrators or agents) for laboratory testing received by Plaintiffs, and to accept the billing rates and terms set forth in the contracts as full payment. Plaintiffs have been injured as a result of Defendants' unfair, deceptive, misleading, unconscionable and fraudulent practices of Balance Billing, Double Billing, Over Billing and/or False Billing in violation of Quest's contractual and legal obligations.

(b). On at least one occasion, August 4, 1999, Kathleen Smucker had laboratory testing done at or by a Quest facility. On each occasion, Mr. or Mrs. Smucker or their doctor's office provided her insurance coverage information to Quest, which was thereafter on file with Quest. Following each of those occasions, Quest engaged in Balance Billing, Over Billing and False Billing of Mr. and Mrs. Smucker by demanding payment of bills for laboratory testing covered by their insurance carrier, or demanding amounts in excess of amounts owed and allowed to be charged by Quest. Quest also engaged in Double Billing, by inducing Mr. and Mrs. Smucker to pay money not owed for laboratory testing done on August 4, 1999.

28. (a). Elizabeth Cruthers is a resident of Oregon. During the relevant time period she was a "participant" as that term is defined by ERISA and applicable regulations, in an ERISA Benefit Plan or Plans that provided her with health insurance, including Regence Blue Cross and Blue Shield of Oregon. Quest has or had contracted to provide laboratory testing services to participants and beneficiaries of Plaintiff's health care Benefit Plan(s), which contract(s) require Quest to invoice Plaintiff's health plan (or its fiduciaries, affiliates,

14

administrators or agents) for laboratory testing received by Plaintiff, and to accept the billing rates and terms set forth in the contracts as full payment.  Plaintiff has been injured as a result of Defendants' unfair, deceptive, misleading, unconscionable and fraudulent practices of Balance Billing, Double Billing, Over Billing and/or False Billing in violation of Quest's contractual and legal obligations.

(b).   On at least three occasions, July 27, 2000, August 30, 2000 and September 1, 2000, Elizabeth Cruthers had laboratory testing done at or by a Quest facility.  On each occasion, she or her doctor's office provided her insurance coverage information to Quest, which was thereafter on file with Quest.  Following each of those occasions, Quest engaged in Balance Billing, Over Billing and False Billing of Mrs. Cruthers by demanding payment of bills for laboratory testing covered by her insurance carrier, or demanding amounts in excess of amounts owed and allowed to be charged by Quest.  Quest also engaged in Double Billing, by inducing Ms. Cruthers to pay money not owed for laboratory testing done on July 27, 2000, August 30, 2000 and September 1, 2000.

29.   (a)   Richard Grandalski and Janet Grandalski are husband and wife residing in Washington, and who formerly resided in Nevada.  During the relevant time period they were members of a health insurance plan provided by Anthem Blue Cross and Blue Shield of Nevada as part of the Blue Cross and Blue Shield Federal Employee Program.  Quest has or had contracted to provide laboratory testing services to participants and beneficiaries of Plaintiffs' health care Benefit Plan(s), which contract(s) require Quest to invoice Plaintiffs' health plan (or its fiduciaries, affiliates, administrators or agents) for laboratory testing received by Plaintiffs, and to accept the billing rates and terms set forth in the contracts as full payment.  Plaintiffs have

15

been injured as a result of Defendants' unfair, deceptive, misleading, unconscionable and fraudulent practices of Balance Billing, Double Billing, Over Billing and/or False Billing in violation of Quest's contractual and legal obligations.

(b)     On at least seven occasions, April 18, 2002, May 12, 2003, July 3, 2003, October 20, 2003, January 7, 2004, January 8 2004, April 14, 2004, Richard Grandalski or Janet Grandalski had laboratory testing done at or by a Quest facility.  On each occasion, Mr. or Mrs. Grandalski or their doctor's office provided their insurance coverage information to Quest, which was thereafter on file with Quest.  Following certain of those occasions, Quest, CBC and/or Quantum engaged in Over Billing or False Billing by demanding payment of bills for laboratory testing covered by their insurance carrier, or demanding amounts in excess of amounts owed and allowed to be charged by Quest.  Quest and CBC also engaged in Double Billing, by inducing Mr. and Mrs. Grandalski to pay money not owed for laboratory testing done on January 7, 2004.  Quest, CBC and Quantum also engaged in False Billing by demanding and collecting $10 collection or "assessment" fees relating to laboratory testing done on July 3, 2003, October 20, 2003 and January 7, 2004.

**Defendants**

30.     Quest is a Delaware corporation with its principal place of business and headquarters located at 1290 Wall Street West, Lyndhurst, New Jersey.  Quest is the largest provider of diagnostic and clinical testing in the nation.  Quest owns and/or operates over 2000 laboratories throughout the United States.  Quest's revenues in 2003 were $4.7 billion, climbing to $5.1 billion in 2004.

31.     Quest is the parent company of numerous subsidiaries that provide laboratory

16

testing, patient billing and related services.  Included among those subsidiaries of Quest are the following companies, each intended to be a defendant in this action to the extent any has participated or profited in any of the activities alleged herein, or aided or abetted Quest to participate or profit in such activities:   Quest Diagnostics Holdings Inc. (a Delaware corporation), Quest Diagnostics Clinical Laboratories, Inc. f/k/a SmithKline Beecham Clinical Laboratories, Inc. (a Delaware corporation), Quest Diagnostics Inc. (a California corporation), Quest Diagnostics Inc. (a Maryland corporation), Quest Diagnostics Inc. (a Michigan corporation),  Quest Diagnostics of Pennsylvania, Inc. (a Pennsylvania corporation), Quest Diagnostics Inc. (a Nevada corporation), Metwest Inc. (a Delaware corporation), Diagnostic Path Lab Inc. (a Texas corporation), Nichols Institute Diagnostics (a California corporation), Nichols Institute Sales Corp. (a United States Virgin Islands corporation), DPD Holdings, Inc. (a Delaware corporation), Diagnostics Reference Services Inc. (a Maryland corporation), American Medical Laboratories, Inc. (a Delaware corporation), AML Inc. (a Delaware corporation), Quest Diagnostics Nichols Institute, Inc. f/k/a Medical Laboratories Corp. (a Virginia corporation), Quest Diagnostics LLC (an Illinois limited liability company), Quest Diagnostics LLC (a Connecticut limited liability company), Quest Diagnostics LLC (a Massachusetts limited liability company), APL Properties Limited Liability Company (a Nevada limited liability company), Unilab Acquisition Corp. d/b/a FNA Clinics of America (a Delaware corporation), Unilab Corp. (a Delaware corporation), Quest Diagnostics Investments Inc. (a Delaware corporation), Quest Diagnostics Finance Inc. (a Delaware corporation), Pathology Building Partnership (a Maryland general partnership), Quest Diagnostics of Puerto Rico Inc., Quest Diagnostics Receivables Inc. (a Delaware corporation), Quest Diagnostics Ventures LLC (a Delaware limited liability

company), Lab Portal Inc. (a Delaware Corporation), LifePoint Medical Corp. (a Delaware corporation), CSClinical Laboratory Inc. d/b/a Clinical Diagnostic Services (a New Jersey corporation), MedPlus, Inc. (an Ohio corporation), Worktiviti, Inc. f/k/a Universal Document Systems, Inc. (an Ohio corporation), Valcor Associates Inc. (a Pennsylvania corporation) and Associated Pathologists Chartered (a Nevada company).

32.     For each of the companies listed in the previous paragraph, Quest owns (directly or indirectly) at least 50% of the equity or voting interest, controls those companies, their management and operations, and shares officers and/or directors with those companies.  For example, Joseph Manory is the Vice President and Treasurer of all or most of those companies, while holding the position of Vice President and Treasurer of Quest.  The revenues and profits for each of those companies are included and consolidated in Quest's financial statements.

33.     AMCA is a debt collection agency with offices located at 2269 Saw Mill River Road, Building 3, Elmsford, New York and 1261 Broadway, New York, New York.   Its collection demand notices list "Regional Offices" in Arizona, California, Colorado and Massachusetts. AMCA is regularly retained by Quest to collect monies from consumers in Florida, Illinois, Iowa, Michigan, New Jersey, New York, North Carolina, Ohio, Oregon and Washington and potentially elsewhere.  AMCA and Quest know, or should reasonably know, that many of the so-called "debts" claimed by AMCA and Quest to be owed by consumers to Quest are not owed.  Nevertheless, AMCA engages in unfair, deceptive and unconscionable methods, acts and practices to collect, or attempt to collect, these unearned and non-existent debts.  AMCA is the operating affiliate of Retrieval Masters Credit Bureau Inc., a New York corporation.

34.     AMCA was founded in 1977.  AMCA operates its debt collection efforts strictly on a contingency basis, meaning that AMCA does not get paid from Quest unless it recovers money from consumers.  According to an AMCA advertisement:  "What's more, we work on a contingency basis, which means NO up-front fees.  You pay for results – not for promises." (Emphasis in original).

35.     CCS is a debt collection agency with offices located at Two Wells Avenue, Newton, Massachusetts.  CCS is regularly retained by Quest to collect monies from consumers in New Jersey, Vermont, Washington, and potentially elsewhere.  CCS and Quest know, or should reasonably know, that many of the so-called "debts" claimed by CCS and Quest to be owed by consumers to Quest are not owed.  Nevertheless, CCS engages in unfair, deceptive and unconscionable methods, acts and practices to collect, or attempt to collect, these unearned and non-existent debts.  CCS is an affiliate and believed to be a wholly-owned subsidiary of CCS Financial Services, Inc.

36.     RCA is a debt collection agency with offices located at G-3285 Van Slyke Road, Flint, Michigan and 1184 Bristol Road, Flint, Michigan.  RCA is regularly retained by Quest to collect monies from consumers in Michigan, and potentially elsewhere.  RCA and Quest know, or should reasonably know, that many of the so-called "debts" claimed by RCA and Quest to be owed by consumers to Quest are not owed.  Nevertheless, RCA engages in unfair, deceptive and unconscionable methods, acts and practices to collect, or attempt to collect, these unearned and non-existent debts.

37.     CBC is a debt collection agency with offices located at 2353 Red Rock Street, Suite 200, Las Vegas, Nevada.  CBC is regularly retained by Quest to collect monies from

19

consumers in Nevada, and potentially elsewhere. CBC and Quest know, or should reasonably know, that many of the so-called "debts" claimed by CBC and Quest to be owed by consumers to Quest are not owed. Nevertheless, CBC engages in unfair, deceptive and unconscionable methods, acts and practices to collect, or attempt to collect, these unearned and non-existent debts.

38.     Quantum is a debt collection agency with offices located at 3223 Civic Center Drive, Las Vegas, Nevada and 1840 East Calvada Boulevard, Suite 11, Pahrump, Nevada. Quantum is regularly retained by Quest to collect monies from consumers in Nevada, and potentially elsewhere. Quantum and Quest know, or should reasonably know, that many of the so-called "debts" claimed by Quantum and Quest to be owed by consumers to Quest are not owed. Nevertheless, Quantum engages in unfair, deceptive and unconscionable methods, acts and practices to collect, or attempt to collect, these unearned and non-existent debts.

39.     SSB is a debt collection agency with offices located at 18820 Aurora Avenue North, Seattle, Washington. SSB is regularly retained by Quest to collect monies from consumers in Washington, and potentially elsewhere. SSB and Quest know, or should reasonably know, that many of the so-called "debts" claimed by SSB and Quest to be owed by consumers to Quest are not owed. Nevertheless, SSB engages in unfair, deceptive and unconscionable methods, acts and practices to collect, or attempt to collect, these unearned and non-existent debts. SSB is an affiliate and believed to be a wholly-owned subsidiary of the National Service Bureau, Inc. ("NBSI").

40.     Does 1 to 50, the identities of whom are not presently known but discoverable from the records of Quest, are other debt collection agencies and other companies retained by

Quest to collect or assist in the collection of unearned and non-existent monies from consumers and who engage in unfair, deceptive and unconscionable methods, acts and practices to collect or attempt to collect those non-existent debts.

41.     During all relevant times, in connection with the activities giving rise to this action, Quest conspired with the Debt Collection Defendants to engage in the various activities set forth herein, and all Defendants agreed to participate in a conspiracy to defraud and deceive Plaintiffs and the Class, and aided and abetted one another in furtherance of that conspiracy.

42.     All Defendants acted jointly and severally as a common enterprise and association-in-fact controlled and directed by Quest, are affiliated with the RICO enterprise alleged herein, and participated in furtherance of the scheme described herein to commit the unlawful acts and practices alleged herein.

43.     Each of the Defendants benefited from the scheme, conspiracy and criminal enterprise alleged herein to deceive and defraud Plaintiffs and the Class.

## FACTUAL ALLEGATIONS

*Quest's Laboratory Testing Business:*

44.     Quest is the nation's leading provider of diagnostic and clinical testing, information and services.  Quest owns and/or operates a nationwide network of laboratories and patient service centers where it provides testing and patient consulting services.  Quest claims to provide its testing services to physicians, hospitals, managed care organizations, employers, governmental institutions, individual patients and other independent clinical laboratories.

45.     Quest was originally formed under the name Metpath Inc., a New York corporation, in 1967.  From 1982 until 1996, Quest was known as Corning Clinical Laboratories

21

Inc., a subsidiary of Corning Inc. It changed it name to Quest in September 1996, after being spun-off from Corning.

46.   Quest has become the largest laboratory testing company in the country primarily as a result of mergers and acquisitions. In September 1999, Quest acquired SmithKline Beecham Clinical Laboratories, Inc. ("SBCL") to become the dominant company in the laboratory industry.

47.   Other acquisitions include Quest's acquisition of Unilab Corporation in February 2003, the leading independent clinical laboratory in California, and Quest's acquisition of American Medical Laboratories, Inc. and LabPortal Inc. in April 2002.

48.   Quest categorizes the testing it provides into 3 categories: i) Routine testing; ii) Esoteric and Gene-Based testing; and iii) Clinical Trials testing. Routine testing accounts for approximately 80% of Quest's revenues, Esoteric/Gene-Based testing approximately 16% of Quest's revenues and Clinical Trial testing approximately 3% of Quest's revenues. Routine tests include such common tests as blood cholesterol level tests, complete blood cell counts, Pap tests, HIV-related tests, urinalyses, pregnancy and pre-natal tests and alcohol and substance abuse tests.

49.   According to Quest's public filings, individual patients account for 5-10% of Quest's revenues, Medicare and Medicaid account for 15-20% of Quest's revenues, Monthly-Billed Payers (such as physicians, hospitals and employers) account for 20-25% of Quest's revenues, Managed Care and Third Party Fee-For-Service (*i.e.* private insurance) providers account for 40-45% of Quest's revenues and Capitated Managed Care (*i.e.* private insurance) providers account for 5-10% of Quest's revenues.

50.     For 2004, Quest publicly reported revenues of $5.1 billion and net income of $507 million.  For 2003, Quest reported revenues of $4.7 billion and net income of $437 million.  For 2002, Quest reported revenues of $4.1 billion and net income of $322 million.  For 2001, Quest reported revenues in excess of 3.6 billion and net income of $162 million.

***Quest's Revenues and Profits Were Hurt by Medicaid, Medicare and Managed Care:***

51.     Although immensely profitable, Quest's public filings admit that Quest has been adversely affected by reductions in Medicaid and Medicare reimbursement rates and the growth of managed care and its efforts to curtail health care costs in the United States.

52.     As explained in Quest's 2003 Form 10-K, "health insurers demand that clinical laboratory service providers accept discounted fee structures or assume all or a portion of the financial risk associated with providing testing services to their members through capitated payment contracts."  An example of the pricing pressure exerted by managed care is evident in a June 28, 2004 article appearing in the *The Wall Street Journal*, reporting that a securities analyst had downgraded Quest's stock performance outlook because, "a large national insurance payer may not renew its contract with Quest unless lowers its rates[]" and as a result "Quest could lose its status as a preferred provider for this insurance payer in certain markets, which would most likely result in lost volume and revenue."

53.     To offset these reduced revenues, Quest has become more aggressive in collecting debts from individual patients.

54.     Quest's zeal to increase revenues has resulted in its use of Balance Billing, Double Billing, Over Billing and False Billing of insured consumers and Medicare patients, in violation of Quest's agreements with Benefit Plan providers, applicable laws and regulations.

23

**Quest's Use of Balance Billing, Double Billing, False Billing and Over Billing:**

55.   More than half of Quest's revenues are derived from laboratory tests performed on individuals covered by private health insurance Benefit Plans.

56.   Quest contracts with most private health insurance providers, or their administrators or agents, to provide their insured members with use of Quest's laboratory testing and other services.  These agreements require Quest to bill only the Benefit Plan providers, or their fiduciaries, affiliates, administrators or agents, for laboratory testing or other services performed by Quest for insured individuals.  In most instances, Quest may only lawfully invoice insured consumers for co-payments and deductibles, if any, expressly permitted by Quest's contracts with health insurance providers.

57.   For example, Plaintiff McKenna's Florida Blue Cross Blue Shield *Schedule of Benefits* makes clear that providers that contract with it to provide laboratory testing to its members "have also agreed not to bill or otherwise collect from any insured any amounts in excess of BCBSF's PPO Schedule Amount, except as otherwise permitted under the terms of their Provider contracts and this Contract."

58.   The Mayo Clinic's Glossary of Terms says of "Balance Billing" the following: "Managed care plans and service plans generally prohibit providers from balance billing except for allowed co-payments, coinsurance, and deductibles. Such prohibition against balance billing may even extend to the plan's failure to pay at all (e.g., because of bankruptcy)."   Aetna likewise explains on its website that:  "Balance billing for costs over the contracted rate is not permitted by participating providers."

59.   Certain state laws and regulations similarly preclude Quest from directly billing

24

insured individuals for services included in a health insurance plan or Benefit Plan for which Quest is a participating or included provider of health care services.  States with such laws or regulations include New York, Florida, Texas, Massachusetts, Maryland, Delaware, Utah and Arkansas.

60.     Quest's agreements with health insurance and Benefit Plan providers also dictate the prices that Quest can charge for services provided, which are almost always lower than the prices normally charged by Quest for the same or similar services.  As explained in Quest's 2004 Form 10-K:  "Fees billed to patients and insurance companies are based on the laboratory's patient fee schedule, *subject to any limitations on fees negotiated with the insurance companies* or with physicians on behalf of their patients."  (Emphasis added).  Quest's provider agreements require them to accept the stated contract price as full payment for all covered services, and preclude Quest from seeking any additional payment from either the insurance provider or insured individual.

61.     Quest has routinely violated their provider agreements by billing and collecting or attempting to collect monies from insured individuals and their insurance providers for the entire amount of the same services ("Balance Billing"), billing and collecting or attempting to collect monies from both the health insurance providers and insured individuals ("Double Billing"), billing and collecting or attempting to collect monies from insured individuals for services in an amount above the rates and prices agreed in the provider agreements ("Over Billing") and billing and collecting or attempting to collect monies not owed by insured or individuals ("False Billing").

62.     Not only does Quest wrongfully engage in Balance Billing, Double Billing, Over

Billing and False Billing, it mails multiple copies of invoices and threatening letters to insured consumers over a period of months demanding payment, wrongly claiming delinquency, threatening to add the individuals to delinquency lists, threatening debt collection, and threatening legal action and liability for costs and expenses.

63. To further promote its Double Billing, Quest's invoices to insured consumers contain a host of deceptive, misleading and false statements, such as stating that the individual's insurance company has denied coverage for the services performed by Quest, and/or that Quest does not have access to the correct billing address of the individual's insurance provider or administrator.

64. The duplicate bills mailed by Quest to insured individuals are routinely and intentionally overstated, whereby Quest invoices the individuals at prices higher than agreed upon in Quest's Benefit Plan agreements.

65. Quest follows through on its threats to use outside debt collection agencies, including the Debt Collector Defendants, to collect and attempt to collect debts from insured individuals, even though such so-called "debts" are fictitious, not properly collected from insured individuals and/or were previously paid by the insurance providers. Worse still, Quest or the Debt Collector Defendants often impose a "collection fee" or "assessment fee" of approximately $10 for each invoice when Quest employs the use of outside debt collectors.

66. Quest provides knowingly and/or recklessly false information to debt collection agencies employed and retained by Quest to wrongfully, deceptively and unconscionably collect and attempt to collect non-existent debts from insured consumers.

67. The Debt Collection Defendants acquiesce in the knowledge that the information

provided by Quest concerning delinquent debts is often false, but knowingly and/or recklessly ignore that information in pursuit of their debt collection activities.

68.    Although it collects debts it knows or should reasonably know are not owed by consumers, AMCA (like the other Debt Collector Defendants) unfairly, deceptively and unconscionably abuses and harasses individuals to pay monies purportedly owed to Quest, but which in fact are not owed. AMCA achieves its illicit goals by repeatedly calling and sending letters to consumers demanding payment to Quest. AMCA's efforts are expressly approved by Quest. According to AMCA: "We find the most effective collection method is a combination of letters and telephone calls ('telecollection'). At AMCA, we have had success mailing up to _nine_ letters to slow payers. Letters are tailored to your specific situation and approved by you before we mail." (Emphasis in original). AMCA promises: "If you want your money, we will collect it for you."

69.    The remaining Debt Collector Defendants engage in substantially similar deceptive, fraudulent and abusive practices to collect debts for Quest that they know, or should reasonably know, are not owed by consumers. Their motivation is amply summarized by a statement on SSB's and NSBI's website: "Because we don't get paid until you do, we strive to achieve quick and efficient results in recovering the money owed you." It is not uncommon for SSB/NSBI to begin debt collection based merely on an electronic order from Quest without confirming the validity of the debt: "NSB[I] works with the top medical labs in the United States ... NSB[I] technology allows for electronic transfer of files and we work with you on customized reporting when and how you need it."

70.    Like the other Debt Collector Defendants, Quantum harasses consumers with

27

letters and telephone calls.  As stated on its website:  "Letters are computer generated and mailed every 14 days until a series of three letters have been mailed.  If the collector handling the account has made satisfactory payment arrangements with the debtor, the letters are stopped and a payment reminder is mailed to the debtor.  The letter series may be restarted at any time by the collector handling the account."  "We do not just provide telephone dunning, though that is an integral part of our service."  Their debt collectors are paid solely by commission, bonuses and "monthly contests," based on the amount of debts collected from consumers.  Quantum also promotes its willingness to begin collection of Quest's debts based solely on an electronic order: "Our company can accept new business, payments, credit and adjustment via electronic download from client via modem."

71.    Aside from Plaintiffs and the investigations of numerous state Attorneys General, consumers nationwide have confirmed the allegations of Balance Billing, Double Billing, Over Billing and False Billing employed by Quest and the Debt Collector Defendants.  Many of these consumers made complaints to state and federal regulators, who have disclosed those consumer complaints to Plaintiffs' counsel following requests made pursuant to state freedom of information laws.

72.    Those consumer complaints further demonstrate Quest's and the Debt Collector Defendants' unlawful, deceptive and fraudulent billing and collection practices.  A small sample of those consumer complaints include the following:

(a)    An Alabama consumer stated in a September 25, 2003 complaint to the Alabama Attorney General:

I have had difficulties with Quest as outlined in my attached letter.  It seems I am not the only individual who has problems with this company. The medical claims are being submitted by Quest to the private medical

28

insurer or Medicare but then Quest is billing the individual (patient) for additional sums above what is being paid by the insurance company. Other laboratories performing the same services never billed any additional charges. According to my Doctor's office Quest is suppose[d] to be a Preferred Medical Provider, i.e. they accept what ever the insurer agrees to pay for the procedure or service. In my case, I am insured under a corporate sponsored group Blue Cross Blue Shield PMD plan and should only be paying a $20 co-payment to my physician. Whatever Quest is doing with the claims is causing the individuals to pay additional charges to Quest. I have talked to my doctor's office on numerous occasions and they can't figure out what is going on with Quest either as to why the individuals are being billed. My Doctor's office has ceased doing business with Quest.

This same Alabama consumer advised Quest of its improper billing practices:

I am today [September 22, 2003] in receipt of the captioned invoice indicating an amount due of $73.40. Further, this invoice indicates that it is a final delinquency notice and the account will be turned over to a collection agency unless the balance in full is remitted. … On August 18th, I received a "third notice" from Quest for the amount of $73.40. On August 19, 2003 I remitted $99.83 under my check number 5752. This represented payment in the amount of $73.42 for services on May 1st and $26.40 for services on May 28th. I returned the entire statement with my check and wrote a note that it is being paid under protest and that I think you are a most unprofessional organization. All during the time between June and August, I had been calling my doctor's office and waiting to hear something to resolve this matter. Quest never cooperated in the matter with my Physician's office or me to resolve which codes were used, why the codes were changed and why the claim had been submitted under my Major Medical insurance. I decided to pay the third notice in the hope that I would never have to deal with such an unprofessional firm again. I guess I was wrong.

(b)     An Illinois consumer stated in an May 21, 2003 complaint to the Illinois Attorney

General:

Quest did tests on my spouse and billed us for the two amounts listed on the copy of the enclosed collection notice. I tried to call them but can't get through on their toll free # because the pin code does not work. Mailed a copy of my bank statement showing payment. I have not received any explanation of what the problem is. To my knowledge the amount American Medical Collection Agency is trying to collect on behalf of Quest Diagnostics is the only amount and not billed from previous tests. AMCA's contact points really frustrate, extend and are

abusive of customers.  I do not know if this has affected my credit rating.

(c)     The Missouri Attorney General, on December 7, 2000, received a complaint from

Missouri consumer stating:

Co[mpany] keeps billing Cons[umer] for the services they render.  Cons[umer]
says that she has a PPO insurance and the Co[mpany] is failing to bill correctly.
Cons[umer] sends at least two letters to the Co[mpany] each month before they
correct their billing.  Cons[umer] believes this is willful and that unsuspecting
seniors will go ahead and pay the invoices because they don't understand how a
PPO discount works.

(d)     The Missouri Attorney General, on April 19, 2001, received a complaint from

Missouri consumer stating:

Cons[umer] had tests done and co[mpany] called her to tell her insurance denied
the claim.  Cons[umer] paid the claim and later found out that the insurance
co[mpany] had covered it.  Co[mpany] will not refund the cons[umer's] money.

(e)     A Massachusetts consumer stated in a complaint to Quest and the Massachusetts

Attorney General:

First I would like to review the history of my problems with Quest Diagnostics
("Quest").  Any medical services needs of mine that arise I use Massachusetts
General Hospital ("MGH") … [who is] apparently passing along my insurance
information for Quest to bill directly.  …  Although Quest has the same
information as MGH has (which has been paid for all services), Quest has claimed
that my insurance has NOT paid and has sent my bills to the collection agency.
Moreover, I have called Quest several times after they had contacted me to give
them my correct insurance information (and also wrote my correct insurance
information on each bill I received from Quest - in the designated box to do so,
and sent it back to Quest).  I also spoke to my insurance company directly who
noted that Quest sent their bills to the wrong office and my insurance company
had requested from Quest in writing to send any bills dated prior to July 31, 200
[redacted by Massachusetts Attorney General] to the address of Blue Cross of
[redacted by Massachusetts Attorney General].  This was never done, and again
the bill was sent to the collection agency.  I now have several bills from Quest, all
of which are covered by my insurance.  These bills sent to Quest's collection
agency has Quest collection group literally "harassing" me with calls at all hours
of the week, and has caused problems with my purchase of a new home.

(f)     An Oregon consumer stated in a December 14, 2000 letter to AMCA, copied to

Quest, the Oregon Attorney General and the FTC:

This letter is to inform you that I dispute the bill that you are attempting to collect
on behalf of Quest Diagnostics.   ...    I have contacted Quest Diagnostics
repeatedly and so has my insurance carrier, Providence Medicare Extra.  My
insurance company assures me that this bill has been satisfied and that there is no
balance owing.

(g)     A Florida consumer stated in an April 19, 2004 complaint concerning Quest to the

Florida Attorney General's Fraud Hotline:

Quest Diagnostics:  Caller has paid his bills (07/03) and then after several months,
a collection agency is harassing them for debt that has already been paid.  It has
happened to several co-workers as well.

(h)     A Florida consumer stated in an August 9, 2004 complaint concerning Quest to

the Florida Attorney General's Fraud Hotline:

Quest Diagnostics (NJ) – they keep billing for debt that has already been paid.
They had sent this to a collection company already.  Insurance had paid this
already.  Caller said that the NY OAG has taken his company to court because of
multiple or false billing.  Quest said go back to the doctor and / or insurance
company and they can fix this, but it repeats.  He has sent letters to the collection
(NY-AMC[A]) and has fixed this once, but it has been resubmitted and the
collection company is contacting him once more.  He will be sending proof to this
collection company once more.

(i)     An Iowa consumer stated in an August 9, 2002 letter to Quest, copied to AMCA

and the Iowa Attorney General's Office:

I am writing you regarding a claim for my wife, [] on May 21, 2001.  According
to my insurance company, Wellmark, Blue Cross Blue Shield (see attachment)
this claim was rejected as PROVIDER LIABILITY, due to information needed to
process the claim not being provided.  This was previously communicated to
Quest.  As I understand it since you are contracted with my insurance company
you cannot bill me for this claim.  I am formally disputing this bill at this time.
As a contracting provider, Quest agrees to file claims on behalf of patients.  You
have not refilled [sic] this claim for [].  I am formally requesting that all collection
activities on this account immediately cease.  Any communications with credit
reporting agencies needs to be corrected as well.

(j)     A Michigan consumer stated in a December 29, 2003 letter to Michigan Attorney

General's Office:

On December 14, 2001, my father, [], had a PSA test ordered by his doctor.  The
test and lab work completed by Quest Diagnostics Inc. were covered by his Blue
Cross of Michigan insurance.  ...  We thought the problem had been settled until
we heard from the collection agency [AMCA].  My father got understandably
nervous and paid the $63.25 to the collection agency.  Almost immediately the
payment form came from Blue Cross indicating that the bill had been paid.  Quest
Diagnostics was paid twice for the same service.  Several calls to Quest
Diagnostics always get the same response, "We will look into it."  My 81 year old
father is discouraged, and I'm angry that a company in the medical field would
deliberately take advantage of an older person.

(k)     A Michigan consumer states in a January 10, 2000 letter to Quest, copied to the

Michigan Attorney General's Office:

I am enclosing a copy of your bill labeled "Third Notice," dated 1/4/2000
indicating that the charges are delinquent, and you will be starting collection
procedures.  You are a network provider from my insurance provider United
Healthcare Insurance Company (UHC).  As such you have a contract to accept as
payment in full the moneys [sic] paid by UHC for services provided by your
company.  I am enclosing copies of statement from UHC dated 11/15/99 and
12/13/99 that show you have been paid in full for the laboratory services listed on
the bill.  I DO NOT owe you any money.  This is not the first time I have had the
same problem with your company.  It is my opinion that this is the result of
incompetent record keeping, or it is an attempt to collect moneys [sic] over and
above the amounts provided by your contract with UHC.

(l)     An Ohio consumer stated in a August 5, 1999 letter to the Ohio Attorney

General's Office, the day before receiving a collection demand notice from AMCA:

I am a State of Ohio employee covered under the HMO from Aetna Insurance.
According to Aetna, my employer's benefit's office and DAS Benefits
Administration's office, Quest has been paid their contracted amount for the
service provided and I as the patient do not owe this amount.  I have contacted
Quest, DAS Benefits has contacted Quest, and my employer's benefits office
have contacted Quest, however, I am still receiving these notices.  Is there
anything I can do to stop this invoice and Quest turning this over to a collection
agency?

(m)     An Ohio consumer stated in a April 15, 1999 letter to SBCL, copied to AMCA

and the Ohio Attorney General's Office:

Per my medical plan and the Medical Mutual of Ohio representative, you have a
contract with them stating that the Insurance payment is considered payment in
full. You have now received duplicate payments for this bill. One from the
insurance company and the other from me in the amount of $149.13. After
receiving payment twice for the same bill you then turned this bill into American
Medical Collection Agency. I recently applied for a new credit card and have
been refused due to your practice of duplicate billing for medical bills.

(n)     A Vermont consumer stated in a November 9, 1998 letter to the Vermont

Attorney General's Office:

I have been threatened several times by SmithKline Beecham Clinical
Laboratories. I am requesting that you look into their business procedures as they
seem to be a little illegal. My husband[']s employer General Electric Co is a self
insured CHP company. All that we have is a $10.00 co-pay and we are not
responsible for any additional lab fees. Four times I have given our insurance
information to the lab (attach #1). On the fourth time Aug[ust] 31, [19]98 (attach
#2) I advised them that any further threats would be considered harassment and
turned over to the Attorney General's Office for fraud. On Oct[ober] 6, [19]98 I
faxed a letter to GE Health Care Preferred for them to check out the problem
(attach #3). Also attached (attach #4) is a copy of my explanation of benefits for
Kaiser Permanente dated 10/29/98 who now does GE CHP coverage. They have
paid SmithKline [redacted by Vermont Attorney General] and the statement says
the balance exceeds the usual fee for this service. Also attached (attach #5) is
another threatening letter dated 11/3/98 from SmithKline stating that this will be
turned over to a collection agency.

(o)     A Washington consumer stated in an August 27, 2002 letter to Quest, copied to

the Washington Attorney General's Office:

Again I have received a collection notice from Credit Collection Service and
another phone call. Per my letter of July 29th, my last bill from Quest was for
$25.20 and was paid and the check has cleared my bank.

(p)     An Alaska consumer and former Washington resident stated in a January 8, 2001

letter to the Washington Attorney General's Office:

In November, 2000, I received a statement from Quest, indicating a balance due

of $169. On November 16, 2000, I reached a Quest representative who identified himself as Quantai W. I explained that I had received [an] Explanation of Benefits from (EOBs) from Blue Cross Blue Cross Blue Shield (BC BS) regarding the amount Quest indicated was due from me. According to the first EOB, the submitted charge from Quest was $136; of that amount, $15.80 was allowed by BC BS. The remaining $120.20 was to be written off by Quest, as they are a preferred BC BS provider, leaving $14.22 to b[e] paid by BC BS and $1.58 to be paid by me. The second EOB reflected a submitted charge from Quest for $33. Blue Cross Blue Shield paid $25.15, Quest was to write off $5.06, and my balance was $2.79. So of the total $169 fee for the 8/22/00 date of service by Quest, my amount due is $4.37. The Quest representative, Quantai W., requested that I fax copies of my EOBs to him at (813) 740-3311 so that he could clear my account. At that time I also requested that he correct the spelling of my last name, as well as correct my mailing address, as Quest was using the wrong information. Yesterday, I received two statements from Quest. Each had my correct name and correct address. However, the statements indicated a balance due of $138.79. That is the original amount due of $169, less a $5.06 write-off and a BC BS payment of $25.15. I contacted BC BS and was advised that BC BS had been having a lot of problems with Quest, and I was only responsible for $4.37.

(q)     A Washington consumer stated in a January 8, 2002 letter to AMCA, copied to

Quest and the Washington Attorney General's Office:

I am in receipt of your letter dated 1.1.02; I have had three prior phone conversations with representatives from your company. In all three of these conversations you were told that this bill was paid to Quest Diagnostics in October 2001, yet you refuse to remove this account from your system.

(r)     A California consumer and former Washington resident stated in a July 16, 2001

letter to the Washington Attorney General's Office concerning SSB and Quest:

On May 3, 2001 I received a notice from a collections agency called Seattle Service Bureau Inc. claiming that I owed a diagnostics company, Quest Diagnostics, $42.12. ... I called phone number provided on the letter for questions regarding the account and was told the debt was from 1999, at which time I was not only a minor, but also insured. When I tried to explain this to the representative, she said to get the money from who ever was responsible for my care at time of the claim, because Quest would not bill my insurance for a 3 year old claim. ... After she refused to provide any further information about the "debt" I asked if I was expected to pay the "debt" without knowing what it was for or whether it was even valid, to which she responded, "its your credit," and proceeded to disconnect the call. I called back several times, each attempt ending

34

with a nasty remark from the representative as she hung up on me.

(s)      A North Carolina consumer stated in a July 9, 2003 letter to the North Carolina

Attorney General's Office:

I am writing to you regarding a recent notice I received from the American
Medical Collection Agency.  This notice is requesting payment regarding a claim
submitted to them by Quest Diagnostics, Incorporated.  Quest has been trying to
collect payment from me on laboratory services performed on my daughter, [].
My health insurance carrier (United Healthcare) has indicated to me that I am not
responsible for paying on this claim and that Quest's attempt to collect any
portion from me is a violation of their contract.  ...   My main concern is that this
collection report will reflect poorly on my daughter's credit report.

On July 15, 2003, this same North Carolina consumer sent a follow-up letter to

the North Carolina Attorney General's Office, attaching a July 7, 2003 letter from United

Healthcare to Quest.  The United Healthcare letter to Quest stated:

In joining our [United Healthcare] network, you [Quest] agreed to accept the
contracted fee as payment in full for the services you provide to our members.  A
payment of $25.56, equal to 100% of your contracted fee, was issued to you on
02/13/03 for services provided for [] on 11/27/2002.  Our records indicate that
you sent a bill to [] in the amount of $37.44.  This amount is above your
contracted fee and is not the member's liability.  Please adjust your records so our
member will not be billed for this balance.  Contractually, our members should
not be billed except for member copayment or coinsurance and certain limited
situations described in your provider contract.

(t)      A January 27, 2003 letter from Blue Cross and Blue Shield of North Carolina to a

North Carolina consumer, attached to the consumer's January 29, 2003 complaint to the

North Carolina Attorney General's Office states:

Per our conversation today, I have contacted Quest Diagnostic.  Despite our
previous conversations, they are now contending that the information submitted
previously was not sufficient to eliminate your balance of $68.88.  I have
collected the voucher that went to Quest Diagnostic from Blue Cross and Blue
Shield of North Carolina on November 6, 2002.  ...   However, you can see from
the info listed that the member liability is $0.00.

35

(u)     A New York consumer stated in a January 12, 1999 letter to the Kenneth

Freeman, then Chief Executive Officer of Quest (which was attached to the consumer's

January 20, 1999 complaint to the New York Attorney General's Office):

In May of 1998 I had [redacted by New York Attorney General] at your Depaw,
New York facility. The girl who took down my insurance information informed
me that should would not accept my secondary insurance (no excuse was given).
When I received my bill I called your billing department and was informed the
reason she didn't take the information at the time of service was because your
computers could not hold it. I gave my secondary information to the rep who said
she would process this through my secondary insurance. Mr. Freeman, I have
been giving this information to your company ever since. I have been billed
repeatedly for the balance (which my secondary insurance covers) since June. I
have promptly called after receiving each and every bill and give the information
to the party I spoke with. After I received the latest bill (January 5, 1999), I called
Choice Care and received the following information: the balance was paid by
Choice Care on October 12, 1998 [redacted by New York Attorney General]. I
relayed this information to Alex along with a toll free number he could call if he
needed any additional information. A few days later the last straw came when I
received a notice that this was turned over to your collection department and I had
until January 21, 1999 to pay.

(v)     A New York consumer stated in a February 14, 2003 letter to the New York

Attorney General's Office, AMCA and Quest:

I have tried on numerous occasions to have the above referenced Quest Bill
corrected. Apparently Quest is unable to review the records of all the information
I have provided at their request to three different P.O. Boxes, the information I
provided on two E-mails and the many telephone conversations I have had with
personnel at Quest. The primary insurance carrier is United Healthcare. THE
SECONDARY INSURANCE CARRIER IS **GHI**. I have contacted GHI and sent
Quest copies of GHI's statement, the check number of payment, the date Quest
cashed the check and a copy of my policy indicating that since Quest is a GHI
provider, they must accept GHI's payment for the entire bill. I verified this with
GHI also. Quest has not recorded any payment from GHI on my bill AT ALL!!!
They tell me they will investigate, but they never do. I have been hounded by
bills from Quest and no one at Quest ever bothers to respond to my inquiries or
read all the information I have sent repeatedly. Now they sent this **PAID BILL**
TO A COLLECTION AGENCY! [Emphasis in original].

(w)     A New York consumer stated in a July 6, 2002 letter to the New York Attorney

General's Office:

**We are in urgent need of your help.** We have been harassed since last year and we would like your help. Last year, my husband and I had some blood work done recommended by our primary doctors. We both went to blood laboratory offices referred by our doctors. Quest Diagnostics Incorporated *the people who did the blood work[,] P.O. Box 64813[,] Baltimore, MD  21264-4814[.] They want us to pay the difference that Blue Cross/Blue Shield doesn't allow for. I spoke with Ms. Muter from Blue Cross/Blue Shield @ (1-800-261-5962) and she said that they only allow a certain amount of money for services rendered to their patients. And, that **we are not responsible** to pay the difference in money that Quest Diagnostics want us to pay. We have received many letters from American Medical Collection Agency #0015155157095[,] 2269 S. Saw Mill River Road, Bldg. 3[,] Elmsford, NY  10523 (1-800-516-4250) (914) 345-7125[.] [Emphasis in original].

(x)     A New Jersey consumer stated in a April 26, 1998 letter to Quest, copied to the

New Jersey Attorney General's Office:

If I weren't so furious, I'd be laughing about the complete ineptitude of your billing system. In September, I had several simple blood tests done. I submitted the charges to the insurance carrier, Mutual of Omaha/Medichoice, who paid them promptly. I continued to receive past due notices from you, despite numerous phone calls and promises that the matter had been resolved. I sent copies of the payment statement from the insurance carrier. I sent letters explaining the situation. I finally sent a check to cover the costs until resolution of the matter so you wouldn't turn me over to a collection agency. After months of hassles and threats on my part to turn this case over to NCQA, the Bergen County Better Business Bureau, and others, you finally cleared the matter and refunded the check. (See attached letter and refund check stub.) The laughable part is that I've now started to receive *past due notices again every two weeks*. I tried calling. That seems to have done nothing. So I talked to people at work, and it seems that many of them have had similar experiences with your lab. I've had it!!! [Emphasis in original].

(y)     A New Jersey consumer stated in a May 19, 1999 letter to AMCA, copied to the

New Jersey Department of Banking and Insurance:

This letter is to inform you that your agency keeps wasting the money to collect an amount of $62.34 which you agency alleges that my 6 year old son [redacted by New Jersey Attorney General] owes for service rendered by your client Quest Diagnostics, Incorporated. You are here put on notice to stop this harassment because MY WIFE'S Insurance Company, thought her former employer, Celgene

Corporation, has reimbursed your client Quest Diagnostics Incorporated for a PPO Provider Discount amount. The original bill from Quest was US$84.80 and they (Quest) have given a PPO discount of US$62.34 to bring the net payment of US$22.46, which has been paid to Quest. A copy of [the] explanation of benefits is attached for your records. I have already written to Quest once in the past in December 1998 (Copy also attached). My efforts seem to have been wasted. They don't seem to understand that I am not putting up with the black mail from agencies like yours.

(z)     A February 24, 1999 letter from the Nippon Life Insurance Company of America

to the New Jersey Insurance Commissioner, copied to Kenneth Freeman, then Chief

Executive Officer of Quest, states:

I am writing to express ongoing concerns that we are experiencing with Quest Diagnostics, Inc. and ask for your help in reaching a resolution. As you can see from the enclosed letters, we have written Quest and asked that they respond to our concerns. To date we have had no response. Since 1997 we have received numerous complaints. It is taking upwards of 8 weeks for Quest to post the insurance payment in their system. During this time they send notices to the insured stating that they need to pay their bill. We have even had instances where the insured's claim has been referred to a collection agency. There are also times that the insured pays Quest and thus creates an overpayment.

One of the attached letters from the Nippon Life Insurance Company of America

to Kenneth Freeman of Quest, dated December 29, 1998, states:

I would like to draw your attention to the second paragraph of the enclosed notice sent by Quest to our insured. This is quite misleading and not a truthful statement. It is implying that the insurance carrier has not provided payment when in fact it appears that our prompt payments are not credited to our insured's account in a timely fashion. I can give you this account as an example but this same situation has occurred with many other insured's using your company's services.

(aa)     A New Jersey consumer stated in a May 19, 1999 letter to AMCA, copied to the

New Jersey Department of Banking and Insurance:

Quest Diagnostics admits that because of their *poor accounting practices* they will <u>double bill</u> clients. Along the way, they will lie to cover the reason for billing clients whose bills are already paid !!! I was just informed today by a client rep at my HMO that *they were billed three times for the services* I received at Quest. I

recently learned those facts when I threatened to involve my lawyer because I have been billed for services paid by my HMO. Quest had notified me that they were about to turn my "unpaid" bill over to a collection agency, which would then effect my credit rating (which is unblemished). When my HMO provided me with proof that they, indeed, had paid my bill by providing me with the check number, the date check was sent and that all services billed by Quest were paid, Quest's agent admitted that they did receive that cited check but had not applied the payment to my account. Over the course of the past 9 months Quest has told me that I owed the money because of many reasons, including: The HMO declined to pay, my doctor had not authorized the blood work, my identification number was wrong, and, I was not covered for the services rendered. My HMO paid for the services on August 8, 2000. When I gave the date along with the check number, "Shirley at Quest said that they had received the check but could not figure out which clients' accounts to apply the payment. So for six months Quest allowed the money to sit in their account without identifying which clients were to be credited. "Shirley" says they often have this problem. In the meantime, we clients are billed and threatened to have our credit ratings jeopardized. … From what Shirley told me, this practice of double billing is normal procedure for them.

(bb)     A New Jersey consumer stated in a February 12, 2002 letter to the SEC, copied to

the New Jersey Attorney General's Office and Robert Hagemann, then Vice President

and Chief Financial Officer of Quest:

I would like to bring to your attention [a] potential revenue recognition matter regarding Quest Diagnostics that I believe requires an investigation. Quest Diagnostics has pre-negotiated rates with my insurance provider, Mayo Management Service, Inc of Rochester, MN. Despite colleting insurance information at the time services are provided, Quest Diagnostics has consistently billed me for services at a rate well in excess of the negotiated fees. As part of the payment process, my insurance company sends an explanation of benefits that clearly describes that the amount of over billing due to the negotiated rate. Rather than issuing a credit to reflect the appropriate rate, Quest Diagnostics uses aggressive collection tactics that include hiring outside collection agencies to collect funds that are not due them. As a former vice president at a Fortune 50 company, I believe that this type of activity in a publicly traded company would certainly deserve further scrutiny. Only the financial professionals at Quest Diagnostics can explain how they account for these transactions. However, the use of a collection agency in this situation gives the appearance of a paper trail creation to support justification of a bad debt write-off for revenues that should have never been booked in the first place. I am enclosing two examples of the situation described above which include 1) Quest Diagnostic Bill, 2) Explanation of Benefits from Mayo Management and 3) Collection Letter from American