## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|
DENISE AGOSTINO, et al.,                |

      Plaintiffs,                |

           |      **Civ. No. 04-4362 (SRC)**

      v.                |

           |      **OPINION**

QUEST DIAGNOSTICS INC., et al.,         |

      Defendants.                |

**CHESLER**, District Judge

      This matter comes before the Court on Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23. Plaintiffs seek certification of a class of all persons in the United States who allege they have been improperly billed by Quest or its outside debt collection agencies, as well as certification of four subclasses: two subclasses seeking injunctive and declaratory relief, and two subclasses seeking monetary remedies. Plaintiffs also argue that the New Jersey Consumer Fraud Act should be applied to the class and all subclasses. As discussed more fully below, the Court finds that the proposed class and subclasses do not meet the requirements of Rule 23 and therefore denies Plaintiffs' motion for class certification.

## I. BACKGROUND

      Plaintiffs[1] initiated this putative class action on September 3, 2004, alleging that

---

[1]The purported class is represented by sixteen named plaintiffs: Denise Agostino, Jennifer Haley, Christine Ranieri, Richard Ranieri, Aria McKenna, Eric Gunther, Denise Cassese, Mark Smaller, Michael Hoeker, Eric Breuer, Danielle Auclair, Ronald Smucker, Kathleen Smucker, Elizabeth Cruthers, Richard Grandalski and Janet Grandalski (collectively "Plaintiffs").

Defendant Quest Diagnostics, Inc. ("Quest"), the nation's leading provider of diagnostic and clinical testing, and its outside debt collection agencies[2] improperly bill consumers at full list price when Quest has unanswered questions concerning consumers' insurance information or when insurance providers do not timely respond to a claim or respond without adjudicating a claim due to incorrect patient information.  Plaintiffs further allege Defendants improperly bill Medicare Part B beneficiaries.

In the First Amended Class Action Complaint, Plaintiffs asserted eight separate causes of action.  However, by Opinion and Order dated October 6, 2005 (hereinafter the "Lifland Opinion"), the Honorable John C. Lifland, U.S.D.J., dismissed Plaintiff Mark Smaller's claim against CCS pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (" ERISA"), Smaller's claim pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. § § 1692, *et seq.* ("FDCPA") against CCS, and all claims that refer to violations of the FDCPA against any Defendant that occurred before September 3, 2003.

The following claims remain:  Count I: violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); Count II: violations of the FDCPA that occurred on or after September 3, 2003, as to all Defendants other than Quest and CCS; Count III: violations of ERISA, as to all Defendants other than CCS; Count IV: violations of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § § 56:8-1, et seq., and similar laws of other states; Count V: violations of consumer protection laws of states other than New Jersey; Count VI: breach of

---

[2]The Debt Collection Defendants are: Retrieval Masters Credit Bureau d/b/a/ American Medical Collection Agency ("AMCA"), Credit Collection Services ("CCS"), Quantum Collections ("Quantum"), Seattle Services Bureau, Inc. ("SSB"), Russell Collection Agency, Inc. ("RCA"), and Credit Bureau Central ("CBC") (collectively, "Debt Collection Defendants" or "DCDs").

contract; Count VII: common law unjust enrichment; and Count VIII: common law fraud.

Subsequent to the motion to dismiss, the Honorable Mark Falk, U.S.M.J., appointed

Interim Class Counsel pursuant to Rule 23(g)(2), and the parties began the discovery process.

Plaintiffs now seek certification of a class[3] ("the Class") defined as:

All natural persons in the United States of America and its territories who are
members, participants, subscribers or beneficiaries of a Health Maintenance
Organization ("HMO") or health insurance plan provided by an insurance provider
or its Third Party Administrator ("TPA") with whom Quest has a participating
provider contract that includes a hold harmless provision or where a hold harmless
provision is imposed by law, or who are participants or beneficiaries of Medicare
Part B.

Plaintiffs also seek certification of four subclasses.  Plaintiffs propose two subclasses

under Rule 23(a) and (b)(2), seeking equitable and/or statutory remedies.  Plaintiffs title and

define the proposed equitable and statutory subclasses as follows:

**i. Refund Interest Subclass**

All natural persons in the United Stated of America and its territories who are
members, participants, subscribers or beneficiaries of a HMO or health insurance
plan provided by an insurance provider with whom Quest had a participating
provider contract that includes a hold harmless provision, or participants or
beneficiaries of Medicare Part B, and to whom Quest or its outside debt collectors
paid a refund without interest as a result of such person being billed at an amount in
excess of the stated patient responsibility on an Explanation of Benefits ("EOB")
provided by an insurance provider or TPA at any time from September 3, 1998,
through the present; and

---

[3]Plaintiffs exclude from the purported class "Defendants, their employees and persons
who exclusively receive health insurance benefits as a participant or beneficiary of Medicaid,
Champus or Tricare." (Plaintiffs' Brief at 4.)  Plaintiffs further state that they do "not intend[]
that any person be entitled to recover more than 100% of the remedies owed to them as a result
of inclusion in more than one certified class, save for punitive relief or interest to be awarded by
the Court or finder of fact at summary judgment or trial."  (Id.)

**ii. Equitable Remedy Subclass**

All natural persons in the United States of America and its territories who are members, participants, subscribers or beneficiaries of a HMO or health insurance plan provided by an insurance provider or its TPA with whom Quest had a participating provider contract that includes a hold harmless provision, or participants or beneficiaries of Medicare Part B, and who since September 3, 1998, were billed or dunned by Quest or its outside debt collectors and paid an amount in excess of the stated patient responsibility on an EOB provided by their insurance provider or TPA or who was billed or dunned after their insurance provider or administrator filed for bankruptcy or were deemed insolvent.

Plaintiffs also seek certification of the following two additional subclasses under Rule 23(a) and (b)(3), seeking damages:

**iii. Medicare Part B Subclass**

All natural persons in the United States of America and its territories who are participants or beneficiaries of Medicare Part B, and who since September 3, 1998, paid any portion of bills or dunning demands by Quest or its outside debt collectors when Quest did not have a signed Advanced Beneficiary Notice ("ABN") and a determination of patient responsibility from Medicare Part B or its administrators; and

**iv. Debtor Subclass**

All natural persons in the United States of America and its territories who received demands for payment from Quest or its outside debt collectors since September 3, 1998, or since September 3, 2003, for FDCPA violations, which demands for payment did any of the following: i) added fees or charges to the debt; ii) made threats the collector was either not authorized and/or not intending to pursue; iii) falsely representing that debts were owed; iv) representing that minors were personally responsible to pay debts.

Plaintiffs propose two methods to identify members of the Subclasses. Under Plaintiffs' proposed plan, Defendants would first be required to review their available records to identify members of the Rule 23(b)(2) and Rule 23(b)(3) Subclasses. Then, upon a finding of liability, Subclass members would be permitted to submit a claim form with supporting documentation

entitling them to relief.  A claims process, following notice, would be used to adjudicate those claims.

## II.  FACTS

In this case, Plaintiffs are challenging Quest's billing procedures.  Quest is the nation's leading provider of diagnostic and clinical testing.  Quest performs these diagnostic and clinical testing services upon the orders of physicians, physicians assistants, and registered nurses. (Declaration of Dr. Hugh Long, ("Long Dec.") at 9.)  Specimens are either obtained by physicians and sent to Quest for testing, or the patient is sent "'to a Quest Diagnostic Patient Service Center with an order to have the specimen drawn.'"  (Declaration of Thomas McGuire filed in support of Plaintiff's motion ("McGuire Dec.") at 31, ¶ 38) (quoting "Assurance of Discontinuance," issued in In re Quest Diagnostics, Inc., Attorney General of the State of New York, June 13, 2002 ("AOD")).  Physicians order the tests in writing, using either Quest's test requisition form, or the physician's prescription pad.  (Id.)  If the patient goes to a Quest Service Center, Quest obtains the patient's personal and billing information directly from the patient. (Id.)

As stated above, Plaintiffs' claims challenge the billing practices of Quest and the Debt Collection Defendants as improper and unconscionable.  The named Plaintiffs assert that they "represent a cross-section of consumers injured by the Defendants' billing and collection practices."  (Plaintiffs Brief at 14.)  Some of the named Plaintiffs have private health insurance plans, while others are covered by Medicare Part B.

In addressing the motion to dismiss, Judge Lifland summarized Plaintiffs' claims as follows:

In the Complaint, Plaintiffs allege that the Defendants injured the Plaintiffs and the Class in three ways: (1) by subjecting Plaintiffs to "Defendants unlawful and repetitive demands to pay debts for laboratory testing not owed or in amounts above the actual amount owed"; (2) by forcing the Plaintiffs "to endure deceptive, misleading, abusive and fraudulent debt collection practices and threats to their credit ratings, records, scores and reports; and (3) by demanding and collecting monies from "some Plaintiffs and many class members . . . that were not owed or in amounts above the amount owed[.]"

. . . .

Plaintiffs specifically allege that "Quest has routinely violated their provider agreements by billing and collecting or attempting to collect monies from insured individuals and their insurance providers for the entire amount of the same services ("Balance Billing"), billing and collecting or attempting to collect monies from both the health insurance providers and insured individuals ("Double Billing"), billing and collecting or attempting to collect monies from insured individuals for services in an amount above the rates and prices agreed in the provider agreements ("Over Billing") and billing and collecting or attempting to collect monies not owed by insured or individuals ("False Billing"). Compl. at ¶ 61. Plaintiffs further allege that "Quest provides knowingly and/or recklessly false information to debt collection agencies employed and retained by Quest to wrongfully, deceptively and unconscionably collect and attempt to collect non-existent debts from insured consumers." Id. at ¶ 66.

. . . .

According to Plaintiffs, the Debt Collector Defendants collect debts that they "know or should know are not owed by consumers" and they "unfairly, deceptively and unconscionably abuse[] and harass[] individuals to pay monies purportedly owed to Quest, but which are in fact not owed." Id. at ¶ 68. Plaintiffs further allege that "[a]ll Defendants acted jointly and severally as a common enterprise and association-in-fact controlled by Quest, are affiliated with the RICO enterprise alleged herein, and participated in furtherance of the scheme described herein to commit the unlawful acts and practices alleged herein." Id. at ¶ 42.

(Memorandum and Order, Docket Item 49, at 2-5.)

In support of the motion for class certification, Plaintiffs have submitted a declaration of

Dr. Thomas McGuire, Professor of Health and Economics in the Department of Health Care Policy

at Harvard Medical School. (McGuire Dec. at ¶ 1.) Dr. McGuire purports to be an expert in the

field of health care economics, and Plaintiffs retained Dr. McGuire to "review and evaluate the likelihood that alleged activities of the Defendants had a common impact on the Class and the [four] Subclasses[,] ... to evaluate the feasability of establishing a class-wide approach to analyzing the impact of Defendant's practices[,] ... to identify[, for those subclasses seeking damages,] the possible methods for measuring damages on a class wide basis[,] ... and to assess Quest's challenged billing practices in light of billing practices between managed care providers."   (Id. at ¶ 9.)  Dr. McGuire concluded that, "virtually all[] of Quest's agreements with insurance providers contain hold-harmless provisions, consumers covered by such agreements were harmed if Quest billed them for any amounts other than those provided on an Explanation of Benefits (EOB) or after receiving an insurance denial not based on a substantive adjudication of the claim form submitted by their insurance provider," therefore, "class-wide analysis is feasible and is the most efficient and effective way of analyzing and measuring damages."  (Id. at ¶¶ 14, 15.)

## A.  Facts Particular to CCS

Only one of the named Plaintiffs, Mark Smaller, asserts claims against CCS.  In Plaintiffs' Reply Brief in support of the motion, Mr. Smaller is identified as a member of the purported Class, as well as the Equitable Remedy and Debtor Subclasses.  Plaintiffs allege that CCS has engaged in "double billing (billing after full payment), over billing (billing above contract rate), and false billing."  (Plaintiffs' Reply Brief at 39; Amended Complaint at ¶¶ 24, 25).  Plaintiffs further contend that CCS, along with Quest and the remaining DCDs, acted as a member of the alleged RICO conspiracy. (Plaintiffs' Reply Brief at 40.)

CCS argues in its brief in opposition to the motion for class certification that the Class should not be certified against CCS because "the sole putative representative plaintiff, Mark

Smaller, does not possess the claim which he seeks to assert [on] behalf of the putative class."

(CCS Brief at 9.)

## III. DISCUSSION

### A.  General Requirements for Class Certification

Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") sets forth a two-pronged standard for class certification.  To obtain class action certification, Plaintiffs must establish that all four prerequisites of Rule 23(a) are met and must also qualify under the one of the three sections of Rule 23(b).  <u>Baby Neal, for and by Kanter v. Casey</u>, 43 F.3d 48, 55 (3d Cir. 1994).  Rule 23(a) requires a showing of: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. <u>See</u> Fed. R. Civ. P. 23(a).  To meet the requirements of Rule 23(b), of which (b)(2) and (b)(3) are applicable in this litigation, the Court must determine that:

> (2) the party opposing class certification has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

> or

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).  Plaintiffs are seeking certification of the general Class under Rule 23(b)(2) and of the defined Subclasses under Rule 23(b)(2) and (b)(3).[4]

Class certification is appropriate only "if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met."  In Re Hydrogen Peroxide, 552 F.3d 305, 309 (3d Cir. 2008) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)) (quotations omitted).  In deciding whether to certify a class, a Court must make a thorough examination of the factual and legal allegations involved in the complaint.  Newton v. Merrill Lynch, Pierce, Fenner & Smith, 259 F.3d 154, 166 (3d Cir. 2001) (citing Barnes v. Am. Tobacco Co., 161 F.3d 127, 140 (3d Cir. 1998).  "It may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."  Newton, 259 F.3d at 166 (quoting Gen. Tel Co. of Sw., 457 U.S. at 160).  "The decision to certify a class calls for findings by the court, not merely a threshold showing by a party, that each requirement of Rule 23 is met."  Hydrogen Peroxide, 552 F.3d at 306.  Indeed, class certification determinations require that a court "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits - including disputes touching on elements of the cause of action."  Id.  Even at the certification stage, a court may "consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take."  Id. at 8.  In determining what a trial will look like, a Court should make its own independent findings and need not afford plaintiff's claims any deference.  Id., n.18 (rejecting its previous statement in Chiang v. Veneman, 385 F.3d 256, 262 (3d Cir. 2004), that "in determining whether a class will be certified, the substantive allegations of the complaint must be taken as true.").

---

[4] Subclasses must separately satisfy the requirements of Rule 23 before they may be certified. See Fed. R. Civ. P. 23(c)(5).

**B.  Requirements for Certification Under Rule 23(b)(2)**

Plaintiffs seek certification of the proposed Class and the Refund Interest and Equitable

Remedy Subclasses pursuant to Rule 23(b)(2), which provides that an action may be maintained as

a class action where "the party opposing the class has acted or refused to act on grounds that apply

generally to the class, so that final injunctive relief or corresponding declaratory relief is

appropriate with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).  In Baby Neal v. Casey,

the Third Circuit stated that the requirements of Rule 23(b)(2) are "almost automatically satisfied

in actions primarily seeking injunctive relief. ... What is important is that the relief sought by the

named plaintiffs should benefit the entire class." 43 F.3d 48, 58-59 (3d Cir. 1994).  Unlike

certification pursuant to Rule 23(b)(3), there are no predominance or superiority requirements for

Rule 23(b)(2) certification.  However, courts in the Third Circuit have consistently held that Rule

23(b)(2) class claims must be "cohesive."  Barnes v. Am. Tobacco Co., 161 F.3d 127, 143 (3d Cir.

1998); Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 248 (3d Cir. 1975); In re Unisys Corp.

Retiree Medical Benefits Litig., 2003 WL 252106, at *3 (E.D.Pa. Feb. 4, 2003).

In Barnes v. American Tobacco Co., the Third Circuit explained that the cohesiveness

required for certification of 23(b)(3) classes, as articulated by the Supreme Court in Amchem

Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997) ("Amchem"), applies equally, if not more so,

to prospective 23(b)(2) classes.  Barnes, 161 F.3d at 142-43.  The Third Circuit noted two reasons

why courts must determine whether a proposed (b)(2) class is cohesive before certifying the class.

"First, unnamed members with valid individual claims are bound by the action without the

opportunity to withdraw and may be prejudiced by a negative judgment in the class action." Id. at

143 (citing Santiago v. City of Philadelphia, 72 F.R.D. 619, 628 (E.D.Pa.1976)).  "[T]he court

must ensure that significant individual issues do not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representatives's (sic) claims present different individual issues than the claims of the absent members present." Id. "Indeed, a(b)(2) class may require more cohesiveness than a(b)(3) class ... because in a (b)(2) action, unnamed members are bound by the action without the opportunity to opt out." Id. at 142-43. Second, "the suit could become unmanageable and little value would be gained in proceeding as a class action ... if significant individual issues were to arise consistently." Id. at 143 (quoting Santiago, 72 F.R.D. at 628).

Accordingly, to protect the interests of absent class members and to promote the efficient litigation of class actions, the Third Circuit has "committed to the district court the discretion to deny certification in Rule 23(b)(2) cases in the presence of 'disparate factual circumstances.'" Geraghty v. United States Parole Comm'n, 719 F.2d 1199, 1205-06 (3d Cir. 1983) (quoting Carter v. Butz, 479 F.2d 1084, 1089 (3d Cir. 1973)).  Therefore, "Rule 23(b)(2) may not be invoked in a case requiring 'significant individual liability or defense issues which would require separate hearings for each class member in order to establish defendants' liability.'" Arch v. American Tobacco Co., Inc., 175 F.R.D. 469, 482 (E.D.Pa. 1997) (quoting Santiago, 72 F.R.D. at 627).  In addition, variation among the laws of the underlying jurisdictions creates an equally compelling reason to deny certification.  Courts routinely refuse to certify proposed classes under 23(b)(2) where there is significant variation in the statutory and common law elements of the claims alleged by the class.  See, e.g., Lemon v. Int'l Union of Operating Engineers, 216 F.3d 577, 580 (7th Cir. 2000); Sanders v. Johnson & Johnson, Inc., 2006 WL 1541033, at *10 (D.N.J. June 2, 2006); In re Propulsid Prod. Liab. Litig., 208 F.R.D. 133, 147 (E.D. La. 2003); Clay v. American Tobacco Co.,

188 F.R.D. 483, 495 (D.C. Ill. 1999).

## C.  Plaintiffs' Arguments in Support of Class Certification

Plaintiffs bring eight causes of action on behalf of the proposed Class under federal and state law.  Specifically, their claims consist of alleged violations of: (1) RICO; (2) the FDCPA; (3) ERISA; (4) the NJCFA; (5) the consumer protection laws of states other than New Jersey; (6) common law breach of contract; (7) unjust enrichment; and (8) common law fraud.  (Amended Complaint ¶¶ 142-202.)  Plaintiffs seek declaratory and injunctive relief barring the following nine (9) billing practices:

(1)    Billing Class members prior to receiving a response from their participating insurance providers or TPAs;

(2)    Billing Class members based upon an insurance denial indicating incorrect patient date of birth, gender or relationship of the patient to the insured;

(3)    Billing Class members when the insurance provider or TPA responded to only part of the claim made by Quest;

(4)    Billing Class members based upon an insurance denial indicating incorrect Insurance/Policy ID or Group Number for failure to recognize the insured;

(5)    Billing Class members when Quest used the wrong address for the insurance provider or TPA;

(6)    Billing Class members upon an insurance denial indicating the wrong employer name for the patient;

(7)    Billing Class members upon an insurance denial indicating that the patient has participating primary insurance;

(8)    Billing Class members upon an insurance denial indicating that a diagnosis or CPT code is required; and

(9)    Billing Medicare Part B participants or beneficiaries when Quest does not have both an ABN signed by the patient [sic] an EOB from Medicare or its administrator assigning patient responsibility.

-12-

(Plaintiffs' Brief at 26-27.)  Underlying each of Plaintiffs' claims is the allegation that the Defendants have acted in contravention of the contractual hold harmless provisions contained in prospective plaintiffs' insurance plans and of the statutory hold harmless rules imposed by Medicare Part B and the laws of various jurisdictions. (Plaintiffs' Brief at 2-3.)

Plaintiffs assert five distinct arguments in support of certifying the proposed Class under Rule 23(b)(2).  First, they argue that certification is appropriate because they are primarily seeking equitable relief.[5]  Because the Court reaches its decision on alternative grounds, it expressly declines to address the question of whether Plaintiffs primarily seek equitable relief with respect to the Class and the Refund Interest and Equitable Remedy Subclasses.  Secondly, Plaintiffs insist that the hold harmless laws and contractual provisions governing Defendants' conduct are substantially uniform, making classwide liability determinations manageable.  Third, they suggest that the Court should follow the lead of the New York Attorney General and various courts by finding unlawful the billing practices allegedly employed by Quest and the DCDs.  Fourth, Plaintiffs claim that the Class claims are amenable to classwide proof of damages, making certification appropriate.  And finally, Plaintiffs aver that class cohesiveness is unnecessary under Rule 23(b)(2) because they have offered evidence that Quest and the DCDs have acted on grounds generally applicable to the Class as a whole.

Defendants dispute Plaintiffs' arguments, contending that class certification is inappropriate because there are significant factual and legal variations among the claims of prospective Class members.  Defendants contend that these variations require individual inquiry by

---

[5] When class certification is sought under Rule 23(b)(2), injunctive or declaratory relief rather than monetary damages must be the primary relief sought.  See Barabin v. Aramark Corp., 2003 WL 355417, at *2 (3d Cir. Jan. 24, 2004).

the Court in order to determine their liability.  (<u>See</u> Declaration of Dr. Zachary Dyckman

("Dyckman Dec.") ¶ 5 ("[I]t is simply not feasible to determine causation and injury, and hence

liability, on a class-wide basis.").)  Because a court would have to engage in a transaction-by-

transaction analysis of the alleged billing improprieties, Defendants conclude that the Class lacks

the requisite cohesiveness and, therefore, certification under Rule 23(b)(2) should be denied.

### 1. Uniformity Among Hold Harmless Provisions and Facts Underlying Each Claim

Plaintiffs claim that any factual differences among putative Class members are minor and

easily managed through routine class action litigation strategies.  They assert that the statutory and

contractual hold harmless provisions which form the basis for their allegations are substantially

similar.   In addition, they claim that the factual circumstances that lead to each prospective

Plaintiff receiving a bill from Quest or the DCDs are not so different as to require individual

analysis.  Therefore, Plaintiffs conclude that the Court can easily determine liability as to the entire

Class by examining only a small number of Class plaintiffs' claims.

Plaintiffs suggest that Defendants have routinely violated the hold harmless laws of various

jurisdictions.  They claim that 46 states and the District of Columbia have enacted similar hold

harmless laws which "yield [] tremendous and uniform protection" and "provide [e]xtensive

[p]rotections to [i]nsured Class and Sub-class [m]embers."  (Plaintiffs' Reply Brief at 22-23.)

Therefore, if Quest was employing certain billing practices nationwide, Plaintiffs insist that those

practices would uniformly violate the hold harmless regulations imposed by state law.   As

evidence of uniformity among these statutes, they have submitted an analysis of state statutes

governing medical billing in which they list the applicable hold harmless laws of each state.

(Declaration of Joseph Tusa ("Tusa Dec.), Ex. 26, "Summary of Laws and Regulations Prohibiting

Balance Billing".)

Based on a review of the applicable statutes, the Court concludes that Plaintiffs have overstated the similarity among state hold harmless provisions. Plaintiffs claim that the statutory hold harmless provisions cited by Mr. Tusa "prohibit[] direct patient billing when a provider like Quest is advised that the patient is insured." (Plaintiffs' Reply Brief at 22). Yet, a cursory examination by the Court indicates that several of these statutes do not even apply to laboratory service providers like Quest. See ALA. CODE 27-21A-3(b)(4) (2008); GA. COMP. R. & REGS. 120-2-75-.06(5)(a),(b) (2008); MINN. STAT. § 62D.123(1) (2008). Defendants claim as many as 16 of the 47 statutory provisions cited by Plaintiffs would not govern Quest's billing practices. (Supplemental Declaration of Diane Bettino ("Supp. Bettino Dec.") ¶ 31.)[6] In addition, Plaintiffs have defined the Class to include members of both HMOs and insurance plans with whom Quest has a participating provider agreement, yet many of the state hold harmless laws apply only to HMO plans. See, e.g., D.C. CODE §§ 31-3412(d)(1)-(3) (2008); MINN. STAT. § 62D.123(1) (2008). Plaintiffs presumably have convinced themselves that the 47 state hold harmless regulations are substantially similar, and therefore, have provided no substantive analysis of the variations among these regulations. The "Summary of Laws and Regulations Prohibiting Balance

_____

[6] In an October 8, 2008 letter to the Court from Plaintiffs' counsel, Lisa J. Rodriguez, Plaintiffs object to the Court's consideration of the Supplemental Declaration of Diane Bettino submitted by Quest on the grounds that supplemental submissions were expressly limited by the Court to five pages in length. The Supplemental Bettino Declaration contains no more information regarding statutory and contractual hold harmless provisions than the Court could and did glean through its own analysis. Moreover, Plaintiffs ignore the fact that it is their burden to establish all elements required for certification. See Baby Neal, 43 F.3d at 55. The submission which Plaintiffs made in support of their contention that the statutory provisions were essentially uniform was perfunctory at best, with no analysis of the relevant provisions. Plaintiffs were certainly free to request an opportunity to rebut the concededly unsolicited submission if they chose to – a request which would have been granted.

Billing"(Tusa Dec., Ex. 26), which Plaintiffs claim to be an "analysis" of the state hold harmless

statutes appears to be nothing more than a copy-and-paste compilation of the relevant provisions of

state law.   Quest, on the other hand, has provided the Court with a comprehensive analysis of the

state hold harmless laws which demonstrates that these provisions vary on a number of issues of

import to this litigation. (See Supp. Bettino. Dec. ¶ 31.)

     Likewise, Plaintiffs insist that the hold harmless provisions contained in the applicable

payer agreements and health plans are substantially similar.  Plaintiffs claim to "have demonstrated

that hold-harmless provisions in Quest's insurance provider and TPA agreements provide near-

uniform protections for patients against Quest's billing policies[,]" that the contractual provisions

"are substantially uniform" and that the differences among the payer contracts are "mere[ly]

stylistic," and immaterial.  (Plaintiffs' Reply Brief at 73.)  Where the provisions are nearly

identical, evidence offered to prove the violation of the terms of one agreement would presumably

suffice as proof that Quest and the DCDs violated almost all of the payer agreements.

     The Court finds that Plaintiffs' conclusions regarding the uniformity of the contractual hold

harmless provisions are not supported by the evidence.  The differences among the contractual

provisions are anything but stylistic.  For example, among the nine billing practices Plaintiffs seek

to enjoin is Quest's practice of billing patients prior to receiving a response from insurance

providers or TPAs.  (Plaintiffs' Brief at 26.)  While some plans flatly prohibit Quest from billing a

patient after no response is received from the payer, others expressly permit Quest to bill a patient

under certain circumstances.  (Declaration of Paul Bond ("Bond Dec.") ¶ 15, Ex. 6.)  Even within a

single health plan containing a standard hold harmless provision, numerous sub-plans permit

patient billing after no response is received by Quest.  (Second Declaration of Diane Bettino

("Bettino II Dec."), Ex. 8.)  In addition, among those plans that do permit patient billing when an insurer fails to respond to a claim, the time Quest must wait for a response from the payer before billing a patient varies from contract to contract. (Dyckman Dec. ¶ 69.)  Another practice of which Plaintiffs seek the cessation is billing patients based upon denials indicating incorrect patient information.  (Plaintiffs Brief at 26.)  Yet, some plans expressly permit Quest to bill a patient if he fails to adequately identify himself.  (Bond Dec. ¶ 25.)  Moreover, contracts vary with respect to whether Quest can bill a patient when the patient's insurer only responds to a portion of the claim. (Supp. Bettino. Dec. ¶ 19.) If Quest receives only a partial response to a claim from an insurer, some plans permit direct patient billing for the unanswered portion of the claim while other plans strictly forbid patient billing under these circumstances.  (Id.)  Notably, this too is among the billing practices which Plaintiffs are seeking to enjoin.  (Plaintiffs' Brief at 27.)

Compounding the differences among the hold harmless provisions is the fact that no two Plaintiffs share the same factual basis for asserting their claims.  For instance, Ms. Agostino complains about being billed initially for the usual charge and then for any unpaid balance even though Quest had no obligation to discount its services where Ms. Agostino's payer had no participating provider agreement with Quest.  Mr. Breuer claims that he should not have billed for any amount even though his insurer issued an EOB that indicated his deductible had not been met. Ms. Cassese claims that she was billed in violation of Medicare Part B's hold harmless provisions. Ms. Cruthers claims that she should not have received a bill from Quest because she had primary and secondary insurance coverage.  Mr. and Mrs. Grandalski complain that Quest didn't properly gather their address information at the testing facility, which resulted in Mrs. Grandalski being billed for an amount that was not owed.  Ms. Haley believes she should not have been billed by

Quest even though her claim was denied because her insurance information was outdated or incorrect. The factual permutations among the named Plaintiffs go on-and-on, with each Class member presenting a new and different factual basis for claiming that he is entitled to relief based on the illegal billing practices employed by Quest and the DCDs.

Despite Plaintiffs' cursory evaluation of the state hold harmless laws and contractual hold harmless provisions, in which they conclude that all are substantially similar, the Court's evaluation discloses that the differences are more than "merely stylistic" – they are marked and material. With regard to the contractual provisions, the situation is even more critical because, despite the fact that potentially hundreds if not thousands of separate third party payer contracts may be at issue, Plaintiffs have identified and presented to the Court little more than a handful of supposedly representative agreements. Thus, the potential for substantial variation is, if anything, greater than the previous discussion discloses. Similarly, the considerable variation among the factual circumstances underlying the Plaintiffs' claims is all-the-more problematic when the Court considers the fact that, according to Plaintiffs, the Class may be comprised of more than one million consumers. As a consequence, the important legal and factual differences undercut one of the principal arguments made by Plaintiffs in support of certifying the Class – that the Class claims are amenable to classwide proof of the Defendants' liability.

**2. Decisions of the New York Attorney General and Courts of Various Jurisdictions**

Plaintiffs contend that where there are factual differences among class members, certification should not be denied because these variations are minor and perfectly manageable. Plaintiffs cite a number of cases, including Grider v. Keystone Health Plan Central, Inc., 2006 WL 3825178 (E.D.Pa. Dec. 20, 2006), and Wachtel v. Health Net, Inc., No. 2:01-cv-04183 (D.N.J.

-18-

Sept. 28, 2006), for the proposition that class certification is routinely granted in medical billing

cases because "[i]n the big business of medical billing, courts recognize the need for class actions

to level the playing field and enable those victimized to obtain relief." (Plaintiffs' Brief at 15.)

Plaintiffs suggest that the nature of the claims involved and the sufficiency of the evidence

produced during discovery is more than enough to support class certification in this case, especially

in light of the fact that the Court must accept the allegations in the Complaint as true in

determining whether to certify the Class.  Furthermore, Plaintiffs assert that Quest's liability is

easily determinable by the Court because "Quest's policies are routinely found unlawful."

(Plaintiff's Reply Brief at 3.)  In their briefs and at oral argument, Plaintiffs repeatedly cite the

2003 settlement between Quest and the New York State Attorney General in In re Quest

Diagnostics, Inc. (the "Assurance of Discontinuance" or "AOD") and a Florida action, Friedland v.

Quest Diagnostics, Inc., Case No. MC-01-8410 RB (15th Jud. Cir., Palm Beach Co., Nov. 4, 2005,

(hereinafter the "Friedland action"),  as proof that Plaintiffs' claims are amenable to classwide

treatment.  Based on these other actions, Plaintiffs seemingly contend that the Court need not

engage itself in individualized factfinding to determine liability because Quest's billing practices

have been found to be unlawful per se.  (Plaintiffs' Reply Brief at 3.)

        Any suggestion that the Court should undertake its certification analysis differently in

medical billing disputes is misguided.  The Third Circuit recently stated in In re Hydrogen

Peroxide that a court should not "relax its certification analysis, or presume a requirement for

certification is met, merely because a plaintiff's claims fall within" an oft-certified category of

cases. 552 F.3d at 322.  The mere fact that this litigation involves medical billing does not change

the fact that the Court must undertake a rigorous analysis to determine if Plaintiffs have met each

and every requirement of Rule 23.  In addition, contrary to Plaintiffs' assertions, a court need not accept plaintiffs' allegations as true in deciding whether to certify a class.  Id. at *8, n15.  Rather, a court is empowered to consider the merits of the class claims and to make whatever factual determinations are necessary to render a definitive and factually reliable class certification decision. Id.

Plaintiffs advance the additional argument that certification is appropriate because the billing practices at issue in this litigation have previously been found unlawful.  This Court is keenly aware of the long and distinguished record of the former Attorney General for the State of New York in vigorously prosecuting consumer fraud actions.  However, the Court is under no obligation to afford any precedential value to the Attorney General's findings regarding the lawfulness of Quest's billing practices.  This is particularly true in this case because the New York AOD is limited to claims alleging violations of New York law and involves no judicial determinations whatsoever.  Likewise, the Friedland action cited by Plaintiffs is irrelevant because the case involved a single plaintiff who alleged that Quest violated the provisions of a single contract and who sought relief under a single state's laws.  Furthermore, the case is distinguishable because the court's summary judgment order was later vacated.  Therefore, Plaintiffs' contention that their claims are susceptible of classwide treatment simply because Quest's billing practices have been found to be illegal by the New York Attorney General and a judge in Florida does not hold water.

### 3.  Classwide Proof of Damages

Though Plaintiffs contend they are primarily seeking injunctive and declaratory relief on behalf of the Class, they also seek damages incidental to the requested equitable relief.  To

persuade the Court that calculating money damages will not create manageability problems should the Court grant certification and provide for such relief, Plaintiffs proffer a report by their medical billing expert, Dr. Thomas McGuire.  Dr. McGuire undertook an extensive analysis of the billing practices at issue in this case and their impact on members of the proposed Class and Subclasses. Based on his examination, he concluded that "virtually all[] of Quest's agreements with insurance providers contain hold-harmless provisions, consumers covered by such agreements were harmed if Quest billed them for any amounts other than those provided on an Explanation of Benefits (EOB) or after receiving an insurance denial not based on a substantive adjudication of the claim form submitted by their insurance provider," therefore, "class-wide analysis is feasible and is the most efficient and effective way of analyzing and measuring damages." (McGuire Dec. ¶¶ 14, 15.)

Because the Court reaches a certification decision on other grounds, it expressly declines to determine if money damages are, as Dr. McGuire concludes, easily determinable on a classwide basis. (Id.)[7]  The Court takes note, however, of what Dr. McGuire's report does not say.  As the Court has previously noted, it has strong concerns about the ability of Plaintiffs to prove liability on a classwide basis.  While he suggests that money damages are amenable to classwide proof, Dr. McGuire is silent as to Plaintiffs' ability to establish liability through classwide proof.  Indeed, underlying Dr. McGuire's entire report is the very assumption that the Plaintiffs' allegations

---

[7] Quest's billing expert, Dr. Zachary Dyckman, criticizes the methodology by which Dr. McGuire proposes to calculate money damages on a classwide basis.  (Dyckman Dec ¶¶ 91-106.) Specifically, he states that Dr. McGuire "oversimplifies the task of class-wide damage estimation by assuming that QDI uses 'standardized' billing and record keeping practices throughout the company, and that billing data that are necessary to calculate damages on a class-wide basis are available."  (Id. ¶ 104.)  Because the Court reaches its class certification decision on other grounds, the Court does not resolve the dispute between the parties' experts with respect to the viability of proving money damages on a classwide basis.

regarding Defendants' liability are true. (McGuire Dec. ¶ 13.)  He assumes that "all, or substantially all, of the contracts between Quest and insurers include hold harmless language protecting patient billing rights." (Id.)  Further, he assumes that Quest and the DCDs routinely violate the contractual hold harmless provisions contained in payer agreements by engaging in the nine billing practices Plaintiffs seek to enjoin.  Viewed through this lens, Dr. McGuire's report does nothing to assuage the Court of its concerns about proving liability on a classwide basis in view of the significant factual variations among the Plaintiffs and the differences among the applicable hold harmless provisions.  Those concerns remain.

### 4.  Must the Class be Cohesive?

Plaintiffs insist that the questions raised by Quest regarding the cohesiveness of the proposed Class are specious because "[c]ohesion is [n]ot a [s]eparate Rule 23(b)(2) [r]equirement." (Plaintiffs' Reply Brief at 40.)  They maintain that a lack of cohesiveness among the Class claims should not stand in the way of class certification because they have clearly demonstrated that Quest and the DCDs have acted on grounds generally applicable to the Class as a whole.

Plaintiffs discussion of cohesiveness is confined to two short paragraphs in their Reply Brief.  (Plaintiffs' Reply Brief at 40-41.)  Plaintiffs claim that district courts applying the Third Circuit's decision in Barnes have rejected the argument that classes lacking in cohesiveness should not be certified under Rule 23(b)(2). (Id.)  Yet, Plaintiffs cite only one case, Hohider v. United Parcel Service, 243 F.R.D. 147 (W.D.Pa. 2007), in support of this assertion.  Hohider involved allegations by employees of UPS that the company's policies with respect to employees who attempted to return to work after medical absences violated the Americans with Disabilities Act. UPS opposed 23(b)(2) class certification on the grounds that the factual determinations underlying

requests for job-related accommodations and employment retaliation claims are both highly

individualized.  Hohider, 243 F.R.D. at 231 (summarizing the Hohider Defendants' arguments).

Citing the Third Circuit's discussion of cohesiveness in Barnes, UPS argued that the proposed

class was not sufficiently cohesive to warrant certification.  Id. at 232.  The district court addressed

Defendants argument by finding that:

> [t]he discussion of cohesiveness in Barnes, however, does not create a separate
> requirement for Rule 23(b)(2) certification, but rather flushes out the meaning of
> grounds generally applicable and the appropriateness of Rule 23(b)(2)
> certification in the face of multiple individual issues of proof that control
> adjudication of a claim.  Issues related to cohesiveness, therefore, overlap with
> issues related to commonality, typicality, and whether the party opposing the
> class acted or refused to act on grounds generally applicable to the class.

Id. at 232-233 (citations omitted).  Having previously determined that Plaintiffs demonstrated

commonality, typicality and that UPS treated plaintiffs on grounds generally applicable to the class,

the court concluded that a cohesiveness analysis would be superfluous.  Id. at 233.  Based on this,

Plaintiffs suggest that a lack of cohesiveness among prospective members of a proposed class

should not bar certification under Rule 23(b)(2).  (Plaintiffs' Reply Brief at 40-41.)

In the Court's view, Plaintiffs reliance upon Hohider is misplaced.  Plaintiffs make only

passing reference to the cohesiveness of the proposed Class, apparently concluding that class

cohesiveness is merely incidental to a finding that Quest and the DCDs have acted on grounds

generally applicable to the Class.  In reality, a determination that a defendant has acted on grounds

generally applicable to the class presumes that the proposed class is cohesive.  See Wetzel, 508

F.2d at 248 ("By its very nature, a (b)(2) class must be cohesive as to those claims tried in the class

action.").  Class cohesiveness, therefore, is an essential element of 23(b)(2) class certification.  In

fact, "when a court determines whether the defendant has acted or refused to act on grounds

-23-

generally applicable to the class, the court is perforce examining whether the class is cohesive in nature." Barnes v. American Tobacco Co., 176 F.R.D. 479, 488 (E.D. Pa. 1997), aff'd, 161 F.3d 127 (3d Cir. 1998). Read in this context, the Hohider court's statement that the Third Circuit's discussion of cohesiveness in Barnes "flushes out the meaning of grounds generally applicable" breaks no new ground. Hohider, 243 F.R.D. at 232. Rather, it is merely another way of stating that a class must be cohesive in order for a court to find that a defendant has acted on grounds generally applicable to the proposed class. Since the Hohider court concluded that UPS acted on grounds generally applicable to the proposed class, the court implicitly concluded that the proposed class was cohesive. Were the Court to read Hohider as Plaintiffs have read it – to hold that a court need not be concerned with a lack of cohesiveness among putative 23(b)(2) class members – the decision would stand in stark conflict to a long line of cases in the Third Circuit which have found that a proposed 23(b)(2) class must be cohesive. See Barnes 161 F.3d at 143 ("a 23(b)(2) class must be cohesive"); Wetzel, 508 F.2d at 248 ("a (b)(2) class must be cohesive as to those claims tried in the class action"); Sanders, 2006 WL 1541033, at *9 (recognizing that "cohesiveness requirement" applies to proposed 23(b)(2) class); In re Managerial, Professional and Technical Employees 2006 WL 38937, at *6 (D.N.J. Jan. 5, 2006) (same); Paige v. Phila. Housing Authority, 2003 WL 22135961, at *4 n.2 (E.D. Pa. Aug. 18, 2003) (same); See also Shook v. Board of County Comm'rs of the County of El Paso, 543 F.3d 597, 604 (10th Cir. 2008) ("Rule 23(b)(2) demands a certain cohesiveness among class members with respect to their injuries"); Maldonado v. Ochsner Clinic Found., 493 F.3d 521, 524 (5th Cir. 2007) (denying certification of proposed 23(b)(2) class where "individualized issues overwhelm class cohesiveness"); In re St. Jude Medical, Inc., 425 F.3d 1116, 1121-22 (8th Cir. 2005) (23(b)(2) class claims must be cohesive).

**D.  Analysis of Plaintiffs' Federal Claims**

The Court examines the underlying causes of action to determine whether the proposed

Class meets the certification requirements of Rule 23.  Plaintiffs assert federal claims seeking

injunctive relief on behalf of the Class for violations of: (1) RICO; (2) the FDCPA; and (3) ERISA.

(Amended Complaint ¶¶ 142-72.)

**(1)  Plaintiffs' RICO Claims Require Individual Proof of Scienter**

Plaintiffs' RICO claims are based on the allegation that Quest and the DCDs conspired to

engage in a series of mail and wire frauds in violation of 18 U.S.C.A. § 1341 and § 1343

respectively.  The racketeering activities and frauds alleged are:

> (a) falsely representing that Plaintiffs and Class members owe money to Quest for
> laboratory testing; (b) falsely representing the amount of money owed to Quest for
> laboratory testing; (c) falsely stating that Plaintiffs' or Class members' insurance
> companies had denied claims to pay Quest for laboratory testing; (d) falsely stating
> state (sic) Plaintiffs or Class members owed money to Quest over and above the
> amount paid by their insurance companies; (e) falsely representing the price of
> laboratory testing procedures that Quest was permitted to charge insured Plaintiffs
> and Class members; (f) falsely stating that Quest had not been fully paid all amounts
> legally due for laboratory testing; (g) falsely stating that Quest or the Debt Collector
> Defendants were entitled to bill or collect money from Plaintiffs or Class members
> for laboratory testing; and (h) falsely threatening to report Plaintiffs' or Class
> members' non-payment of bills for laboratory testing to credit reporting agencies.

(Complaint ¶147.)  Defendants contend that Plaintiffs' RICO claim should not be certified because

the claim, by its very nature, would require "each putative class member ... to show Defendants'

actual knowledge that the billed amount was not correct, or reckless disregard about the same.  The

mere fact that a mailed or wired communication contains a factual misrepresentation does not, by

itself, constitute wire fraud."  (Defendant SSB's Opposition Brief at 11-12.)

To successfully prosecute a RICO claim, it is well settled that a plaintiff must make a

showing regarding scienter.  See United States v. Boyer, 694 F.2d 58, 60 (3d Cir.1982) (specific

intent to deceive requirement of 18 U.S.C. § 1341 may be inferred from reckless misstatement);

United States v. Pearlstein, 576 F.2d 531, 537 (3d Cir.1978) (in prosecution for mail fraud

government must prove willful participation in fraudulent scheme with knowledge of its falsity);

United States v. Klein, 515 F.2d 751, 754 (3d Cir.1975) (mail fraud statute requires proof of

specific intent to defraud).  A plaintiff must show that the defendant had the specific intent to

defraud, which can be shown through actual knowledge or "may be found from a material

misstatement of fact made with reckless disregard for the truth." U.S. v. Coyle, 63 F.3d 1239, 1243

(3d Cir. 1995) (quoting U.S. v. Hannigan, 27 F.3d 890, 892 n.1 (3d Cir. 1994)).

    A court may deny certification where proof of an essential element of a cause of action

requires individualized inquiry into the facts underlying the plaintiff's claim. See Newton, 259

F.3d at 172; In re Unisys Retiree Med. Benefits Litig., 2003 WL 252106, at *4 (E.D. Pa. Feb. 4,

2003). To succeed with their RICO claims, the putative Class members would have to show that

Quest and the DCDs knew or should have known that each of the billed amounts at issue was

incorrect.  The mere allegation that a Plaintiff received a bill for an amount above that which is

allowable under the relevant hold harmless provisions is not sufficient to prove scienter.  Billing

mistakes happen for any number of reasons, some of which are not attributable to malfeasance on

the part of the Defendants.  Indeed, an analysis by Quest's medical billing expert of 51 of the

patient billing disputes at issue concluded that, where inappropriate billing was alleged, errors

causing patient bills to issue could have been attributable to Quest, but also to patients, referring

physicians, payers or to a combination of errors by any multiple of the parties involved.  (Dyckman

Report ¶ 52.)[8]   As an additional matter, implicit in Plaintiffs' RICO claim is the presumption that

the amounts billed were incorrect.  Determining whether the Plaintiffs were billed amounts in

excess of amounts actually owing is disputed and, as the Court has noted, requires an

individualized inquiry into the facts and applicable contracts.  Moreover, after nearly three years of

discovery, the Plaintiffs have not introduced any evidence to suggest that classwide proof of

scienter exists.  Rather, any proof of scienter will only surface pursuant to patient-by-patient and

transaction-by-transaction analyses rather than from evidence applicable to the entire Class or

Subclasses.   Therefore, because the Court has previously determined that proof that Quest and the

DCDs billed in excess of permissible amounts requires individualized inquiry, it follows that proof

that the Defendants knew they were billing in excess of allowable amounts also requires an

individualized analysis of each prospective plaintiff's RICO claim.

Plaintiffs cite Grider v. Keystone Health Plan Central, Inc., as proof that RICO claims can

be certified under Rule 23. 2006 WL 3825178 (E.D. Pa. Dec. 20, 2006) (certifying RICO claims

under Rule 23(b)(3)).  The Court willingly admits that there are cases in which RICO claims may

be certified.  However, this is not one of those cases.  The decision in Grider is readily

distinguishable from this case because the district court in Grider determined that classwide proof

of liability could be established for the plaintiffs' RICO claims.  Id. at *28.  The court found that

_____

[8] Plaintiffs contend that the Court should not credit Dr. Dyckman's Report because "[h]e purports to make 'expert' opinions on causation, injury, and liability that clearly invade the province of this Court."  (Plaintiffs' Reply Brief at 54.)  On the contrary, the Dyckman Report does not offer opinions on the ultimate question of the Defendants' liability.  Rather, just as Plaintiffs proffer the Declaration of Dr. Thomas McGuire to show that damages may be determined on a classwide basis, Dr. Dyckman's Report addresses another key issue before the Court – whether liability can be proven with evidence common to the Class.  Therefore, nothing bars the Court from weighing his opinion.

"plaintiffs have come forward with evidence that they have been injured; a member-by-member

analysis is not required for the determination of liability..."  Id.  Here, injury and questions of

liability require a transaction-by-transaction analysis of the claims.  Therefore, Plaintiffs' RICO

claims are simply not amenable to classwide proof of liability, making class treatment

inappropriate.[9]  See Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 189 (3d Cir. 2001) (denying

certification of RICO claims under (b)(3) because proof of scienter required individual treatment).

### (2) Plaintiffs' ERISA Claims Require Individualized Proof That Defendants Breached the Terms of QDI-Payer Agreements and Health Plan Contracts

Additionally, Plaintiffs assert violations of ERISA predicated on Defendants' breach of the

terms of Quest's contracts with the benefit plans covering certain prospective Plaintiffs.

(Complaint ¶¶ 165-72.)  Plaintiffs allege that Quest and the DCDs have violated the hold harmless

provisions of various ERISA-covered benefit plans by engaging in balance billing, double billing,

over billing and false billing.  Pursuant to 29 U.S.C. §1132(a), Plaintiffs are seeking equitable

relief, including injunctive relief to enforce the terms of the agreements between Quest and the

Plans, rescission, imposition of constructive trusts, restitution, disgorgement, declaratory relief, and

other appropriate remedies.  (Id. ¶172.)

As evidence that ERISA claims are generally susceptible to class treatment, Plaintiffs cite

Mulder v. PCS Health Sys., 216 F.R.D. 307 (D.N.J. 2003), a case in which the court certified the

ERISA claims of a class of health plan beneficiaries against a pharmacy benefit manager.  The

Court reiterates that a plaintiff's citation to an arguably similar case in which certification was

---

[9]  Plaintiffs also cite Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004), for their argument that their RICO claims should be certified.  Grider and Klay share one dispositive trait missing from this case – proof of liability in those cases did not require an inquiry into the plaintiffs' individual circumstances.

granted does not ease the burden on a plaintiff to demonstrate that the requirements of Rule 23 have been met.  Hydrogen Peroxide, 552 F.3d at 322.  A rigorous analysis of a proposed class' compliance with the requirements of Rule 32 is required in every case.  Regardless, Mulder is clearly distinguishable because, in that case, "the Complaint focuse[d] on enjoining the[] allegedly illegal practices and on restoring money to plans based on plan-wide arrangements, rather than to individuals based on individualized wrongs."  Mulder, 216 F.R.D. at 319.  Here, Plaintiffs are seeking relief based on the alleged violation of the hold harmless provisions of the applicable individual insurance plans and payer contracts.  Because these agreements vary from contract to contract and plaintiff to plaintiff, an analysis like this would require the Court to delve into each transaction to determine whether the Defendants violated a hold harmless provision by overbilling, false billing, double billing or balance billing.

Where ERISA claims require individual proof as to each prospective class members, a district court within this Circuit has concluded that certification under 23(b)(2) is inappropriate.  Unisys, 2003 WL 252106, at *4 (decertifying Plaintiffs' class for ERISA claims where "each of the[] elements will require individualized proof ... [T]hus [the class] lacks the cohesiveness required to be litigated as a class action under Rule 23(b)(2).").  A cursory glance at the Complaint evinces that every alleged breach by the Defendants of an ERISA covered plan is based on an entirely unique and individualized set of facts for which no classwide proof would be sufficient.  In determining whether to certify Plaintiffs' ERISA claims, the Court is guided by the thoughtful analysis of certifying a (b)(2) class for ERISA claims contained in In re Managed Care Litig., 209 F.R.D. 678 (S.D. Fla. 2002), aff'd in part, rev'd in part on other grounds and remanded, Klay v. Humana 382 F.3d 1241 (11th Cir. 2004).  In that case, Plaintiffs sought certification under Rule

23(b)(2) of a proposed class of 145 million patients/subscribers of numerous HMOs who alleged

ERISA violations based on the HMOs' purported uniform scheme of misrepresentation and fraud

with respect to their coverage under each plan. The district court refused to certify the proposed

class under 23(b)(2) because plaintiffs failed to meet their "burden of proving that [d]efendants

acted on grounds 'generally applicable to the class as a whole' as the caselaw has interpreted that

phrase." Managed Care, 209 F.R.D. at 686.  Finding that there were material differences among

the various health plan documents and the representations made to plaintiffs, the Court ruled that

"[p]laintiffs' claims turn on the [d]efendants individualized dealings with each [p]laintiff ...

[thereby] render[ing] the ERISA class unsuitable for class treatment under Rule 23(b)(2)." Id.

       In this case, there are significant differences among the hold harmless provisions contained

in the patient health plans and the relevant payer contracts.  Classwide proof will not suffice to

determine whether the hold harmless provisions of each contract were breached.  Rather, the

factfinder ultimately must consider the provisions of the applicable payer agreementt or insurance

plan and apply the facts surrounding each billing transaction to determine whether the Defendants

violated the terms of the contract by billing the patient.  As a result, the Class lacks cohesiveness

with respect to the claims for violations of ERISA   Therefore, certification under 23(b)(2) is

denied as to these claims.

### (3) Plaintiffs May Not Seek Equitable Relief Under the FDCPA

       Despite Plaintiffs' protestations otherwise, the Court cannot certify the proposed 23(b)(2)

Class for claims grounded in alleged violations of the Fair Debt Collection Practices Act, 15

U.S.C. §§ 1692, et seq.  Third Circuit precedent is clear that injunctive or declaratory relief is not

available to private plaintiffs pursuing claims under the FDCPA. See Weiss v. Regal Collections,

385 F.3d 337, 342 (3d Cir. 2004) ("injunctive and declaratory relief are not available to litigants

acting in an individual capacity under the FDCPA"); See also Beck v. Maximus, 457 F.3d 291, 301

(3d Cir. 2006) (citing Weiss);  Smith v. Lyons, Doughty & Veldhuius, P.C., 2008 WL 2885887, at

*9 (D.N.J. Jul 23, 2008) (dismissing class claim because injunctive and declaratory relief is not

available under the FDCPA).  Therefore, the Court denies certification of the proposed Class with

respect to FDCPA claims.[10]

## E.  Plaintiffs State Law Claims Cannot Be Certified

In addition to their federal claims, Plaintiffs assert state law claims on behalf of the

proposed Class for violations of the New Jersey Consumer Fraud Act (Count IV) or of the various

applicable state consumer fraud statutes (Count V), and for common law breach of contract (Count

VI), unjust enrichment (Count VII) and common law fraud (VIII).  (Amended Complaint ¶¶ 173-

202.)  The Court may deny certification when the laws of the 51 underlying jurisdictions vary to

the extent that class treatment would become impracticable. See Lemon, 216 F.3d at 580

("[s]ignificant variations in applicable state laws ... preclude any finding that the interests of the

class members are cohesive and homogenous."); Sanders, 2006 WL 1541033, at *10 ("Class

members would be subject to different state laws governing the numerous claims, defenses and

forms of relief in this case, and Plaintiff has failed to demonstrate that those difference (sic) can be

managed in a practical and efficient manner.").  In order to ascertain whether Plaintiffs' state law

claims are sufficiently cohesive to permit class certification, the Court must first determine which

laws to apply to each claim.

---

[10] The Court likewise denies certification of FDCPA claims asserted by members of the
Refund Interest and Equitable Remedy Subclasses.

**(1) Choice of Law Analysis**

Plaintiffs contend that New Jersey choice of law rules demand that New Jersey law apply to the state law claims of the Class and Subclasses.  (Plaintiffs' Brief at 38-40.)  Plaintiffs claim that the application of New Jersey law is warranted, indeed is required, because Quest's principal place of business and executive offices are located in New Jersey and the alleged illegal billing practices and policies emanated from there.  Additionally, Plaintiffs assert that the application of New Jersey law is proper because Quest's contracts with the DCDs contain choice of law clauses mandating the application of New Jersey law.  Finally, with respect to Plaintiffs' consumer fraud claims, they emphasize that the NJCFA should apply to the entire nationwide class because New Jersey's consumer fraud law provides protection equal to or greater than the laws of other states.  Defendants respond that the laws of each Plaintiff's home state should apply because each respective state has a greater interest in protecting its residents from the type of claims asserted in this case.  In addition, Defendants point out that, among the Defendants, only Quest is based in New Jersey.  Therefore, Defendants insist that the Court should apply the laws of each Plaintiff's home state rather than the laws of New Jersey to the Class.

Prospective class members have a due process right to have their claims governed by the state law applicable to their dispute.  Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 821-23 (1985).  In the context of class action certification, the Supreme Court has stated that a district court "may not take a transaction with little or no relationship to the forum and apply the law of the forum in order to satisfy the procedural requirement that there be a common question of law.  Id. at 821.  According to the Third Circuit, a court "must apply an individualized choice of law analysis to each of plaintiff's claims."  Georgine, 83 F.3d at 627 (citing Shutts, 472 U.S. at 823).  In a

diversity case, the forum state's choice of law rules govern.  See Gen. Star Nat. Ins. Co. v. Liberty Mut. Ins. Co., 960 F.2d 377, 379 (3d Cir. 1992).

A court's characterization of a plaintiff's claims has been of the utmost importance because, until recently, New Jersey applied two distinct choice of law standards to contract and tort claims.  The standard applied in contract claims was based on "the 'most significant relationship' test enunciated in the Restatement (Second) of Conflict of Laws § 188 (1971)." State Farm Mut. Auto. Ins. Co. v. Simmons' Estate, 84 N.J. 28, 34 (N.J.1980); see Glynwed, Inc. v. Plastimatic, Inc., 869 F.Supp. 265, 270 (D.N.J. 1994). In contrast, the standard applied in tort claims was denominated as the flexible "governmental interest" test.  Warriner v. Stanton, 475 F.3d 497, 500 (3d Cir. 2007); Fu v. Fu, 160 N.J. 108, 118 (1999).  Therefore, the choice of law analysis and resultant legal determinations often hinged upon a court's characterization of a plaintiff's claims. See, e.g., St. Louis Chiropractic v. Fed. Ins. Co., 2008 WL 4056225, at *10, n.9 (D.N.J. Aug. 26, 2008).

During the pendency of this motion, the New Jersey Supreme Court adopted a new framework for resolving conflict of law disputes arising out of tort claims.  In P.V. v. Camp Jaycee, the Court was confronted with a choice of law dispute in a case filed against a New Jersey charity by the parents of a mentally disabled New Jersey resident who had been sexually abused at the charity's Pennsylvania summer camp. 2008 WL 5102951 (N.J. Nov. 24, 2008).  The trial court applied New Jersey law and granted the charity's motion for summary judgment under this State's haritable immunity statute. Id. at *1 (summarizing the trial court decision).  The Appellate Division reversed, finding that Pennsylvania had a greater governmental interest in the case because the wrongful conduct and injury occurred there and because the commonwealth has abrogated

charitable immunity.  P.V. ex rel. T.V. v. Camp Jaycee,  393 N.J. Super 19, 26-27 (App. Div.

2007).  The trial court and the Appellate Division both applied New Jersey's flexible

"governmental interests" test in reaching conflicting outcomes.  On November 24, 2008, the New

Jersey Supreme Court resolved the dispute by issuing an opinion affirming the decision of the

Appellate Division to apply Pennsylvania law.  P.V. v. Camp Jaycee, 2008 WL 5102951, at *14.

However, the Court expressly declined to apply the traditional flexible governmental interest test to

the tort claim, instead opting to apply the Restatement (Second)'s "most significant relationship"

test.  Restatement (Second) of Conflict of Laws (1971) (the "Restatement").  The Court reasoned

that, while continuing to denominate the tort choice-of-law framework as a sort of governmental

interests analysis, its prior jurisprudence had evolved to the point where the Court had clearly

applied the Second Restatement's most significant relationship test to choice of law disputes

arising under tort law.  Id. at *5 (citing Erny v. Estate of Merola, 171 N.J. 86, 95-97 (2002) and Fu

v. Fu, 160 N.J. 108 at 119-39 (1999)).  Therefore, the Court adopted the most significant

relationship test and the corresponding choice of law factors included in the Second Restatement.

Id.  Since the New Jersey Supreme Court has abandoned the flexible governmental interests

analysis in favor of the most significant relationship test in the context of tort choice of law issues,

the Court will apply this test to Plaintiffs' tort claims as well as to their breach of contract claim.[11]

_____

[11] Plaintiffs and Defendants have spent significant effort attempting to convince the Court
why it should or should not apply New Jersey law to the nationwide class.  The whole of each
side's analysis assumes that the Court must apply a flexible governmental interests analysis to
choice of law disputes arising in tort. In light of the New Jersey Supreme Court's abandonment
of the governmental interests analysis in favor of a most significant relationship test, the Court
will consider the parties' arguments to the extent that they may overlap with the Court's choice
of law determination under the new framework.

### (2)  Choice of Law Analysis for Plaintiffs' Consumer Fraud Claims

New Jersey's most significant relationship test consists of two prongs.  The first prong of

the analysis requires a court to examine the substance of the potentially applicable laws in order to

determine if an actual conflict exists.  Camp Jaycee at *6 (citing Lebegern v. Forman, 471 F.3d

424, 430 (3d Cir. 2006)).  Where there is no actual conflict, the analysis ends and the court applies

the law of the forum state.  See In re Ford Motor Co., 110 F.3d 954, 965 (3d Cir. 1997); Rowe v.

Hoffman-La Roche, Inc., 189 N.J. 615, 621 (2007).

Courts have recognized that significant conflicts exist between the NJCFA and the

consumer protection statutes of other states.  Elias v. Ungar's Food Prod., Inc., 252 F.R.D. 233,

247 (D.N.J. 2008);  Fink v. Ricoh Corp., 365 N.J.Super. 520, 584 (Law. Div. 2003).  Plaintiffs

claim that any perceived conflict between the NJCFA and other consumer protection statutes is

illusory because the chief differences among these laws are in the area of monetary remedies.

Since Plaintiffs seek only equitable relief on behalf of the Class, they conclude that there are no

actual conflicts among state consumer fraud statutes.  (Plaintiffs' Reply Brief at 62.)  Contrary to

Plaintiffs' argument, the distinctions among the statutes are not limited to monetary remedies.  In

Int'l Union of Operating Engineers Local # 68 Welfare Fund v. Merck & Co., Inc., a New Jersey

appellate court noted the many conflicts between the NJCFA and various state counterparts:

> New Jersey allows and often encourages private class actions for consumer fraud
> while several other states prohibit private class action consumer fraud suits. E.g.,
> Miss.Code Ann. § 75-24-15(4); S.C.Code Ann. § 39-5-140(a); Ala.Code §
> 8-19-10(f). NJ law finds actionable fraud in connection with the sale of goods or
> services for commercial or business uses, whereas some states "confine their
> consumer fraud statute remedies to items purchased 'primarily for personal, family
> or household purposes.' " Fink, 365 N.J. Super at 572 (citing Mo. Ann. Stat. §
> 407.025(1); 73 P.S. § 201-9.2; Miss.Code Ann. § 75-24-15(4)). Some states require
> proof that the defendant willfully or knowingly made false representations "with

specific intent to deceive," while New Jersey does not require such a showing. <u>Fink</u>, 365 N.J.Super. at 576. Furthermore, variations exist in the award of damages, especially the decision or ability of a court to award punitive or treble damages.

384 N.J. Super. 275, 294-95 (App. Div. 2006) ("Vioxx II"). In addition to these conflicts, the requirement of some consumer fraud laws that a plaintiff show ascertainable loss creates another conflict between the NJCFA and the respective consumer protection statutes of other states.  In order to bring a claim under the NJCFA, a plaintiff must allege that he has suffered an ascertainable loss as a result of the unfair or deceptive practices alleged.  N.J.S.A. 56:8-19; <u>Weinberg v. Sprint Corp.</u>, 173 N.J. 233, 237 (2002).  In contrast, the Hoecker and Smucker Plaintiffs reside in Ohio, one of 17 states in which the consumer protection statutes do not require plaintiffs to allege an ascertainable loss in order to sustain a consumer fraud claim. <u>See</u> OHIO REV. CODE ANN. § 1345.09; Mary Dee Pridgen, Consumer Protection and the Law App. 5A (2008) (hereinafter "CP&L").  Therefore, the Court concludes that actual conflicts exist between the NJCFA and the consumer protection laws of other states.

The second prong of the most significant relationship test requires the Court to weigh the factors enumerated in the Restatement section corresponding to the Plaintiffs' cause of action.  <u>See</u> <u>Camp Jaycee</u>, 2008 WL 510295, at *6.  Because the Plaintiffs are seeking to assert claims under the NJCFA, the Court applies the conflict of laws analysis of Section 148 for claims sounding in fraud or misrepresentation.  Restatement (Second) of Conflict of Laws § 148 (1971).  Plaintiffs claim that they have been injured by reason of the "unconscionable commercial practices, deception, and fraud in connection with [Defendants'] improper billing and debt collection for laboratory testing and other services." (Complaint ¶ 176.)   Specifically, Plaintiffs allege that Quest and the DCDs engaged in "[b]alance [b]illing, [d]ouble [b]illing, [o]ver [b]illing and [f]alse

-36-

[b]illing of individual insured consumers." (Id.)  Plaintiffs' injuries allegedly stem from the fact

that many members of the proposed class paid an amount not due and owing based on the false

representations made by Quest and the DCDs in the bills and dunning demands.

>Under Section 148(1) of the Restatement:

>When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 148 (1971). This Section recognizes that the state in

which a prospective plaintiff acted in reliance on a defendant's fraud is presumed to have the

predominant relationship to the parties and the issues in the litigation.  Indeed, under the rule of

Subsection (1), "when the false representations are made and received in the only state where the

plaintiff relied on these representations by taking action, the local law of this state determines the

rights and liabilities of the parties unless, with respect to the particular issue, some other state has a

more significant relationship to the occurrence and the parties[.]" Id.  Here,  Plaintiffs received the

bills and dunning demands in their home states.  Those plaintiffs who relied on the bills and paid an

amount not due presumably did so by making a payment by check or credit card from their respective

home states.  And while the purportedly illegal billing practices may have emanated from Quest's

home state of New Jersey, they were directed at each plaintiff's home state.  With respect to the debt

collectors, none of these defendants is headquartered in New Jersey.  Rather, they are based in

Massachusetts, Michigan, New York and Washington.  Based on the foregoing, the Court finds that

there is a strong presumption under Section 148 that the consumer fraud law of each class plaintiff's

home state should apply to his respective claim.

Nothing in the analysis of the principles delineated in Section 6 of the Restatement rebuts the presumption that each prospective plaintiff's home state has the most significant interest in litigating its residents' claims.  The New Jersey Supreme Court has articulated five principles underlying Section 6: "(1) interstate comity, (2) the interests of the parties, (3) the  interests underlying the substantive body of law, (4) the interests of judicial administration, and (5) the competing interests of the states."  Erny, 171 N.J. at 101-02 (quoting Fu, 160 N.J. at 122).  The interests of interstate comity clearly favor the application of the law of each prospective class member's state of residence.  See Fink, 365 N.J. Super at 585.  Second, the interests of the parties "is of extreme importance in the field of contracts," but it "plays little or no part in a choice-of-law question in the field of torts."  Fu, 160 N.J. at 123 (quoting Pfizer, Inc. v. Employers Ins. of Wausau, 154 N.J. 187, 199 (1998)).  Third, because "[e]ach plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws,"  the competing interests of the states overlaps with the interests underlying consumer protection law and favors applying the 51 state consumer fraud statutes.  In re Ford Motor Co., 174 F.R.D. at 348.  The fifth factor does not alter the Court's analysis because the New Jersey Supreme Court has found that the interests of judicial administration factor "must yield to strong state interests implicated by the remaining factors."  Fu, 160 N.J. at 124.

Because none of the aforementioned factors suffice to rebut the presumption that the state in which each plaintiff resides has the most significant relationship with the parties and the issues related to each plaintiff's consumer fraud claims, the Court will apply the consumer fraud statutes of each plaintiff's home state.  The Court rejects Plaintiffs claim that the NJCFA should apply

-38-

nationwide, instead finding that each state has an overwhelming interest in seeing its own consumer protection statute govern in cases where residents were victims of fraud perpetrated within the state's borders.[12]

### (3)  Choice of Law Analyses for Plaintiffs' Common Law Fraud, Breach of Contract and Unjust Enrichment Claims

The Court applies New Jersey's most significant relationship test to Plaintiffs' remaining state law claims as well.  Camp Jaycee, 2008 WL 5102951, at *1 (applying the Restatement's most significant relationship test to tort claim); State Farm Mut. Auto. Ins. Co. 84 N.J. 28, 34 (1980) (applying most significant relationship test to contract claim).  Plaintiffs assert that New Jersey law should apply nationwide to all of their state claims.  However, their choice of law analysis is conspicuously limited to the application of the NJCFA to nationwide classes.  They do not offer any support for applying NJ law to the remaining state law claims.  Therefore, the Court must undertake its own independent analysis of whether New Jersey law should apply to the fraud, breach of contract and unjust enrichment claims asserted by the class.

---

[12] Even courts that have applied New Jersey's former choice-of-law framework to tort cases have nonetheless declined to apply the NJCFA to out-of-state consumers.  See, e.g., Atlass v. Mercedes-Benz USA, LLC, 2007 WL 2892803 (D.N.J. Sept. 25, 2007); Heindel v. Pfizer, 381 F. Supp. 2d 364 (D.N.J. 2004); In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 348 (D.N.J. 1997); Pratt v. Panasonic Consumer Electronics Co., 2006 WL 1933660 (N.J. Super. Ct., Law Div., July 12, 2006); Margulies v. Chase Manhattan Mortg. Corp., 2005 WL 2923580 (N.J. Super. Ct., App. Div., Nov. 7, 2005).  In other cases in which courts have certified the NJCFA for nationwide classes, the courts' choice of law analyses have relied on the premise that the New Jersey statute provided equal or greater protection than other consumer fraud statutes.  See Elias, 252 F.R.D.at 247; Dal Ponte, 2006 WL 2403982, at 7; International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., 2005 WL 2205341, *20 (N.J. Super. Ct. Law Div. July 29, 2005).  In this case, numerous named plaintiffs have failed to allege that they have suffered an ascertainable loss as required to state a claim under the NJCFA.  These plaintiffs would actually receive less protection under the NJCFA than they would under the 17 consumer fraud statutes which do not require an ascertainable loss.

Applying the first prong of the most significant relationship test, the Court concludes that there are no actual conflicts among the among the laws of unjust enrichment.  See Powers v. Lycoming Engines, 245 F.R.D. 226, 231 (E.D.Pa. 2007).  Since no actual conflicts exist, the court will apply New Jersey law to Plaintiffs' claims for unjust enrichment.  There are, however, actual conflicts among the potentially applicable state laws regarding the elements of fraud and breach of contract.  States apply materially different standards of claim accrual, statutes of limitations, tolling, economic loss requirements, burdens of proof, scienter and reliance to common law fraud claims.  See Joel S. Feldman et al., "Class Certification Issues for Non-Federal Question Class Actions -- Defense Perspective," 777 PLI/Lit 35, 99 (2008).[13]  In addition, state breach of contract laws conflict with respect to the application of the parol evidence rule, burdens of proof and statutes of limitations.  Id. at 100-01.

The second step of the most significant relationship test requires that the court apply the appropriate section of the Restatement.  See Camp Jaycee, 2008 WL 510295, at *6.  Applying Section 148 of the Restatement for claims sounding in fraud, the Court previously found that the Plaintiffs' consumer fraud claims should be governed by each the 51 state consumer fraud statutes. The choice of law analysis is the same for Plaintiffs' common law fraud claims.  The Court concludes that each plaintiff's home state has the most significant relationship to the parties and the issues affecting each plaintiff's claims.  As such, the Court will apply each state's notion of common law fraud to claims by residents of that state.

With respect to Plaintiffs' breach of contract claims seeking relief for Defendants' violation

---

[13] Neither party has provided the Court with an analysis of the uniformity of state common law fraud claims among the states.

of the hold harmless provisions contained in the QDI-payer contracts, the Court applies Section

188 of the Restatement.  This Section lays out the factors to consider in the absence of a

contractual choice of law provision.[14]  In this regard, a court should consider: (1) the place of

contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the

location of the subject matter of the contract, and (5) the domicil, residence, nationality, place of

incorporation and place of business of the parties.  Applying these factors, the Court concludes that

the majority of the factors militate against applying New Jersey law to Plaintiffs' breach of contract

claims.  Prospective Class members live in each of the 50 states and the District of Columbia.  The

subject matter of the payer contracts, the provision of laboratory testing services, presumably

occurred in each plaintiff's home state.  In addition, the injuries allegedly suffered by prospective

Class members as the result of Quest and the DCDs' conduct occurred in these jurisdictions as

well.  Further, Defendants' alleged breach of the payer and health plan contracts is traceable to the

bills and dunning letters sent to each plaintiff in their respective home states.  The only factors

favoring the application of New Jersey law are that Quest maintains its headquarters in New Jersey

and is alleged to have conceived their billing schemes there.[15]  Taking these factors into account,

the Court will apply the laws of the prospective Class members' home states because each state has

---

[14] In a contract suit brought by a third party beneficiary, the Court need not give effect to a contractual choice of law provision in the absence of express language making the provision applicable to the third party.  See Union Steel America Co., v. M/S Sanko Spruce, 14 F. Supp. 2d 682, 693 (D.N.J. 1998). Presumably the QDI-payer contracts contain choice of law provisions that may be relevant to Plaintiffs' claims.  However, Plaintiffs have failed to suggest how the choice of law provisions affect the choice of law analysis for third party claims.

[15] Plaintiffs have not provided the Court with any information on where the payer contracts were drafted or executed.  Therefore, those factors do not enter into to the Court's choice of law analysis.

the most signficant relationship with the contract claims asserted by their home state plaintiffs.

### (4)  Plaintiffs' Unjust Enrichment Claims Cannot Be Certified

Plaintiffs assert unjust enrichment claims on behalf of the proposed Class based on Defendants' "unlawful and inequitable acts resulting in the payment of monies by insured individuals." (Complaint ¶¶ 188-89.)  They further allege that "Defendants have and are continuing to derive profits and revenues resulting from their false, misleading, deceptive, unfair, inequitable and unconscionable conduct." (Id.)  Pursuant the Court's choice of law analysis, New Jersey law applies to this claim.

In New Jersey, an unjust enrichment claim requires that plaintiff "show both that defendant received a benefit and that retention of that benefit without payment would be unjust." VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994).  Plaintiff must prove "that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." Id.  After analyzing the 51 billing transactions still at issue, Quest's billing expert concluded that prospective plaintiffs paid an amount to Quest in only 17 instances.  (Dyckman Report, Attachment D.)  Dr. Dyckman concluded that, of the 17 transactions in which plaintiffs' made payments, three payments were made for amounts legally due and owing.  And in five instances, Quest subsequently refunded plaintiffs for making payment on a bill that was not actually owed.  So among the named Class plaintiffs, only nine of the 51 transactions form the basis for alleging unjust enrichment claims.  For those nine transactions, Plaintiffs must prove that Quest has unjustly retained a payment.  The Court has previously concluded that determining whether bills received by prospective Class members are legally due and owing is simply not susceptible of the

type of generalized proof required by Rule 23(b)(2).  In reconstructing each billing transaction to determine whether a bill was issued in contravention of a payer contract or health plan agreement, the Court would have to examine explanation of benefits ("EOB") forms, patient invoices, requisition notices, payment documentation and health benefit documents.

Courts will deny certification of unjust enrichment claims when individualized factual and legal inquiries overwhelm the issues susceptible of classwide proof.  See Westways World Travel, Inc. V. AMR Corp., 265 F. App'x 472, 476 (9th Cir. 2008) (affirming district court's denial of certification of a 23(b)(3) class of travel agents because RICO, contract, and unjust enrichment claims "would require individualized inquiries into American Airlines's legal and contractual relationship with each class member..."); Klay, 342 F.3d at 1267 (reversing district court's certification of plaintiffs' unjust enrichment claims "[b]ecause individualized factual determinations overwhelm the common issues of fact and law.").  The Court concludes that the Plaintiffs' unjust enrichment claims are not amenable to classwide proof.  Lacking cohesion, the Court cannot certify these claims.

### (5) Standard of Review for Certifying Multistate Claims

The Court has concluded that the laws of the various states will apply to Plaintiffs' consumer fraud, common law fraud and breach of contract claims.  The Court appreciates that the "[e]xistence of state law variations is not alone sufficient to preclude class certification." Chin v. Chrysler Corp., 182 F.R.D. 448, 458 (D.N.J.1998).  However, in cases "[w]here the source of law derives from the law of the 50 states, as opposed to a unitary federal cause of action,[ ] differences in state law will 'compound the[ ] disparities' among class members from the different states." In re Ford Motor Co. Ignition Switch Prod Liab. Litig., 174 F.R.D. 332, 349 (D.N.J. 1997) (quoting

Amchem, 521 U.S. at 623).  Therefore, numerous courts have concluded that state law variations create overwhelming obstacles to certification under Rule 23(b)(2).  See Lemon, 216 F.3d at 580 ("[s]ignificant variations in applicable state laws ... preclude any finding that the interests of the class members are cohesive and homogenous."); Sanders, 2006 WL 1541033, at *10; In re Propulsid, 208 F.R.D. at 147; Clay, 188 F.R.D. at 495.  In cases where numerous state laws are potentially applicable to a proposed class, the plaintiffs bear the burden to "creditably demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.'" Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C. Cir. 1986) (quoting In re School Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986)).

### (6)  Plaintiffs' Consumer Fraud Claims Cannot Be Certified

The Court has concluded that it must apply the laws of the fifty states to Plaintiffs' consumer fraud claims.  In support of their motion for class certification, Plaintiffs rely upon several decisions which have certified multi-state classes based upon the consumer protection laws of more than one state.  (Plaintiffs' Reply Brief at 66.)  However, these decisions are unavailing because the majority of them conclude that multiple state laws can apply to fraud claims without any meaningful discussion of the difficulties created by variation among the applicable state laws.[16] As further support for certifying the Class for consumer fraud claims, Plaintiffs have produced a chart analyzing the various state consumer fraud statutes.  The chart certainly provides a complete picture of each of the potentially applicable state laws, but it also indicates that these statutes differ

_____

[16] One case cited by Plaintiffs, Lorazapam & Chlorazepate Antitrust Litig., 205 F.R.D. 369 (D.D.C. 2002), is inapposite because it involved a class action settlement.  See Amchem, 521 U.S. at 620 (determining that, for class action settlement purposes, "a district court need not inquire whether the case, if tried, would present intractable management problems ... for the proposal is that there be no trial.")

immensely from jurisdiction to jurisdiction.  And Plaintiffs have not suggested how the many

permutations in state consumer protection law can be managed by the Court.  See Lyon v.

Caterpillar, Inc., 194 F.R.D. 206, 218-22 (E.D. Pa. 2000) (discussing failure by plaintiffs to

provide relevant analysis of the applicable consumer fraud statutes).  Rather, a review of the state

consumer protection statutes only validates the Court's concerns about its ability to practically and

efficiently try individualized issues as a class action.

Plaintiffs assert consumer fraud claims seeking injunctive and declaratory relief on behalf

of the nationwide Class.  However, only 33 states have authorized private plaintiffs to seek

injunctive relief under their respective consumer fraud statutes.[17]  Pridgen, CP&L § 6.9.

Furthermore, 34 state consumer fraud laws require that a plaintiff plead an ascertainable loss

resulting from the unfair or deceptive practices alleged.  Id., App. 5A.  Whether a plaintiff suffered

an ascertainable loss is one of the key contested elements of each Plaintiff's claims, and one which

the Court has determined requires a highly individualized analysis of each billing transaction.  In

fact, Defendant AMCA suggests that, among the New York plaintiffs alone, as many as 23 of the

27 transactions at issue do not allege an ascertainable loss.  See Morgan v. Markerdowne Corp.,

201 F.R.D. 341, 350 (D.N.J. 2001) (denying certification of a proposed class for claims arising

under the NJCFA where some members of the proposed class did not suffer an ascertainable loss).

Another difference among the state consumer fraud statutes relates to the statutes of limitations

applicable to these claims.  Among the home states of the named Plaintiffs, Oregon's consumer

---

[17] Defendants' claim that the NJCFA does not provide for equitable relief is unfounded. In addition to awarding treble damages, the statute specifically provides for "any other appropriate legal or equitable relief" the court deems appropriate.  N.J. Stat. Ann. 56:8-19.  The statute expressly "allows a private cause of action to proceed for all available remedies, including an injunction...."  Weinberg v. Sprint Corp., 173 N.J. 233, 253 (2002).

fraud statute contains a one-year limitations period while Florida's law allows for a four-year

period. Pridgen, CP&L, App. 6A.  New York's statute does not define the limitations period, but

has been construed to provide for claims within a three-year limitations period.  See Gaidon v.

Guardian Life Ins. Co. of America, 96 N.Y.2d 201, 210 (2001).  Although the Third Circuit in In re

Linerboard Antitrust Litig., 305 F.3d 145, 162 (3d Cir. 2002), refused to adopt any per se rule

denying certification based solely on variation among the applicable statutes of limitations, it has

clearly stated that certification may be denied when differences among the limitations periods are

one of several issues requiring individual treatment. See Barnes, 161 F.3d at 147 n.25 ("We

acknowledge that the existence of affirmative defenses as to some class members may not by itself

[be] enough [to] warrant the denial of certification .... But we note that the defenses are only one of

many matters raising individual issues in this case.") (citations omitted).

    The Court concludes that the Plaintiffs have not met their burden of proving that the legal

variations among state consumer fraud statutes and the factual variations among the Class

members can be managed in a practical manner in this litigation.  The marked variations among the

state consumer fraud statutes with respect to, inter alia, available remedies, ascertainable loss,

limitations periods, coupled with the patient-by-patient and contract-by-contract inquiries already

required to determine liability, destroy any modicum of Class cohesiveness.

### (7)  Plaintiffs' Breach of Contract Claims Cannot Be Certified

    Plaintiffs seek certification of common law breach of contract claims based on the

Defendants alleged breach of the hold harmless provisions contained in payer agreements and

health plan contracts.  Plaintiffs contend that Quest has breached the payer contracts by billing and

collecting payments other than those owed by patients under the relevant agreements.  Plaintiffs

-46-

assert that they are intended third party beneficiaries of these agreements who have been injured by these breaches, and that the DCDs aided and abetted Quest in perpetrating these illegal acts. (Complaint ¶¶ 181-86.)

As this Court has made clear in its discussion of Plaintiffs' ERISA claims, determinations as to whether Defendants have breached the contractual hold harmless provisions of the payer contracts and the insurance plans are not susceptible to classwide proof.  With the contracts at issue potentially numbering in the thousands and containing materially different provisions, proof of a right to recovery under one contract does not necessarily establish a classwide right to recovery.[18] Moreover, while Plaintiffs have alleged that Quest has employed nine billing practices which breach the hold harmless provisions contained in various contracts, the manner in which the breaches are alleged to have occurred are not uniform.  Plaintiffs allege that some patients were billed after the insurance provider or TPA responded to only part of the claim while others were billed as a result of a missing or incorrect CPT code.  As a practical matter, the resolution of this Defendants' liability splinters into an unmanageable number of individual factual inquiries. See Georgine, 83 F.3d at 626 (stating that beyond broad common issues surrounding harmfulness of asbestos exposure, class members' claims against asbestos manufacturers varied widely in

_____

[18] Defendants cite Ritti v. U-Haul Intern., Inc., 2006 WL 1117878, for the proposition that Plaintiffs' breach of contract claims cannot be certified because they are based on many different payer agreements and insurance contracts. Ritti is distinguishable because it involved contracts containing both written and oral terms.  However, Judge Diamond's discussion of Plaintiffs' breach of contract claims remains instructive.  Judge Diamond cites several cases in which courts have denied class certification where different written contracts were at issue.  Id. at *10 (citing Klay, 382 F.3d at 1263; Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 343 (4th Cir. 1998); Avery v. State Farm Mut. Ins. Co., 216 Ill.2d 100 (2005)).  In each of these cases, the contracts at issue were fully integrated and did not require the consideration of oral terms. Nevertheless, the courts refused to certify the proposed classes because the numerous contracts were nonuniform.

character and could not be tried on a class basis).

Additionally, Plaintiffs have failed to persuade the Court that the legal variations among the breach of contract laws of the various states will not create additional obstacles to class treatment. Plaintiffs' state-by-state analysis purporting to demonstrate the similarity of state contract laws is overly simplistic and wholly inadequate. Limiting the analysis to the existence of four elements (offer, acceptance, consideration, definite terms) completely ignores variations among the states in several relevant areas of contract law, including application of the parol evidence rule, the absence of damages, and third party beneficiaries.[19]  As the Court noted in its choice of law analysis, state common law breach of contract claims vary with respect to statutes of limitations, parol evidence and burdens of proof.  See Feldman, "Class Certification Issues for Non-Federal Question Class Actions -- Defense Perspective," 777 PLI/Lit at 100-01 (2008).  Plaintiffs have not suggested any manageable way to litigate the claims in light of the variation among state laws of contract with respect to important elements of Plaintiffs' contract claims.

Because the litigation of Plaintiffs' breach of contract claims would require individualized inquiries into the factual circumstances surrounding each transaction and an examination of the applicable contractual provisions, class certification under 23(b)(2) of the Plaintiffs' breach of

---

[19] Plaintiffs citation to cases purporting to hold that state contract law is uniform does not satisfy their burden of showing that state contract laws are similar with respect to the elements at issue in this case.  The Supreme Court's statement in a footnote in American Airlines v. Wolens, 513 U.S. 219, 223 (1995), that "contract law is not at its core diverse, nonuniform, and confusing" does not preclude a finding that state contract laws may vary with respect to certain issues of import in this case.  With respect to Plaintiffs' citation to Klay v. Humana, 382 F.3d at 1262-63, in that case  the singular question of contract law was whether a breach had occurred.  Since the concept of a breach doesn't materially differ from state to state, the 11th Circuit determined that the state laws were sufficiently similar so as not to preclude certification.  Id.  Notably, the Circuit reversed the district court's certification of plaintiffs' contract claims on the grounds that individual issues of fact far outweighed common issues.  Id. at 1263.

contract claims is denied.

### (8)  Plaintiffs' Common Law Fraud Claims Cannot Be Certified

Count VIII of the the Complaint alleges that Quest and the DCDs perpetrated common law

fraud.  Plaintiffs claim that the Defendants "intentionally, knowingly, willfully and recklessly

charged and collected fees for laboratory billing and other services ... [that] were known or should

have been known by Defendants to be false, misleading, incomplete, and untrue when made ... and

Plaintiffs and the other members of the Class had a right to rely, and did reasonably rely on,

Defendants' statements, misrepresentations, and omissions."  (Complaint ¶¶ 194-202.)  Based on

its previous analysis, the Court applies the laws of the applicable 51 jurisdictions to Plaintiffs'

common law fraud claims.

Generally, a claim for common law fraud must assert that the defendant:  (1) made a false

representation of a material fact, (2) knew or should have known that the representation was false,

and (3) intended to induce the plaintiff to rely on the representation.  See Restatement (Second) of

Torts § 525 (1977).  In addition, the plaintiff: (4) must have actually relied on the representation in

a manner justifiable under the circumstances and (5) suffered damage as a result of his reliance. Id.

The allegations by Plaintiffs do not lend themselves to classwide resolution of their common law

fraud claims.  Couching the action in fraud rather than breach of contract does not change the fact

that Plaintiffs cannot show through classwide proof that Quest or the DCDs falsely billed or

dunned patients for amounts that were not due and owing.  Determinations with respect to the first

element of common law fraud (false representation of material fact) would require an

individualized analysis of each billing transaction.  Further, while Plaintiffs have alleged that Quest

purposefully employed illegal billing practices, they have not persuaded the Court that there is any

practical way of determining the Defendants' scienter other than through an in-depth examination of the bills and dunning demands sent to each patient.  Moreover, common law fraud claims require that Plaintiffs show they were damaged as a result of their justifiable reliance on the bills sent to them by Quest and the DCDs.  Yet, of the 51 billing transactions remaining this litigation, Quest's medical billing expert concluded that prospective plaintiffs paid an amount to Quest in only 17 instances.  (Dyckman Report, Attachment D.)  Class members who have not paid anything would presumably be asserting injury merely for being billed by Quest and the DCDs.  And even among those patients who did make a payment to Quest, several have subsequently received refunds.  Moreover, Defendants' affirmative defenses, including whether Plaintiffs' failure to provide correct or complete insurance information resulted in bills issuing, present additional issues to be decided on an individual bases.  See Barnes, 161 F.3d at 149.

Plaintiffs failure to provide the Court with an analysis of the variations among state common law fraud actions further militates against certifying their common law fraud claims on behalf of the proposed Class.  Several courts have refused to certify common law fraud claims for classwide treatment due to the divergence among state laws.  See, e.g., Lichoff v. CSX Transp., Inc., 2004 WL 2280354 (N.D. Ohio Oct. 6, 2004); Majeski v. Balcor Entm't Co., 134 F.R.D. 240 (E.D. Wis. 1991); Margolis v. Caterpillar, Inc., 815 F.Supp. 1150 (C.D. Ill. 1991).  Here, Plaintiffs have not offered an analysis of the variations in state common law with respect to fraud.  Nor have they persuaded the Court that the Class' fraud claims could be managed in a practical and efficient manner.

The Court concludes that class cohesiveness is lacking because several elements of Plaintiffs' common law fraud claims require individual treatment.  See, e.g., Gunnells v.

<u>Healthplan Services, Inc.</u>, 348 F.3d 417, 435 (4th Cir. 2003) (vacating class certification of fraud and negligent misrepresentation claims alleged against agents who marketed and sold insurance plans because "individualized inquiry will be required to show that Plaintiffs actually relied on the ... alleged misrepresentations."); <u>Gavron v. Blinder Robinson Co.</u>, 115 F.R.D. 318, 325 (E.D. Pa.1987) (denying certification because "[u]nder a common law fraud claim, each plaintiff must demonstrate his individual reliance upon the defendants' misstatements.").  In addition, Plaintiffs have not met their burden of demonstrating to the Court that the variations among state laws of common law fraud can be managed efficiently on class basis.  Consequently, certification of Plaintiffs' common law fraud claims is inappropriate.

## F.  Certification of the Proposed Class Under Rule 23(b)(2) Is Denied

Based on the foregoing, the Court will deny certification under Rule 23(b)(2) because the proposed Class is not sufficiently cohesive to protect the interests of absent members and preserve the efficiencies gained through class litigation.  Individual questions of fact pervade the entire action, overwhelming any issues common to the Class.  With respect to the contractual hold harmless provisions governing prospective Class members, some payer agreements permit patient billing after no response is received while other contracts prohibit it.  There are agreements that prohibit patient billing in the event a plan files for bankruptcy and agreements that may allow billing under these same circumstances.  (See Bond Dec. at 4.)  Likewise, certain agreements unconditionally proscribe billing when Quest receives incorrect patient information while others clearly allow billing a patient for providing incorrect or incomplete information.  With respect to the different issues of fact, the Court notes that some Plaintiffs are members of HMO plans while others are covered through a PPO or Medicare Part B.  Some Class members have paid Quest and

the DCDs, others have not, and some are unsure if they've ever made a payment.  Of the Class

members who have paid an amount, some have received refunds and others have not.  Certain

Class members had one form of insurance while others had both primary and secondary coverage.

And many Plaintiffs have received bills directly from Quest, but others were billed and dunned by

the Debt Collector Defendants.

  While Plaintiffs have asserted eight separate causes of action on behalf of the Class, the

crux of each and every claim is the allegation that Quest and the Debt Collector Defendants have

billed in violation of a statutory or contractual hold harmless provision.  To prove their claims,

therefore, Plaintiffs would have to show that they were covered under a statutory or contractual

hold harmless provision, that one or more of the Defendants violated that provision by billing or

dunning Plaintiff for an amount that was not due, and that they were injured as a result.  This sort

of analysis is impossible on a classwide basis because there are material differences among the

hundreds of contractual hold harmless provisions applicable to prospective Class members and

significant variations among the facts underlying each Plaintiff's claims.  See Geraghty, 719 F.2d

at 1205-06 (committing to the district court "the discretion to deny certification in Rule 23(b)(2)

cases in the presence of disparate factual circumstances.") (citations omitted).  The Court cannot

blind itself to the reality that there are myriad circumstances under which Quest and the DCDs may

bill a patient while remaining in strict adherence to the applicable contractual and statutory hold

harmless provisions.  Instead, the Court would have to embark on an exhaustive transaction-by-

transaction examination of explanation of benefits ("EOB") forms, patient invoices, requisition

notices, payment documentation, health benefit documents and deposition testimony.

  The many distinct issues of fact present in this case suffice to preclude certification under

Rule 23(b)(2).  See Barnes, 161 F.3d at 143; Faulman v. Sec. Mut. Fin. Life Ins. Co., 2006 U.S.

Dist. LEXIS 60811, at *14 (D.N.J. 2006).  The fact that there are numerous variations among the

laws applicable to the Class only reinforces the Court's conclusion that the proposed Class is not

sufficiently cohesive to warrant certification.  See Lemon, 216 F.3d at 580; Sanders, 2006 WL

1541033, at *10. The differences among the state hold harmless laws recited by the Court foreclose

Plaintiffs from offering classwide proof that Quest or the DCDs billed in violation of these laws.

Class members would also be subject to different state laws governing their consumer fraud,

breach of contract, and common law fraud claims.  As a result, Court would have to determine

which law to apply on a plaintiff-by-plaintiff basis.  On that score, Plaintiffs have failed their

burden of convincing the Court that the differences among these laws can be managed in a

reasonably practical and efficient manner.  See Walsh, 807 F.2d at 1017.

　　　The Court finds that certifying the proposed Class will not advance "the efficiency and

economy of litigation which is a principal purpose of the procedure." Gen. Tel. Co. of the

Southwest, 457 U.S. at 159 (citation omitted).  Rather, were the Court to certify the proposed Class

for injunctive relief under Rule 23(b)(2), not only would absent Class members be bound to a

decision in a case where the facts and legal theories upon which relief is sought look nothing like

their own, but the Court would be guilty of creating a litigation management nightmare by

certifying an action in which thousands and potentially millions of mini-trials would inevitably

need to occur.  It is clear that Plaintiffs face significant obstacles in bringing their claims on an

individual basis.  Even taking that consideration into account, the Court simply cannot certify the

proposed Class under Rule 23(b)(2) in view of the numerous factual and legal variations present.

To do so would be the legal equivalent of encountering a sign warning of quicksand, yet rushing

headlong forward despite the warning.  The Court is not inclined to step into this class litigation morass.

Accordingly, because various individual issues of fact and law destroy any modicum of cohesiveness among members of the Class, the Court cannot find that Defendants have acted on grounds generally applicable to the Class.  Thus, the Court denies certification of the proposed Class under Rule 23(b)(2).

### G.  Certification of Plaintiffs Proposed 23(b)(2) Subclasses

Plaintiffs also seek certification under 23(b)(2) of two proposed subclasses: the Refund Interest Subclass and the Equitable Remedy Subclass.   Under Fed. R. Civ. P. 23(c)(5), subclasses must separately satisfy the requirements of Rule 23 before they may be certified.  Consequently, Plaintiffs must establish that each proposed Subclass meets the requirements of 23(a) as well as the requirements of 23(b)(2).  See Baby Neal, 43 F.3d at 55.

### (1)  The Refund Interest Sub-Class

The Refund Interest Sub-Class is limited to prospective class members to whom Quest or the DCDs "paid a refund without interest as a result of such person being billed an amount in excess of the stated patient responsibility on an Explanation of Benefits ("EOB")[.]"  (Plaintiffs' Brief at 3.)  Plaintiffs are seeking prospective injunctive and declaratory remedies as well as monetary remedies incidental to equitable relief.  (Plaintiffs' Reply Brief at 41-42.)  They seek to assert the same eight causes of action on behalf of the Subclass which they propose to assert on behalf of the proposed Class.  Among the Class plaintiffs, Plaintiffs contend that the Ronald and Kathleen Smucker, Michael Hoecker and Elizabeth Cruthers are adequate Subclass representatives.

*a. The Refund Interest Subclass Does Not Meet the Requirements of Rule 23(b)(2)*

The Court concludes that there are too many individualized issues of fact for the Refund Interest Subclass to be considered cohesive.  Plaintiffs' narrowing of the scope of class membership to only those members included in the Refund Interest Subclass does not eliminate the need for transaction-by-transaction analysis to determine whether Quest or the DCDs have engaged in balance billing, double billing, false billing or overbilling.  By defining the Subclass in terms of those members who received a refund as a result of being billed in excess of an EOB, Plaintiffs suggest that the rationale behind refunds issuing are easily ascertainable.  It is true that Quest maintains a regular record of the refunds it issues.  (See Bowman Tr. at 82.)  However, according to testimony proffered by QDI's former project manager for billing operations, Quest does not maintain any record of the reasons underlying each of the refunds it issues.  (See Deposition of Francisco Espinal, April 13, 2007, p. 126.)  Rather, determinations regarding whether a refund was issued as a result of being billed in excess of an EOB would require the Court to reconstruct each billing transaction by examining multiple documents and deposition testimony.

Billing errors can be attributable to various sources.  To assume that all refunds resulted from billing in excess of an EOB would cast a net far too broad.  Refunds may issue in circumstances under which QDI bears no fault.  For instance, QDI may direct that a payment be refunded because a patient mistakenly paid their bill twice or because a patient was billed for a service by both QDI and the physician.  (See Dyckman Report ¶ 85.)  Quest cannot readily distinguish between those refunds which were issued as a result of Quest's error versus those issued because of an error by the patient, his physician or the insurance company.  (See Declaration of Michael J. Hanlon ¶48.)   Therefore, certification under 23(b)(2) is improper because the Court

cannot determine which transactions properly fall under the umbrella of the Refund Interest Subclass without extensive individualized review.

> b.  *The Refund Interest Subclass Does Not Meet the Requirements of Rule 23(a)*

In addition, Plaintiffs have failed to establish that the Refund Interest Subclass satisfies each of the prerequisites of Rule 23(a).  Defendants do not contest that the numerosity, commonality or typicality of this proposed Subclass.  Rather, Quest contends that the Refund Interest Subclass cannot be certified because it lacks an adequate class representative. (Quest's Opposition Brief at 35-36.)  Quest suggests that the Plaintiffs' proposed representatives of the Refund Interest Subclass are not adequate because, unlike the Subclass definition, none of the prospective Plaintiffs were billed by Quest in excess of an EOB, made a payment pursuant to the EOB, and then received a refund for overpayment.  (Id. at 36.) Specifically, Quest claims that Mr. Hoecker is an inadequate Subclass representative because he received a refund after paying his deductible twice and that Mr. and Mrs. Smucker cannot represent the Subclass because Quest issued a refund as a courtesy after Mrs. Smucker complained that her insurer, HealthFirst, Inc., had gone bankrupt.  (Id. at 35.)  Further, Quest argues that Mrs. Cruthers does not fit within the defined Refund Interest Subclass because Quest issued her a bill, which she paid, for an amount contained in the EOB issued by her primary insurer.  (Id.)  Plaintiffs have not rebutted Quest's argument regarding whether the proposed subclass representatives fit within the parameters of the Refund Interest Subclass.  Rather, Plaintiffs simply reiterate that the Smuckers[20], Mr. Hoecker, and Mrs. Cruthers have been harmed by Quest's failure to pay interest on refunds.  (Plaintiffs' Reply Brief at 41, n29.)

---

[20] Ronald and Kathleen Smucker.

In asserting that Plaintiffs' proposed Subclass representatives cannot adequately represent the interests of the Refund Interest Subclass, Defendants' reliance upon the adequacy of representation prong incorporated in Rule 23(a)(4) is misplaced.  Rule 23(a)(4) provides that a class action may be maintained only if "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To find that Rule 23(a)(4) has been met, a court must determine that the putative representative's interests do not conflict with those of the proposed class and that the class attorney is capable of representing the entire class.  Johnston, 265 F.3d at 185.  In this case, there has been no allegation that class counsel is incapable of representing the Refund Interest Subclass and Defendants do not contend that the interests of the proposed Subclass representatives conflict with those of the absent Subclass members.  Rather, Quest merely suggests that the Smuckers, Mr. Hoecker and Mrs. Cruthers cannot be adequate class representatives because none of these Plaintiffs are members of the defined Subclass.

Quest's misapplication of the Rule 23(a) requirements, however, does not cripple its assertion that the Refund Interest Subclass should not be certified.  The Court reaches the same conclusion as Quest – that Plaintiffs' prospective representatives of the Refund Interest Subclass are not members of that subclass as Plaintiffs have defined it.  While Rule 23(a) does not contain an explicit class membership requirement, the Supreme Court has "repeatedly held that a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."  Falcon, 457 U.S. at 156 (quoting East Texas Motor Freight System Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)).  Membership in a class is not a separate requirement of Rule 23(a), but is an implicit requirement normally met through the application of the commonality, typicality and adequacy of representation requirements.  See Ritti v. U-Haul Intern.,

Inc., 2006 WL 1117878, at *2 (E.D. Pa. April 26, 2006); William B. Rubenstein, Alba Conte and

Herbert B. Newberg, 1 Newberg on Class Actions § 3:19 (4th ed.) ("Within the scheme of Rule 23,

class membership by the representative is what should exist at the end or conclusion of the strict

application of Rule 23(a) prerequisites, particularly the claim typicality test, if a class action is

properly to be maintained.").

 Rather than denying certification under the adequacy of representation rubric of Rule 23(a),

the Court finds that the Refund Interest Subclass cannot be certified because the claims of the

prospective Subclass representatives are not typical of those of absent members of the Subclass.

Under Rule 23(a)(3), "claims or defenses of the representative parties [must be] typical of the

claims or defenses of the class..."  "Typicality asks whether the named plaintiff[s'] claims are

typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are

aligned with those of the class." Baby Neal, 43 F.3d at 55.  In evaluating typicality, the Court

should consider whether "the named plaintiff[s'] individual circumstances are markedly different

or ... the legal theory upon which the claims are based differs from that upon which the claims of

other class members will perforce be based."  Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir.

1985) (internal citation omitted).  A named plaintiff's claims would be atypical if his "factual or

legal stance is not characteristic of that of the other class members."  Weiss v. York Hosp., 745

F.2d 786, 810 (3d Cir. 1984).  In addition, "[a] proposed class representative is neither typical nor

adequate if the representative is subject to a unique defense that is likely to become a major focus

of the litigation." Beck v. Maximus, Inc., 457 F.3d 291, 300 (3d Cir. 2006).

 The Court has determined that the claims asserted by the Smuckers, Mr. Hoecker and Mrs.

Cruthers are factually distinct from those of absent members of the Refund Interest Subclass and

are subject to a unique defenses that threaten to become the focus of the litigation.  Rule 23(a)(3) does not require factual identity, but the facts underlying a class representative's claims must not markedly differ from those of absent class members.  <u>Weiss</u>, 745 F.2d at 810.  Absent Subclass members are seeking injunctive relief under 23(b)(2) based on the allegation that they were billed by Quest in excess of a the amount stated in an EOB and that, upon receiving a refund from Quest, the refunded amount did not include interest on the overpayment.  In contrast, Plaintiffs have not proffered any evidence to suggest that Quest overbilled the Smuckers or Mr. Hoecker in excesss of an EOB.  And with respect to Mrs. Cruthers, Quest relied on a valid EOB from Mrs. Cruthers' primary insurer when it billed her $11.08.  Moreover, each proposed subclass representatives' claims are subject to unique defenses.  Defendants have raised the defense that the Smuckers are not entitled to relief because Quest was not legally bound to refund Mrs. Smuckers' payment and only did so as a courtesy.  With respect to Mr. Hoecker's allegation that he was double billed, Defendants have raised the defense of voluntary payment.  (Quest Opposition Brief at 34.)  And the claims asserted by Mrs. Cruthers necessarily require the court to determine whether Quest's reliance upon an EOB issued by a primary insurer shields it from liability for billing based upon that EOB.

Plaintiffs argue that typicality of the proposed Class and all Subclasses, including the Refund Interest Subclass, are satisfied because their claims are based on nine allegedly illegal billing practices which are uniformly employed by Quest and the DCDs.  The Court recognizes that typicality "does not mandate that all putative class members share identical claims."  <u>Barnes</u>, 161 F.3d at 141.  Rather, a cause of action "framed as a violative practice can support a class action embracing a variety of injuries so long as those injuries cal all be linked to the practice."  <u>Baby</u>

-59-

Neal, 43 F.3d at 63.   In Baby Neal, plaintiffs' central claim was that the Pennsylvania Department

of Human Services violated a number of constitutional rights and statutory rights by failing to

provide mandated welfare services.  Id. at 52.  The Third Circuit held that the district court erred in

denying class certification due to differences in the harms suffered by the putative class members.

In finding so, the Circuit emphasized that "trial will not require an individualized inquiry into a

vast network of institutions" since it was "only the Philadelphia DHS's provision of the mandated

services that is at issue." Id. at 62. Additionally, the Court reasoned that because "the nature of the

violations could be verified by reference to the applicable statutes; it is not necessary to examine

each plaintiff's circumstances to evaluate the claims." Id.  It ultimately found that plaintiffs were

linked by "the common theme of attacking DHS's systemwide failure to comply with its legal

mandates." Id. at 63.  This case is readily distinguishable from Baby Neal because Plaintiffs are not

alleging systemic failure, but rather are seeking to assert individual claims for violations of

statutory and contractual hold harmless provisions contained in health insurance and payer

contracts on a classwide basis.  Baby Neal is further distinguishable because the violations alleged

in that case could easily be determined by analyzing whether the DHS's actions complied with

statutory mandates.  Here, the alleged violations of the hold harmless provisions require a

transaction-by-transaction inquiry into each patient's individual circumstances.

### c. Conclusion

Because each transaction that resulted in a refund must be independently examined to

ascertain whether Quest billed in excess of an EOB, Plaintiffs simply cannot make a showing that

the Refund Interest Subclass is sufficiently cohesive.  In addition, since the claims of the

prospective Subclass representatives are not typical of the members of the proposed Refund

Interest Subclass, Plaintiffs have failed to establish that the requirements of Rule 23(a) have been met.  Therefore, certification of the Refund Interest Subclass must be denied.

### (2)  The Equitable Remedy Subclass

Plaintiffs also seek certification under Rule 23(b)(2) for the Equitable Remedy Subclass, which is limited to Class members who "were billed or dunned by Quest or its outside debt collectors and paid an amount in excess of the stated patient responsibility on an EOB provided by their insurance provider or TPA or who was [sic] billed or dunned after their insurance provider or administrator filed for bankruptcy or were deemed to be insolvent []."  (Plaintiffs' Brief at 3.)  The Court concludes that certification of the Equitable Remedy Subclass must be denied because, like the proposed Refund Interest Subclass, the claims of proposed Subclass representatives are not typical of the Subclass they seek to represent.

Among the named Plaintiffs, the only members of the Class who could arguably represent the interests of the Equitable Remedy Subclass are the Smuckers and Richard Grandalski.  The Plaintiffs' have defined this Subclass as comprised of two distinct groups of Class members – those who were billed and paid an amount in excess of an EOB, and those who were billed or dunned after their payer filed for bankruptcy or became insolvent.  Defendants have not contested Mr. Grandalski's membership in this Subclass.  Based on the fact that Mr. Grandalski alleges that he was billed by Quest and various DCDs for amounts in excess of and EOB and paid those amounts, the Court concludes that he is a member of the Equitable Remedy Subclass.  Plaintiffs contend that the Smuckers are members of this Subclass because their insurer became insolvent and they were induced to pay $92.80 to Quest after being billed for an amount they assert they did not owe.

Defendants contest the Smuckers' membership in the Equitable Remedy Subclass because the definition expressly requires that a subclass member have been "billed or dunned <u>after</u> their insurance provider or administrator filed for bankruptcy or were deemed to be insolvent []." (Plaintiffs' Brief at 3) (emphasis added).  Based on the evidence provided by Plaintiffs, it appears that the Smuckers were billed by Quest on December 1, 1999 and again on December 22, 1999 for laboratory services provided on August 4, 1999. (Tusa Ex. 87.)  It further appears that the Smuckers' insurance provider, HealthFirst, was not deemed insolvent by the Ohio Court until July 24, 2000.  (Id.)  Plaintiffs offer no evidence that the Smuckers were billed or dunned at any time after their insurance provider became insolvent.  Therefore, the Smuckers are not members of the Equitable Remedy Subclass as Plaintiffs have defined it.  The Court finds that the sole representative of the Equitable Remedy Subclass among the named Plaintiffs is Mr. Grandalski.

### a. The Sole Class Representative's Claims are Not Typical of the Subclass

The typicality requirement of Rule 23(a)(3) is not a high bar.  The requirement "does not mandate that all putative class members share identical claims." <u>Barnes</u>, 161 F.3d at 141.  "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." <u>Id.</u> "[I]nterests sufficiently parallel to ensure a vigorous and full presentation of all potential claims for relief should satisfy Rule 23(a)(3)." <u>Weiss</u>, 745 F.2d at 810.  In order to ascertain whether the interests are aligned, a court should examine the claims of the putative class representative and those of absent subclass members, and the nature of the evidence needed to prove those claims. <u>See</u> <u>Reeb v. Ohio Dept. of Rehabilitation and Correction</u>, 435 F.3d 639, 644 (6th Cir. 2006).

Mr. Grandalski's claims are not typical of those of the Subclass he purports to represent.

-62-

The legal theory on which he bases his claims differs from the theory underlying the claims of other Subclass members.  Like Mr. Grandalski, some Subclass members are seeking relief because Defendants' billing induced them to pay an amount in excess of an EOB.  However, as defined by Plaintiffs, the Equitable Remedy Subclass also includes members who have been billed by Quest or the DCDs after their insurer went bankrupt or became insolvent.  Mr. Grandalski does not claim that he was billed after insurer went bankrupt or became insolvent.  Rather, his claims are based on the allegation that Quest and the DCDs induced him to pay an amount in excess of a valid EOB.  The former allegations by Plaintiffs have no relationship or coincidence to those claims asserted by Mr. Grandalski and similarly situated Subclass members.  They are based on completely different legal theories.  Moreover, the damages sought by Mr. Grandalski would not be typical of other members of this Subclass.  Mr. Grandalski and Subclass members who have paid an amount in excess of an EOB are seeking disgorgement of the excess amount paid as well as any other available remedies.  On the other hand, absent subclass members who were billed after their insurers went bankrupt or became insolvent need not have paid any amount in order to fit within the definition of the Subclass.  These members of the Equitable Remedy Subclass have no claim for disgorgement.[21]  These variations among the relief sought by members of the Subclass make Mr. Grandalski's claims atypical.  See Clay, 188 F.R.D. at 493 (denying class certification where putative class representatives sought a remedy that did not benefit the entire class).

_____

[21] The differences among the forms of relief available to members of the Equitable Remedy Subclass also creates cohesiveness and manageability problems that can preclude certification under 23(b)(2).  "[N]o matter how easy it is to establish damages on a class level, if it is extremely difficult or almost impossible to distribute these sums to their rightful recipients, the class is unmanageable."  City of Philadelphia v. American Oil Co., 53 F.R.D. 45, 72 (D.N.J. 1971).

### b. *Conclusion*

Because the claims of Plaintiffs' sole Subclass representative are not typical of the

Equitable Remedy Subclass, the Court denies Plaintiffs' motion for class certification of this

Subclass.

## H.  23(b)(3) Subclasses

### (1)  Introduction

Plaintiffs seek certification under Rule 23(b)(3) of the proposed Medicare Part B and

Debtor Subclasses.  Rule 23(b)(3) provides that a class action may be maintained if "the court finds

that the questions of law or fact common to class members predominate over any questions

affecting only individual members and that a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The inquiry under

this subsection is twofold: (1) the Court must determine whether common questions predominate

over individual questions, and (2) the Court must decide whether a class action is the superior

means of adjudicating the case.  Courts frequently refer to these dual requirements as

predominance and superiority.  See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.,

148 F.3d 283, 313 (3d Cir. 1998).  A proper predominance inquiry "trains on the legal or factual

questions that qualify each member's case as a genuine controversy, questions that preexist any

settlement, and tests whether proposed classes are sufficiently cohesive to warrant adjudication by

representation."  Amchem, 521 U.S. at 623.  The superiority requirement asks a district court "to

balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative

available methods' of adjudication."  Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d

Cir.1996), aff'd, 521 U.S. 591 (1997) ("Georgine").  Rule 23(b)(3) instructs that the matters

pertinent to this inquiry include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).  To decide whether a class action is superior despite manageability concerns, a court must consider whether reasonably foreseeable difficulties render some other method of adjudication superior to class certification. See In re Cmty. Bank of N. Virginia, 418 F.3d 277, 309 (3d Cir. 2005).

### (2)  Medicare Part B Subclass

Plaintiffs move for certification under Rule 23(b)(3) for the proposed Medicare Part B Subclass, which is defined as:

> All natural persons in the United States of America and its territories who are participants or beneficiaries of Medicare Part B, and who since September 3, 1998, paid any portion of bills or dunning demands by Quest or its outside debt collectors when Quest did not have a signed Advanced Beneficiary Notice ("ABN") and a determination of patient responsibility from Medicare Part B or its administrators[.]

Plaintiffs allege that Quest and the DCDs have routinely "bill[ed] Medicare Part B participants when Quest does not have both an ABN signed by the patient[, and] (sic) an EOB from Medicare or its administrator assigning patient responsibility[,]" in violation of Medicare statutes and regulations. (Plaintiffs' Reply Brief at 16.)  Specifically, Plaintiffs contend that Quest and the DCDs engaged in a routine course of conduct in violation of 42 U.S.C. §§ 1395(h)(1) and 1395(j), which prohibit providers such as Quest from billing Medicare beneficiaries for clinical laboratory services.  (Id. at 16-17.)

-65-

*a. Predominance*

The court finds that common issues predominate over individual ones among members of the proposed Medicare Part B Subclass with respect to their claims against Quest.  At the certification stage, Quest contends that 23(b)(3) class certification is inappropriate because individual issues could overwhelm those common to the proposed Subclass.  (Quest's Opposition Brief at 36-37.)   It points out that there are certain laboratory tests for which it is permitted to bill a patient.  As a result, it claims that liability can only be determined after an individualized inquiry into the facts of each billing transaction. (Id.)

Plaintiffs' claims involving Defendants alleged billing in violation of the Medicare statute are very different from the claims related to the eight other billing practices allegedly employed by Quest and the DCDs.  The Medicare statute, under which all Medicare Part B beneficiaries are covered, contains a universal hold harmless provision that does not vary from patient to patient. While there are a handful of tests for which providers are permitted to bill Medicare beneficiaries, there are approximately 1,100 clinical laboratory tests for which there is no patient financial obligation whatsoever under Part B.  Patient responsibility for payment of laboratory services is the rare exception rather than the rule under Medicare Part B.  Quest's suggestion otherwise effectively begs the Court to focus on a few trees while remaining blind to the forest.

The reality is that Plaintiffs' claims against the Medicare Part B Subclass simply do not require the same sort of individualized inquiry that precludes the Court from granting certification of the Class and Subclasses comprised of privately insured patients.  Plaintiffs' claims allege that Quest routinely violates the Medicare statute and guidelines by employing the practice of billing Medicare beneficiaries when more information about a claim is required.  At trial, no

individualized inquiry would be necessary.  The proof offered by one member of the Subclass would closely mirror that offered by every other prospective Subclass member.  Furthermore, Plaintiffs have persuaded the Court that any damage calculations, though unique to each prospective Subclass member, can be easily ascertained using a standard methodology.  (McGuire Dec. ¶¶ 56-58.)[22]  Neither liability issues nor damage determinations would create an insuperable obstacle to litigating Plaintiffs' claims against Quest on a classwide basis.  Therefore, common questions of fact and law clearly predominate over any questions unique to individual Medicare Part B Subclass members with respect to claims against Quest.

The Court's determination that common questions predominate for claims asserted against Quest does not obviate the Court's duty to determine whether common issues predominate for claims asserted against the DCDs.  These analyses are separate and distinct. With respect to the Debt Collector Defendants, however, the Court finds that common questions of fact and law among prospective members of the Medicare Part B Subclass do not predominate over individual issues.  Plaintiffs contend that the DCDs' "blind allegiance to Quest's [billing] decision[s]" predominates over individual issues.  (Plaintiffs' Brief at 31.)   The Court has already determined that significant individual inquiry is required to determine what each Debt Collector Defendant knew about the veracity of each debt Quest allegedly represented as due and owing.  The Court's conclusion does not change merely because the claims are limited to those related to violations of

---

[22] Dr. Dyckman takes issue with Dr. McGuire's methodology for calculating damages for the Medicare Part B Subclass.  (Dyckman Report ¶ 103.)  Dr. Dyckman points out that the few services for which Quest may bill Medicare beneficiaries "represent a large portion of laboratory revenue for QDI[.]" (Id.)  This, however, does not change the fact that those tests are few in number and are readily identifiable upon a review of patient records.  See Walsh v. Pittsburgh, 160 F.R.D. 527, 531 (W.D. Pa. 1994) (finding predominance met where issue of individual damages was "largely a matter of mathematical calculation")

the hold harmless provisions of Medicare Part B.  Any determination of liability would require, among other things, an analysis of what, if anything, each Debt Collector Defendant knew concerning each respective debt it was assigned, a review of the accuracy of Quest's prior representations to the DCDs, and a determination regarding the adequacy of the procedures adopted by each DCD to avoid billing for debts not owed.  Since these determinations necessarily rely upon transaction-by-transaction inquiries, the Court finds that individual questions of fact and law predominate over those questions common to the members of the proposed Medicare Part B Subclass with respect to their claims against the DCDs.

### b.  Superiority

Plaintiffs assert that a class action is superior to other available methods of adjudication because each Plaintiff is seeking a relatively small recovery, there are a large number of prospective Subclass members geographically dispersed throughout the United States and because most plaintiffs would not seek redress individually.

The Court finds that certification of the proposed Medicare Part B Subclass is the superior method for adjudicating their claims.  The factors listed in Rule 23(b)(3) clearly militate in favor of certification.  See Fed. R. Civ. P. 23(b)(2).  There is no indication that prospective plaintiffs would prefer to prosecute this action independently and the Court finds it desirable to concentrate these claims in one forum.  In addition, Courts have recognized that class treatment is important in cases like this where nominal claims are not likely to be pursued independently.  See Amchem, 521 U.S. at 617 (citing Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997).  Furthermore, while the Court has pointed out the significant cohesiveness issues that would preclude certification of the Class and proposed Subclasses under 23(b)(2), the Court does not perceive that similar

difficulties will be encountered in managing the claims of the Medicare Part B Subclass. Consequently, the Court finds that a class action is the superior method of adjudicating the claims asserted by the Medicare Part B Subclass.

### c. Rule 23(a) Requirements

In addition to compliance with the predominance and superiority requirements of Rule 23(b)(3), Plaintiffs must also prove that the prospective subclass representative meets the prerequisites of numerosity, commonality, typicality, and adequacy of representation specified in Rule 23(a).  Defendants do not contest that the claims of prospective Medicare Part B subclass members are sufficiently numerous, common, or typical of absent subclass members.  Rather, Quest contends that the Medicare Part B Subclass cannot be certified because it lacks an adequate class representative (Quest's Opposition Brief at 35-36.)  Quest suggests that the Plaintiffs' sole class representative for the Medicare Part B Subclass, Denise Cassesse, is not an adequate representative because, unlike the Subclass definition, Ms. Cassese has not alleged that she has "paid any portion of the bills or dunning demands."  (Id.)  Plaintiffs respond that Ms. Cassese is, nonetheless, an adequate subclass representative because she was improperly billed by Quest and the DCDs in violation of the Medicare statute and regulations.

The Court's discussions of adequacy of representation and typicality with respect to the proposed Refund Interest and Equitable Remedy Subclasses apply equally to the proposed Medicare Part B Subclass. Defendants do not allege that Plaintiffs have failed to meet the requirements of 23(a)(4) – that class counsel is incapable of representing the class and that Ms. Cassese's interests conflict with those of the absent subclass members who have actually paid an amount pursuant to those bills.  Rather, Quest merely suggests that Ms. Cassese cannot be an

adequate class representative because she is not a member of the defined subclass.

The Court finds that the Medicare Part B Subclass cannot be certified because Ms. Cassese'

claims are not typical of those of the absent members of the proposed Subclass. Ms. Cassese is the

sole prospective representative of the proposed Medicare Part B Subclass. Under the Complaint,

the Subclass is seeking monetary damages based on the central allegation that they have paid

amounts above what they actually owe because they relied on the bills or dunning demands they

received from Quest or the DCDs. Yet, nowhere in the Complaint or their supporting briefs do

Plaintiffs actually allege that Ms. Cassese paid any portion of the bills or dunning demands she

received from Quest or the DCDs. In her deposition testimony, Ms. Cassese merely stated that she

thought she had paid a bill from Quest. (See Cassese Tr. at 48) ("I do remember getting sent some

kind of a collection agency and getting harassed, and I think I paid them based on that.")

Furthermore, Ms. Cassese's claims are based on a markedly different legal theory than the

claims of the Subclasses. In seeking monetary damages under 23(b)(3), Ms. Cassese is contending

that she was somehow damaged by simple act of being billed in violation of the Medicare statute.

As defined by Plaintiffs, the proposed Medicare Part B Subclass is comprised of class members

seeking relief for fraudulent billing based on actually having paid amounts to Quests or to the

DCDs pursuant to illegal dunning demands. Ms. Cassese does not share this claim. Additionally,

unlike the claims of absent members of the Medicare Part B Subclass, Ms. Cassese's claims are

clearly subject to the unique defense that she was not injured by the billing and dunning activities

of Quest and the DCDs because she never paid an amount in response to the dunning demands.

See Beck, 457 F.3d at 300 ("A proposed class representative is neither typical nor adequate if the

representative is subject to a unique defense that is likely to become a major focus of the

litigation.").  The defense asserted against Ms. Cassese of nonpayment would not apply to any other member of the proposed Subclass, further rendering her claims atypical.  See Nafar v. Hollywood Tanning Sys., Inc., 2008 U.S. Dist. LEXIS 61439, at *11 (D.N.J. Aug. 11, 2008).

Ms. Cassese's claims are factually distinct from those of absent subclass members, are based on a legal theory distinct from than the legal theory underlying the Subclass claims, and are subject to a unique defense that threatens to become the focus of the litigation.  Because the claims of the sole prospective member of the Medicare Part B Subclass are not typical of claims of absent Subclass members, Plaintiffs have failed to meet the requirement of Rule 23(a)(3).  Therefore, the Court denies certification of the Medicare Part B Subclass.

### (3)  Debtor Subclass

Plaintiffs are also seeking money damages pursuant to Rule 23(b)(3) for the proposed Debtor Subclass, which is defined as:

> All natural persons in the United States of America and its territories who received demands for payment from Quest or its outside debt collectors since September 3, 1998, or since September 3, 2003, for FDCPA violations, which demands for payment did any of the following: i) added fees or charges to the debt; ii) made threats the collector was either not authorized and/or not intending to pursue; iii) falsely representing that debts were owed; iv) representing that minors were personally responsible to pay debts.

Defendants challenge the manner in which the Debtor Subclass is defined.  They insist that the Subclass definition is improper because membership in the Debtor Subclass necessarily depends upon the Defendants' liability.

It has long been held that Rule 23 implicitly requires that prospective plaintiffs propose a class definition that is readily ascertainable based on objective criteria.  See, e.g., Crosby v. Social Sec. Admin. of U.S., 796 F.2d 576, 580 (1st Cir. 1986); Simer v. Rios, 661 F.2d 655, 669 (7th Cir.

1981); Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 2006 WL 2161887, at

*3 (S.D. N.Y. 2006), aff'd, 2008 WL 4554156 (2d Cir. 2008); Annotated Manual for Complex

Litigation (4th ed.), at § 21.222.  Certification should be denied where "[d]etermining membership

in the [sub]class would essentially require a mini-hearing on the merits of each case."  Forman v.

Data Transfer, Inc., 164 F.R.D. 400, 403 (E.D. Pa. 1995) (denying certification of a class asserting

violations of the Telephone Consumer Protection Act of 1991 where Plaintiffs defined the

proposed class as "all residents and businesses who have received unsolicited facsimile

advertisements"); See Dafforn v. Rousseau Assocs., 1976 WL 1358, *1 (N.D. Ind. July 27, 1976)

(class certification denied for a class of all sellers of single family residences who paid "artificially

fixed and illegal" brokerage fees because the class was defined in terms which prejudged the

merits).  A court must reject a proposed class or subclass definition that "inextricably intertwines

identification of class members with liability determinations."  Pichler v. UNITE, 228 F.R.D. 230,

247 (E.D. Pa. 2005), aff'd, 542 F.3d 380 (3d Cir. 2008).

    An ill-defined class definition is all-the-more problematic when plaintiffs are seeking

certification under Rule 23(b)(3). Under 23(b)(3), class members have to be able to determine

whether they are in the class so that they can decide whether to exercise their right to object to or

opt out of the class.  See In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1104-1105, (5th

Cir. 1977) (Without a clear class definition, prospective class members lack adequate notice and

cannot exercise their right to make an "informed, intelligent decision of whether to opt out or

remain a member of the class and be bound by the final judgment.").  If the class definition is

based on a merits determination, prospective plaintiffs may not recognize that they are in the class,

and may be deprived of the opportunity to object or opt out.  See Kresefky v. Panasonic

Communications and Systems Co., 169 F.R.D. 54, 62 (D.N.J. 1996) ("Precision in pleading is

essential because ... an overbroad class carries potential for unfairness to class members.").

The Court concludes that membership in the Debtor Subclass is not readily ascertainable

based on objective criteria.  The Subclass definition includes prospective plaintiffs who received

demands for payment which Defendants were "not authorized and/or not intending to pursue" and

those plaintiffs who received demands that "falsely represent[ed] that debts were owed."

(Plaintiffs' Motion for Class Certification at 3-4.)  To determine membership in the proposed

Subclass under these criteria, the Court would have to establish whether the patient was billed for

an amount that was not due and owing.  Further, the Court would be forced to consider evidence

and make credibility determinations regarding the Defendants' intent.  In doing so, the court would

be making an impermissible inquiry into the merits of prospective Subclass members' claims.

Therefore, the Plaintiffs' motion to certify the proposed Debtor Subclass is denied.[23]

## IV.  CONCLUSION

For the reasons stated above, the Court denies Plaintiffs' motion for class certification in its

entirety.

---

[23] Plaintiffs suggest that, if necessary, the Court should exercise its discretion to amend
Plaintiffs' proposed Subclass definition *sua sponte*.  Because this action currently involves a
class and four subclasses, with each asserting eight separate causes of action, the Court is
persuaded that the contours of an amended subclass are better fashioned by the Plaintiffs.  See
U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 408 (1980) (finding that, on remand to the
district court, the burden to propose certifiable subclasses was on the respondent rather than the
court).  Therefore, the Court declines to *sua sponte* amend the Debtor Subclass definition.