UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 04-4362-SRC


DENISE AGOSTINO, et al.,                    MOTIONS

        Plaintiffs,

vs.

QUEST DIAGNOSTICS, INC.,
et al.,

        Defendants.
_____

                        September 7, 2010
                        Newark, New Jersey



B E F O R E:   HONORABLE STANLEY R. CHESLER, USDJ



Pursuant to Section 753 Title 28 United States Code, the
following transcript is certified to be an accurate record
as taken stenographically in the above-entitled
proceedings.


S/Jacqueline Kashmer____
JACQUELINE KASHMER
Official Court Reporter




                JACQUELINE KASHMER, C.S.R.
                OFFICIAL COURT REPORTER
                    P. O. Box 12
                Pittstown, NJ 08867
                  (908) 229-6496

```
 1     A P P E A R A N C E S:

 2

 3          TRUJILLO, RODRIGUEZ & RICHARDS, LLP
            258 Kings Highway East
 4          Haddonfield, NJ 08033
            BY:  LISA J. RODRIGUEZ, ESQ.
 5

 6               and

 7

 8          WHALEN & TUSA, P.C.,
            33 West 19th Street - 4th Floor
            New York, NY 10011
 9          BY:  JOSEPH S. TUSA, ESQ.
            For the Plaintiffs
10

11

12          REED SMITH, LLP
            Princeton Forrestal Village
13          136 Main Street - Suite 250
            P.O. Box 7839
14          Princeton, NJ 08543-7839
            BY:  MARK S. MELODIA, ESQ.
15               DIANE BETTINO, ESQ.
            For the Defendant Quest Diagnostics, Inc.
16

17

18          GARRITY, GRAHAM, MURPHY GAROFALO & FLINN,
            72 Eagle Rock Avenue - Suite 350
19          East Hanover, NJ 07936
            BY:  PETER CIPPARULO, ESQ.
20          For the Defendants American Medical Collection
      Agency, Russell Collection Agency, Credit Bureau Central,
21    Quantum Collection, Seattle Service Bureau, Inc.

22

23

24

25
```

```
 1          THE CLERK:  Agostino vs. Quest Diagnostics, 04-4362.
 2     Please note your appearances for the record.
 3          MR. TUSA:  Joseph Tusa from the firm of Whalen & Tusa
 4     for the plaintiffs, your Honor.  Good morning.
 5          MS. RODRIGUEZ:  Good morning, your Honor.  Lisa
 6     Rodriguez also for the plaintiffs.
 7          THE COURT:  Good morning.
 8          MR. MELODIA:   Good morning, your Honor.  Mark
 9     Melodia from Reed Smith for the defendant Quest.
10          MS. BETTINO:  Good morning, your Honor.  Diane
11     Bettino, also from Reed Smith and also on behalf of Quest
12     Diagnostics.
13          MR. CIPPARULO:  Good morning, your Honor.  Peter
14     Cipparulo from the law firm Garrity, Graham, Murphy,
15     Garofalo & Flinn on behalf of the defendants American
16     Medical Collection Agency, Russell Collection Agency,
17     Credit Bureau Central, Quantum Collection, Seattle Service
18     Bureau, Incorporated.
19          THE COURT:  And Mr. Cipparulo, they've disowned you
20     over there.  They've made you --
21          MR. CIPPARULO:   I just like to be as far away from
22     the fray as possible, your Honor.
23          THE COURT:  All right.
24          MR. CIPPARULO:  Thank you.
25          THE COURT:  Okay.  Who's going to be arguing for
```

1    plaintiffs?

2         MR. TUSA:  I will, your Honor.

3         THE COURT:  All right, Mr. Tusa.  It's your motion.

4    I'll hear you.

5         MR. TUSA:  Thank you very much.  Does your Honor

6    prefer we use the podium?

7         THE COURT:  Wherever you are comfortable.

8         MR. TUSA:  If it's okay with your Honor, I'll stay at

9    counsel table.  I'm fighting a little bit of a cold.  If

10   you need me to speak up, please let me know.

11        With your Honor's indulgence and permission, I may be

12   referring to some hearing exhibits we brought with us.  I

13   prepared a packet of them.  May I hand it up?  I have

14   plenty.

15        THE COURT:  Sure.  Make sure opposing counsel has

16   copies.  Thanks.

17        MR. TUSA:  These are the same charts.

18        THE COURT:  Okay.  Thank you, Mr. Tusa.

19        MR. TUSA:  Thank you, your Honor.  As your Honor is

20   aware, this is plaintiffs' renewed motion for class

21   certification.  We had made a motion about three years ago.

22        About a little more than a year ago, February 2008, I

23   believe, your Honor decided it, denying class

24   certification.

25        From plaintiffs' perspective, I think the first thing

1    I could say is, you know, we took your Honor's opinion very

2    seriously.  We abided by it very closely.  My colleagues

3    and I spent a good amount of time deciding whether or not

4    we should seek 23(f) appeal.

5         Your Honor wrote an extraordinarily in-depth opinion

6    and after reading it, we decided it was, in fact, a road

7    map of how we could perhaps renew our motion.

8         I think what came through in your Honor's first

9    opinion, came through crystal career, you thought we bit

10   off too much.  You thought we tried to go after too much,

11   too many legal claims, too many practices.  I think that

12   came through crystal clear to plaintiffs and I sort of want

13   to start out where defendants' opposition starts out, with

14   this notion that somewhat gets mixed up that either we

15   weren't allowed to make a renewed motion for class

16   certification or that, if we were, it's nothing more than a

17   retread of our --

18        THE COURT:  We'll stop that.  All right.  There's no

19   doubt that you're allowed to make a renewed motion.  All

20   right.  And indeed, look, my comments when we had our

21   informal conference were really directed at two issues; one

22   which was, yeah, you took a good long time to look over

23   what you wanted to do with this complaint, about a year.

24        And secondly, as I commented, the fact that Judge

25   Dickinson Debevoise and I came out with different analysis

1    on choice-of-law issues is not a basis for a

2    reconsideration motion.

3         And I will tell you today that that is a view which I

4    continue to adhere to.  To the extent that there is, you

5    know, a difference of opinion between Judge Debevoise and

6    this Court, if it ultimately has to be resolved, it will be

7    resolved by the Third Circuit Court of Appeals.

8         But, quite frankly, you indeed have a different class

9    that you are defining at this point and that raises

10   different issues to some degree.  So, let's get both of

11   those out of the way.  All right?

12        MR. TUSA:  Fine.  Good.  That, I mean that clears the

13   slate and brings us exactly to where we want to start.

14        Leaving aside, and we agree a hundred percent about

15   the right to make a new motion, our first hearing exhibit,

16   your Honor, and I'm not going to belabor the point at this

17   point in time, goes through the differences between the

18   first motion and the second motion because -- a number of

19   reasons.

20        You know what, those differences are what are at

21   issue today and in this present motion, I think one of our

22   pointed critiques of the defendants' oppositions is they

23   somewhat relive the past.

24        A good amount of their opposition brief, for

25   instance, likes to talk about individual issues that they

1    believe still need to be addressed, citing very liberally

2    your Honor's first opinion talking about, for instance --

3         THE COURT:  You're all very good at citing those

4    portions of my opinion which favor you.

5         MR. TUSA:  I'm sure we do.  I'm sure we do, your

6    Honor.  That all being said, your Honor has another

7    comprehensive set of briefs in front of you.  We were not

8    intending today to go through all of those points.  You

9    have our briefs.

10        I want to just pick up on just a few of the items,

11   perhaps raise a few issues that have come to light in the

12   court decisions since we've briefed it and, of course, and

13   most directly address any questions your Honor has.

14        So, like I say, the exhibit chart number one is

15   really the differences between the first and the second

16   motion, and some of them are quite pointed.

17        For instance, in the first motion, your Honor, we

18   were seeking both a (b)(2) and (b)(3) classes.  We no

19   longer seek (b)(2) classes.  We no longer seek injunctive

20   remedies.  We no longer seek equitable remedies.

21        THE COURT:  In other words, you decided you're not

22   going to try for belt and suspenders.

23        MR. TUSA:  We are not going to try for belt and

24   suspenders.  Again, I say, your Honor, we read your opinion

25   very closely and while I won't stand up here and say my

1    colleagues and I agreed with it all, we read it and, for

2    instance, we limit all of our classes to only those people

3    who have ascertainable out-of-pocket losses.

4        No longer do we say somebody is going, you know, just

5    because they were billed in an inappropriate way, should

6    they be in the class.

7        The one exception to that is for the debt collector

8    class, the FDCPA does recognize a statutory violation, and

9    that's a small part.

10       Last time, the first chart I showed your Honor were

11   nine Quest pre-EOB billing practices.  Save for billing of

12   Medicare patients, we don't rely on any pre-EOB billing

13   practices anymore.

14       We pick up from where defendants and their experts

15   and their counsel last time said one needs to pick up, from

16   the issuance by the insurance company of an EOB or an EOB

17   that's electronic is called an ERA, electronic remittance.

18       For today's hearing, your Honor, I will just use the

19   term EOB but I will be referring to the electronic version

20   and the regular version.

21       We no longer seek any class for ERISA.  We no longer

22   seek any class for common law fraud.  We only have one

23   class that seeks breach of contract under one state law.

24   That is our Anthem Blue Cross Blue Shield class.  It relies

25   on one provider agreement, that provider agreement being

1     Quest, Anthem Blue Cross Blue Shield, and one sub-plan,

2     because your Honor was pretty clear last time that there

3     are a lot of provider agreements, there could be sub-plans

4     within provider agreements and that could cause additional

5     manageability and predominance issues, so, we have limited

6     that class now, Anthem Blue Cross class.  One provider

7     agreement, one sub.  That sub-plan being the Federal

8     Employees Health Benefits program.

9          And why that one?  Because our class rep, Mr.

10    Grandalski, was a member of that plan and that sub-plan.

11    He was a 37-year employee of the Department of Agriculture,

12    retired now, retired as the director of civil -- I think

13    assistant director of some civil compliance, now in

14    retirement works for the United States and the World Bank.

15    That's why that's the plan.  That's why that's the

16    sub-plan.

17         Our choice-of-law analysis, you touched on it before.

18    I am not going to stand up here and try to change your

19    Honor's mind on the choice-of-law standards.  You have our

20    briefs.

21         The one additional thing I would add to our briefs is

22    the Third Circuit's opinion in Cooper v. Samsung.  We think

23    it adds quite a bit.

24         THE COURT:  I'm just curious how -- first -- actually

25    two things.  First of all, and I will candidly caution both

1    of you, when the Third Circuit issues a non-precedential

2    opinion, the Court, of course, is going to examine it for

3    its persuasive authority, but that's what it is.

4         The Third Circuit has repeatedly cautioned district

5    courts they are not to treat non-precedential opinions as

6    if they were precedential opinions.

7         Indeed, if I take a look at that opinion, if I recall

8    correctly, two of the three judges who authored that

9    opinion are on senior status, and the third judge dissented

10   and actually, as far as I can see, it is a dissent which

11   most strongly favors your position because the dissent, in

12   fact, seems to take the position that Judge Debevoise, in

13   Mercedes-Benz, got it right and that the issues which Judge

14   Debevoise focused on in Mercedes-Benz, if we were going to

15   use subdivision two --

16        MR. TUSA:  Right.

17        THE COURT:  -- would have warranted at least a very

18   careful consideration of New Jersey law as being the choice

19   of law.

20        The other two judges using subdivision two said

21   taking a look at all these factors, we still end up with --

22   I forget which Midwestern state it was --

23        MR. TUSA:  Arizona.

24        THE COURT:  -- Midwestern state substantive law

25   applies, New Jersey's Consumer Fraud Act does not get extra

1    territorial effect and will not be able to export its

2    civilizing aspects to benighted sections of the country.

3         MR. TUSA:  Your Honor's recall is a hundred percent

4    correct and, again, it wasn't my intention to belabor that

5    aspect of our choice-of-law opinion today.

6         THE COURT:  Okay.

7         MR. TUSA:  I know it's an area of interest to your

8    Honor and your Honor was correct in the opinion.

9         We cite, of course Cooper is an NPO opinion, as is

10   Nafar, which the Third Circuit also slightly dipped its toe

11   into these issues as well.

12        THE COURT:  And in fact, if you folks have been

13   paying very careful attention, the Third Circuit vacated

14   the decision in DeBeers.

15        MR. TUSA:  Yeah.

16        THE COURT:  And is going to hear it en banc, and that

17   could create one of the more interesting issues about

18   choice-of-law analysis, although of course, as you're all

19   fully aware, that the choice-of-law issue, coupled with

20   what is -- well, not coupled with an issue which is present

21   here, which is manageability.

22        MR. TUSA: We, of course, read your Honor's opinion in

23   Sullivan.  We read the Third Circuit's pre-vacation opinion

24   in Sullivan and the order vacating it, and your Honor is

25   right, the Third Circuit is going to continue along with

```
 1        its instructive analysis in the area of certification of

 2        multi-state classes.

 3             You know, obviously they're at the vanguard of this

 4        issue back when they decided the Prudential sales

 5        litigation in '98.  They added something to it in the

 6        Warfarin analysis I believe in 2004.  Again, those were

 7        both settlement opinions, in where both instances the court

 8        said, sure, you can group the multi-state.

 9             Now, those were settlement classes, so, admittedly

10        they didn't have the touch on manageability and

11        superiority, but the Warfarin court, and I believe -- yeah,

12        the Warfarin court, and I'm trying to remember the decision

13        afterwards, were careful to say just because you have

14        multiple states and you see certification in multiple

15        states, you are not going to run afoul necessarily of

16        predominance and commonality.

17             Of course, and plaintiffs acknowledge this, there is

18        a burden to be shouldered if you are the plaintiffs and you

19        seek a multi-state class certification, as we do for at

20        least one of our legal claims.  The burden is on us to show

21        you that it is manageable in a non-settlement context and

22        to the extent predominance and commonality and typicality

23        come into play, certainly those as well.

24             If it's okay with your Honor, I'm going to put choice

25        of law aside for the moment.
```

1      THE COURT:  Okay.  Except let me ask you one other

2  question.

3      MR. TUSA:  Sure.

4      THE COURT:  You cite a couple of cases which

5  essentially assert -- all right -- and on the choice of law

6  issue, of course, the key is the Consumer Fraud Act and

7  whether or not it can be applied to a nationwide class.

8      Your alternate B is groupings of consumer fraud type

9  statutes, and I've read your briefing on that, on both

10  sides.

11     Alternate C, I will tell you, I've read those

12  opinions.  Exemplars, what are exemplars?  Are these test

13  cases they're talking about?

14     MR. TUSA:  You're making reference to the Relafen

15  opinion and the Carzem opinion?

16     THE COURT:  Yes.

17     MR. TUSA:  The federal judges in Relafen, District of

18  Massachusetts, which was Chief Judge Young, and I'm trying

19  to recall the judge's name in Carzem way back when it was a

20  case -- I'm sorry, escapes me at the moment -- faced with a

21  multiple state certification, these were primarily cases

22  that challenged pharmaceutical drug pricing.

23     THE COURT:  And they're antitrust cases, and they're

24  antitrust cases and they -- the problem was national class,

25  was a federal antitrust case and the problem with state

1    class, state antitrust certification was Illinois Brick and

2    Illinois Brick Repealers.  Gee, sounds like DeBeers.

3        MR. TUSA:  Sounds a lot like DeBeers.  As your Honor

4    is most acutely aware from your DeBeers experience and

5    perhaps others, the Illinois Brick Repealer states have

6    been entered not nationwide.  It's a decision certain state

7    legislators have made and, more to the point, some state

8    legislators, some state courts recognizes Illinois Brick

9    Repealers, some in the antitrust statute, some in the

10   consumer protection statute.

11       THE COURT:  I'm trying to understand what this Court

12   did.  They certified a national class on federal antitrust

13   claims and did not certify a national class on state

14   antitrust claims.

15       MR. TUSA:  Your Honor asked whether there was --

16       THE COURT:  And what did they do?

17       MR. TUSA:  Well, your Honor asked if they certified a

18   test case.  It seems to me that they did certify a test

19   case.  They wanted to take the case through the pretrial

20   phase using the test case.  They're going to try it, that

21   case, and assuming it worked out for the plaintiffs, then

22   the court apparently was going to deal with the remainder

23   of the certifications.

24       I could tell you in both cases it never got to that

25   because the cases settled.

```
1        THE COURT:  Okay.  But let me ask you this.  If I
2   were in theory to do that -- well, let me take it back.
3   Step back.
4        MR. TUSA:  Sure.
5        THE COURT:  Let's take those test cases.  Suppose
6   they certify a national class, a federal antitrust Sherman
7   violation act, if I recall correctly.
8        MR. TUSA:  Sure.
9        THE COURT:  All right.  And they certify six exemplar
10  states and they try state antitrust claims against
11  remote -- involving remote purchases in those exemplar
12  cases.  Now, the view is then towards coming to a
13  settlement.  Correct?
14       MR. TUSA:  I can't necessarily put myself in Chief
15  Judge Young's head.  I imagine it certainly was a factor in
16  it, although I don't know why exactly he did --
17       THE COURT:  Well, exemplar cases are typically used
18  in cases which have been consolidated by the panel on
19  Multi-District Litigation to, in fact, see whether or not
20  there is a pattern that can be used to do overall mass
21  settlements.  Correct?
22       MR. TUSA:  And both of those were JP MDL cases.
23       THE COURT:  Okay.  Now, my question is suppose you
24  did some exemplar cases in those antitrust cases.
25       MR. TUSA:  Sure.
```

1       THE COURT:  And suppose the remote purchases did well

2   and got recoveries in those test cases.

3       If the panel decision in DeBeers were to stand, there

4   would still be no possible settlement, would there, because

5   at its core, the panel decision in DeBeers says you can't

6   do a class certification for a class where members of your

7   class have no cause of action whatsoever.

8       MR. TUSA:  That is what's -- that is some of what

9   Sullivan says, your Honor.  Yes, your Honor.

10      THE COURT:  Look, if I put Judge Jordan's holding in

11  plain English -- all right -- that's what it says.  It says

12  I tried to put apples and oranges together in this

13  settlement.

14      MR. TUSA:  Well, I'd answer a couple fold, your

15  Honor.  I don't disagree with your Honor's reading of it.

16  In reading the panel decision in Sullivan, I think my

17  colleagues and I -- I speak for myself if nothing else --

18  thought it was a little odd that the body of the decision

19  said that and in the footnotes would commonly say but we're

20  not saying this could never happen just on these facts.

21      Now, I don't -- let me say something.  I don't

22  disagree with -- I don't disagree with both Judge Jordan's,

23  and to the extent your Honor agrees with Judge Jordan's

24  comment, that you can't allege a class from a state statute

25  where there is no claim.  And for instance, let me just

1    suggest, we have suggested grouping the statutes in two

2    groups, your Honor, and we don't have all the state

3    statutes.

4        There are nine states that we have no statutes for.

5    Why is that?  Because there either is no private right of

6    action, ala Iowa under its separate practice statute.  Some

7    state separate practice statutes don't allow class actions;

8    Alabama, Mississippi, South Carolina.  They're not in our

9    grouping.

10       So, I don't disagree with your Honor that you can't

11   include in your state-by-state grouping analysis states

12   where there's no cause of action.  I don't agree with that.

13   I think we took care in our grouping analysis for the

14   states' separate practice statutes to only include those

15   statutes where there is a private cause of action and class

16   actions in particular are permitted.

17       Of course we don't draw on a blank slate.  There are

18   any number of opinions.  You know that we relied somewhat

19   heavily on Judge Saris' opinion in AWP.  Seventh Circuit

20   has recently done this in Pella, to a lesser extent.

21   Correct.

22       We submitted to your Honor a compendium from the

23   National Consumer Law Center, all 51 -- actually, it's more

24   than 51 because they include some of the United States

25   territories like the Virgin Islands and Guam, all of the

1    states' separate practice statutes we submitted, that's

2    2009 compendium, so, we took a very close look at those

3    consumer protection statutes, only proposed those that we

4    thought there was a private cause of action on these facts.

5         So, I don't disagree with your Honor that -- and I

6    don't think plaintiffs' propose state separate practice

7    claims for a state where a claim -- this is not a

8    settlement class, certainly not this juncture, and so, we

9    were careful to abide by that.

10        I was going to move on but let me just stick with

11   choice of law for just a moment to mention -- I think your

12   Honor said, and your Honor is right, the way the new motion

13   has broke out, choice of law really only applies to one of

14   plaintiffs' state claims.  That is the state consumer

15   protection statutes.

16        We no longer seek any class for common law fraud.

17   Our breach of contract is limited to one contract and one

18   state, that's Connecticut.  And your Honor has previously

19   held, and nobody has disputed at least on this motion, that

20   unjust enrichment law is not conflict driven and therefore

21   we could apply New Jersey law nationwide.

22        So, the only state claims for which we proffer

23   classes on are the state consumer protection statutes and

24   admittedly we are at odds with defendants on the proper

25   choice of law.

```
 1          Your Honor has correctly also noticed we proffered

 2     three ideas, New Jersey, CFA nationwide.  Your Honor has

 3     made himself clear on that.

 4          I mentioned Cooper.  Fair enough.  I just want to

 5     mention two other cases just so it's in the record.

 6          We think the Supreme Court's decision in Hertz v.

 7     Friend has some bearing on this, and there have now been at

 8     least two district court opinions, including the Federal

 9     Circuit last week, that relied on Hertz v. Friend in

10     conducting its choice-of-law analysis.

11          THE COURT:  Okay.  Well, I will tell you that, and

12     with the greatest respect for the Fed Circuit --

13          MR. TUSA:  Federal Circuit, but yes, your Honor.

14          THE COURT:  Yeah.  With the greatest respect for the

15     Federal Circuit, I don't buy it.

16          MR. TUSA:  Okay.

17          THE COURT:  I mean Hertz, you read through Hertz --

18     look, they admit in the end that they have made a decision

19     predicated in large part on expediency.  They want a bright

20     line test for jurisdictional purposes.  They recognize that

21     there are theoretically any number of different bases which

22     would be used to determine the principal place of business

23     of a corporation.

24          They chose a test which, in fact, would not have the

25     district courts trying to figure out how many angels dance
```

1    on the head of a pin every time they've got a subject

2    matter jurisdiction issue.  And I mean, if you read the

3    subtext of the opinion, that ultimately is the rationale

4    for it, not some sort of overarching scheme about what

5    constitutes the location of a corporation for all purposes

6    generally.

7         MR. TUSA:  Listen, your Honor's made yourself clear

8    on this.  We won't belabor --

9         THE COURT:  Let me ask you, am I wrong?

10        MR. TUSA:  Listen, the Supreme Court was dealing with

11   a common problem the Supreme Court always deals with,

12   different circuits reaching different conclusions on a, in

13   this case, threshold matter, subject matter jurisdiction.

14        By choosing the nerve center test as they chose it,

15   yes, part of it was expediency, but they could have just as

16   easily for expediency purposes chose one of the alternative

17   proffers and they thought nerve center test where the

18   officers of the corporation made corporate level decisions,

19   that really, you know, from their principal place of

20   business, they thought, yes, expediency was one part of it,

21   but that was the one that I can only imagine a unanimous

22   Supreme Court decided made the most logistical sense.

23        Now, mind you, your Honor, it was diversity

24   jurisdiction.  We don't pretend to stand up here and say it

25   was a choice-of-law opinion.  However, it's a fairly new

1       opinion, January 2010, I believe, and already the district

2       courts are using it in their restatement of

3       conflict-of-laws analysis because one of the subsections,

4       whether you use subsection one or two, has to do with where

5       the statements are being emanating from.

6            Your Honor may not agree with that, but to the extent

7       that your Honor is asking our opinion --

8            THE COURT:  Okay.

9            MR. TUSA:  -- we do believe Hertz bears on it for

10      that way.  But your Honor seems to have very definite and

11      strong feelings on that subject and I don't want to belabor

12      this morning's argument.

13           THE COURT:  I have very definite and strong opinions

14      that you don't take a Supreme Court decision which is

15      designed and intended to deal with a very specific

16      pragmatic issue which has been deviling the federal courts

17      for decades now and say, oh, they have come up with a

18      Rosetta Stone and apply it to all sorts of other situations

19      where they didn't even purport to voice an opinion.

20           MR. TUSA:  Fair enough, your Honor.

21           THE COURT:  Okay.

22           MR. TUSA:  I do.  For the time being and perhaps the

23      rest of this hearing, I'm going to move off choice of law.

24      Maybe I'll come back if your Honor has more questions.

25           THE COURT:  Okay.

1          MR. TUSA:  Okay.  I probably will want to circle back

2     to some of our grouping analysis a little bit later.

3          Okay.  So, our first chart today was not so much for

4     just the point that we can make a new motion, we wanted to

5     make it very clear that we put a lot of thought and care

6     into reading your Honor's opinions and these are all new

7     aspects of our motion.

8          I want to sort of segue at this point in time into

9     one of our classes, the post-EOB billing class.  That is

10    the one -- this is hearing chart two for those following at

11    home and, your Honor, we read not only your Honor's opinion

12    but defendants' statements in their briefing, their expert

13    statements and the hearing transcript, and uniformly what

14    they said, and we have excerpted some of their statements

15    in this hearing exhibit number two, is if you want to talk

16    about patient billing, you cannot start before issuance of

17    the EOB.

18         The EOB is the critical document, according to

19    defendants, that tells Quest if it can bill, when it could

20    bill and how much it could bill.

21         And excerpted on hearing chart two is, we have

22    statements from Quest, from their counsel, from their

23    expert.  They say uniformly the EOB is the critical

24    document, the one that Mr. Melodia said last time we could

25    take it to the bank that what is on the EOB is the amount

1    the patient owes, nothing more, nothing less.

2        Fine, we said.  We're limiting our class, our EOB

3    billing class, to just those people who were billed after

4    the EOB in an amount in excess of what the EOB said was

5    patient's responsibility, and because your Honor's

6    ascertainable loss statements and opinion, only those

7    people who paid in excess of what they owed.

8        Now, the defendants said, well, nobody should be

9    billed above the EOB.  That's what their statement said,

10   and, yet, in their opposition to our present motion,

11   somewhat astounding to plaintiffs, they say there are tens

12   of hundreds of thousands of people who fit into this class.

13   By the way, tens of hundreds of thousands of people is

14   millions to us.

15       It's quite an astounding thing to hear them say after

16   they repeatedly told your Honor nobody should be billed --

17   the EOB is the document.  The insurance company is the

18   adjudicator.  It's the one we rely upon.  It's the one that

19   summarizes the provider agreements, the patient's benefit

20   plan, all of those things.

21       It's the one that we relied upon and, yet, now they

22   say there may be millions of people who were billed in

23   excess of EOBs and who paid in excess of EOBs.

24       THE COURT:  Well, then you satisfied numerosity.

25       MR. TUSA:  Thank you, your Honor.  I don't think -- I

1    don't believe that one is contested.

2            Not to be too glib about this, what defendants do say

3    is you haven't solved the problem because we -- before we

4    criticized you for relying on the provider agreements and

5    the state separate billing laws, and now they say, oh, no,

6    now you got to look at those again.

7            In some respects this is a sort of damned-if-you-do,

8    damned-if-you-don't approach by the defendants.

9            We did what they said.  We did what the Court said.

10   We defined our class running from the EOB and we're only

11   including people like Mr. Grandalski, who is our class rep,

12   who was billed afterwards in excess and paid.

13           Why did they pay?  They got a bill from Quest saying

14   they owed the money.  You could read the statements from

15   their own expert, Dr. Dyckman.  It's the last quote on our

16   charge.

17           It says, "In addition to the requisition, the EOB is

18   of critical importance in regard to laboratory patient

19   billing.  It instructs the laboratory whether to bill the

20   patient and how much to bill the patient based on the

21   patient's benefit coverage and the pricing provisions of

22   the payer's contract with the laboratory."

23           He doesn't say and, of course, in practice Quest

24   doesn't have to pull out its provider agreement every time

25   they bill a patient.  That's not what happens.  They rely

1    on the EOB.

2         So, for them to now say we couldn't possibly have an

3    EOB -- a post-EOB billing class without looking at the

4    provider agreements and the state anti-balance billing

5    laws, it's not only disingenuous, it's not what they do in

6    practice.  They do bill everybody based on the EOBs.

7         Now, they said there are millions of people in this

8    class.  What they didn't say and what we expected them to

9    say is, listen, we may screw this up but in the days and

10   weeks that follow, we fix it because we eventually can

11   match everything up and we fix it.

12        Indeed, you know, their director of technology, this

13   gentleman, Mr. Hanlon, had said, and we quoted this as well

14   in our reply brief, he says, "For every claim, we know all

15   cash and adjustments and whether or not the cash that was

16   logged was insurance cash and patient cash."

17        But we didn't see a defense from Quest that they gave

18   the money back.  So, what we have is a scenario and class

19   here where all of these people like Mr. Grandalski, who is

20   our rep, was billed in excess of what his insurance company

21   told Quest they could bill him.  He paid it.  He never got

22   his money back.

23        I should mention that this is not the first time he's

24   complaining about this.  Mr. Grandalski complained to the

25   company and to their debt collectors, Quantum and CBC, who

1    Quest used to chase him and his wife down four times for

2    ten extra dollars.

3         When those complaints hit a brick wall, he complained

4    to the Nevada Attorney General because he was living in

5    Nevada at the time.  He was posted to Nevada.

6         The Nevada Attorney General -- I know your Honor is

7    not keen from our last hearing on hearing what state

8    officers say about these kinds of things, but the Nevada

9    Attorney General decided that what Quest did to Mr.

10   Grandalski and what the debt collectors did to Mr.

11   Grandalski was, quote, unquote, "illegal deceptive

12   practice."

13        They told -- their counsel told Nevada Attorney

14   General they were going to refund Mr. Grandalski's money.

15   They never did.  I don't think that point is at issue,

16   either, and I sort of just want to highlight Mr.

17   Grandalski's experiences a little bit because he is the

18   plaintiff for three of our four classes.

19        So that's my hearing chart number three, your Honor.

20   Four dates of service.  He was insured by Anthem Blue Cross

21   Blue Shield every time, which dovetails into our Anthem

22   Blue Cross class.  The date of the EOB and the amount the

23   EOB is set.  In every case there was $20, that was his

24   co-pay.

25        The date the EOB was -- if you notice the date that

1    either Quest or one of their two debt collectors, Quantum

2    or CBC, billed him, are months after the EOB was received.

3    And what they did is they tacked on an extra ten bucks

4    because they decided they had to send it to their debt

5    collectors and they were going to tack on an extra ten

6    bucks.

7         That dovetails a little bit into our FDCPA claim, but

8    more on that later.

9         Their own expert, Dr. Dyckman, says this look like

10   this was a problem.  Your Honor, in your prior opinion,

11   noted the fact that Quest did not deny that the last time

12   around we called a similar class this, which for the equity

13   were remedy subclass, we had bankruptcy people shoved in

14   there.  Your Honor didn't like that.  We threw the

15   bankruptcy people out.

16        Your Honor noted that defendants don't contest Mr.

17   Grandalski as a member of this subclass who was billed

18   after the EOB in excess of the EOB and paid.  So, that's

19   our class rep.

20        We don't possibly see -- you know, listen, we think

21   that we meet all of the Rule 23(b)(3) and (a) criteria for

22   this EOB billing class.  We don't possibly see how we

23   cannot.

24        Defendants raise one of the most rogue defenses that

25   you normally see.  They're, like, well, everybody's damages

1    will be different.  Yes, that's true, but that is hardly

2    ever a reason to deny class certification.  There are

3    opinions ad nauseam stating that fact.

4        And otherwise, they generally rely on the fact that

5    they think they are going to have to go back and pull

6    provider agreements and look at state balance billings laws

7    which they continually told you -- well, they certainly did

8    tell you when we sought out prior classes that they didn't

9    have to do.  They said the EOB was the important document.

10       This is a common issue.  It's a common problem.  It's

11   a unitary -- it's a unitary claim on behalf of this class.

12   We think it satisfies predominance.

13       As far as superiority goes, your Honor made note of

14   the fact Mr. Grandalski was overcharged ten dollars.  You

15   know, it's an amount that is so small, that nobody is

16   otherwise going to sue on its own behalf for ten dollars.

17   It happened to him four times.

18       I'm, of course, reminded of Judge Posner's decision

19   in the Carnegie case, only a lunatic or fanatic sues for

20   ten dollars.  The alternative to a class action are not in

21   that case 17 million cases, but no cases.  Nobody sues for

22   ten dollars, certainly not a corporate behemoth like Quest.

23   It's just not worth it.  The only way this is viable is in

24   a class context.

25       THE COURT:  Let me ask you a question.

1          MR. TUSA:  Surely.

2          THE COURT:  If I recall correctly, this gentleman is

3     a class rep for all the classes except for the --

4          MR. TUSA:  Medicare.

5          THE COURT:  -- the Medicare class.  Okay.  Let's take

6     the RICO class.

7          MR. TUSA:  Yeah.  Well, the RICO claim.  There's not

8     a RICO class.

9          THE COURT:  Okay.  The RICO claim.  Okay.  Now, the

10     RICO claim is predicated upon multiple mail frauds as the

11     predicate offenses.  Correct?

12          MR. TUSA:  Mail and wire fraud, yes, your Honor.

13          THE COURT:  Okay.  And of course, that requires

14     scienter.

15          MR. TUSA:  Yes.  Of course, your Honor.

16          THE COURT:  Now, I'm trying to -- I was trying to

17     identify exactly where in the complaint you had described

18     the scheme and artifice to defraud that was engaged in by

19     Quest, and I do recall seeing it had a number of points

20     that constituted the scheme and artifice to defraud.

21          MR. TUSA:  Yes, your Honor.

22          THE COURT:  Including at its core billing when you

23     weren't entitled to bill.

24          My question is this.  Now, to make out this claim,

25     ultimately you're going to have to demonstrate that, in

1    fact, Quest possessed the requisite scienter.

2         MR. TUSA:  Yes, your Honor.

3         THE COURT:  And I'm trying to really in my own mind

4    sort of scope out what the scheme is or, more particularly,

5    is it pleading the scheme.  And here is what is hitting me

6    from looking at the pleadings.

7         There's no doubt that you indeed make factual

8    assertions that they billed people in excess of their EOBs.

9    On the other hand, there's also no doubt that thousands of

10   people, tens of thousands of people, hundreds of tens of

11   thousands of people, in defendants' words, were not billed

12   in excess of their EOBs.

13        So, I am trying to see how the complaint in fact

14   describes a scheme or artifice to defraud because the

15   complaint does not suggest any particular rhyme or reason

16   as to why Quest, when it sends out bills, sends out bills

17   with a flying fickle finger of fate, ends up with me

18   getting a bill in excess of my EOB and Miss Trivino,

19   sitting 30 feet away from me, she gets perfectly fine

20   bills.

21        I mean, and the complaint does not really describe

22   something other than frankly the result, which is lots of

23   people get EOBs and they get billed for amounts over their

24   EOBs.  Others don't.  And I'm sitting here, particularly in

25   the context of trying to figure out, well, how do we go

1    about actually managing this case?  How do we prove a

2    scheme?  What constitutes the kinds of proofs that would,

3    in fact, prove a scheme which had in fact the requisite

4    scienter to constitute a criminal violation since, as we

5    all know, while you've got a civil RICO, all that is is a

6    civil remedy to a criminal offense and you, in fact, have

7    to demonstrate that the criminal scienter existed.

8         Now, explain that to me, how this becomes, in fact,

9    something which is manageable and, perhaps more

10   significantly, how this is a class other than a class of

11   people who are described by virtue of, in fact, having been

12   found to have been victimized.  In short, not a discrete

13   class as it were.

14        MR. TUSA:  Your Honor asked a lot in your

15   explanation.  I'll try to answer as best I can.

16        I think your Honor inherently asked a pleading

17   question and a class question.  You asked where in our

18   complaint -- I presume your Honor was looking at the

19   operative first amended class action complaint I believe

20   filed in 2005, before any discovery was taken.

21        THE COURT:  Actually, I was looking at the second

22   amended --

23        MR. TUSA:  The proposed, yeah, the proposed amended

24   pleading.  That's the one we submitted, of course, with our

25   motion for intervention.  As your Honor is aware, Rule

1    24(c) requires us to submit that.

2         Now, I will tell you, save your Honor for updating

3    the class allegations and the dates of issue of service,

4    given Judge Lifland's motion-to-dismiss opinion, we did not

5    substantively change most of the allegations in that

6    complaint.  We certainly could.

7         I mean, of course, we're aware, and we have not at

8    this point in time tried, your Honor.  Rule 15, we can

9    conform the complaint to the evidence.  We haven't tried to

10   do that.  There hasn't been a suggestion -- well, firstly,

11   discovery is still in the middle, but we haven't had --

12   there's been not a suggestion --

13        THE COURT:  Let's assume that you do.  Let's assume

14   you do that, you amend the complaint to, in fact, assert

15   that there's a scheme and artifice to defraud patients who

16   go to Quest by billing them for amounts in excess of the

17   EOBs which were electronically issued by their respective

18   insurers.

19        MR. TUSA:  And I think your Honor asked the same

20   question probably two years ago when we were here on our

21   last motion.

22        THE COURT:  Did I?  My memory isn't that good

23   anymore.  That's what happens.

24        MR. TUSA:  And of course, I think the answer is

25   dramatically different for those classes than it is for

1    this class.

2         Last time we said, what is the -- Quest has these

3    nine corporate billing practices that ultimately are the

4    result of all of these billing problems.  They are all

5    pre-EOB issuance.  Okay.

6         And if I remember -- and I'm paraphrasing your

7    opinion now -- you said those were nothing -- billing

8    mistakes happen for a variety of reasons, I believe was

9    your Honor's quote or paraphrasing, and pre-EOB --

10        THE COURT:  Not with me.  With me, they're, as far as

11   I'm concerned, the improper bills I get are a conspiracy,

12   but I don't know about the rest of the world.

13        MR. TUSA:  I understand completely, your Honor.  So

14   your Honor took us to task last time, and I think in your

15   Honor's opinion -- and certainly this was defendants'

16   position -- that pre-EOB, billing mistakes happen for a

17   company this large who does this many transactions, your

18   Honor was willing to cut them the benefit of the doubt.

19        I don't think plaintiffs were.  I think they should

20   do their job better and if they don't do their job better,

21   they should have to be responsible for mistakes they make.

22        Your Honor was not of that opinion, I think it's fair

23   to say, in the pre-EOB world.  In the post-EOB world, I

24   think it's dramatically different.  Okay.  Quest has said,

25   their counsel has said, their experts have said, how does

1    Quest know what the right number to bill is?

2        They had actual knowledge when they get the EOB,

3    actual knowledge, and if they don't have actual knowledge,

4    they've recklessly disregarded it.

5        Page 27, footnote 11 of our opening class cert.

6    brief we cite a gentleman by the name of Gerald Diffley.

7    He's defendants' director of corporate compliance.  He said

8    all the EOBs or ERAs come in at one central place, a

9    department they call remittance applications is what Quest

10    calls it.

11        One department gets all of these things.  They then

12    turn around, if the EOB tells them they could bill, they

13    bill.  They use a billing vendor, this outside company that

14    we have made reference to called Regulus.  Quest doesn't

15    actually send out their own bills.  They send a very, very

16    large electronic file to this billing vendor, I believe

17    once or twice a day.  This billing vendor, Regulus,

18    actually sends the bills, I believe the testimony was, from

19    somewhere in the Midwest.

20        Now, we may be able to cut them some slack in the

21    pre-EOB world.  In the post-EOB world, there is absolutely

22    no excuse to give them the same degree of respect.  They

23    have what they have self-described as the critical document

24    in their hands to know the amount of the bill, the EOB, the

25    ERA.

1        For all of the people in this class, they are making

2    a decision, either with knowledge or with actual disregard

3    for the piece of paper they have in their hand, as to what

4    this person owes and when they owe it.

5        Now, Quest has decided and it uses debt collectors

6    and it uses this outside billing vendor, Regulus, that they

7    are not necessarily going to either in all instances comply

8    with the EOB or spend the right amount of time in setting

9    up the right compliance procedures to do it.

10        Now, I'm not -- we have -- you asked me what about

11    people who they didn't mess up.  They're not in a class.

12    We're not looking to include those people.

13        THE COURT:  I understand that.

14        MR. TUSA:  Okay.

15        THE COURT:  But my recollection is, and I may not

16    word it as articulately as I would like, but my

17    recollection is that in defining a class, as a general

18    rule, one can't define a class by saying we're going to

19    define the class by determining in fact which members have

20    been victimized by a practice; that there has to be some

21    unifying theme apart from the fact that there is

22    victimization, certainly at least as to a Rule 23(b), a

23    money damages class.  Injunctive class may be somewhat

24    different.

25        So, for example, you've cited to me Judge Hochberg's

1    decision and the Third Circuit's decision in the UCR

2    cases.  You're familiar with them.  Correct?

3         MR. TUSA:  I'm sorry.  What does that stand for?

4         THE COURT:  UCR is usual and customary --

5         LAW CLERK:   Usual and customary rate.

6         THE COURT:  Usual and customary rates.  It was a

7    class action in which the allegations were that the

8    insurance companies were routinely using a database for

9    determining what the usual and customary rates for medical

10   practitioners in a particular area were, which where

11   prepared, if I recall correctly, the allegation is by a

12   company called Egenix or Ingenix.

13        MR. TUSA:  I'm familiar.

14        THE COURT:  And the allegation was and is, because I

15   have some of these cases --

16        MR. TUSA:  Yeah.

17        THE COURT:  -- that this database was intentionally

18   played around with and that, in fact, the actual usual and

19   customary rates on an average were much higher than this

20   company reported, that the insurance companies were in bed

21   with the company and, therefore, everyone who was out of

22   network and who submitted a claim got reimbursements at a

23   much lower rate and the doctors got a much lower rate.

24        Now, there's a scheme.  All right.  There's a

25   unifying theory, might prove to be true, might prove to not

1    be true, but the unifying aspect of that was an allegation

2    that this database was in fact manipulated to lower across

3    the board in various geographic areas the calculation of

4    what the usual and customary rate of various practitioners

5    were and, therefore, people who got billed based upon that

6    ended up arguably being victimized.  Now --

7         MR. TUSA:  I believe your Honor is referring to the

8    Wachtel case.

9         THE COURT:  Yes.  Indeed, and you cited Wachtel.

10        MR. TUSA:  Not in these briefs, we didn't, your

11   Honor, but in our -- I believe now you're testing my

12   memory.

13        THE COURT:  Actually, I think you got Wachtel in here

14   also, if I recall correctly.  That's vague recollection but

15   we don't have to test my memory.  You may only prove that

16   it's failing.

17        MR. TUSA:  That's fair, your Honor.

18        THE COURT:  What I'm trying to understand is --

19   okay -- look --

20        MR. TUSA:  Sure.

21        THE COURT:  -- I understand that you are indeed

22   pleading a particular result, which is that people got

23   overbilled.  All right.  And you certainly are suggesting

24   that it was the result of improper conduct.  But the

25   complaint doesn't particularly allege what conduct -- what

1     scheme it is that results in this injury, and I'm sitting

2     here saying, okay, there's no doubt I've got you alleging

3     that people are injured.

4          Now, they have to have criminal intent.  They have to

5     intend to defraud or to create a scheme or artifice to

6     defraud of money and property now, unless they've got a

7     bribery scheme under current Supreme Court law.  All right.

8     And I'm trying to see how does that play in terms of how do

9     you prove intent.

10         MR. TUSA:  Your Honor is staying on the RICO so I can

11    appreciate that.  I believe you're asking us what we

12    believe the schemes -- your Honor, in your prior opinion,

13    spoke some about RICO and scienter.  Your Honor cited the

14    appropriate test in the Third Circuit and it is actual

15    knowledge or reckless disregard.

16         We don't understand, I say we, I mean plaintiffs, we

17    don't understand that a prerequisite for a RICO claim is

18    that every one of a defendant's customers must be the

19    victim of a particular scheme, and I don't know that your

20    Honor is suggesting that.

21         THE COURT:  I'm not suggesting that.

22         MR. TUSA:  I mean, in Wachtel and, of course, the

23    11th Circuit's decision in Clay, very similar case, yes, it

24    was essentially every single doctor, or Wachtel's case, I

25    believe every single private insured in that particular

1    case.

2         Now, it doesn't have to be that case.  Now, your

3    Honor recognized under the Third Circuit's standard of

4    scienter it could be actual intent or it could be reckless

5    disregard, and I think -- I don't know that we have enough

6    right now to say actual intent because we haven't certainly

7    gotten that discovery, but I think what we do have, and I

8    think what we have demonstrated certainly to the Third

9    Circuit's Hydrogen Peroxide standards, Quest has said this

10   should never happen.  They now just said this happens

11   millions of times.

12        We are either to suggest that that is a standard of

13   deviation, we as the plaintiffs, and the Court is willing

14   to live with, or they are intentionally turning their head

15   the other way and not realizing this massive mistake, which

16   coincidentally financially benefits them and hurts the

17   class and consumers.  Lucky for them, I suppose.

18        I believe it's our opinion that they either know or

19   should have known they have intentionally disregarded this

20   major error and that's enough for scienter for a RICO

21   claim.  Your Honor is asking about RICO.

22        Of course, the other claims we seek for both this

23   post-EOB billing class and some other classes are non-RICO-

24   based, they're also non-scienter-based.  But your Honor is

25   asking about RICO.  I can appreciate that.

1          I think that is our answer.  They have a department

2     that deals with this.  They are supposed to get this right.

3     They are telling you that they do get it right.

4          And now they're telling you that millions of people

5     have been billed in excess of EOB, paid in excess of EOB,

6     and we've heard no statement that they got their money

7     back.  Certainly Mr. Grandalski didn't.

8          Why should we give them the benefit of the doubt and

9     say these millions of people, these millions of errors,

10    hundreds, thousands, millions a day, why should they be

11    permitted to retain that money?  That's not their money.

12         Now, that's perhaps more of an unjust enrichment

13    concept that's equitable.  But if they have intentionally

14    disregarded what is under their noses, that's scienter.

15    That's knowledge.  That's fraud.  I think that's our

16    position.

17         THE COURT:  Let's go to the unjust enrichment class.

18    To a certain degree doesn't that get us back into specific

19    contractual provisions and state laws barring balance

20    billing?

21         MR. TUSA:  I'm sorry, your Honor.  Someone opened the

22    door.  I couldn't hear your question entirely.

23         THE COURT:  Doesn't that get us into issues of

24    specific contractual provisions about balance billing and,

25    likewise, issues about state statutes dealing with balance

1    billing?

2        MR. TUSA:  No.  It is certainly plaintiffs' position

3    that it does not.  Why?  Again, we come back to what the

4    defendants repeatedly have said.  You don't need to look

5    when you adjudicate a claim, when you send out a bill, you

6    don't need to look at the provider agreement.  You don't

7    need to look at the state balance billing law.

8        Certainly they don't look at those things when they

9    send out their bills everyday.  They look at the EOB.

10   According to their expert, Dr. Dyckman, we quote in the

11   paragraph exhibit chart two, the EOB reflects all of those

12   things.

13       Mr. Melodia said at the hearing last time all of

14   those things are wrapped up in the EOB.  If it weren't the

15   case, it would be such an unwieldy system, we would never

16   be able to send out a bill.  If they had to look at the

17   contract, the state law, every time they wanted to send a

18   bill, they would never send out a bill, certainly not a

19   timely bill.  All of that information is wrapped up in the

20   EOB.

21       Mr. Melodia said we are dependent on the EOB.  The

22   EOB says what you owe, what you can bill, how much you

23   could bill.

24       Of course, unjust enrichment is an equitable remedy.

25   It says they have money that they should not have had and

```
1    they should return it.  If you have paid more than the EOB
2    says you owe, if you paid it, if they have not given you
3    your money back, they are unjustly enriched.  From the
4    matter of equity, they should give the money back.
5            THE COURT:  What happens if you got two carriers,
6    primary and secondary?
7            MR. TUSA:  I'm sorry.  Is your Honor done with this
8    question?
9            THE COURT:  Yeah.  What happens if you've got two
10   carriers, primary and secondary, and they both issue EOBs?
11           MR. TUSA:  I presume your Honor's question is such
12   that the first carrier allowed Quest to bill and the second
13   carrier said no.  I presume two carriers with different
14   results.
15           THE COURT:  Let me put this way.  Have you ever had
16   two carriers?
17           MR. TUSA:  Personally no, your Honor.  But some of
18   our plaintiffs do.  I'm familiar with the scenario.
19   Primary insurance, secondary insurance, happens to a lot of
20   people on Medicare.
21           THE COURT:  Coordination of benefits issues.
22           MR. TUSA:  Sure.
23           THE COURT:  If they bill in excess of an EOB, does
24   that necessarily mean that they have in fact improperly
25   billed?
```

1      MR. TUSA:  The answer is still yes, and the reason is

2   if the secondary insurer adjudicates the claim after the

3   primary insurer adjudicates the claim to determine that

4   there is no responsibility because they had an agreement

5   with Quest, and that adjudication is reflected in their

6   EOB, no.  If the answer is zero, you shouldn't be billing.

7      Now, maybe Quest desires a little bit of leeway.

8   Maybe it should have a couple of -- it gets -- according to

9   Mr. Hanlon, they know all insurer cash received, all

10  patient cash received, so, maybe you say, fine, they should

11  have some time after the second EOB to make this right.

12     We're willing to let Quest say, fine, we gave these

13  people their money back because there were two payers.

14     That's not what they've said.  I don't think they

15  denied that if the secondary carrier is a contracted

16  carrier, participating providers, they have to also comply

17  with the secondary carrier, the first carrier.  They don't

18  distinguish between their legal obligations to comply with

19  both.

20     I don't think they also agree with the fact that

21  those obligations are also wrapped up in the EOB.  If there

22  is a difference, Quest has to comply with it because

23  they're both participating carriers.  They're both

24  contained in the EOB.

25     At best, at best, and this is not Mr. Grandalski's

1    scenario, but at best they bill, they receive some money.

2    They shouldn't get it.  They should give the money back.

3    And if they didn't refund it, they should refund it.

4         I don't see any other scenario that is equitable, if

5    you're talking about equity, and if you're talking about

6    legal, acceptable under the state consumer --

7         THE COURT:  What I'm asking is do I have to --

8    forgetting then about state statutes.  Do I have to look at

9    the contracts?

10        MR. TUSA:  I don't think you do.

11        THE COURT:  Do I have to look at coordination-of-

12   benefit issues?

13        MR. TUSA:  We don't think you do.  And the reason --

14   I mean, I could give you a different explanation, but I

15   keep on coming back to what defendants said, their expert

16   said, their counsel said.

17        If they had to look at all of those things when they

18   sent out a patient bill, it would never work.  The whole

19   system of patient billing that I guess we have and Quest

20   has would never work.

21        All of those things are contained in the EOB because,

22   you know, to borrow defendants' terms, it's in its hearing

23   exhibit 2, the insurance provider is the adjudicator.

24   That's the term they use.  They know all of those things.

25   They have incorporated all of those things.

1      The EOB is the only document you need.  That, when

2  we redefine these classes, we considered your Honor's

3  manageability concerns, and that's the document you need.

4      Now, listen, I realize Quest will say, both in

5  response to this motion and probably any class motion, not

6  doable, not doable, too difficult, too big, too unwieldy.

7      THE COURT:  I think your prediction is a hundred

8  percent correct.

9      MR. TUSA:  Thank you very much.  I've also read their

10  papers so I'm cheating a little bit.  But I think we need

11  to hold them to their prior representations which, quite

12  honestly, at least in this context are right.

13      THE COURT:  Okay.  Let me just, a couple of other

14  quick questions that I want to ask you, then I'm going to

15  give defense counsel a very brief time to be heard.

16      Let me ask this.  The debt collector class --

17      MR. TUSA:  Yes, your Honor.  I'm listening.  I want

18  to change charts.  Please go ahead.

19      THE COURT:  I'll make sure I get the mic a little bit

20  closer to me.  Do you have another chart for me?

21      MR. TUSA:  Two, but go ahead.

22      THE COURT:  Okay.  You're going -- I will tell you,

23  for the future, you're going to have to make charts for

24  geriatric judges.  All right.  That's way too far for me to

25  see.

```
1            MR. TUSA:  That's why we have the handouts as well.

2            THE COURT:  Okay.

3            MR. TUSA:  So that you have them in front of you as

4    well.

5            THE COURT:  Now, I've got essentially two claims in

6    your debt collector --

7            MR. TUSA:  Yes, we do.

8            THE COURT:  -- class right now.  One is misleading

9    threatening language.

10           MR. TUSA:  Yes.

11           THE COURT:  All right.  Either threatening something

12   which they were not authorized to do or threatening

13   something which they had no intention to do.

14           MR. TUSA:  True.  Yes, your Honor.

15           THE COURT:  All right.  And the second is charging

16   unauthorized fees for collection essentially.

17           MR. TUSA:  Yes.

18           THE COURT:  And as I understand it, by the way, I've

19   got Quest and the debt collectors pointing figures at each

20   other as to whose the source of these bills.

21           MR. TUSA:  Certainly not necessarily at one another

22   but at Quest, yes.

23           THE COURT:  Okay.  If I recall correctly, I've got

24   five debt collector defendants.   Is that correct?

25           MR. TUSA:  Well, you dismissed one.
```

```
 1            MR. CIPPARULO:  There's five left, your Honor.

 2            THE COURT:  There's five left.  Good.  All right.  I

 3       had granted summary judgment with regard to one of the

 4       plaintiffs already.

 5            MR. CIPPARULO:   That was Credit Collection Services,

 6       your Honor.

 7            THE COURT:  Okay.  Now, I've got two other

 8       plaintiffs.  Is that correct?

 9            MR. TUSA:  The representatives for this class?

10            THE COURT:  Yes, for this class.

11            MR. TUSA:  Three, actually, your Honor.  Mr.

12       Grandalski, Miss McKenna and Mr. and Mrs. Ranieri.

13            THE COURT:  Okay.  And they received dunning letters

14       from how many defendants?

15            MR. TUSA:  Mr. Grandalski from two different

16       defendants, Quantum and Credit Bureau Central, and then the

17       other two class reps, Miss McKenna and the Ranieris, from

18       American -- AMCA, American Medical --

19            THE COURT:  Okay.

20            MR. TUSA:  So, three total.

21            THE COURT:  So, I've got two debt collector

22       defendants in this case who nobody makes any allegations

23       against.

24            MR. TUSA:  I think not that we don't make any

25       allegations.  We don't have a class rep that dealt with
```

1    them.

2         THE COURT:  No, I don't have a plaintiff.  I do not

3    have a plaintiff who makes any claim against them.

4         MR. TUSA:  And you're referring to --

5         THE COURT:  It's not a question of standing.  I know

6    you're arguing it as standing but, in short, it's one thing

7    whether or not you have standing to assert a cause of

8    action under law of state A, B or C.

9         It's another thing to say we've got a defendant in

10   this case who nobody is a class rep against.

11        MR. TUSA:  Okay.  Let me -- I think your Honor is

12   asking me the following two questions.  Let me try to be

13   succinct about it.

14        You're asking if we have a class rep that dealt

15   individually with defendant RCA or SSB, and the answer is

16   we do not.  Okay.  I want to be clear about that.  We don't

17   proffer anybody who dealt with them.

18        Why do we think that's okay.  I think that's what

19   you're asking.  The scheme or artifice is the same and, you

20   know, I think what our position is, the legal claim is the

21   same, albeit the defendant is different.

22        We have -- it's our opinion, and we rely in no small

23   way on your Honor's opinion in Sheet Metal Workers, citing

24   Ortiz v. Fibreboard, saying if the classes were certified,

25   there would be class members who would have dealt with them

1     and, therefore, it's a sort of cart-before- the-horse

2     argument.

3          That's our view of it and, so, we do believe it's a

4     standing defense.

5          THE COURT:  If I recall correctly, all right, it's

6     one thing to say, hey, I've paid your bills and the issue

7     is whether or not I've got standing under a particular

8     statute to pursue a claim against you, and to say I've got

9     nothing from you.

10         And let me ask you this.  Suppose I had no plaintiff.

11    Suppose I had no plaintiff against any debt collector, no

12    one who ever got dunned.  Could I have a class action

13    against the debt collectors for engaging in a scheme?

14         MR. TUSA:  I think you'd lack practicality because

15    nobody would have had that common legal problem.  I mean,

16    so -- but I don't think that's our factual scenario.

17         THE COURT:  But how do I deal with typicality, for

18    example?  How do I deal with atypical defenses, for

19    example, where there's nobody who in fact purports to

20    assert a claim against two defendants in this case?

21         MR. TUSA:  Well, I think the answer is somewhat

22    dependent on what legal claim we're speaking about.  If

23    we're speaking about the FDCPA --

24         THE COURT:  That's what I'm talking about.  That's

25    what I'm talking about.

1      MR. TUSA:  It's a strict liability statute and, by

2  the way, my two charts here, your Honor correctly

3  identified the two things that we now still complain about.

4      We wanted to, in charts five and six for defense

5  counsel, point out the fact that charging threats are

6  expressly verboten by (e)(5) and (e)(10); adding additional

7  penalties expressly verboten by (e)(2) and (f)(1).

8      I just wanted to make that clear, that what we're

9  complaining about now are really the most rote of list

10  enumerated FDCPA defenses.

11      Strict liability statute, this Court's decision, I

12  don't mean your Honor, I mean this district's decision in

13  Pace, the Supreme Court's recent decision in Germane,

14  whether or not -- and I think our point for our class is

15  it's the conduct that's the mistake and the conduct is the

16  same.

17      We have plaintiffs who were victims of the conduct.

18  They all did the same things.  They were all working for

19  Quest.  We think that's the answer.

20      Now, your Honor, I understand what you're saying

21  about those two --

22      THE COURT:  Could they sue every debt collector who

23  engages in that kind of conduct even if they weren't

24  associated with Quest?

25      MR. TUSA:  I'm sorry.  They being who, your Honor?

```
 1            THE COURT:  Your three reps.

 2            MR. TUSA:  Well, I think if there was a commonality

 3       in the violation, the answer is anybody who -- well, if

 4       you're saying if they were not dealing with Quest?

 5            THE COURT:  Yeah.  I mean, suppose, for example --

 6            MR. TUSA:  Fair enough.

 7            THE COURT:  Let me give you my hypothetical, all

 8       right, which is, if I recall correctly --

 9            MR. TUSA:  Yeah.

10            THE COURT:  --  you specifically defined me out of

11       your class, didn't you?

12            MR. TUSA:  I don't believe we did but when your Honor

13       raised the issue, we did waive recusal.

14            THE COURT:  Okay.  Let's suppose I am a member of

15       your class.  All right.  Now, I get this letter which tells

16       me to pay $10 in collection fees.

17            I am indeed properly outraged and I sue that debt

18       collection agency and, you know something, I am

19       sufficiently outraged at this practice so that I conduct a

20       diligent search to find out the name of every other debt

21       collector in the country who tacks on collection fees and I

22       sue all of them in a class action, saying each of them, as

23       a regular practice, adds on $10 in collection fees to their

24       dunning notices and bills.

25            It's the same practice.  It's the same scheme.  It's
```

1        the same legal issue.  Can I get certified?

2             MR. TUSA:  I think there are certain notions that,

3        yes, you can get certified.

4             THE COURT:  Okay.

5             MR. TUSA:  Now, would every --

6             THE COURT:  Now, let's put it this way.  At least I

7        have your position, which is that, at least in my view, if

8        I placed it as a reductio absurd, you're still willing to

9        go along with it.

10            MR. TUSA:  Your Honor, I don't believe it's that

11       absurd.  I will have to say, quite different from your

12       Honor's factual scenario, we have another tie-in

13       characteristic in that all of these companies were doing

14       this under the supervision of Quest.  I don't believe the

15       case law says, however, even in the FDCPA context, that the

16       debt collectors' practice must be tied to a single client.

17            I mean, except in the scenario where a debt collector

18       purchases the debts and collects on its own behalf, they're

19       working for a particular creditor.  I don't believe the

20       cases supports the notion.  Certainly, I haven't seen that.

21       I might be more fair and say it like that.

22            Where the debt collector really is tied to one

23       particular creditor, it's the violation that they're going

24       after.

25            Briefly, while we're on the subject of the FDCPA, I

1     want to bring to your Honor's attention something we did

2     say in our briefs.  This past April the Supreme Court

3     decided the Germane decision.  It was the court's latest

4     FDCPA decision, somewhat insightful on a number of points

5     at issue here.  For instance, it rejected the bona fide

6     error defense.

7          Also very importantly, it expressly recognized -- the

8     Third Circuit had done this as well -- but for the first

9     time the Supreme Court expressly recognized a practice that

10    is deceptive, unfair or misleading under the FDCPA is also

11    as such under the FTC Act and, of course, your Honor is

12    well aware we have little FTC Act claims, which is why, of

13    course, for this particular class we don't only seek

14    certification under the FDCPA, we also seek certification

15    under the state consumer protection laws, because if it's

16    deceptive, it's still deceptive.

17         That was previously the Third Circuit's position in a

18    case called FTC v. Check Enforcement.  It's in our brief.

19    I won't belabor the point.  I know your Honor is looking to

20    wrap up.  I just --

21         THE COURT:  I'm not going to cut you guys short.  All

22    right.  Let me just stop you for one second.

23         (Discussion off the record.)

24         MR. TUSA:  A few words, your Honor, on our class, the

25    Anthem Blue Cross Blue Shield class.  There was no doubt in

1    your Honor's last opinion that your Honor was of the

2    impression that a class dependent on too many contracts and

3    too many state laws was not going to fly for class

4    certification, certainly not in this court.

5         We took those statements to heart.  We have a class,

6    one provider agreement, one sub-plan.  And the defendants

7    have made the point, and I just want to address this real

8    quick, that Mr. Grandalski, even though a member of the

9    plan, could not be a third-party beneficiary to raise a

10   breach-of-contract claim.

11        This is the only class for which we have a breach-of-

12   contract claim, and we set out here, your Honor, from the

13   contract -- this is also Tusa exhibit 10, but here is the

14   hold harmless clause.  Here is the definition of payment

15   covered services member, and it very clearly says

16   laboratory may not -- I'm paraphrasing -- may not bill for

17   anything other than copays for deductibles.

18        We know for Mr. Grandalski that was $20 in all four

19   of his instances.  They billed him for $30.  It says

20   expressly, laboratory agrees this provision shall be

21   construed for the benefit of the member.  That's Mr.

22   Grandalski.  The contract says expressly it's for the

23   benefit of the member.

24        Now, this is -- we agree that Connecticut law

25   applies.

```
1            THE COURT:  What subdivision is this?

2            MR. TUSA:  This is my chart exhibit four.  It's also

3    the full agreement is Tusa exhibit 10.

4            THE COURT:  What subdivision of the contract?

5            MR. TUSA:  I'm sorry, your Honor.  It is -- let me

6    pull out the full one.  The hold harmless clause is section

7    2, sub B, sub 4.  Are you with me, your Honor?

8            THE COURT:  I got it.

9            MR. TUSA:  Okay.

10           THE COURT:  Mr. Melodia, it looks like you've got a

11   contractual provision interpretation issue here.

12           MR. MELODIA:  Well, at best, I think, your Honor,

13   we've got a factual issue around this contract.

14           I think, more importantly, in looking at the papers

15   preparing for today's hearing, it's not clear to me at all

16   how this contract found at Mr. Tusa's exhibit 10 or today's

17   exhibit 4 even applies to their sole named representative,

18   Mr. Grandalski.

19           It's not clear to me that this plan even covers

20   Grandalski.  Grandalski is in Nevada.  He's a federal

21   employee.  It's not clear to me that this contract is one

22   that governs federal employees or Mr. Grandalski in Nevada.

23   I don't think --

24           THE COURT:  Let me ask you a more fundamental

25   question.  With regard to a class consisting of members who
```

```
1    are only covered by a particular plan, the Anthem plan, a

2    particular contract in the Anthem plan, if I recall

3    correctly --

4         MR. TUSA:  Yes, your Honor, and exhibit 11, the next

5    one, is the amendment that deals with federal employees.

6         THE COURT:  Okay.  But really when you get right down

7    to it, isn't that an issue which goes purely to the merits

8    of the claim?

9         In short, you may have a summary judgment.  You may

10   have a motion to dismiss on, you know, depending on the

11   actual language in this one plan.  But does that go to any

12   of the issues which fundamentally deal with class

13   certification?

14        MR. MELODIA:   I think it does very much, your Honor.

15        THE COURT:  How so?

16        MR. MELODIA:   They like to call this a post-EOB

17   class, as if all we need to do is look at the EOB, as we've

18   heard, and if there's any bill as to that EOB, it's

19   automatically wrongful and improper.

20        But we know that not to be true and we know that not

21   to be true by looking at the actual named plaintiffs

22   they've put forward during the six years of this

23   litigation, including continuing to put them forward as

24   members of this class, this post-EOB class, at exhibit 25

25   to Mr. Tusa's declaration.
```

1          So, to go to your Honor's question, take the

2    Agostinos.  Why do we need to look at the Agostino payer

3    contract and understand what's in it versus what is in

4    hearing exhibit 4, which we believe to be actually the

5    Breuer-Auclair plan, not the Grandalski plan, but in any

6    event, whoever it applies to, and we still don't know six

7    years into the case, the point is you need to look at

8    different contracts in order to understand, for example,

9    whether the Agostinos have a claim and are in the class at

10   all, not merits, but whether or not there's membership in

11   the class; ascertainability and specificity around class

12   definition.

13        The Agostinos' contract, it turned out, was with a

14   nonparticipating payer.  That makes all the difference in

15   the world as to whether they're in or out.

16        THE COURT:  Well, you haven't contested that, was it

17   Mr. Grandalski's contract is with this particular, this

18   Anthem plan, have you?

19        MR. MELODIA:   I am right now, your Honor.  I

20   apologize, but in looking at the exhibits in preparation

21   for today, I don't see where the exhibits being put in

22   front of you as the plan is one that necessarily applies to

23   Mr. Grandalski.

24        THE COURT:  Okay.

25        MR. MELODIA:   In any event, there's not an Anthem

```
 1    plan.  We all know that.  Remember last hearing, we looked
 2    at the Illinois Attorney General exhibit and we saw how
 3    many plans there are.
 4         THE COURT:  So, if I certify this as to the contract
 5    which Mr. Grandalski is a beneficiary of, whatever it may
 6    be, does that solve the problem?
 7         MR. MELODIA:  Well, it doesn't.  I mean, it solves a
 8    problem.
 9         THE COURT:  What problem doesn't it solve?
10         MR. MELODIA:  It doesn't solve the problem of the
11    very practices, the mish-mosh of practices that are issue;
12    the lack of a scheme, the lack of scienter under RICO.
13         THE COURT:  Just a breach of contract.  What I'm
14    asking you is, forget the bells and whistles for a second.
15    Okay.  Excuse me for characterizing a civil RICO claim as
16    bells and whistles.
17         MR. TUSA:  No offense taken, your Honor.
18         THE COURT:  Forget the bells and whistles.  A
19    breach-of-contract claim with that gentleman as a class
20    representative for people who are covered by that contract
21    who were billed in excess of their EOBs, pure breach,
22    what's the problem with that?
23         MR. MELODIA:  The problem is that, as the Court
24    suggested earlier in a question, every time there's a bill
25    in excess of an EOB, it's not a breach, and it's not an
```

1    improper practice.

2         Now, I'm not arguing merits.  I'm arguing what does

3    the Court need to look at in order to determine whether

4    there's a breach of contract, and that analysis requires

5    not just looking at the plain language of the contract, but

6    requires the exact documents that plaintiffs don't want to

7    put in front of the Court anymore because your Honor

8    already accepted in your earlier opinion in February of '09

9    that, in fact, you would need to look at the requisition

10   and all the pre-EOB activity.

11        Why do we need to look at it?  We need to look at it

12   for the reasons that are obvious when looking at Mr. Tusa's

13   exhibit 25, that go through the various proposed members of

14   a post-EOB class.

15        We need to understand why they were billed more than

16   an amount stated on an EOB.  One of the reasons, for

17   example, might be the situation your Honor brought up,

18   Cruthers, which is competing EOBs from two different

19   carriers.

20        Our expect, in fact, did not say what was

21   characterized by Mr. Tusa earlier.  Our expert said that a

22   secondary carrier can't tell a primary carrier what to bill

23   and can't direct Quest and, so, Quest is in the middle.

24   That's one scenario, that coordination-of-benefits issue.

25        Another scenario is where there are multiples EOBs

1    conflicting with each other from the same payer.  We have

2    that scenario in this case with Hoecher.  We have with Ms.

3    McKenna, one of the named representatives put forward by

4    plaintiffs today six years into this litigation.  We have

5    three different scenarios.

6        THE COURT:  Got it.  Okay.  We're going to take a

7    half-hour break because I wouldn't dream of shorting any of

8    you in this interesting issue.  All right.

9        (Recess is taken.)

10       THE COURT:  Okay.  Mr. Tusa, I pretty much kept you

11   on the hot seat for this morning, so, before we give

12   defense counsel an opportunity to experience that, is there

13   anything which you wish to add which you think you may have

14   missed or that I may have missed?

15       MR. TUSA:  Three very brief points, your Honor.

16       THE COURT:  I'm sorry?

17       MR. TUSA:  I just want to make three very brief

18   points.

19       THE COURT:  Go right ahead.

20       MR. TUSA:  Some topics we have not touched upon and

21   then I will gladly cede the floor.

22       THE COURT:  Okay.

23       MR. TUSA:  When we broke we were talking briefly

24   about the Anthem Blue Cross Blue Shield contract.  Mr.

25   Melodia expressed his opinion that he thinks maybe we're

1    talking about the wrong contract because it doesn't mention

2    federal employees.

3         I would mention two things.  Exhibit 11 to my opening

4    declaration is the exhibit to -- is the amendment to the

5    contract in exhibit number 10, expressly incorporating

6    federal employees, so, we think it is the right contract.

7         The other only point I make is this is the first time

8    we're hearing about it.  We got these documents from

9    defendants and we didn't hear in their opposition papers

10   that they thought we had the wrong contract.  If that's the

11   case, we're hearing it for the first time.

12        Secondly, I won't belabor the point.  I had one last

13   hearing chart, your Honor, and it sort of dovetailed into

14   the two issues about Medicare and intervention and we'll

15   largely rest on our papers on these issues.

16        You know, your Honor might recall I have a motion

17   pending to intervene one new plaintiff who would be our

18   class rep for the Medicare class.  It's our position that

19   she satisfies the lone problem you had with our last

20   Medicare representative.  She undoubtedly was Medicare

21   covered, was billed and paid.  It was the unpaid part that

22   your Honor had a problem with last time.  Miss Camaj would

23   satisfy that one problem.

24        Defendants don't take issue with any of what we

25   believe is relevant.  They pretty much attack her by

1    suddenly coming up with an advance beneficiary notice.

2    This is all primarily in the papers, if not in the class

3    motion papers, in the intervention motion papers.

4        The only additional point I'd like to make is

5    defendants filed an unapproved surreply and I don't know if

6    your Honor is going to accept it, not accept it.

7        I just have one thing to say about it.  We had made

8    the position in our reply papers in support of intervention

9    to allow Miss Camaj in that while it seems that Quest has

10    suddenly found this ABN after a year of Miss Camaj asking

11    her for it, it's clearly defective on its face for at least

12    two reasons.

13        Number one, they never gave her a copy of it, and

14    that is an express requirement under the Medicare laws.

15    And number two, if you don't give somebody a copy, the ABN

16    is absolutely defective, and that's what the chart says.

17        THE COURT:  Let me ask you this, though.  One of the

18    things about the Medicare class was cohesiveness and

19    manageability issues.

20        This issue about the ABN raises two issues.  One is

21    whether or not -- actually raises a number of issues but

22    first, one issue is whether or not she's an adequate class

23    representative, since your class is defined as people for

24    whom no ABN had ever been issued, if I recall correctly,

25    not a class consisting of people who either had no ABN or

1     had defective ABNs.

2            Secondly, assuming that it were expanded to deal with

3     that situation -- well, let me put it this way.  First,

4     does it potentially raise, among other things, whether or

5     not she is not an adequate representative because she is

6     subject to atypical defenses which the class would not be

7     subject to -- let me continue -- and third, if this class

8     were to include both people for whom no ABN had ever been

9     issued and people for whom defective ABNs were issued,

10    doesn't that create an issue of, in fact, embroiling this

11    Court in individualized analyses of each individual

12    claimant's position, particularly whether or not an ABN was

13    defective, not defective or, indeed, as the defense has

14    argued and, quite frankly, I don't remember it's in their

15    surreply or whatever, but I do know that they had argued

16    that under Medicare rules, if the beneficiary in fact has

17    actual notice that the procedure is not covered, then even

18    if they got a defective ABN, they are still properly

19    billed.  At least that's my understanding of what their

20    argument was.

21           MR. TUSA:  Your Honor asked a number of questions.  I

22    want to see if I could answer them all.

23           Let me take your last one first.  Do they have to

24    issue an ABN.   We don't think there's any doubt that these

25    are the Medicare regs.  We've attached these, by the way.

1    The provider, practitioner or supplier must issue an ABN

2    each time and as soon as it makes an assessment that

3    Medicare payment certainly or probably will not be made.

4         We think they're just wrong.  We think you must.

5         Now, you ask -- your Honor asked me a different

6    question.  Your Honor asked me a question about whether or

7    not -- let me take a step back.

8         Miss Camaj and her physician asked Quest for copies

9    of this ABN for eight months.  They continually told her it

10   didn't exist.  We proffered her as a class rep.

11        After they told her it didn't exist, she asked

12   Medicare.  Medicare said we don't have one, either.  Okay.

13        So we proffered her as a class rep.  Lo and behold,

14   even though Quest apparently misrepresented itself to Miss

15   Camaj and her physician a number of times, they found one.

16   But they attached it to Mr. Diffley's affidavit.

17        We took a look at it and to our eyes it's materially

18   defective.  And you asked me what's the import of that.

19        Our class is defined about people who don't have an

20   ABN, and it's our view that if the ABN is defective, it

21   doesn't exist at all.  It's void.  It's a nullity.  It

22   doesn't exist.  So, in our view she can be the class rep.

23        But I think this is one of those Hydrogen Peroxide

24   issues that your Honor has to deal with.  I think this is

25   one of those instances where the facts, the merits overlap

1    with the class determination and I think we need an

2    individual determination as to whether or not she

3    individually is a proper class representative.

4         If your Honor decides that the ABN was, in fact,

5    defective, as she swore it was because they didn't give it

6    to her, we have other reasons why it's defective.  They

7    listed the wrong test.  That's neither here nor there.

8    They both are individual to her.  And you decide that the

9    ABN is defective, it's a nullity.  She doesn't have an ABN,

10   she can fit into the existing class.

11        THE COURT:  Then my question is this:  What is my

12   class now?  Is my class a class of people who have never

13   gotten an ABN or a class of people who have never gotten an

14   ABN or, alternatively, have gotten defective ABNs?

15        MR. TUSA:  Thank you very much.  That's the question

16   I was getting to because that's another question your Honor

17   asked.

18        Once again, we were somewhat taken by surprise about

19   this issue because defendants didn't give it to Miss Camaj

20   when she asked for.  They also didn't give it to her at the

21   time she had it, so, of course, we never saw it.  That's

22   why our class was defined the way it was.

23        Your Honor asked could the class be changed to say

24   people with either no ABN, like our initial class

25   representative, Miss Cassese, or a defective ABN.  That is

1     one way to deal with it.  Again, this issue was somewhat

2     thrust upon us with defendants' opposition papers.

3          We think either alternative is fine and we don't

4     think -- there is another question pregnant in your Honor's

5     question and, that is, did they just not give her the ABN

6     or is it their policy not to give the copies to anyone.

7          If that's the policy, then it really is uniquely

8     appropriate for class.

9          Now, I will tell you when she put in her declaration,

10    said I never got a copy of this and that's the rule,

11    defense put a surreply and their response was, oh, yeah, we

12    gave her a copy.

13         No, they never said that.  They don't dispute she

14    never got a copy.  That alone voids the ABN.

15         I'll say there's another issue that voids the ABN.

16    They listed the wrong test and this is somewhat technical,

17    and I don't expect -- you really need the papers for this

18    one -- but they listed the test as one code.  It was

19    another.  We read their explanation from Mr. Diffley and

20    his surreply affidavit, and I will -- I just want to put on

21    the record this one point.

22         If you look at Tusa exhibit E in support of

23    intervention, the reply declaration, and compare it to Mr.

24    Diffley's Exhibit 6, which is with his surreply, this lists

25    tests for the two codes, and we still believe they're

1    different.  I know they believe they're not different.  But

2    we believe they describe one test to her and reported

3    reimbursement to Medicare for another.

4        I believe those are all the points I wanted to

5    briefly touch on today.  Thank you, your Honor.

6        THE COURT:  Thank you. All right.

7        MR. MELODIA:   Where do I start after an hour and a

8    half?  I'll try to be brief and responsive.

9        THE COURT:  Let me put it this way.  Okay.  Your job

10   is to persuade me, not to go through your checklist.  I've

11   been asking Mr. Tusa some fairly tough questions as we've

12   gone along here, and Mr. Tusa has indeed been doing a

13   superb job of responding and arguing.

14       So, deal with his responses.  In short, forget about

15   what any prepared outline you might have might consist of.

16   I've read the papers.

17       MR. MELODIA:   Yes, your Honor.  Let me start at the

18   end with the Medicare point and Miss Camaj as potential

19   intervenor here.

20       Of course, any intervenor has to have some claim in

21   the case, some cause of action, some interest which has

22   been affected, whether we're looking at Rule 15, 20 or 24,

23   (a) or (b).

24       That's very much in question here, and we've heard

25   again many of the reasons why that remains very much in

1    question here today.

2         It is clear that Miss Camaj has not said that she did

3    not sign the ABN.  She never says in her declaration that

4    she did not sign it, that that's not her signature, that

5    that is not an ABN which she signed prior to the test being

6    given and any billing.

7         And of course, that's the test.  And I appreciate

8    what Mr. Tusa thinks Medicare regulations should say, what

9    they should be, but the reality is what they are, is that

10   this legal analysis turns on whether or not Miss Camaj had

11   prior knowledge in any form that Quest might send a bill

12   for this service.  And of course, Miss Camaj did.  We know

13   that, and that's not disputed.

14        What's disputed is whether she received a copy, and

15   Mr. Tusa says that he and she were surprised that Quest

16   came forward with an ABN and, yet, she doesn't say she

17   didn't sign it.

18        We were surprised a year after your Honor's decision

19   that Miss Camaj came forward as a potential named

20   representative in this case, and we have no evidence that

21   Miss Camaj or her physician ever called or contacted

22   anybody at Quest.

23        We have seen her improper contact with CMS,

24   attempting to get information that CMS would not have and

25   CMS told her and the physician that they would not have.

As important, Quest has a determination from CMS prior to billing her that says please go ahead and bill her, a Medicare patient. So, Miss Camaj has no claim but this isn't an improper merits argument. This is an argument about what is required under their class definition as modified in their briefing and argument today.

Now, if we go back to what your Honor said is actually in the stated definition, it talks about whether somebody did or did not sign an ABN, and we have a signed ABN, so, Miss Camaj can't intervene on behalf of that class. She can't be adequate. She can't be typical. We know that.

THE COURT: Okay. Let me stop you there.

(Discussion off the record.)

THE COURT: I apologize. I'm trying to multi-task.

MR. MELODIA: Fair enough, your Honor. Just to continue and finish briefly on the Medicare issues that have been raised, even if there were, which there is not, some factual question about what happened and whether or not Miss Camaj has some claim, under their modified class definition, in order for Miss Camaj to have any claim and any standing before this Court at all, it has to be on the basis that her ABN was somehow defective, to use Mr. Tusa's word, or not valid, and that determination we know will

1    require looking at individualized facts in a way that, when

2    the Court was looking at Miss Cassese's situation and the

3    no payment there, you did not have those facts before you.

4        Your Honor looked previously and found that Miss

5    Cassese, the previous named representative put forward by

6    plaintiffs on behalf of this purported class, was not

7    typical and not adequate because she had not made a

8    payment.

9        Mr. Tusa seemed to think if he could find anybody who

10   had made a payment on a Medicare bill, that automatically

11   they would therefore step in and become a valid class

12   representative.

13       Clearly that's not -- that does not follow logically

14   from the Court's prior opinion, and the Court before was

15   not presented with this validity and defective argument

16   before, and your Honor was not presented before with the

17   language of what is actually required by the Medicare

18   regulations in order to determine whether or not Quest has

19   a right to bill.  It is not true that every bill is

20   wrongful.

21       THE COURT:  Now, let's move on to the proposed

22   breach-of-contract class.

23       MR. MELODIA:   Good.  I understand from your Honor's

24   questions prior to our break that -- I won't presume to

25   know where your Honor is in your rulings or thinking.

1          THE COURT:  Don't even guess.

2          MR. MELODIA:   I'm not even going to guess.  And I

3     have ripped up my prior outline.  So, let me go to what I

4     understand, though, to be Quest's hardest case, our

5     toughest position, which would be single claim breach of

6     contract, single payer contract, and single state.

7          That's Quest's toughest case.  If we can persuade you

8     that that class is not certifiable, then clearly everything

9     else in the post-EOB class cannot be certified because we

10    know there are -- your Honor's already ruled in February of

11    '09 concerning the differences in state contract law.  So,

12    if there are different contracts at issue, that goes away.

13         We've already had a discussion about scienter and

14    RICO and a whole lot of other things.

15         If we focus and assume, let's assume, take away the

16    issue of whether or not exhibit four, hearing exhibit four,

17    and the Anthem contract put forward is or is not covering

18    Mr. Grandalski.  Let's assume it is.  And let's assume

19    further that the third-party beneficiary argument in our

20    brief is wrong.

21         THE COURT:  Or alternatively is --

22         MR. MELODIA:   In dispute.

23         THE COURT:  -- frankly a pure merits issue which does

24    not destroy certification.

25         MR. MELODIA:   We have at least three issues that

1    still make class certification of that class impossible.

2         First, in order to determine the issue, even if the

3    contract is as clear as plaintiffs say it is on the third-

4    party beneficiary issue, and even if on the plain language

5    of the contract defendants' position is incorrect, that

6    does not mean that contract gets enforced under Connecticut

7    law, if there's a hold harmless provision in the state

8    statute which differs or if there's other, statutory

9    law in Connecticut which would need to be looked at. Point

10   number one.

11        We would need to look at what does Connecticut law

12   say about these issues and is this contract language

13   enforceable.

14        THE COURT:  But dealing with that, quite frankly,

15   that deals with cohesive -- having to look at individual

16   state law deals with cohesiveness issues, deals with

17   manageability issues, in fact, deals with whether or not a

18   class action is preferable to other means of resolving it.

19        All right.  If I'm looking at the law of one state,

20   that doesn't present those issues.  It may very well be

21   that on the merits is a determination by the Court that

22   there is or is not a cause of action.  But that's what

23   looking at Connecticut law implicates in terms of, you

24   know, proceeding with a class action.

25        MR. MELODIA:   Fair enough.  Let's take the

1    choice-of-law issue completely off the table for these

2    discussions.  We still have at least two problems here.

3          One is, there's been a lot of discussion about the

4    EOB and how the EOB is sacrosanct and always right and must

5    be relied upon.  That's essentially plaintiffs' position.

6          They say it's our position, and they provided some

7    quotes in one of the hearing exhibits today during the

8    course of this case in which we didn't say that.

9          What we said was, and what we continue to say,

10   because our position in this six-year case has been

11   consistent, we say that the EOB is important, Quest is

12   dependent upon it, and it is absolutely true, as Mr.

13   Diffley and others testified, that Quest does not go back

14   for the 500,000 bills it sends a day and check every payer

15   contract and have discussions with physicians and look at

16   requisitions and do everything else that's involved in that

17   understanding of an individual transaction in order to send

18   a bill.

19         We do map our systems to meet payer contracts but,

20   more importantly, we do rely on EOBs.  We're dependent on

21   them.  That's true.

22         That is utterly different than saying that everything

23   that went into an EOB is irrelevant, and everything that

24   happened before an EOB was issued is irrelevant.  And it's

25   utterly different than saying every EOB is correct.

1    We know that's not true.  We know that's not true in

2    this case and, therefore, it follows that it's also

3    ridiculous on this record to claim that every bill that's

4    sent above an EOB or different than an EOB is improper.  It

5    is absolutely false.

6        How do we know that?  We look at the plaintiffs and

7    the transactions that Mr. Tusa has put before us.  We look

8    at exhibit 25 to Mr. Tusa's certification, and we look at

9    Hoecher, we look at McKenna and we look at Haley, to take

10   three examples where EOBs were wrong.

11       We also look at Cruthers.  We look at Cruthers

12   because she had competing EOBs from different carriers, the

13   scenario that the Court talked about earlier.

14       Therefore, it is incorrect and a false premise to

15   start basing a class on to say that simply because Quest

16   billed an amount different than an EOB, that that

17   automatically becomes improper or unlawful.

18       Why is that important?  Because then all of the

19   findings of this Court from February of 2009 become

20   relevant again.  Everything your Honor found earlier about

21   needing to look at the requisitions, needing to look at all

22   of the documents leading up to the EOB are very much still

23   at issue.

24       And again, I'm not making this up as a defense lawyer

25   to make this unduly complex.  I am tracking the evidence of

1    record in this case, mainly presented by Mr. Tusa, but also

2    from the expert, Mr. Dyckman.  So, that's point number one.

3         THE COURT:  Let me ask you this.  Suppose in a single

4    state with a single contract you have provisions which say

5    that Quest shall not balance bill any beneficiary who is

6    part of the preferred provider -- of a preferred provider

7    network or actually this preferred provider network which

8    is the subject of this contract.

9         MR. MELODIA:   Right.

10        THE COURT:  You get an EOB and you bill in excess of

11   the EOB -- the patient responsibility shown on the EOB.

12   Okay.  And let's assume that the contractual provision is,

13   in fact, intended to provide the consumer with the rights

14   of the third-party beneficiary under the contract.  Let's

15   also assume arguendo that the state law also says you can't

16   balance bill in excess of what an EOB says.

17        MR. MELODIA:   And that it covers Quest and

18   laboratories and not just HMOs and all the other things.

19        THE COURT:  Right.  Assuming all of that.

20        MR. MELODIA:   Yes.

21        THE COURT:  Why would one have to go back looking

22   through the history to do a straight breach-of-contract

23   claim?  In short, if I were the plaintiffs in this case, I

24   would be saying to you, you know, the EOB is wrong.  It's

25   your job to sort out the EOB with the insurance company --

1    all right -- and it's your job to do it before you bill me,

2    and if you actually billed me and I paid and it was in

3    excess of what the EOB said, that's a breach of the

4    contract and I was intended to be a beneficiary of it.

5         MR. MELODIA:   Right.

6         THE COURT:  What's wrong with that argument?

7         MR. MELODIA:   Okay.  Well, several things.  One,

8    obviously you're making a lot of assumptions and we don't

9    and never have in six years of litigation had that scenario

10   in front of us, so we don't have -- not only do we not have

11   numerosity, we don't have a named plaintiff for that

12   purported class.  After six years, plaintiffs' burden on

13   the last motion, plaintiffs' burden on this motion.

14        Number two, the closest we have to that scenario is a

15   date of service for McKenna, September 26, '05, in which

16   what we've called in prior proceedings a chubby finger

17   error, a data entry error, has resulted in a bill going out

18   for an amount in excess of an EOB.  It went out for $604.02

19   instead of $60.40.

20        That clerical error fits all of your criteria, your

21   Honor.  That bill would be in your class and, yet, nobody

22   can argue that there was a breach of contract that would

23   hold up because McKenna, number one, never paid, knew that

24   it was an error and never paid and, number two, let's talk

25   about refunds, because in a breach-of-contract case we have

1      to have damages.  We know that.  And I believe the Court

2      has previously held that in your earlier decision.

3              THE COURT:  I don't think there's much doubt that

4      there has to be an element of a breach of contract.

5              MR. MELODIA:   There's no statutory damage here and

6      it is also not true that simply sending a bill without any

7      other action on the part of the plaintiff receiving the

8      bill gives rise to a cause of action that would be valid

9      under breach of contract or other theories, and nobody has

10     pointed after six years to any law that says, you know, it

11     is improper and a breach of contract to send the bill.

12             But let's assume payment, which we don't have in the

13     McKenna transaction, or any other which fits your Honor's

14     criteria, and then the question becomes was there a refund.

15     And that issue, your Honor has already ruled upon under the

16     FRD cite for the Agostino decision for February of '09, it

17     would be 256 FRD at 471.

18             THE COURT:  I remember that page precisely.

19             MR. MELODIA:  I knew you would.  And there are at

20     least two quotes on that page which specifically go to the

21     issue of why evidence of record in this case establishes

22     that a refund does raise individualized issues and cannot

23     be determined in any systemic way that relied on Dyckman,

24     our expert, that relied on Hanlon, uncontradicted

25     testimony, and it relied on the uncontradicted testimony of

1    Quest employees, Bowman, and I'm forgetting all the names,

2    but there were three or maybe four, Frank Espinal, four

3    depositions in which Quest employees said essentially the

4    same thing.

5         THE COURT:  Okay.  Let me shift to another subject --

6    all right -- and it's going to implicate you at this point,

7    both of you.

8         In short, and let's forget about the issue of the

9    standing issues and so on.  I got -- I do have plaintiffs

10   who in fact have debt collection claims who are still in

11   here, and they're of two different characters.  Let's take

12   first the additional fee.

13        MR. MELODIA:   Okay.  Your Honor, the debt collection

14   claim is not against Quest at all.  I don't know if perhaps

15   my colleague can address these.

16        THE COURT:  But you assert that in fact it was

17   assessed by Quest.

18        MR. CIPPARULO:  Good afternoon, your Honor.  Yes, it

19   was asserted -- it was tacked on or placed onto the

20   collection by Quest.  That is undisputed.  Quest does not

21   dispute that it placed on the collection fee prior to it

22   being transmitted to the collection agencies.

23        And there are only two collection agencies that were

24   even involved in this $10 fee.  That would be Quantum and

25   CBC, and it's undisputed that Quantum and CBC did collect

1    those fees if they were successful, but it's also

2    undisputed that those fees were given to Quantum, given to

3    CBC, with the fee added on by QDI, and QDI will not dispute

4    that.

5         What is also undisputed is that the plaintiff does

6    not have a suitable class representative because Mr.

7    Grandalski testified, who is the only representative with

8    respect to those Quantum and CBC, Mr. Grandalski testified

9    in his deposition that he did not believe he had been

10   misled by Quantum, so, there's now a fact specific defense

11   that will not apply to --

12        THE COURT:  Well, the charging of fees, does that

13   depend upon being deceived?

14        MR. CIPPARULO:  Well, one of the elements of the

15   plaintiff is charging under the FDCPA is that it was a

16   deceptive practice.  Also, this has to be made very clear,

17   and I apologize if it's not made clear in my papers, the

18   fee has to be added on by a collector and that fee is not

19   permitted between the underlying agreement between the

20   creditor and the plaintiff or the consumer.

21        That's not the case here.  This is not a case where

22   the collector took a bill and said I'm going to put $10 on

23   for my efforts to collect this fee.  This fee was put on

24   long before it ever saw the collector's desk.

25        THE COURT:  Question, is that an issue which goes to

1   the merits as opposed to whether or not a class could be

2   certified?  In short, if indeed the routine practice of

3   Quest was to add a $10 fee before it was ever sent to you

4   and if that constitutes a defense under the statute, is

5   that something which defeats class certification?

6        MR. CIPPARULO:   Well, I think with respect -- that's

7   one of the reasons why I brought up Grandalski, because

8   there is a fact specific defense to Grandalski, but I

9   think, understanding your Honor's question, I do think

10   there has to be at least not an inquiry into the

11   substantive of the claim but -- into the substance of the

12   claim, but has to be some sort of inquiry into the

13   mechanism of the claim, and I think the mechanism that the

14   plaintiff relies on in his second amended complaint -- this

15   is the one that he has filed with the Camaj motion --

16   suggests that -- not suggests -- states that fee was added

17   on by the collector, and that's simply not the case.

18        THE COURT:  What I'm suggesting to you is this:  What

19   changes this from being a situation in which I certify a

20   class and you win a summary judgment motion?  I haven't had

21   summary judgment motions.

22        MR. MELODIA:   Just one, your Honor, and you granted

23   it.

24        THE COURT:  Just the one.  And what I'm suggesting to

25   you, you know, I am permitted and, indeed, encouraged to

 1    look at the merits of the claim but only for a particular

 2    reason, and that is to explore how the claim could in fact

 3    be established at trial and, therefore, whether it's

 4    susceptible in practical terms to being treated as a class.

 5    And that's the purpose for looking at the merits of claims,

 6    not to decide on the merits, whether somebody wins or

 7    doesn't win on the merits.

 8         MR. CIPPARULO:   I understand, your Honor.   Thank

 9    you.

10         THE COURT:   In short, I could certify a class which

11    was the absolutely dead loser of all time and it could

12    still be a properly certified class.   Correct?

13         MR. CIPPARULO:   It could be properly certified but

14    ultimately be dismissed.   I understand your Honor's

15    question.

16          I think that you would have to also get to the

17    question as to why some of the fees were added on and why

18    some of the fees weren't added on, because it was not a

19    unified practice.

20         MR. MELODIA:   And that, your Honor, if I could --

21         MR. CIPPARULO:   Please.

22         MR. MELODIA:   -- add on to what's been said here,

23    that was the assumption in your Honor's point, that there

24    has been established in some way of record by the

25    plaintiffs who have a burden on this motion six years into

1   the case to -- that there is a unified practice and that

2   there is numerosity.

3          There is no showing on this record, there's

4   absolutely no numerosity of record in this case.  That's

5   number one right now on this record something that

6   prohibits certification of even this $10 add-on charge

7   claim.

8          The other thing I'd point out is that there is no

9   class that's been put forward by plaintiffs as simply about

10  this $10 charge.  That's an issue that comes out of the

11  record and out of the briefing as something that is more

12  discrete, and I understand why the Court raises it, but it

13  is not something that plaintiffs have put forward as a

14  simple class.

15         THE COURT:  The Court's allowed to narrow classes

16  and --

17         MR. MELODIA:  The Court obviously can conform to the

18  record evidence, as plaintiffs could have conformed their

19  complaint over the past six years to the record evidence.

20         THE COURT:  Okay.  One second question, which is, as

21  to the claims which essentially say deceptive wording in

22  the dunning letter and, again, as directed at those

23  collection agencies which, in fact, have a plaintiff who

24  received a letter from those agencies, what prevents them

25  from being certified as a class?

```
 1          MR. CIPPARULO:   That's -- I'll give you two

 2    arguments.  I'm going to delve into the merits just briefly

 3    because it has to be stated, but regarding more the class

 4    argument, you have to look into subjective intent.  Your

 5    Honor dealt with that extensively in the first opinion.

 6          You have to look at the intent of each collector as

 7    to whether it was authorized to send this letter, whether

 8    it was an unintended threat.

 9          It's not a simple form letter case, your Honor, which

10    you're saying this language as a matter of fact is a

11    violation of the FDCPA.  Form letters cases are

12    particularly susceptible to class certification.  This is

13    not a form letter case.

14          THE COURT:  Well, how many -- I mean, to put it

15    truthfully, and this may not be -- obviously, it's not in

16    the record.  I've never heard of a collection agency which

17    does not have form letters, form letter A, B, C, D or E,

18    but they tend to have progressive form letters as it were.

19    Isn't that correct?

20          MR. CIPPARULO:   Let me be clearer.  You're

21    absolutely correct.  But the language of the form letter

22    can be particularly susceptible to FDCPA claim.

23          For example, if you do not have the necessary

24    warnings that are required by the FDCPA, you can contest

25    that.  If that language is missing in your initial letter,
```

1    that's an easy class to certify.  Anyone who received that

2    letter can be -- can be a member of the class.

3         THE COURT:  Okay.  As I understand it, the core of

4    plaintiffs' claims are, apart from the $10 fee, are

5    deceptive letters in that either they're threatening

6    further conduct implicitly or explicitly, when no further

7    conduct is intended or, alternatively, making such threats

8    where they were not authorized by Quest to, in fact, engage

9    in such conduct if there was no payment.

10        Now, I understand full well that, you know, that the

11   statute stems from the good all days when the letter would

12   say if you don't pay this, the funds in dispute by X date,

13   we will initiate suit against you.  All right.

14        The letters don't say that anymore, and when the

15   letters did say that, it would be very simple to see

16   whether or not there was an internal policy with regard to

17   initiating suit, for example, a dollar cutoff, which is not

18   uncommon, or alternatively, a procedure for specifically

19   requesting preauthorization from the creditor.

20        Now, as I understand it, the letters in question here

21   are less definitive.  They tend to suggest further action

22   without specifying what the action is.  Correct?

23        MR. CIPPARULO:  Further collection attempts.

24        THE COURT:  Okay.  And one question, of course, is,

25   indeed, whether or not implicitly that is threatening legal

1    action, for example, and counsel for plaintiff have been

2    very generous in citing case law to me which essentially

3    says that, what we all know, which is that we are to view

4    all the language in these letters in light of the most

5    unsophisticated recipient and whether or not that

6    unsophisticated recipient would indeed interpret it as a

7    threat of litigation, for example.  Correct?

8        MR. CIPPARULO:   Least sophisticated consumer

9    standard.

10       THE COURT:  Okay.  So, with regard to this language,

11   one common issue would be whether or not, viewing it

12   through the light of the most unsophisticated recipient, it

13   would be interpreted as threatening litigation.  Correct?

14       MR. CIPPARULO:  I'm not sure that that's been pled.

15   I think what's been pled is that -- what he's claiming is

16   that we were putting a threat in our letter that we weren't

17   intending to pursue.

18       THE COURT:  But frankly, I assume that -- I assume,

19   quite frankly, that the thrust of that was either going to

20   be initiated litigation or, alternatively, initiating

21   communications with a credit bureau, one or the other.  Is

22   that correct?

23       MR. TUSA:  Your Honor is correct, yes.

24       MR. CIPPARULO:   The problem I have with plaintiffs'

25   argument is that he attaches letters from 2004, he attaches

1    letters from 1998, he attaches letters from 2001, but in

2    the very papers that he relies on, if you look at his

3    exhibit 15, he concedes that the first time it was even

4    discussed in QDI as to whether they should even address

5    these form letters or these letters with their debt

6    collection agency isn't until 2005, so, the letters

7    saying -- the statute says you cannot send a letter in

8    which you have no intent to pursue or are not authorized to

9    pursue conduct.

10            There's no evidence at all in this case that any of

11   the debt collectors took any action that they were not

12   allowed to pursue.

13            The first time it's even discussed, according to Miss

14   Espinal's testimony, is in June 2005, and that's in the

15   plaintiffs' moving papers, exhibit 15, specifically page 52

16   of Miss Espinal's testimony.  So, how can you say that they

17   were not -- that's why I tried to make the point before,

18   you're going to have to look into the subjective intent of

19   each -- of the writer of the letter because it wasn't even

20   discussed with QDI in its debt collection until sometime in

21   2005, and the letters that he relies on in exhibits 16, 17,

22   18, 19 and 20 for various reasons are all dated pre-2005.

23            MR. MELODIA:   If your Honor is done on that, I want

24   to go back to the $10 issue for one moment.

25            THE COURT:  All right.

1      MR. MELODIA:  Because I think while your Honor may

2  view this as too close to a merits issue or too unique or

3  peculiar to Mr. Grandalski, the only person to claim this

4  $10 fee having been added, we think it goes more to what

5  Hydrogen Peroxide counsels, that is, how do I go about

6  making a decision, what are the types of issues that could

7  arise when I'm looking at the merits of a claim.

8      And, in particular, there are, I guess, three things

9  I want to say.  First, there's no allegation or at least no

10  evidence at all before the Court that this $10 fee was in

11  any way a national practice or practice for any extended

12  period of time.

13      I already made the point about no numerosity of

14  record.  But in addition, I want to make the point that at

15  most, what we're dealing with is a business unit, Las

16  Vegas, for a very limited period of time where this charge

17  is in question.  That's point number one.

18      Number two is, we still have the question of refunds

19  in this context, whether or not refunds were given post

20  collection.  There are circumstances where courtesy and

21  other refunds are given, and we have had examples of that

22  in the named plaintiffs, not Mr. Grandalski, but in other

23  named plaintiffs.

24      THE COURT:  Would that save -- would a refund save

25  anybody from a Fair Debt Collection Practices Act claim

1    frankly?  I doubt it very much.

2        MR. MELODIA:   Probably not.  It's not a breach of

3    contract.

4        And I think the third point may go more to a breach-

5    of-contract scenario, but I'm not sure about that.  I just

6    wanted to raise factually that we're in a setting,

7    according to the record, with regard to Mr. Grandalski,

8    where he owes -- and there's no real dispute that he owes

9    $40 that he never paid to Quest, because the bills that

10   were being sent were correct bills, consistent with the

11   EOB, by the way, and he never paid them.  We think because

12   the address was wrong.  Again, we go back to this garbage

13   in, garbage out.  If you have garbage in on the address at

14   the front end, you end up with an EOB going to the wrong

15   person, a bill going to the wrong person at the wrong

16   address.

17       THE COURT:  Thank you, folks.  Look, I believe we've

18   covered a lot of territory and you've been helpful.

19       Now, you get one last crack.  Fifteen pages from each

20   of you, no surreplies, no surreplies, no anything.  All

21   right.  15 pages simultaneously submitted, dealing with

22   what you think are the most significant things I should now

23   be dealing with.  You've heard my concerns.  Persuade me.

24       MR. TUSA:  Your Honor, single spaced, double spaced?

25       THE COURT:  According to our standard motion practice

1    rules.  Okay.  And the reason why I've got it at 15 is, I

2    know you're all superb lawyers and it takes superb lawyers

3    to write brief briefs.

4            I've already had your extensive ones.  Now I need the

5    short ones.  All right?

6            MR. CIPPARULO:   Your Honor, do I get fifteen pages

7    for each debt collector defendant?

8            THE COURT:  No, you don't.

9            MR. CIPPARULO:   Okay, your Honor.

10           THE COURT:  Thank you, folks.  It's been a pleasure.

11           MR. TUSA:  When will those briefs be due?

12           THE COURT:  Talk about it between yourselves.  All

13   right.  I'm sure this much you can decide upon.  Okay?

14           MR. MELODIA:   Yes, sir.

15           THE COURT:  Thank you.

16           (Whereupon the proceedings are adjourned.)

17

18

19

20

21

22

23

24

25

**$**

**$10** [11] - 51:16, 51:23, 78:24, 79:22, 80:3, 82:6, 82:10, 84:4, 86:24, 87:4, 87:10
**$20** [2] - 26:23, 54:18
**$30** [1] - 54:19
**$40** [1] - 88:9
**$60.40** [1] - 76:19
**$604.02** [1] - 76:18

**'**

**'05** [1] - 76:15
**'09** [3] - 59:8, 71:11, 77:16
**'98** [1] - 12:5

**0**

**04-4362** [1] - 3:1
**04-4362-SRC** [1] - 1:2
**07936** [1] - 2:19
**08033** [1] - 2:4
**08543-7839** [1] - 2:14
**08867** [1] - 1:24

**1**

**10** [4] - 54:13, 55:3, 55:16, 61:5
**10011** [1] - 2:8
**11** [3] - 34:5, 56:4, 61:3
**11th** [1] - 38:23
**12** [1] - 1:23
**136** [1] - 2:13
**15** [6] - 32:8, 67:22, 86:3, 86:15, 88:21, 89:1
**16** [1] - 86:21
**17** [2] - 28:21, 86:21
**18** [1] - 86:22
**19** [1] - 86:22
**1998** [1] - 86:1
**19th** [1] - 2:8

**2**

**2** [2] - 44:23, 55:7
**20** [2] - 67:22, 86:22
**2001** [1] - 86:1
**2004** [2] - 12:6, 85:25
**2005** [4] - 31:20, 86:6, 86:14, 86:21

**2008** [1] - 4:22
**2009** [2] - 18:2, 74:19
**2010** [2] - 1:9, 21:1
**229-6496** [1] - 1:24
**23(b** [1] - 35:22
**23(b)(3** [1] - 27:21
**23(f** [1] - 5:4
**24** [1] - 67:22
**24(c** [1] - 32:1
**25** [3] - 56:24, 59:13, 74:8
**250** [1] - 2:13
**256** [1] - 77:17
**258** [1] - 2:3
**26** [1] - 76:15
**27** [1] - 34:5
**28** [1] - 1:14

**3**

**30** [1] - 30:19
**33** [1] - 2:8
**350** [1] - 2:18
**37-year** [1] - 9:11

**4**

**4** [3] - 55:7, 55:17, 57:4
**471** [1] - 77:17
**4th** [1] - 2:8

**5**

**500,000** [1] - 73:14
**51** [2] - 17:23, 17:24
**52** [1] - 86:15

**6**

**6** [1] - 66:24

**7**

**7** [1] - 1:9
**72** [1] - 2:18
**753** [1] - 1:14
**7839** [1] - 2:13

**9**

**908** [1] - 1:24

**A**

**abide** [1] - 18:9
**abided** [1] - 5:2
**able** [3] - 11:1, 34:20, 41:16
**ABN** [29] - 62:10, 62:15, 62:20, 62:24, 62:25, 63:8, 63:12, 63:18, 63:24, 64:1, 64:9, 64:20, 65:4, 65:9, 65:13, 65:14, 65:24, 65:25, 66:5, 66:14, 66:15, 68:3, 68:5, 68:16, 69:10, 69:11, 69:24
**ABNs** [3] - 63:1, 63:9, 65:14
**above-entitled** [1] - 1:15
**absolutely** [7] - 34:21, 62:16, 73:12, 74:5, 81:11, 82:4, 83:21
**absurd** [2] - 52:8, 52:11
**accept** [2] - 62:6
**acceptable** [1] - 44:6
**accepted** [1] - 59:8
**according** [6] - 22:18, 41:10, 43:8, 86:13, 88:7, 88:25
**accurate** [1] - 1:15
**acknowledge** [1] - 12:17
**act** [1] - 15:7
**Act** [5] - 10:25, 13:6, 53:11, 53:12, 87:25
**ACTION** [1] - 1:2
**action** [21] - 16:7, 17:6, 17:12, 17:15, 18:4, 28:20, 31:19, 36:7, 48:8, 49:12, 51:22, 67:21, 72:18, 72:22, 72:24, 77:7, 77:8, 84:21, 84:22, 85:1, 86:11
**actions** [2] - 17:7, 17:16
**activity** [1] - 59:10
**actual** [11] - 34:2, 34:3, 35:2, 36:18, 38:14, 39:4, 39:6, 56:11, 56:21, 63:17
**acutely** [1] - 14:4
**ad** [1] - 28:3
**add** [5] - 9:21, 60:13, 80:3, 81:22, 82:6
**add-on** [1] - 82:6
**added** [7] - 12:5, 79:3,

79:18, 80:16, 81:17, 81:18, 87:4
**adding** [1] - 50:6
**addition** [2] - 24:17, 87:14
**additional** [5] - 9:4, 9:21, 50:6, 62:4, 78:12
**address** [7] - 7:13, 54:7, 78:15, 86:4, 88:12, 88:13, 88:16
**addressed** [1] - 7:1
**adds** [2] - 9:23, 51:23
**adequate** [4] - 62:22, 63:5, 69:12, 70:7
**adhere** [1] - 6:4
**adjourned** [1] - 89:16
**adjudicate** [1] - 41:5
**adjudicates** [2] - 43:2, 43:3
**adjudication** [1] - 43:5
**adjudicator** [2] - 23:18, 44:23
**adjustments** [1] - 25:15
**admit** [1] - 19:18
**admittedly** [2] - 12:9, 18:24
**advance** [1] - 62:1
**affected** [1] - 67:22
**affidavit** [2] - 64:16, 66:20
**afoul** [1] - 12:15
**afternoon** [1] - 78:18
**afterwards** [2] - 12:13, 24:12
**agencies** [4] - 78:22, 78:23, 82:23, 82:24
**Agency** [4] - 2:20, 3:16
**agency** [3] - 51:18, 83:16, 86:6
**ago** [3] - 4:21, 4:22, 32:20
**AGOSTINO** [1] - 1:3
**Agostino** [3] - 3:1, 57:2, 77:16
**Agostinos** [2] - 57:2, 57:9
**Agostinos'** [1] - 57:13
**agree** [5] - 6:14, 17:12, 21:6, 43:20, 54:24
**agreed** [1] - 8:1
**agreement** [9] - 8:25, 9:7, 24:24, 41:6, 43:4, 54:6, 55:3, 79:19
**agreements** [6] - 9:3, 9:4, 23:19, 24:4,

25:4, 28:6
**agrees** [2] - 16:23, 54:20
**Agriculture** [1] - 9:11
**ahead** [4] - 45:18, 45:21, 60:19, 69:2
**al** [2] - 1:3, 1:7
**ala** [1] - 17:6
**Alabama** [1] - 17:8
**albeit** [1] - 48:21
**allegation** [4] - 36:11, 36:14, 37:1, 87:9
**allegations** [5] - 32:3, 32:5, 36:7, 47:22, 47:25
**allege** [2] - 16:24, 37:25
**alleging** [1] - 38:2
**allow** [2] - 17:7, 62:9
**allowed** [5] - 5:15, 5:19, 42:12, 82:15, 86:12
**alone** [1] - 66:14
**alternate** [2] - 13:8, 13:11
**alternative** [3] - 20:16, 28:20, 66:3
**alternatively** [5] - 65:14, 71:21, 84:7, 84:18, 85:20
**AMCA** [1] - 47:18
**amend** [1] - 32:14
**amended** [4] - 31:19, 31:22, 31:23, 80:14
**amendment** [2] - 56:5, 61:4
**American** [4] - 2:20, 3:15, 47:18
**amount** [11] - 5:3, 6:24, 22:25, 23:4, 26:22, 28:15, 34:24, 35:8, 59:16, 74:16, 76:18
**amounts** [2] - 30:23, 32:16
**analyses** [1] - 63:11
**analysis** [12] - 5:25, 9:17, 11:18, 12:1, 12:6, 17:11, 17:13, 19:10, 21:3, 22:2, 59:4, 68:10
**angels** [1] - 19:25
**answer** [11] - 16:14, 31:15, 32:24, 40:1, 43:1, 43:6, 48:15, 49:21, 50:19, 51:3, 63:22
**Anthem** [12] - 8:24, 9:1, 9:6, 26:20, 26:21, 53:25, 56:1,

56:2, 57:18, 57:25, 60:24, 71:17
**anti** [1] - 25:4
**anti-balance** [1] - 25:4
**antitrust** [10] - 13:23, 13:24, 13:25, 14:1, 14:9, 14:12, 14:14, 15:6, 15:10, 15:24
**apart** [2] - 35:21, 84:4
**apologize** [3] - 57:20, 69:16, 79:17
**appeal** [1] - 5:4
**Appeals** [1] - 6:7
**appearances** [1] - 3:2
**apples** [1] - 16:12
**applications** [1] - 34:9
**applied** [1] - 13:7
**applies** [6] - 10:25, 18:13, 54:25, 55:17, 57:6, 57:22
**apply** [3] - 18:21, 21:18, 79:11
**appreciate** [3] - 38:11, 39:25, 68:7
**approach** [1] - 24:8
**appropriate** [2] - 38:14, 66:8
**April** [1] - 53:2
**area** [3] - 11:7, 12:1, 36:10
**areas** [1] - 37:3
**arguably** [1] - 37:6
**argue** [1] - 76:22
**argued** [2] - 63:14, 63:15
**arguendo** [1] - 75:15
**arguing** [5] - 3:25, 48:6, 59:2, 67:13
**argument** [11] - 21:12, 49:2, 63:20, 69:4, 69:5, 69:6, 70:15, 71:19, 76:6, 83:4, 85:25
**arguments** [1] - 83:2
**arise** [1] - 87:7
**Arizona** [1] - 10:23
**articulately** [1] - 35:16
**artifice** [3] - 29:18, 29:20, 30:14, 32:15, 38:5, 48:19
**ascertainability** [1] - 57:11
**ascertainable** [2] - 8:3, 23:6
**aside** [2] - 6:14, 12:25
**aspect** [2] - 11:5, 37:1
**aspects** [2] - 11:2, 22:7
**assert** [5] - 13:5, 32:14, 48:7, 49:20,

78:16
**asserted** [1] - 78:19
**assertions** [1] - 30:8
**assessed** [1] - 78:17
**assessment** [1] - 64:2
**assistant** [1] - 9:13
**associated** [1] - 50:24
**assume** [11] - 32:13, 71:15, 71:18, 75:12, 75:15, 77:12, 85:18
**assuming** [3] - 14:21, 63:2, 75:19
**assumption** [1] - 81:23
**assumptions** [1] - 76:8
**astounding** [2] - 23:11, 23:15
**attached** [2] - 63:25, 64:16
**attaches** [3] - 85:25, 86:1
**attack** [1] - 61:25
**attempting** [1] - 68:24
**attempts** [1] - 84:23
**attention** [2] - 11:13, 53:1
**Attorney** [5] - 26:4, 26:6, 26:9, 26:13, 58:2
**atypical** [2] - 49:18, 63:6
**Auclair** [1] - 57:5
**authored** [1] - 10:8
**authority** [1] - 10:3
**authorized** [4] - 46:12, 83:7, 84:8, 86:8
**automatically** [3] - 56:19, 70:10, 74:17
**Avenue** [1] - 2:18
**average** [1] - 36:19
**aware** [6] - 4:20, 11:19, 14:4, 31:25, 32:7, 53:12
**AWP** [1] - 17:19

## B

**b)** [1] - 67:23
**b)(2** [2] - 7:18, 7:19
**b)(3** [1] - 7:18
**balance** [8] - 25:4, 28:6, 40:19, 40:24, 40:25, 41:7, 75:5, 75:16
**banc** [1] - 11:16
**bank** [1] - 22:25
**Bank** [1] - 9:14
**bankruptcy** [2] -

27:13, 27:15
**barring** [1] - 40:19
**based** [5] - 24:20, 25:6, 37:5, 39:24
**bases** [1] - 19:21
**basing** [1] - 74:15
**basis** [2] - 6:1, 69:24
**bearing** [1] - 19:7
**bears** [1] - 21:9
**become** [2] - 70:11, 74:19
**becomes** [3] - 31:8, 74:17, 77:14
**bed** [1] - 36:20
**behalf** [7] - 3:11, 3:15, 28:11, 28:16, 52:18, 69:11, 70:6
**behemoth** [1] - 28:22
**behold** [1] - 64:13
**belabor** [6] - 6:16, 11:4, 20:8, 21:11, 53:19, 61:12
**bells** [2] - 58:14, 58:16, 58:18
**belt** [2] - 7:22, 7:23
**beneficiary** [9] - 54:9, 58:5, 62:1, 63:16, 71:19, 72:4, 75:5, 75:14, 76:4
**benefit** [7] - 23:19, 24:21, 33:18, 40:8, 44:12, 54:21, 54:23
**Benefits** [1] - 9:8
**benefits** [3] - 39:16, 42:21, 59:24
**benighted** [1] - 11:2
**Benz** [2] - 10:13, 10:14
**best** [5] - 31:15, 43:25, 44:1, 55:12
**better** [1] - 33:20
**BETTINO** [2] - 2:15, 3:10
**Bettino** [1] - 3:11
**between** [7] - 6:5, 6:17, 7:15, 43:18, 79:19, 89:12
**big** [1] - 45:6
**bill** [48] - 22:19, 22:20, 24:13, 24:19, 24:20, 24:25, 25:6, 25:21, 29:23, 30:18, 34:1, 34:12, 34:13, 34:24, 41:5, 41:16, 41:18, 41:19, 41:22, 41:23, 42:12, 42:23, 44:1, 44:18, 54:16, 56:18, 58:24, 59:22, 68:11, 69:2, 70:10, 70:19, 73:18, 74:3, 75:5,

75:10, 75:16, 76:1, 76:17, 76:21, 77:6, 77:8, 77:11, 79:22, 88:15
**billed** [22] - 8:5, 23:3, 23:9, 23:16, 23:22, 24:12, 25:20, 27:2, 27:17, 30:8, 30:11, 30:23, 37:5, 40:5, 42:25, 54:19, 58:21, 59:15, 61:21, 63:19, 74:16, 76:2
**billing** [30] - 8:11, 8:12, 22:9, 22:16, 23:3, 24:5, 24:19, 25:3, 25:4, 27:22, 29:22, 32:16, 33:3, 33:4, 33:7, 33:16, 34:13, 34:16, 34:17, 35:6, 39:23, 40:20, 40:24, 41:1, 41:7, 43:6, 44:19, 68:6, 69:2
**billings** [1] - 28:6
**bills** [13] - 30:16, 30:20, 33:11, 34:15, 34:18, 41:9, 46:20, 49:6, 51:24, 73:14, 88:9, 88:10
**bit** [9] - 4:9, 5:9, 9:23, 22:2, 26:17, 27:7, 43:7, 45:10, 45:19
**blank** [1] - 17:17
**Blue** [12] - 8:24, 9:1, 9:6, 26:20, 26:21, 26:22, 53:25, 60:24
**board** [1] - 37:3
**body** [1] - 16:18
**bona** [1] - 53:5
**borrow** [1] - 44:22
**Bowman** [1] - 78:1
**Box** [2] - 1:23, 2:13
**breach** [20] - 8:23, 18:17, 54:10, 54:11, 58:13, 58:19, 58:21, 58:25, 59:4, 70:22, 71:5, 75:22, 76:3, 76:22, 76:25, 77:4, 77:9, 77:11, 88:2, 88:4
**breach-of** [1] - 54:11
**breach-of-contract** [5] - 54:10, 58:19, 70:22, 75:22, 76:25
**break** [2] - 60:7, 70:24
**Breuer** [1] - 57:5
**Breuer-Auclair** [1] - 57:5
**bribery** [1] - 38:7
**Brick** [4] - 14:1, 14:2,

14:5, 14:8
**brick** [1] - 26:3
**brief** [10] - 6:24, 25:14, 34:6, 45:15, 53:18, 60:15, 60:17, 67:8, 71:20, 89:3
**briefed** [1] - 7:12
**briefing** [4] - 13:9, 22:12, 69:6, 82:11
**briefly** [5] - 52:25, 60:23, 67:5, 69:18, 83:2
**briefs** [8] - 7:7, 7:9, 9:20, 9:21, 37:10, 53:2, 89:3, 89:11
**bright** [1] - 19:19
**bring** [1] - 53:1
**brings** [1] - 6:13
**broke** [2] - 18:13, 60:23
**brought** [3] - 4:12, 59:17, 80:7
**bucks** [2] - 27:3, 27:6
**burden** [5] - 12:18, 12:20, 76:12, 76:13, 81:25
**bureau** [1] - 85:21
**Bureau** [5] - 2:20, 2:21, 3:17, 3:18, 47:16
**business** [3] - 19:22, 20:20, 87:15
**buy** [1] - 19:15
**BY** [4] - 2:4, 2:9, 2:14, 2:19

## C

**C.S.R.** [1] - 1:22
**calculation** [1] - 37:3
**Camaj** [17] - 61:22, 62:9, 62:10, 64:8, 64:15, 65:19, 67:18, 68:2, 68:10, 68:12, 68:19, 68:21, 69:3, 69:11, 69:21, 69:22, 80:15
**candidly** [1] - 9:25
**cannot** [5] - 22:16, 27:23, 71:9, 77:22, 86:7
**care** [2] - 17:13, 22:5
**career** [1] - 5:9
**careful** [4] - 10:18, 11:13, 12:13, 18:9
**Carnegie** [1] - 28:19
**Carolina** [1] - 17:8
**carrier** [8] - 42:12, 42:13, 43:15, 43:16,

43:17, 59:22
**carriers** [7] - 42:5, 42:10, 42:13, 42:16, 43:23, 59:19, 74:12
**cart** [1] - 49:1
**cart-before** [1] - 49:1
**Carzem** [2] - 13:15, 13:19
**case** [46] - 13:20, 13:25, 14:18, 14:19, 14:20, 14:21, 20:13, 26:23, 28:19, 28:21, 31:1, 37:8, 38:23, 38:24, 39:1, 39:2, 41:15, 47:22, 48:10, 49:20, 52:15, 53:18, 57:7, 60:2, 61:11, 67:21, 68:20, 71:4, 71:7, 73:8, 73:10, 74:2, 75:1, 75:23, 76:25, 77:21, 79:21, 80:17, 82:1, 82:4, 83:9, 83:13, 85:2, 86:10
**cases** [22] - 13:4, 13:13, 13:21, 13:23, 13:24, 14:24, 14:25, 15:5, 15:12, 15:17, 15:18, 15:22, 15:24, 16:2, 19:5, 28:21, 36:2, 36:15, 52:20, 83:11
**cash** [6] - 25:15, 25:16, 43:9, 43:10
**Cassese** [2] - 65:25, 70:5
**Cassese's** [1] - 70:2
**caution** [1] - 9:25
**cautioned** [1] - 10:4
**CBC** [6] - 25:25, 27:2, 78:25, 79:3, 79:8
**cede** [1] - 60:21
**Center** [1] - 17:23
**center** [2] - 20:14, 20:17
**Central** [3] - 2:20, 3:17, 47:16
**central** [1] - 34:8
**cert** [1] - 34:5
**certain** [3] - 14:6, 40:18, 52:2
**certainly** [19] - 12:23, 15:15, 18:8, 28:7, 28:22, 32:6, 33:15, 35:22, 37:23, 39:6, 39:8, 40:7, 41:2, 41:8, 41:18, 46:21, 52:20, 54:4, 64:3
**certifiable** [1] - 71:8
**certification** [20] -

4:21, 4:24, 5:16, 12:1, 12:14, 12:19, 13:21, 14:1, 16:6, 28:2, 53:14, 54:4, 56:13, 71:24, 72:1, 74:8, 80:5, 82:6, 83:12
**certifications** [1] - 14:23
**certified** [11] - 1:15, 14:12, 14:17, 48:24, 52:1, 52:3, 71:9, 80:2, 81:12, 81:13, 82:25
**certify** [8] - 14:13, 14:18, 15:6, 15:9, 58:4, 80:19, 81:10, 84:1
**CFA** [1] - 19:2
**challenged** [1] - 13:22
**change** [3] - 9:18, 32:5, 45:18
**changed** [1] - 65:23
**changes** [1] - 80:19
**characteristic** [1] - 52:13
**characterized** [1] - 59:21
**characterizing** [1] - 58:15
**characters** [1] - 78:11
**charge** [4] - 24:16, 82:6, 82:10, 87:16
**charging** [4] - 46:15, 50:5, 79:12, 79:15
**chart** [11] - 7:14, 8:10, 22:3, 22:10, 22:21, 26:19, 41:11, 45:20, 55:2, 61:13, 62:16
**charts** [5] - 4:17, 45:18, 45:23, 50:2, 50:4
**chase** [1] - 26:1
**cheating** [1] - 45:10
**check** [1] - 73:14
**Check** [1] - 53:18
**checklist** [1] - 67:10
**CHESLER** [1] - 1:12
**Chief** [2] - 13:18, 15:14
**choice** [16] - 6:1, 9:17, 9:19, 10:18, 11:5, 11:18, 11:19, 12:24, 13:5, 18:11, 18:13, 18:25, 19:10, 20:25, 21:23, 73:1
**choice-of-law** [9] - 6:1, 9:17, 9:19, 11:5, 11:18, 11:19, 19:10, 20:25, 73:1

**choosing** [1] - 20:14
**chose** [3] - 19:24, 20:14, 20:16
**chubby** [1] - 76:16
**CIPPARULO** [20] - 2:19, 3:13, 3:21, 3:24, 47:1, 47:5, 78:18, 79:14, 80:6, 81:8, 81:13, 81:21, 83:1, 83:20, 84:23, 85:8, 85:14, 85:24, 89:6, 89:9
**Cipparulo** [2] - 3:14, 3:19
**circle** [1] - 22:1
**Circuit** [5] - 6:7, 10:1, 10:4, 11:10, 11:13, 11:25, 17:19, 19:9, 19:12, 19:13, 19:15, 38:14, 53:8
**Circuit's** [7] - 9:22, 11:23, 36:1, 38:23, 39:3, 39:9, 53:17
**circuits** [1] - 20:12
**circumstances** [1] - 87:20
**cite** [4] - 11:9, 13:4, 34:6, 77:16
**cited** [3] - 35:25, 37:9, 38:13
**citing** [4] - 7:1, 7:3, 48:23, 85:2
**CIVIL** [1] - 1:2
**civil** [5] - 9:12, 9:13, 31:5, 31:6, 58:15
**civilizing** [1] - 11:2
**claim** [44] - 16:25, 18:7, 25:14, 27:7, 28:11, 29:7, 29:9, 29:10, 29:24, 36:22, 38:17, 39:21, 41:5, 43:2, 43:3, 48:3, 48:20, 49:8, 49:20, 49:22, 54:10, 54:12, 56:8, 57:9, 58:15, 58:19, 67:20, 69:3, 69:21, 69:22, 71:5, 74:3, 75:23, 78:14, 80:11, 80:12, 80:13, 81:1, 81:2, 82:7, 83:22, 87:3, 87:7, 87:25
**claimant's** [1] - 63:12
**claiming** [1] - 85:15
**claims** [15] - 5:11, 12:20, 14:13, 14:14, 15:10, 18:7, 18:14, 18:22, 39:22, 46:5, 53:12, 78:10, 81:5, 82:21, 84:4

**class** [153] - 4:20, 4:23, 5:15, 6:8, 8:6, 8:8, 8:21, 8:22, 8:23, 8:24, 9:6, 9:9, 12:19, 13:7, 13:24, 14:1, 14:12, 14:13, 15:6, 16:6, 16:7, 16:24, 17:7, 17:15, 18:8, 18:16, 22:9, 23:2, 23:3, 23:12, 24:10, 24:11, 25:3, 25:8, 25:18, 26:22, 27:12, 27:19, 27:22, 28:2, 28:11, 28:20, 28:24, 29:3, 29:5, 29:6, 29:8, 31:10, 31:13, 31:17, 31:19, 32:3, 33:1, 34:5, 35:1, 35:11, 35:17, 35:18, 35:19, 35:23, 36:7, 39:17, 39:23, 40:17, 45:5, 45:16, 46:8, 47:9, 47:10, 47:17, 47:25, 48:10, 48:14, 48:25, 49:12, 50:14, 51:11, 51:15, 51:22, 53:13, 53:24, 53:25, 54:2, 54:3, 54:5, 54:11, 55:25, 56:12, 56:17, 56:24, 57:9, 57:11, 58:19, 59:14, 61:18, 62:2, 62:18, 62:22, 62:23, 62:25, 63:6, 63:7, 64:10, 64:13, 64:19, 64:22, 65:1, 65:3, 65:10, 65:12, 65:13, 65:22, 65:23, 65:24, 66:8, 69:5, 69:12, 69:21, 70:6, 70:11, 70:22, 71:8, 71:9, 72:1, 72:18, 72:24, 74:15, 76:12, 76:21, 79:6, 80:1, 80:5, 80:20, 81:4, 81:10, 81:12, 82:9, 82:14, 82:25, 83:3, 83:12, 84:1, 84:2
**classes** [15] - 7:18, 7:19, 8:2, 12:2, 12:9, 18:23, 22:9, 26:18, 28:8, 29:3, 32:25, 39:23, 45:2, 48:24, 82:15
**clause** [2] - 54:14, 55:6
**Clay** [1] - 38:23
**clear** [14] - 5:12, 9:2, 19:3, 20:7, 22:5, 48:16, 50:8, 55:15,

55:19, 55:21, 68:2, 72:3, 79:16, 79:17
**clearer** [1] - 83:20
**clearly** [4] - 54:15, 62:11, 70:13, 71:8
**clears** [1] - 6:12
**clerical** [1] - 76:20
**CLERK** [2] - 3:1, 36:5
**client** [1] - 52:16
**close** [2] - 18:2, 87:2
**closely** [2] - 5:2, 7:25
**closer** [1] - 45:20
**closest** [1] - 76:14
**CMS** [4] - 68:23, 68:24, 68:25, 69:1
**co** [1] - 26:24
**co-pay** [1] - 26:24
**code** [1] - 66:18
**Code** [1] - 1:14
**codes** [1] - 66:25
**cohesive** [1] - 72:15
**cohesiveness** [2] - 62:18, 72:16
**coincidentally** [1] - 39:16
**cold** [1] - 4:9
**colleague** [1] - 78:15
**colleagues** [3] - 5:2, 8:1, 16:17
**collect** [2] - 78:25, 79:23
**Collection** [8] - 2:20, 2:20, 2:21, 3:16, 3:17, 47:5, 87:25
**collection** [17] - 46:16, 51:16, 51:18, 51:21, 51:23, 78:10, 78:13, 78:20, 78:21, 78:22, 78:23, 82:23, 83:16, 84:23, 86:6, 86:20, 87:20
**collector** [15] - 8:7, 45:16, 46:6, 46:24, 47:21, 49:11, 50:22, 51:21, 52:17, 52:22, 79:18, 79:22, 80:17, 83:6, 89:7
**collector's** [1] - 79:24
**collectors** [8] - 25:25, 26:10, 27:1, 27:5, 35:5, 46:19, 49:13, 86:11
**collectors'** [1] - 52:16
**collects** [1] - 52:18
**comfortable** [1] - 4:7
**coming** [3] - 15:12, 44:15, 62:1
**comment** [1] - 16:24
**commented** [1] - 5:24
**comments** [1] - 5:20

**common** [7] - 8:22, 18:16, 20:11, 28:10, 49:15, 85:11
**commonality** [3] - 12:16, 12:22, 51:2
**commonly** [1] - 16:19
**communications** [1] - 85:21
**companies** [2] - 36:8, 36:20, 52:13
**company** [10] - 8:16, 23:17, 25:20, 25:25, 33:17, 34:13, 36:12, 36:20, 36:21, 75:25
**compare** [1] - 66:23
**compendium** [2] - 17:22, 18:2
**competing** [2] - 59:18, 74:12
**complain** [1] - 50:3
**complained** [2] - 25:24, 26:3
**complaining** [2] - 25:24, 50:9
**complaint** [13] - 5:23, 29:17, 30:13, 30:15, 30:21, 31:18, 31:19, 32:6, 32:9, 32:14, 37:25, 80:14, 82:19
**complaints** [1] - 26:3
**completely** [2] - 33:13, 73:1
**complex** [1] - 74:25
**compliance** [3] - 9:13, 34:7, 35:9
**comply** [4] - 35:7, 43:16, 43:18, 43:22
**comprehensive** [1] - 7:7
**concedes** [1] - 86:3
**concept** [1] - 40:13
**concerned** [1] - 33:11
**concerning** [1] - 71:11
**concerns** [2] - 45:3, 88:23
**conclusions** [1] - 20:12
**conduct** [11] - 37:24, 37:25, 50:15, 50:17, 50:23, 51:19, 84:6, 84:7, 84:9, 86:9
**conducting** [1] - 19:10
**conference** [1] - 5:21
**conflict** [2] - 18:20, 21:3
**conflict-of-laws** [1] - 21:3
**conflicting** [1] - 60:1
**conform** [2] - 32:9, 82:17

**conformed** [1] - 82:18
**Connecticut** [6] - 18:18, 54:24, 72:6, 72:9, 72:11, 72:23
**consideration** [1] - 10:18
**considered** [1] - 45:2
**consist** [1] - 67:15
**consistent** [2] - 73:11, 88:10
**consisting** [2] - 55:25, 62:25
**consolidated** [1] - 15:18
**conspiracy** [1] - 33:11
**constitute** [1] - 31:4
**constituted** [1] - 29:20
**constitutes** [3] - 20:5, 31:2, 80:4
**construed** [1] - 54:21
**consumer** [10] - 13:8, 14:10, 18:3, 18:14, 18:23, 44:6, 53:15, 75:13, 79:20, 85:8
**Consumer** [3] - 10:25, 13:6, 17:23
**consumers** [1] - 39:17
**contact** [1] - 68:23
**contacted** [1] - 68:21
**contained** [2] - 43:24, 44:21
**contest** [2] - 27:16, 83:24
**contested** [2] - 24:1, 57:16
**context** [6] - 12:21, 28:24, 30:25, 45:12, 52:15, 87:19
**continually** [2] - 28:7, 64:9
**continue** [5] - 6:4, 11:25, 63:7, 69:18, 73:9
**continuing** [1] - 56:23
**contract** [50] - 8:23, 18:17, 24:22, 41:17, 54:10, 54:12, 54:13, 54:22, 55:4, 55:13, 55:16, 55:21, 56:2, 57:3, 57:13, 57:17, 58:4, 58:13, 58:19, 58:20, 59:4, 59:5, 60:24, 61:1, 61:5, 61:6, 61:10, 70:22, 71:6, 71:11, 71:17, 72:3, 72:5, 72:6, 72:12, 73:15, 75:4, 75:8, 75:14, 75:22, 76:4, 76:22, 76:25, 77:4, 77:9, 77:11,

88:3, 88:5
**contracted** [1] - 43:15
**contracts** [5] - 44:9, 54:2, 57:8, 71:12, 73:19
**contractual** [4] - 40:19, 40:24, 55:11, 75:12
**Cooper** [3] - 9:22, 11:9, 19:4
**coordination** [3] - 42:21, 44:11, 59:24
**coordination-of** [1] - 44:11
**coordination-of-benefits** [1] - 59:24
**copays** [1] - 54:17
**copies** [4] - 4:16, 64:8, 66:6
**copy** [6] - 62:13, 62:15, 66:10, 66:12, 66:14, 68:14
**core** [3] - 16:5, 29:22, 84:3
**corporate** [4] - 20:18, 28:22, 33:3, 34:7
**corporation** [3] - 19:23, 20:5, 20:18
**correct** [20] - 11:4, 11:8, 15:13, 15:21, 17:21, 29:11, 36:2, 45:8, 46:24, 47:8, 73:25, 81:12, 83:19, 83:21, 84:22, 85:7, 85:13, 85:22, 85:23, 88:10
**correctly** [12] - 10:8, 15:7, 19:1, 29:2, 36:11, 37:14, 46:23, 49:5, 50:2, 51:8, 56:3, 62:24
**counsel** [11] - 4:9, 4:15, 8:15, 22:22, 26:13, 33:25, 44:16, 45:15, 50:5, 60:12, 85:1
**counsels** [1] - 87:5
**country** [2] - 11:2, 51:21
**couple** [4] - 13:4, 16:14, 43:8, 45:13
**coupled** [2] - 11:19, 11:20
**course** [26] - 7:12, 10:2, 11:9, 11:18, 11:22, 12:17, 13:6, 17:17, 24:23, 28:18, 29:13, 29:15, 31:24, 32:7, 32:24, 38:22, 39:22, 41:24, 53:11,
**court** [7] - 7:12, 12:7, 12:11, 12:12, 14:22, 19:8, 54:4
**Court** [28] - 1:19, 6:6,

53:13, 65:21, 67:20, 68:7, 68:12, 73:8, 84:24
**COURT** [162] - 1:1, 1:23, 3:7, 3:19, 3:23, 3:25, 4:3, 4:7, 4:15, 4:18, 5:18, 7:3, 7:21, 9:24, 10:17, 10:24, 11:6, 11:12, 11:16, 13:1, 13:4, 13:16, 13:23, 14:11, 14:16, 15:1, 15:5, 15:9, 15:17, 15:23, 16:1, 16:10, 19:11, 19:14, 19:17, 20:9, 21:8, 21:13, 21:21, 21:25, 23:24, 28:25, 29:2, 29:5, 29:9, 29:13, 29:16, 29:22, 30:3, 31:21, 32:13, 32:22, 33:10, 35:13, 35:15, 36:4, 36:6, 36:14, 36:17, 37:9, 37:13, 37:18, 37:21, 38:21, 40:17, 40:23, 42:5, 42:9, 42:15, 42:21, 42:23, 44:7, 44:11, 45:7, 45:13, 45:19, 45:22, 46:2, 46:5, 46:8, 46:11, 46:15, 46:18, 46:23, 47:2, 47:7, 47:10, 47:13, 47:19, 47:21, 48:2, 48:5, 49:5, 49:17, 49:24, 50:22, 51:1, 51:5, 51:7, 51:10, 51:14, 52:4, 52:6, 53:21, 55:1, 55:4, 55:8, 55:10, 55:24, 56:6, 56:15, 57:16, 57:24, 58:4, 58:9, 58:13, 58:18, 60:6, 60:10, 60:16, 60:19, 60:22, 62:17, 65:11, 67:6, 67:9, 69:14, 69:16, 70:21, 71:1, 71:21, 71:23, 72:14, 75:3, 75:10, 75:19, 75:21, 76:6, 77:3, 77:18, 78:5, 78:16, 79:12, 79:25, 80:18, 80:24, 81:10, 82:15, 82:20, 83:14, 84:3, 84:24, 85:10, 85:18, 86:25, 87:24, 88:17, 88:25, 89:8, 89:10, 89:12, 89:15
**court's** [1] - 53:3
**Court's** [5] - 19:6, 50:11, 50:13, 70:14, 82:15
**courtesy** [1] - 87:20
**courts** [5] - 10:5, 14:8, 19:25, 21:2, 21:16
**coverage** [1] - 24:21
**covered** [6] - 54:15, 56:1, 58:20, 61:21, 63:17, 88:18
**covering** [1] - 71:17
**covers** [2] - 55:19, 75:17
**crack** [1] - 88:19
**create** [3] - 11:17, 38:5, 63:10
**credit** [1] - 85:21
**Credit** [4] - 2:20, 3:17, 47:5, 47:16
**creditor** [1] - 52:19, 52:23, 79:20, 84:19
**criminal** [4] - 31:4, 31:6, 31:7, 38:4
**criteria** [3] - 27:21, 76:20, 77:14
**critical** [4] - 22:18, 22:23, 24:18, 34:23
**criticized** [1] - 24:4
**critiques** [1] - 6:22
**Cross** [7] - 8:24, 9:1, 9:6, 26:20, 26:22, 53:25, 60:24
**Cruthers** [3] - 59:18, 74:11
**crystal** [2] - 5:9, 5:12
**curious** [1] - 9:24
**current** [1] - 38:7
**customary** [6] - 36:4, 36:5, 36:6, 36:9, 36:19, 37:4
**customers** [1] - 38:18
**cut** [3] - 33:18, 34:20, 53:21
**cutoff** [1] - 84:17

**D**

**damage** [1] - 77:5
**damages** [3] - 27:25,

6:7, 10:2, 14:11, 20:10, 20:11, 20:22, 21:14, 24:9, 38:7, 39:13, 53:2, 53:9, 58:23, 59:3, 59:7, 63:11, 69:23, 70:2, 70:14, 72:21, 74:13, 74:19, 77:1, 82:12, 82:17, 87:10

35:23, 77:1
**damned** [2] - 24:7, 24:8
**damned-if-you-do** [1] - 24:7
**damned-if-you-don't** [1] - 24:8
**dance** [1] - 19:25
**data** [1] - 76:17
**database** [3] - 36:8, 36:17, 37:2
**date** [5] - 26:22, 26:25, 76:15, 84:12
**dated** [1] - 86:22
**dates** [2] - 26:20, 32:3
**days** [2] - 25:9, 84:11
**dead** [1] - 81:11
**deal** [9] - 14:22, 21:15, 49:17, 49:18, 56:12, 63:2, 64:24, 66:1, 67:14
**dealing** [7] - 20:10, 40:25, 51:4, 72:14, 87:15, 88:21, 88:23
**deals** [7] - 20:11, 40:2, 56:5, 72:15, 72:16, 72:17
**dealt** [5] - 47:25, 48:14, 48:17, 48:25, 83:5
**DeBeers** [6] - 11:14, 14:2, 14:3, 14:4, 16:3, 16:5
**Debevoise** [4] - 5:25, 6:5, 10:12, 10:14
**debt** [25] - 8:7, 25:25, 26:10, 27:1, 27:4, 35:5, 45:16, 46:6, 46:19, 46:24, 47:21, 49:11, 49:13, 50:22, 51:17, 51:20, 52:16, 52:17, 52:22, 78:10, 78:13, 86:5, 86:11, 86:20, 89:7
**Debt** [1] - 87:25
**debts** [1] - 52:18
**decades** [1] - 21:17
**deceived** [1] - 79:13
**deceptive** [7] - 26:11, 53:10, 53:16, 79:16, 82:21, 84:5
**decide** [3] - 65:8, 81:6, 89:13
**decided** [9] - 4:23, 5:6, 7:21, 12:4, 20:22, 26:9, 27:4, 35:5, 53:3
**decides** [1] - 65:4
**deciding** [1] - 5:3
**decision** [24] - 11:14,

12:12, 14:6, 16:3, 16:5, 16:16, 16:18, 19:6, 19:18, 21:14, 28:18, 35:2, 36:1, 38:23, 50:11, 50:12, 50:13, 53:3, 53:4, 68:18, 77:2, 77:16, 87:6
**decisions** [2] - 7:12, 20:18
**declaration** [5] - 56:25, 61:4, 66:9, 66:23, 68:3
**deductibles** [1] - 54:17
**defeats** [1] - 80:5
**defective** [16] - 62:11, 62:16, 63:1, 63:9, 63:13, 63:18, 64:18, 64:20, 65:5, 65:6, 65:9, 65:14, 65:25, 69:24, 70:15
**defendant** [5] - 3:9, 48:9, 48:15, 48:21, 89:7
**Defendant** [1] - 2:15
**defendant's** [1] - 38:18
**Defendants** [2] - 1:8, 2:20
**defendants** [21] - 3:15, 8:14, 18:24, 22:19, 23:8, 24:2, 24:8, 27:16, 27:24, 41:4, 44:15, 46:24, 47:14, 47:16, 47:22, 49:20, 54:6, 61:9, 61:24, 62:5, 65:19
**defendants'** [9] - 5:13, 6:22, 22:12, 30:11, 33:15, 34:7, 44:22, 66:2, 72:5
**defense** [12] - 25:17, 45:15, 49:4, 50:4, 53:6, 60:12, 63:13, 66:11, 74:24, 79:10, 80:4, 80:8
**defenses** [4] - 27:24, 49:18, 50:10, 63:6
**define** [2] - 35:18, 35:19
**defined** [5] - 24:10, 51:10, 62:23, 64:19, 65:22
**defining** [2] - 6:9, 35:17
**definite** [2] - 21:10, 21:13
**definition** [5] - 54:14, 57:12, 69:6, 69:9,

69:22
**definitive** [1] - 84:21
**defraud** [6] - 29:18, 29:20, 30:14, 32:15, 38:5, 38:6
**degree** [3] - 6:10, 34:22, 40:18
**delve** [1] - 83:2
**demonstrate** [2] - 29:25, 31:7
**demonstrated** [1] - 39:8
**denied** [1] - 43:15
**DENISE** [1] - 1:3
**deny** [2] - 27:11, 28:2
**denying** [1] - 4:23
**Department** [1] - 9:11
**department** [2] - 34:9, 34:11, 40:1
**dependent** [5] - 41:21, 49:22, 54:2, 73:12, 73:20
**deposition** [1] - 79:9
**depositions** [1] - 78:3
**depth** [1] - 5:5
**describe** [2] - 30:21, 67:2
**described** [3] - 29:17, 31:11, 34:23
**describes** [1] - 30:14
**designed** [1] - 21:15
**desires** [1] - 43:7
**desk** [1] - 79:24
**destroy** [1] - 71:24
**determination** [5] - 65:1, 65:2, 69:1, 69:25, 72:21
**determine** [5] - 19:22, 43:3, 59:3, 70:18, 72:2
**determined** [1] - 77:23
**determining** [2] - 35:19, 36:9
**deviation** [1] - 39:13
**deviling** [1] - 21:16
**Diagnostics** [3] - 2:15, 3:1, 3:12
**DIAGNOSTICS** [1] - 1:6
**Diane** [1] - 3:10
**DIANE** [1] - 2:15
**Dickinson** [1] - 5:25
**difference** [3] - 6:5, 43:22, 57:14
**differences** [4] - 6:17, 6:20, 7:15, 71:11
**different** [28] - 5:25, 6:8, 6:10, 19:21, 20:12, 28:1, 32:25, 33:24, 35:24, 42:13,

44:14, 47:15, 48:21, 52:11, 57:8, 59:18, 60:5, 64:5, 67:1, 71:12, 73:22, 73:25, 74:4, 74:12, 74:16, 78:11
**differs** [1] - 72:8
**difficult** [1] - 45:6
**Diffley** [1] - 34:6
**diffley** [2] - 66:19, 73:13
**diffley's** [2] - 64:16, 66:24
**diligent** [1] - 51:20
**dipped** [1] - 11:10
**direct** [1] - 59:23
**directed** [5] - 5:21, 82:22
**directly** [1] - 7:13
**director** [4] - 9:12, 9:13, 25:12, 34:7
**disagree** [5] - 16:15, 16:22, 17:10, 18:5
**discovery** [3] - 31:20, 32:11, 39:7
**discrete** [2] - 31:12, 82:12
**discussed** [3] - 86:4, 86:13, 86:20
**discussion** [4] - 53:23, 69:15, 71:13, 73:3
**discussions** [2] - 73:2, 73:15
**disingenuous** [1] - 25:5
**dismiss** [2] - 32:4, 56:10
**dismissed** [2] - 46:25, 81:14
**disowned** [1] - 3:19
**dispute** [6] - 66:13, 71:22, 78:21, 79:3, 84:12, 88:8
**disputed** [3] - 18:19, 68:13, 68:14
**disregard** [3] - 35:2, 38:15, 39:5
**disregarded** [3] - 34:4, 39:19, 40:14
**dissent** [2] - 10:10, 10:11
**dissented** [1] - 10:9
**distinguish** [1] - 43:18
**District** [2] - 13:17, 15:19
**DISTRICT** [2] - 1:1, 1:1
**district** [4] - 10:4, 19:8, 19:25, 21:1
**district's** [1] - 50:12

**diversity** [1] - 20:23
**doable** [2] - 45:6
**doctor** [1] - 38:24
**doctors** [1] - 36:23
**document** [7] - 22:18, 22:24, 23:17, 28:9, 34:23, 45:1, 45:3
**documents** [3] - 59:6, 61:8, 74:22
**dollar** [1] - 84:17
**dollars** [5] - 26:2, 28:14, 28:16, 28:20, 28:22
**done** [4] - 17:20, 42:7, 53:8, 86:23
**door** [1] - 40:22
**double** [1] - 88:24
**doubt** [5] - 5:19, 30:7, 30:9, 33:18, 38:2, 40:8, 53:25, 63:24, 77:3, 88:1
**dovetailed** [1] - 61:13
**dovetails** [2] - 26:21, 27:7
**down** [2] - 26:1, 56:6
**Dr** [3] - 24:15, 27:9, 41:10
**dramatically** [2] - 32:25, 33:24
**draw** [1] - 17:17
**dream** [1] - 60:7
**driven** [1] - 18:20
**drug** [1] - 13:22
**due** [1] - 89:11
**dunned** [1] - 49:12
**dunning** [3] - 47:13, 51:24, 82:22
**during** [2] - 56:22, 73:7
**Dyckman** [4] - 24:15, 27:9, 41:10, 77:23
**dyckman** [1] - 75:2

# E

**e)(10** [1] - 50:6
**e)(2** [1] - 50:7
**e)(5** [1] - 50:6
**Eagle** [1] - 2:18
**easily** [1] - 20:16
**East** [2] - 2:3, 2:19
**easy** [1] - 84:1
**effect** [1] - 11:1
**efforts** [1] - 79:23
**Egenix** [1] - 36:12
**eight** [1] - 64:9
**either** [15] - 5:14, 17:5, 26:16, 27:1, 35:2, 35:7, 39:12, 39:18,

46:11, 62:25, 64:12, 65:24, 66:3, 84:5, 85:19
**electronic** [4] - 8:17, 8:19, 34:16
**electronically** [1] - 32:17
**element** [1] - 77:4
**elements** [1] - 79:14
**emanating** [1] - 21:5
**embroiling** [1] - 63:10
**employee** [2] - 9:11, 55:21
**employees** [6] - 55:22, 56:5, 61:2, 61:6, 78:1, 78:3
**Employees** [1] - 9:8
**en** [1] - 11:16
**encouraged** [1] - 80:25
**end** [5] - 10:21, 19:18, 67:18, 88:14
**ended** [1] - 37:6
**ends** [1] - 30:17
**enforceable** [1] - 72:13
**enforced** [1] - 72:6
**Enforcement** [1] - 53:18
**engage** [1] - 84:8
**engaged** [1] - 29:18
**engages** [1] - 50:23
**engaging** [1] - 49:13
**English** [1] - 16:11
**enriched** [1] - 42:3
**enrichment** [4] - 18:20, 40:12, 40:17, 41:24
**entered** [1] - 14:6
**entirely** [1] - 40:22
**entitled** [2] - 1:15, 29:23
**entry** [1] - 76:17
**enumerated** [1] - 50:10
**EOB** [86] - 8:11, 8:12, 8:16, 8:19, 22:9, 22:17, 22:18, 22:23, 22:25, 23:2, 23:4, 23:9, 23:17, 24:10, 24:17, 25:1, 25:3, 26:22, 26:23, 26:25, 27:2, 27:18, 27:22, 28:9, 30:18, 33:5, 33:9, 33:16, 33:23, 34:2, 34:12, 34:21, 34:24, 35:8, 39:23, 40:5, 41:9, 41:11, 41:14, 41:20, 41:21, 41:22, 42:1, 42:23,

43:6, 43:11, 43:21, 43:24, 44:21, 45:1, 56:16, 56:17, 56:18, 56:24, 58:25, 59:10, 59:14, 59:16, 71:9, 73:4, 73:11, 73:23, 73:24, 73:25, 74:4, 74:16, 74:22, 75:10, 75:11, 75:16, 75:24, 75:25, 76:3, 76:18, 88:11, 88:14
**EOBs** [16] - 23:23, 25:6, 30:8, 30:12, 30:23, 30:24, 32:17, 34:8, 42:10, 58:21, 59:18, 59:25, 73:20, 74:10, 74:12
**equitable** [4] - 7:20, 40:13, 41:24, 44:4
**equity** [3] - 27:12, 42:4, 44:5
**ERA** [2] - 8:17, 34:25
**ERAs** [1] - 34:8
**ERISA** [1] - 8:21
**error** [6] - 39:20, 53:6, 76:17, 76:20, 76:24
**errors** [1] - 40:9
**escapes** [1] - 13:20
**Espinal** [1] - 78:2
**Espinal's** [2] - 86:14, 86:16
**ESQ** [5] - 2:4, 2:9, 2:14, 2:15, 2:19
**essentially** [8] - 13:5, 38:24, 46:5, 46:16, 73:5, 78:3, 82:21, 85:2
**established** [2] - 81:3, 81:24
**establishes** [1] - 77:21
**et** [2] - 1:3, 1:7
**event** [2] - 57:6, 57:25
**eventually** [1] - 25:10
**everyday** [1] - 41:9
**evidence** [8] - 32:9, 68:20, 74:25, 77:21, 82:18, 82:19, 86:10, 87:10
**exact** [1] - 59:6
**exactly** [3] - 6:13, 15:16, 29:17
**examine** [1] - 10:2
**example** [10] - 35:25, 49:18, 49:19, 51:5, 57:8, 59:17, 83:23, 84:17, 85:1, 85:7
**examples** [2] - 74:10, 87:21
**except** [3] - 13:1, 29:3,

52:17
**exception** [1] - 8:7
**excerpted** [2] - 22:14, 22:21
**excess** [20] - 23:4, 23:7, 23:23, 24:12, 25:20, 27:18, 30:8, 30:12, 30:18, 32:16, 40:5, 42:23, 58:21, 58:25, 75:10, 75:16, 76:3, 76:18
**excuse** [2] - 34:22, 58:15
**exemplar** [4] - 15:9, 15:11, 15:17, 15:24
**exemplars** [2] - 13:12
**exhibit** [24] - 6:15, 7:14, 22:15, 41:11, 44:23, 54:13, 55:2, 55:3, 55:16, 55:17, 56:4, 56:24, 57:4, 58:2, 59:13, 61:3, 61:4, 61:5, 66:22, 71:16, 74:8, 86:3, 86:15
**Exhibit** [1] - 66:24
**exhibits** [5] - 4:12, 57:20, 57:21, 73:7, 86:21
**exist** [4] - 64:10, 64:11, 64:21, 64:22
**existed** [1] - 31:7
**existing** [1] - 65:10
**expanded** [1] - 63:2
**expect** [2] - 59:20, 66:17
**expected** [1] - 25:8
**expediency** [4] - 19:19, 20:15, 20:16, 20:20
**experience** [2] - 14:4, 60:12
**experiences** [1] - 26:17
**expert** [9] - 22:12, 22:23, 24:15, 27:9, 41:10, 44:15, 59:21, 75:2, 77:24
**experts** [2] - 8:14, 33:25
**explain** [1] - 31:8
**explanation** [3] - 31:15, 44:14, 66:19
**explicitly** [1] - 84:6
**explore** [1] - 81:2
**export** [1] - 11:1
**express** [1] - 62:14
**expressed** [1] - 60:25
**expressly** [7] - 50:6, 50:7, 53:7, 53:9,

54:20, 54:22, 61:5
**extended** [1] - 87:11
**extensive** [1] - 89:4
**extensively** [1] - 83:5
**extent** [5] - 6:4, 12:22, 16:23, 17:20, 21:6
**extra** [4] - 10:25, 26:2, 27:3, 27:5
**extraordinarily** [1] - 5:5
**eyes** [1] - 64:17

**F**

**f)(1)** [1] - 50:7
**face** [1] - 62:11
**faced** [1] - 13:20
**fact** [41] - 5:6, 5:24, 10:12, 11:12, 15:19, 19:24, 27:11, 28:3, 28:4, 28:14, 30:1, 30:13, 31:3, 31:6, 31:8, 31:11, 32:14, 35:19, 35:21, 36:18, 37:2, 42:24, 43:20, 49:19, 50:5, 59:9, 59:20, 63:10, 63:16, 65:4, 72:17, 75:13, 78:10, 78:16, 79:10, 80:8, 81:2, 82:23, 83:10, 84:8
**factor** [1] - 15:15
**factors** [1] - 10:21
**facts** [5] - 16:20, 18:4, 64:25, 70:1, 70:3
**factual** [5] - 30:7, 49:16, 52:12, 55:13, 69:20
**factually** [1] - 88:6
**failing** [1] - 37:16
**fair** [8] - 19:4, 21:20, 33:22, 37:17, 51:6, 52:21, 69:17, 72:25
**Fair** [1] - 87:25
**fairly** [2] - 20:25, 67:11
**false** [2] - 74:5, 74:14
**familiar** [3] - 36:2, 36:13, 42:18
**fanatic** [1] - 28:19
**far** [5] - 3:21, 10:10, 28:13, 33:10, 45:24
**fate** [1] - 30:17
**favor** [1] - 7:4
**favors** [1] - 10:11
**FDCPA** [13] - 8:8, 27:7, 49:23, 50:10, 52:15, 52:25, 53:4, 53:10, 53:14, 79:15, 83:11, 83:22, 83:24

**February** [5] - 4:22, 59:8, 71:10, 74:19, 77:16
**Fed** [1] - 19:12
**federal** [10] - 13:17, 13:25, 14:12, 15:6, 21:16, 55:20, 55:22, 56:5, 61:2, 61:6
**Federal** [4] - 9:7, 19:8, 19:13, 19:15
**fee** [13] - 78:12, 78:21, 78:24, 79:3, 79:18, 79:23, 80:3, 80:16, 84:4, 87:4, 87:10
**feelings** [1] - 21:11
**fees** [9] - 46:16, 51:16, 51:21, 51:23, 79:1, 79:2, 79:12, 81:17, 81:18
**feet** [1] - 30:19
**few** [3] - 7:10, 7:11, 53:24
**fibreboard** [1] - 48:24
**fickle** [1] - 30:17
**fide** [1] - 53:5
**fifteen** [2] - 88:19, 89:6
**fighting** [1] - 4:9
**figure** [2] - 19:25, 30:25
**figures** [1] - 46:19
**file** [1] - 34:16
**filed** [3] - 31:20, 62:5, 80:15
**financially** [1] - 39:16
**findings** [1] - 74:19
**fine** [6] - 6:12, 23:2, 30:19, 43:10, 43:12, 66:3
**finger** [2] - 30:17, 76:16
**finish** [1] - 69:18
**firm** [2] - 3:3, 3:14
**first** [27] - 4:25, 5:8, 6:15, 6:18, 7:2, 7:15, 7:17, 8:10, 9:24, 9:25, 22:3, 25:23, 31:19, 42:12, 43:17, 53:8, 61:7, 61:11, 62:22, 63:3, 63:23, 72:2, 78:12, 83:5, 86:3, 86:13, 87:9
**firstly** [1] - 32:10
**fit** [2] - 23:12, 65:10
**fits** [2] - 76:20, 77:13
**five** [4] - 46:24, 47:1, 47:2, 50:4
**fix** [2] - 25:10, 25:11
**FLINN** [1] - 2:18
**Flinn** [1] - 3:15

floor [1] - 60:21
Floor [1] - 2:8
fly [1] - 54:3
flying [1] - 30:17
focus [1] - 71:15
focused [1] - 10:14
fold [1] - 16:14
folks [3] - 11:12, 88:17, 89:10
follow [2] - 25:10, 70:13
following [3] - 1:15, 22:10, 48:12
follows [1] - 74:2
footnote [1] - 34:5
footnotes [1] - 16:19
forget [5] - 10:22, 58:14, 58:18, 67:14, 78:8
forgetting [2] - 44:8, 78:1
form [9] - 68:11, 83:9, 83:11, 83:13, 83:17, 83:18, 83:21, 86:5
Forrestal [1] - 2:12
forward [9] - 56:22, 56:23, 60:3, 68:16, 68:19, 70:5, 71:17, 82:9, 82:13
four [10] - 26:1, 26:18, 26:20, 28:17, 54:18, 55:2, 71:16, 78:2
Frank [1] - 78:2
frankly [8] - 6:8, 30:22, 63:14, 71:23, 72:14, 85:18, 85:19, 88:1
Fraud [2] - 10:25, 13:6
fraud [5] - 8:22, 13:8, 18:16, 29:12, 40:15
frauds [1] - 29:10
fray [1] - 3:22
FRD [2] - 77:16, 77:17
friend [2] - 19:7, 19:9
front [6] - 7:7, 46:3, 57:22, 59:7, 76:10, 88:14
FTC [3] - 53:11, 53:12, 53:18
full [3] - 55:3, 55:6, 84:10
fully [1] - 11:19
fundamental [1] - 55:24
fundamentally [1] - 56:12
funds [1] - 84:12
future [1] - 45:23

## G

garbage [3] - 88:12, 88:13
Garofalo [1] - 3:15
GAROFALO [1] - 2:18
Garrity [1] - 3:14
GARRITY [1] - 2:18
gee [1] - 14:2
General [5] - 26:4, 26:6, 26:9, 26:14, 58:2
general [1] - 35:17
generally [2] - 20:6, 28:4
generous [1] - 85:2
gentleman [2] - 25:13, 29:2, 34:6, 58:19
geographic [1] - 37:3
Gerald [1] - 34:6
geriatric [1] - 45:24
Germane [2] - 50:13, 53:3
given [7] - 32:4, 42:2, 68:6, 79:2, 87:19, 87:21
gladly [1] - 60:21
glib [1] - 24:2
governs [1] - 55:22
GRAHAM [1] - 2:18
Graham [1] - 3:14
Grandalski [26] - 9:10, 24:11, 25:19, 25:24, 26:10, 28:14, 40:7, 47:12, 47:15, 54:8, 54:18, 54:22, 55:18, 55:20, 55:22, 57:5, 57:23, 58:5, 71:18, 79:7, 79:8, 80:7, 80:8, 87:3, 87:22
grandalski [3] - 26:11, 27:17, 88:7
Grandalski's [4] - 26:14, 26:17, 43:25, 57:17
granted [2] - 47:3, 80:22
greatest [2] - 19:12, 19:14
group [1] - 12:8
grouping [5] - 17:1, 17:9, 17:11, 17:13, 22:2
groupings [1] - 13:8
groups [1] - 17:2
Guam [1] - 17:25
guess [4] - 44:19, 71:1, 71:2, 87:8
guys [1] - 53:21

## H

Haddonfield [1] - 2:4
Haley [1] - 74:9
half [1] - 60:7, 67:8
half-hour [1] - 60:7
hand [3] - 4:13, 30:9, 35:3
handouts [1] - 46:1
hands [1] - 34:24
Hanlon [2] - 25:13, 77:24
hanlon [1] - 43:9
Hanover [1] - 2:19
hardest [1] - 71:4
hardly [1] - 28:1
harmless [3] - 54:14, 55:6, 72:7
head [3] - 15:15, 20:1, 39:14
Health [1] - 9:8
hear [5] - 4:4, 11:16, 23:15, 40:22, 61:9
heard [6] - 40:6, 45:15, 56:18, 67:24, 83:16, 88:23
hearing [21] - 4:12, 6:15, 8:18, 21:23, 22:10, 22:13, 22:15, 22:21, 26:7, 26:19, 41:13, 44:22, 55:15, 57:4, 58:1, 61:8, 61:11, 61:13, 71:16, 73:7
heart [1] - 54:5
heavily [1] - 17:19
held [2] - 18:19, 77:2
helpful [1] - 88:18
Hertz [5] - 19:6, 19:9, 19:17, 21:9
higher [1] - 36:19
highlight [1] - 26:16
Highway [1] - 2:3
himself [1] - 19:3
history [1] - 75:22
hit [1] - 26:3
hitting [1] - 30:5
HMOs [1] - 75:18
Hochberg's [1] - 35:25
Hoecher [2] - 60:2, 74:9
hold [5] - 45:11, 54:14, 55:6, 72:7, 76:23
holding [1] - 16:10
home [1] - 17:24
honestly [1] - 45:12
Honor [147] - 3:4, 3:5,

3:8, 3:10, 3:13, 3:22, 4:2, 4:5, 4:8, 4:19, 4:23, 5:5, 6:16, 7:6, 7:13, 7:17, 7:24, 8:10, 8:18, 9:2, 11:8, 11:24, 12:24, 14:3, 14:15, 14:17, 16:9, 16:15, 16:23, 17:2, 17:10, 17:22, 18:5, 18:12, 18:18, 19:1, 19:2, 19:13, 20:23, 21:6, 21:7, 21:10, 21:20, 21:24, 22:11, 23:16, 23:25, 26:6, 26:19, 27:10, 27:14, 27:16, 28:13, 29:12, 29:15, 29:21, 30:2, 31:14, 31:16, 31:18, 31:25, 32:2, 32:8, 32:19, 33:13, 33:14, 33:18, 33:22, 37:7, 37:11, 37:17, 38:10, 38:12, 38:13, 38:20, 39:3, 39:21, 39:24, 40:21, 42:7, 42:17, 45:17, 46:14, 47:1, 47:6, 47:11, 48:11, 50:2, 50:12, 50:20, 50:25, 51:12, 52:10, 53:11, 53:19, 53:24, 54:1, 54:12, 55:5, 55:7, 55:12, 56:4, 56:14, 57:19, 58:17, 59:7, 59:17, 60:15, 61:13, 61:16, 61:22, 62:6, 63:21, 64:5, 64:6, 64:24, 65:4, 65:16, 65:23, 67:5, 67:17, 69:8, 69:17, 70:4, 70:16, 70:25, 74:20, 76:21, 77:15, 78:13, 78:18, 80:22, 81:8, 81:20, 83:5, 83:9, 85:23, 86:23, 87:1, 88:24, 89:6, 89:9
Honor's [29] - 4:11, 5:1, 5:8, 7:2, 9:19, 11:3, 11:22, 16:15, 20:7, 22:6, 22:11, 23:5, 33:9, 33:15, 42:11, 45:2, 48:23, 52:12, 53:1, 54:1, 57:1, 66:4, 68:18, 70:23, 71:10, 77:13, 80:9, 81:14, 81:23
HONORABLE [1] - 1:12
horse [1] - 49:1
hot [1] - 60:11

hour [2] - 60:7, 67:7
hundred [2] - 6:14, 11:3, 45:7
hundreds [4] - 23:12, 23:13, 30:10, 40:10
hurts [1] - 39:16
Hydrogen [3] - 39:9, 64:23, 87:5
hypothetical [1] - 51:7

## I

ideas [1] - 19:2
identified [1] - 50:3
identify [1] - 29:17
illegal [1] - 26:11
Illinois [5] - 14:1, 14:2, 14:5, 14:8, 58:2
imagine [2] - 15:15, 20:21
implicate [1] - 78:6
implicates [1] - 72:23
implicitly [2] - 84:6, 84:25
import [1] - 64:18
importance [1] - 24:18
important [3] - 28:9, 69:1, 73:11, 74:18
importantly [3] - 53:7, 55:14, 73:20
impossible [1] - 72:1
impression [1] - 54:2
improper [9] - 33:11, 37:24, 56:19, 59:1, 68:23, 69:4, 74:4, 74:17, 77:11
improperly [1] - 42:24
in-depth [1] - 5:5
inappropriate [1] - 8:5
INC [1] - 1:6
Inc [2] - 2:15, 2:21
include [5] - 17:11, 17:14, 17:24, 35:12, 63:8
including [4] - 19:8, 24:11, 29:22, 56:23
incorporated [1] - 44:25
Incorporated [1] - 3:18
incorporating [1] - 61:5
incorrect [2] - 72:5, 74:14
indeed [14] - 5:20, 6:8, 10:7, 25:12, 30:7, 37:9, 37:21, 51:17, 63:13, 67:12, 80:2, 80:25, 84:25, 85:6

**individual** [6] - 6:25, 63:11, 65:2, 65:8, 72:15, 73:17
**individualized** [3] - 63:11, 70:1, 77:22
**individually** [2] - 48:15, 65:3
**indulgence** [1] - 4:11
**informal** [1] - 5:21
**information** [2] - 41:19, 68:24
**Ingenix** [1] - 36:12
**inherently** [1] - 31:16
**initial** [2] - 65:24, 83:25
**initiate** [1] - 84:13
**initiated** [1] - 85:20
**initiating** [2] - 84:17, 85:20
**injunctive** [2] - 7:19, 35:23
**injured** [1] - 38:3
**injury** [1] - 38:1
**inquiry** [2] - 80:10, 80:12
**insightful** [1] - 53:4
**instance** [6] - 6:25, 7:2, 7:17, 8:2, 16:25, 53:5
**instances** [4] - 12:7, 35:7, 54:19, 64:25
**instead** [1] - 76:19
**instructive** [1] - 12:1
**instructs** [1] - 24:19
**insurance** [10] - 8:16, 23:17, 25:16, 25:20, 36:8, 36:20, 42:19, 44:23, 75:25
**insured** [2] - 26:20, 38:25
**insurer** [3] - 43:2, 43:3, 43:9
**insurers** [1] - 32:18
**intend** [1] - 38:5
**intended** [4] - 21:15, 75:13, 76:4, 84:7
**intending** [2] - 7:8, 85:17
**intent** [8] - 38:4, 38:9, 39:4, 39:6, 83:4, 83:6, 86:8, 86:18
**intention** [2] - 11:4, 46:13
**intentionally** [4] - 36:17, 39:14, 39:19, 40:13
**interest** [2] - 11:7, 67:21
**interesting** [2] - 11:17, 60:8

**internal** [1] - 84:16
**interpret** [1] - 85:6
**interpretation** [1] - 55:11
**interpreted** [1] - 85:13
**intervene** [2] - 61:17, 69:11
**intervenor** [2] - 67:19, 67:20
**intervention** [5] - 31:25, 61:14, 62:3, 62:8, 66:23
**involved** [2] - 73:16, 78:24
**involving** [1] - 15:11
**Iowa** [1] - 17:6
**irrelevant** [2] - 73:23, 73:24
**Islands** [1] - 17:25
**issuance** [3] - 8:16, 22:16, 33:5
**issue** [45] - 6:21, 11:19, 11:20, 12:4, 13:6, 20:2, 21:16, 26:15, 28:10, 32:3, 42:10, 49:6, 51:13, 52:1, 53:5, 55:11, 55:13, 56:7, 58:11, 59:24, 60:8, 61:24, 62:20, 62:22, 63:10, 63:24, 64:1, 65:19, 66:1, 66:15, 71:12, 71:16, 71:23, 72:2, 72:4, 73:1, 74:23, 77:15, 77:21, 78:8, 79:25, 82:10, 85:11, 86:24, 87:2
**issued** [2] - 32:17, 62:24, 63:9, 73:24
**issues** [30] - 5:21, 6:1, 6:10, 6:25, 7:11, 9:5, 10:1, 10:13, 11:11, 11:17, 40:23, 40:25, 42:21, 44:12, 56:12, 61:14, 61:15, 62:19, 62:20, 62:21, 64:24, 69:18, 71:25, 72:12, 72:16, 72:17, 72:20, 77:22, 78:9, 87:6
**items** [1] - 7:10
**itself** [1] - 64:14

## J

**JACQUELINE** [2] - 1:18, 1:22
**January** [1] - 21:1
**JERSEY** [1] - 1:1
**Jersey** [4] - 1:10,

10:18, 18:21, 19:2
**Jersey's** [1] - 10:25
**job** [6] - 33:20, 67:9, 67:13, 75:25, 76:1
**Jordan's** [3] - 16:10, 16:22, 16:23
**JOSEPH** [1] - 2:9
**Joseph** [1] - 3:3
**JP** [1] - 15:22
**Judge** [13] - 5:24, 6:5, 10:12, 10:13, 13:18, 15:15, 16:10, 16:22, 16:23, 17:19, 28:18, 32:4, 35:25
**judge** [1] - 10:9
**judge's** [1] - 13:19
**judges** [4] - 10:8, 10:20, 13:17, 45:24
**judgment** [4] - 47:3, 56:9, 80:20, 80:21
**juncture** [1] - 18:8
**June** [1] - 86:14
**jurisdiction** [3] - 20:2, 20:13, 20:24
**jurisdictional** [1] - 19:20

## K

**Kashmer** [1] - 1:18
**KASHMER** [2] - 1:18, 1:22
**keen** [1] - 26:7
**keep** [1] - 44:15
**kept** [1] - 60:10
**key** [1] - 13:6
**kind** [1] - 50:23
**kinds** [2] - 26:8, 31:2
**Kings** [1] - 2:3
**knowledge** [7] - 34:2, 34:3, 35:2, 38:15, 40:15, 68:11
**known** [1] - 39:19

## L

**laboratories** [1] - 75:18
**laboratory** [5] - 24:18, 24:19, 24:22, 54:16, 54:20
**lack** [3] - 49:14, 58:12
**language** [11] - 46:9, 56:11, 59:5, 70:17, 72:4, 72:12, 83:10, 83:21, 83:25, 85:4, 85:10
**large** [3] - 19:19,

33:17, 34:16
**largely** [1] - 61:15
**Las** [1] - 87:15
**last** [20] - 8:10, 8:15, 9:2, 19:9, 22:24, 24:15, 26:7, 27:11, 32:21, 33:2, 33:14, 41:13, 54:1, 58:1, 61:12, 61:19, 61:22, 63:23, 76:13, 88:19
**latest** [1] - 53:3
**law** [41] - 3:14, 6:1, 8:22, 8:23, 9:17, 9:19, 10:18, 10:19, 10:24, 11:5, 11:18, 11:19, 12:25, 13:5, 18:11, 18:13, 18:16, 18:20, 18:21, 18:25, 19:10, 20:25, 21:23, 38:7, 41:7, 41:17, 48:8, 52:15, 54:24, 71:11, 72:7, 72:8, 72:9, 72:11, 72:16, 72:19, 72:23, 73:1, 75:15, 77:10, 85:2
**Law** [1] - 17:23
**LAW** [1] - 36:5
**laws** [8] - 21:3, 24:5, 25:5, 28:6, 40:19, 53:15, 54:3, 62:14
**lawyer** [1] - 74:24
**lawyers** [1] - 89:2
**leading** [1] - 74:22
**least** [16] - 10:17, 12:20, 18:19, 19:8, 35:22, 45:12, 52:6, 52:7, 62:11, 63:19, 71:25, 73:2, 77:20, 80:10, 85:8, 87:9
**leaving** [1] - 6:14
**leeway** [1] - 43:7
**left** [2] - 47:1, 47:2
**legal** [10] - 5:11, 12:20, 43:18, 44:6, 48:20, 49:15, 49:22, 52:1, 68:10, 84:25
**legislators** [2] - 14:7, 14:8
**less** [2] - 23:1, 84:21
**lesser** [1] - 17:20
**letter** [14] - 51:15, 82:22, 82:24, 83:7, 83:9, 83:13, 83:17, 83:21, 83:25, 84:2, 84:11, 85:16, 86:7, 86:19
**letters** [16] - 47:13, 83:11, 83:17, 83:18, 84:5, 84:14, 84:15, 84:20, 85:4, 85:25,

86:1, 86:5, 86:6, 86:21
**level** [1] - 20:18
**liability** [2] - 50:1, 50:11
**liberally** [1] - 7:1
**Lifland's** [1] - 32:4
**light** [3] - 7:11, 85:4, 85:12
**likewise** [1] - 40:25
**limit** [1] - 8:2
**limited** [3] - 9:5, 18:17, 87:16
**limiting** [1] - 23:2
**line** [1] - 19:20
**LISA** [1] - 2:4
**Lisa** [1] - 3:5
**list** [1] - 50:9
**listed** [3] - 65:7, 66:16, 66:18
**listen** [5] - 20:7, 20:10, 25:9, 27:20, 45:4
**listening** [1] - 45:17
**lists** [1] - 66:24
**litigation** [7] - 12:5, 56:23, 60:4, 76:9, 85:7, 85:13, 85:20
**Litigation** [1] - 15:19
**live** [1] - 39:14
**living** [1] - 26:4
**LLP** [2] - 2:3, 2:12
**lo** [1] - 64:13
**location** [1] - 20:5
**logged** [1] - 25:16
**logically** [1] - 70:13
**logistical** [1] - 20:22
**lone** [1] - 61:19
**look** [47] - 5:20, 5:22, 10:7, 10:21, 16:10, 18:2, 19:18, 24:6, 27:9, 28:6, 37:19, 41:4, 41:6, 41:7, 41:8, 41:9, 41:16, 44:8, 44:11, 44:17, 56:17, 57:2, 57:7, 59:3, 59:9, 59:11, 64:17, 66:22, 72:11, 72:15, 73:15, 74:6, 74:7, 74:8, 74:9, 74:11, 74:21, 81:1, 83:4, 83:6, 86:2, 86:18, 88:17
**looked** [3] - 58:1, 70:4, 72:9
**looking** [19] - 25:3, 30:6, 31:18, 31:21, 35:12, 53:19, 55:14, 56:21, 57:20, 59:5, 59:12, 67:22, 70:1, 70:2, 72:19, 72:23,

75:21, 81:5, 87:7
**looks** [1] - 55:10
**loser** [1] - 81:11
**loss** [1] - 23:6
**losses** [1] - 8:3
**lower** [3] - 36:23, 37:2
**lucky** [1] - 39:17
**lunatic** [1] - 28:19

## M

**mail** [2] - 29:10, 29:12
**Main** [1] - 2:13
**major** [1] - 39:20
**manageability** [6] -
 9:5, 11:21, 12:10,
 45:3, 62:19, 72:17
**manageable** [2] -
 12:21, 31:9
**managing** [1] - 31:1
**manipulated** [1] - 37:2
**map** [2] - 5:7, 73:19
**mark** [1] - 3:8
**MARK** [1] - 2:14
**mass** [1] - 15:20
**Massachusetts** [1] -
 13:18
**massive** [1] - 39:15
**match** [1] - 25:11
**materially** [1] - 64:17
**matter** [5] - 20:2,
 20:13, 42:4, 83:10
**McKenna** [7] - 47:12,
 47:17, 60:3, 74:9,
 76:15, 76:23, 77:13
**MDL** [1] - 15:22
**mean** [17] - 6:12,
 19:17, 20:2, 30:21,
 32:7, 38:16, 38:22,
 42:24, 44:14, 49:15,
 50:12, 51:5, 52:17,
 58:7, 72:6, 83:14
**means** [1] - 72:18
**mechanism** [1] -
 80:13
**Medical** [3] - 2:20,
 3:16, 47:18
**medical** [1] - 36:9
**Medicare** [22] - 8:12,
 29:4, 29:5, 42:20,
 61:14, 61:18, 61:20,
 62:14, 62:18, 63:16,
 63:25, 64:3, 64:12,
 67:3, 67:18, 68:8,
 69:3, 69:18, 70:10,
 70:17
**meet** [2] - 27:21, 73:19
**melodia** [4] - 41:13,
 41:21, 55:10, 60:25

**Melodia** [2] - 3:9,
 22:24
**MELODIA** [34] - 2:14,
 3:8, 55:12, 56:14,
 56:16, 57:19, 57:25,
 58:7, 58:10, 58:23,
 67:7, 67:17, 69:17,
 70:23, 71:2, 71:22,
 71:25, 72:25, 75:9,
 75:17, 75:20, 76:5,
 76:7, 77:5, 77:19,
 78:13, 80:22, 81:20,
 81:22, 82:17, 86:23,
 87:1, 88:2, 89:14
**member** [8] - 9:10,
 27:17, 51:14, 54:8,
 54:15, 54:21, 54:23,
 84:2
**members** [6] - 16:6,
 35:19, 48:25, 55:25,
 56:24, 59:13
**membership** [1] -
 57:10
**memory** [3] - 32:22,
 37:12, 37:15
**mention** [5] - 18:11,
 19:5, 25:23, 61:1,
 61:3
**mentioned** [1] - 19:4
**Mercedes** [2] - 10:13,
 10:14
**Mercedes-Benz** [2] -
 10:13, 10:14
**merits** [15] - 56:7,
 57:10, 59:2, 64:25,
 69:4, 71:23, 72:21,
 80:1, 81:1, 81:5,
 81:6, 81:7, 83:2,
 87:2, 87:7
**mess** [1] - 35:11
**Metal** [1] - 48:23
**mic** [1] - 45:19
**middle** [2] - 32:11,
 59:23
**Midwest** [1] - 34:19
**Midwestern** [2] -
 10:22, 10:24
**might** [8] - 36:25,
 52:21, 59:17, 61:16,
 67:15, 68:11
**million** [1] - 28:21
**millions** [8] - 23:14,
 23:22, 25:7, 39:11,
 40:4, 40:9, 40:10
**mind** [3] - 9:19, 20:23,
 30:3
**mish** [1] - 58:11
**mish-mosh** [1] - 58:11
**misleading** [2] - 46:8,
 53:10

**misled** [1] - 79:10
**misrepresented** [1] -
 64:14
**Miss** [22] - 30:18,
 47:12, 47:17, 62:9,
 62:10, 64:14, 65:19,
 65:25, 67:18, 68:2,
 68:10, 68:12, 68:19,
 68:21, 69:3, 69:11,
 69:21, 69:22, 70:2,
 70:4, 86:13, 86:16
**miss** [1] - 61:22, 64:8
**missed** [2] - 46:10
**missing** [1] - 83:25
**Mississippi** [1] - 17:8
**mistake** [2] - 39:15,
 50:15
**mistakes** [3] - 33:8,
 33:16, 33:21
**mixed** [1] - 5:14
**modified** [2] - 69:6,
 69:21
**moment** [4] - 12:25,
 13:20, 18:11, 86:24
**money** [15] - 24:14,
 25:18, 25:22, 26:14,
 35:23, 38:6, 40:6,
 40:11, 41:25, 42:3,
 42:4, 43:13, 44:1,
 44:2
**months** [2] - 27:2,
 64:9
**morning** [7] - 3:4, 3:5,
 3:7, 3:8, 3:10, 3:13,
 60:11
**morning's** [1] - 21:12
**mosh** [1] - 58:11
**most** [11] - 7:13,
 10:11, 14:4, 20:22,
 27:24, 32:5, 50:9,
 85:4, 85:12, 87:15,
 88:22
**motion** [33] - 4:3,
 4:20, 4:21, 5:7, 5:15,
 5:19, 6:2, 6:15, 6:18,
 6:21, 7:16, 7:17,
 18:12, 18:19, 22:4,
 22:7, 23:10, 31:25,
 32:4, 32:21, 45:5,
 56:10, 61:16, 62:3,
 76:13, 80:15, 80:20,
 81:25, 88:25
**motion-to-dismiss** [1]
 - 32:4
**MOTIONS** [1] - 1:3
**motions** [1] - 80:21
**move** [3] - 18:10,
 21:23, 70:21
**moving** [1] - 86:15
**MR** [163] - 3:3, 3:8,

3:13, 3:21, 3:24, 4:2,
4:5, 4:8, 4:17, 4:19,
6:12, 7:5, 7:23,
10:16, 10:23, 11:3,
11:7, 11:15, 11:22,
13:3, 13:14, 13:17,
14:3, 14:15, 14:17,
15:4, 15:8, 15:14,
15:22, 15:25, 16:8,
16:14, 19:13, 19:16,
20:7, 20:10, 21:9,
21:20, 21:22, 22:1,
23:25, 29:1, 29:4,
29:7, 29:12, 29:15,
29:21, 30:2, 31:14,
31:23, 32:19, 32:24,
33:13, 35:14, 36:3,
36:13, 36:16, 37:7,
37:10, 37:17, 37:20,
38:10, 38:22, 40:21,
41:2, 42:7, 42:11,
42:17, 42:22, 43:1,
44:10, 44:13, 45:9,
45:17, 45:21, 46:1,
46:3, 46:7, 46:10,
46:14, 46:17, 46:21,
46:25, 47:1, 47:5,
47:9, 47:11, 47:15,
47:20, 47:24, 48:4,
48:11, 49:14, 49:21,
50:1, 50:25, 51:2,
51:6, 51:9, 51:12,
52:2, 52:5, 52:10,
53:24, 55:2, 55:5,
55:9, 55:12, 56:4,
56:14, 56:16, 57:19,
57:25, 58:7, 58:10,
58:17, 58:23, 60:15,
60:17, 60:20, 60:23,
63:21, 65:15, 67:7,
67:17, 69:17, 70:23,
71:2, 71:22, 71:25,
72:25, 75:9, 75:17,
75:20, 76:5, 76:7,
77:5, 77:19, 78:13,
79:14, 80:6, 80:22,
81:8, 81:13, 81:20,
81:21, 81:22, 82:17,
83:1, 83:20, 84:23,
85:8, 85:14, 85:23,
85:24, 86:23, 87:1,
88:2, 88:24, 89:6,
89:9, 89:11, 89:14
**MS** [2] - 3:5, 3:10
**multi** [4] - 12:2, 12:8,
 12:19, 69:16
**Multi** [1] - 15:19
**Multi-District** [1] -
 15:19
**multi-state** [3] - 12:2,

12:8, 12:19
**multi-task** [1] - 69:16
**multiple** [4] - 12:14,
 13:21, 29:10
**multiples** [1] - 59:25
**Murphy** [1] - 3:14
**MURPHY** [1] - 2:18
**must** [5] - 38:18,
 52:16, 64:1, 64:4,
 73:4

## N

**Nafar** [1] - 11:10
**name** [3] - 13:19, 34:6,
 51:20
**named** [8] - 55:17,
 56:21, 60:3, 68:19,
 70:5, 76:11, 87:22,
 87:23
**names** [1] - 78:1
**narrow** [1] - 82:15
**national** [5] - 13:24,
 14:12, 14:13, 15:6,
 87:11
**National** [1] - 17:23
**nationwide** [4] - 13:7,
 14:6, 18:21, 19:2
**nauseam** [1] - 28:3
**necessarily** [6] -
 12:15, 15:14, 35:7,
 42:24, 46:21, 57:22
**necessary** [1] - 83:23
**need** [21] - 4:10, 7:1,
 41:4, 41:6, 41:7,
 45:1, 45:3, 45:10,
 56:17, 57:2, 57:7,
 59:3, 59:9, 59:11,
 59:15, 65:11, 66:17,
 72:9, 72:11, 89:4
**needing** [2] - 74:21
**needs** [1] - 8:15
**nerve** [2] - 20:14,
 20:17
**network** [3] - 36:22,
 75:7
**Nevada** [8] - 26:4,
 26:5, 26:6, 26:8,
 26:13, 55:20, 55:22
**never** [23] - 14:24,
 16:20, 25:21, 26:15,
 39:10, 41:15, 41:18,
 44:18, 44:20, 62:13,
 65:12, 65:13, 65:21,
 66:10, 66:13, 66:14,
 68:3, 76:9, 76:23,
 76:24, 83:16, 88:9,
 88:11
**NEW** [1] - 1:1

**new** [6] - 6:15, 18:12, 20:25, 22:4, 22:6, 61:17
**New** [6] - 1:10, 2:8, 10:18, 10:25, 18:21, 19:2
**Newark** [1] - 1:10
**next** [1] - 56:4
**nine** [3] - 8:11, 17:4, 33:3
**NJ** [4] - 1:24, 2:4, 2:14, 2:19
**NO** [1] - 1:2
**nobody** [11] - 18:19, 23:8, 23:16, 28:15, 28:21, 47:22, 48:10, 49:15, 49:19, 76:21, 77:9
**non** [5] - 10:1, 10:5, 12:21, 39:23, 39:24
**non-precedential** [2] - 10:1, 10:5
**non-RICO** [1] - 39:23
**non-scienter-based** [1] - 39:24
**non-settlement** [1] - 12:21
**nonparticipating** [1] - 57:14
**normally** [1] - 27:25
**noses** [1] - 40:14
**note** [2] - 3:2, 28:13
**noted** [2] - 27:11, 27:16
**nothing** [6] - 5:16, 16:17, 23:1, 33:7, 49:9
**notice** [4] - 26:25, 62:1, 63:17
**noticed** [1] - 19:1
**notices** [1] - 51:24
**notion** [2] - 5:14, 52:20
**notions** [1] - 52:2
**NPO** [1] - 11:9
**nullity** [2] - 64:21, 65:9
**number** [23] - 6:18, 7:14, 17:18, 19:21, 22:15, 26:19, 29:19, 34:1, 53:4, 61:5, 62:13, 62:15, 62:21, 63:21, 64:15, 72:10, 75:2, 76:14, 76:23, 76:24, 82:5, 87:17, 87:18
**numerosity** [5] - 23:24, 76:11, 82:2, 82:4, 87:13
**NY** [1] - 2:8

# O

**obligations** [2] - 43:18, 43:21
**obvious** [1] - 59:12
**obviously** [4] - 12:3, 76:8, 82:17, 83:15
**odd** [1] - 16:18
**odds** [1] - 18:24
**OF** [1] - 1:1
**of-contract** [1] - 88:5
**offense** [2] - 31:6, 58:17
**offenses** [1] - 29:11
**officers** [2] - 20:18, 26:8
**Official** [1] - 1:19
**OFFICIAL** [1] - 1:23
**once** [2] - 34:17, 65:18
**one** [96] - 5:21, 6:21, 7:14, 8:7, 8:15, 8:22, 8:23, 8:25, 9:1, 9:6, 9:7, 9:9, 9:21, 11:17, 12:20, 13:1, 18:13, 18:17, 20:16, 20:20, 20:21, 21:3, 21:4, 22:9, 22:10, 22:24, 23:18, 23:21, 24:1, 27:1, 27:24, 31:24, 34:8, 34:11, 35:18, 38:18, 46:8, 46:21, 46:25, 47:3, 48:6, 49:6, 49:12, 52:22, 53:22, 54:6, 55:6, 55:21, 56:5, 56:11, 57:22, 59:16, 59:24, 60:3, 61:12, 61:17, 61:23, 62:7, 62:13, 62:17, 62:20, 62:22, 63:23, 64:12, 64:15, 64:23, 64:25, 66:1, 66:18, 66:21, 67:2, 72:10, 72:19, 73:3, 73:7, 75:2, 75:21, 76:7, 76:23, 79:14, 80:7, 80:15, 80:22, 80:24, 82:5, 82:20, 84:24, 85:11, 85:21, 86:24, 87:17, 88:19
**ones** [2] - 89:4, 89:5
**opened** [1] - 40:21
**opening** [2] - 34:5, 61:3
**operative** [1] - 31:19
**opinion** [40] - 5:1, 5:5, 5:9, 6:5, 7:2, 7:4, 7:24, 9:22, 10:2, 10:7, 10:9, 11:5, 11:8, 11:9, 11:22,

11:23, 13:15, 17:19, 20:3, 20:25, 21:1, 21:7, 21:19, 22:11, 23:6, 27:10, 32:4, 33:7, 33:15, 33:22, 38:12, 39:18, 48:22, 48:23, 54:1, 59:8, 60:25, 70:14, 83:5
**opinions** [9] - 10:5, 10:6, 12:7, 13:12, 17:18, 19:8, 21:13, 22:6, 28:3
**opportunity** [1] - 60:12
**opposed** [1] - 80:1
**opposing** [1] - 4:15
**opposition** [5] - 5:13, 6:24, 23:10, 61:9, 66:2
**oppositions** [1] - 6:22
**oranges** [1] - 16:12
**order** [7] - 11:24, 57:8, 59:3, 69:22, 70:18, 72:2, 73:17
**Ortiz** [1] - 48:24
**otherwise** [2] - 28:4, 28:16
**out-of-pocket** [1] - 8:3
**outline** [2] - 67:15, 71:3
**outraged** [2] - 51:17, 51:19
**outside** [2] - 34:13, 35:6
**overall** [1] - 15:20
**overarching** [1] - 20:4
**overbilled** [1] - 37:23
**overcharged** [1] - 28:14
**overlap** [1] - 64:25
**owe** [3] - 35:4, 41:22, 42:2
**owed** [2] - 23:7, 24:14
**owes** [4] - 23:1, 35:4, 88:8
**own** [6] - 24:15, 27:9, 28:16, 30:3, 34:15, 52:18

# P

**P.C** [1] - 2:7
**P.O** [1] - 2:13
**Pace** [1] - 50:13
**packet** [1] - 4:13
**page** [4] - 34:5, 77:18, 77:20, 86:15
**pages** [3] - 88:19, 88:21, 89:6

**paid** [15] - 23:7, 23:23, 24:12, 25:21, 27:18, 40:5, 42:1, 42:2, 49:6, 61:21, 76:2, 76:23, 76:24, 88:9, 88:11
**panel** [4] - 15:18, 16:3, 16:5, 16:16
**paper** [1] - 35:3
**papers** [14] - 45:10, 55:14, 61:9, 61:15, 62:2, 62:3, 62:8, 66:2, 66:17, 67:16, 79:17, 86:2, 86:15
**paragraph** [1] - 41:11
**paraphrasing** [2] - 33:6, 33:9, 54:16
**part** [7] - 8:9, 19:19, 20:15, 20:20, 61:21, 75:6, 77:7
**participating** [2] - 43:16, 43:23
**particular** [15] - 17:16, 30:15, 36:10, 37:22, 38:19, 38:25, 49:7, 52:19, 52:23, 53:13, 56:1, 56:2, 57:17, 81:1, 87:8
**particularly** [6] - 30:4, 30:24, 37:25, 63:12, 83:12, 83:22
**party** [4] - 54:9, 71:19, 72:4, 75:14
**past** [3] - 6:23, 53:2, 82:19
**patient** [22] - 16:16, 23:1, 24:18, 24:20, 24:25, 25:16, 43:10, 44:18, 44:19, 69:3, 75:11
**patient's** [3] - 23:5, 23:19, 24:21
**patients** [2] - 8:12, 32:15
**pattern** [1] - 15:20
**pay** [4] - 24:13, 26:24, 51:16, 84:12
**payer** [5] - 57:2, 57:14, 60:1, 71:6, 73:14, 73:19
**payer's** [1] - 24:22
**payers** [1] - 43:13
**paying** [1] - 11:13
**payment** [7] - 54:14, 64:3, 70:3, 70:8, 70:10, 77:12, 84:9
**peculiar** [1] - 87:3
**Pella** [1] - 17:20
**penalties** [1] - 50:7
**pending** [1] - 61:17

**people** [36] - 8:2, 23:3, 23:7, 23:12, 23:13, 23:22, 24:11, 25:7, 25:19, 27:13, 27:15, 30:8, 30:10, 30:11, 30:23, 31:11, 35:1, 35:11, 35:12, 37:5, 37:22, 38:3, 40:4, 40:9, 42:20, 43:13, 58:20, 62:23, 62:25, 63:8, 63:9, 64:19, 65:12, 65:13, 65:24
**percent** [3] - 6:14, 11:3, 45:8
**perfectly** [1] - 30:19
**perhaps** [7] - 5:7, 7:11, 14:5, 21:22, 31:9, 40:12, 78:14
**period** [2] - 87:12, 87:16
**permission** [1] - 4:11
**permitted** [4] - 17:16, 40:11, 79:19, 80:25
**Peroxide** [3] - 39:9, 64:23, 87:5
**person** [4] - 35:4, 87:3, 88:15
**personally** [1] - 42:17
**perspective** [1] - 4:25
**persuade** [3] - 67:10, 71:7, 88:23
**persuasive** [1] - 10:3
**PETER** [1] - 2:19
**Peter** [1] - 3:13
**pharmaceutical** [1] - 13:22
**phase** [1] - 14:20
**physician** [4] - 64:8, 64:15, 68:21, 68:25
**physicians** [1] - 73:15
**pick** [2] - 7:10, 8:14, 8:15
**piece** [1] - 35:3
**pin** [1] - 20:1
**Pittstown** [1] - 1:24
**place** [3] - 19:22, 20:19, 34:8
**placed** [3] - 52:8, 78:19, 78:21
**plain** [3] - 16:11, 59:5, 72:4
**plaintiff** [14] - 26:18, 48:2, 48:3, 49:10, 49:11, 61:17, 76:11, 77:7, 79:5, 79:15, 79:20, 80:14, 82:23, 85:1
**plaintiffs** [29] - 3:4, 3:6, 4:1, 5:12, 12:17, 12:18, 14:21, 23:11,

33:19, 38:16, 39:13, 42:18, 47:4, 47:8, 50:17, 56:21, 59:6, 60:4, 70:6, 72:3, 74:6, 75:23, 78:9, 81:25, 82:9, 82:13, 82:18, 87:22, 87:23
**Plaintiffs** [2] - 1:4, 2:9
**plaintiffs'** [11] - 4:20, 4:25, 18:6, 18:14, 41:2, 73:5, 76:12, 76:13, 84:4, 85:24, 86:15
**plan** [19] - 9:1, 9:7, 9:10, 9:15, 9:16, 23:20, 54:6, 54:9, 55:19, 56:1, 56:2, 56:11, 57:5, 57:18, 57:22, 58:1
**plans** [2] - 9:3, 58:3
**play** [2] - 12:23, 38:8
**played** [1] - 36:18
**pleading** [4] - 30:5, 31:16, 31:24, 37:22
**pleadings** [1] - 30:6
**pleasure** [1] - 89:10
**pled** [2] - 85:14, 85:15
**plenty** [1] - 4:14
**pocket** [1] - 8:3
**podium** [1] - 4:6
**Point** [1] - 72:9
**point** [27] - 6:9, 6:16, 6:17, 14:7, 22:4, 22:8, 26:15, 32:8, 50:5, 50:14, 53:19, 54:7, 57:7, 61:7, 61:12, 62:4, 66:21, 67:18, 75:2, 78:6, 81:23, 82:8, 86:17, 87:13, 87:14, 87:17, 88:4
**pointed** [3] - 6:22, 7:16, 77:10
**pointing** [1] - 46:19
**points** [6] - 7:8, 29:19, 53:4, 60:15, 60:18, 67:4
**policy** [2] - 66:6, 66:7, 84:16
**portions** [1] - 7:4
**position** [16] - 10:11, 10:12, 33:16, 40:16, 41:2, 48:20, 52:7, 53:17, 61:18, 62:8, 63:12, 71:5, 72:5, 73:5, 73:6, 73:10
**Posner's** [1] - 28:18
**possessed** [1] - 30:1
**possible** [2] - 3:22, 16:4

possibly [3] - 25:2, 27:20, 27:22
**post** [10] - 22:9, 25:3, 33:23, 34:21, 39:23, 56:16, 56:24, 59:14, 71:9
**post-EOB** [9] - 22:9, 25:3, 33:23, 34:21, 39:23, 56:16, 56:24, 59:14, 71:9
**posted** [1] - 26:5
**potential** [2] - 67:18, 68:19
**potentially** [1] - 63:4
**practical** [1] - 81:4
**practicality** [1] - 49:14
**practice** [22] - 17:6, 17:7, 17:14, 18:1, 18:6, 24:23, 25:6, 26:12, 35:20, 51:19, 51:23, 51:25, 52:16, 53:9, 59:1, 79:16, 80:2, 81:19, 82:1, 87:11, 88:25
**Practices** [1] - 87:25
**practices** [6] - 5:11, 8:11, 8:13, 33:3, 58:11
**practitioner** [1] - 64:1
**practitioners** [2] - 36:10, 37:4
**pragmatic** [1] - 21:16
**pre** [9] - 8:11, 8:12, 11:23, 33:5, 33:9, 33:16, 33:23, 34:21, 59:10
**pre-2005** [1] - 86:22
**pre-EOB** [8] - 8:11, 8:12, 33:5, 33:9, 33:16, 33:23, 34:21, 59:10
**pre-vacation** [1] - 11:23
**preauthorization** [1] - 84:19
**precedential** [3] - 10:1, 10:5, 10:6
**precisely** [1] - 77:18
**predicate** [1] - 29:11
**predicated** [2] - 19:19, 29:10
**prediction** [1] - 45:7
**predominance** [4] - 9:5, 12:16, 12:22, 28:12
**prefer** [1] - 4:6
**preferable** [1] - 72:18
**preferred** [3] - 75:6, 75:7
**pregnant** [1] - 66:4

premise [1] - 74:14
**preparation** [1] - 57:20
**prepared** [3] - 4:13, 36:11, 67:15
**preparing** [1] - 55:15
**prerequisite** [1] - 38:17
**present** [4] - 6:21, 11:20, 23:10, 72:20
**presented** [3] - 70:15, 70:16, 75:1
**presume** [4] - 31:18, 42:11, 42:13, 70:24
**pretend** [1] - 20:24
**pretrial** [1] - 14:19
**pretty** [3] - 9:2, 60:10, 61:25
**prevents** [1] - 82:24
**previous** [1] - 70:5
**previously** [4] - 18:18, 53:17, 70:4, 77:2
**pricing** [2] - 13:22, 24:21
**primarily** [2] - 13:21, 62:2
**primary** [5] - 42:6, 42:10, 42:19, 43:3, 59:22
**Princeton** [2] - 2:12, 2:14
**principal** [2] - 19:22, 20:19
**private** [4] - 17:5, 17:15, 18:4, 38:25
**problem** [17] - 13:24, 13:25, 20:11, 24:3, 27:10, 28:10, 49:15, 58:6, 58:8, 58:9, 58:10, 58:22, 58:23, 61:19, 61:22, 61:23, 85:24
**problems** [2] - 33:4, 73:2
**procedure** [2] - 63:17, 84:18
**procedures** [1] - 35:9
**proceeding** [1] - 72:24
**proceedings** [3] - 1:16, 76:16, 89:16
**proffer** [2] - 18:22, 48:17
**proffered** [2] - 19:1, 64:10, 64:13
**proffers** [1] - 20:17
**program** [1] - 9:8
**progressive** [1] - 83:18
**prohibits** [1] - 82:6
**proofs** [1] - 31:2

proper [2] - 18:24, 65:3
**properly** [4] - 51:17, 63:18, 81:12, 81:13
**property** [1] - 38:6
**propose** [1] - 18:6
**proposed** [5] - 18:3, 31:23, 59:13, 70:21
**protection** [5] - 14:10, 18:3, 18:15, 18:23, 53:15
**prove** [6] - 31:1, 31:3, 36:25, 37:15, 38:9
**provide** [1] - 75:13
**provided** [1] - 73:6
**provider** [17] - 8:25, 9:3, 9:4, 9:6, 23:19, 24:4, 24:24, 25:4, 28:6, 41:6, 44:23, 54:6, 64:1, 75:6, 75:7
**providers** [1] - 43:16
**provision** [4] - 54:20, 55:11, 72:7, 75:12
**provisions** [4] - 24:21, 40:19, 40:24, 75:4
**Prudential** [1] - 12:4
**pull** [3] - 24:24, 28:5, 55:6
**purchases** [3] - 15:11, 16:1, 52:18
**pure** [3] - 58:21, 71:23
**purely** [1] - 56:7
**purport** [1] - 21:19
**purported** [2] - 70:6, 76:12
**purports** [1] - 49:19
**purpose** [1] - 81:5
**purposes** [3] - 19:20, 20:5, 20:16
**Pursuant** [1] - 1:14
**pursue** [5] - 49:8, 85:17, 86:8, 86:9, 86:12
**put** [25] - 12:24, 15:14, 16:10, 16:12, 22:5, 42:15, 52:6, 56:22, 56:23, 57:21, 59:7, 60:3, 63:3, 66:9, 66:11, 66:20, 67:9, 70:5, 71:7, 74:7, 79:22, 79:23, 82:9, 82:13, 83:14
**putting** [1] - 85:16

**Q**

**QDI** [4] - 79:3, 86:4, 86:20

proper Quantum [10] - 2:21, 3:17, 25:25, 27:1, 47:16, 78:24, 78:25, 79:2, 79:8, 79:10
**QUEST** [1] - 1:6
**Quest** [64] - 2:15, 3:1, 3:9, 3:11, 8:11, 9:1, 22:19, 22:22, 24:13, 24:23, 25:17, 25:21, 26:1, 26:9, 27:1, 27:11, 28:22, 29:19, 30:1, 30:16, 32:16, 33:2, 33:24, 34:1, 34:9, 35:5, 39:9, 42:12, 43:5, 43:7, 43:12, 43:22, 44:19, 45:4, 46:19, 46:22, 50:19, 50:24, 51:4, 52:14, 59:23, 62:9, 64:8, 64:14, 68:11, 68:15, 68:22, 69:1, 70:18, 73:11, 73:13, 74:15, 75:5, 75:17, 78:1, 78:3, 78:14, 78:17, 78:20, 80:3, 84:8, 88:9
**quest** [1] - 34:14
**Quest's** [2] - 71:4, 71:7
**questions** [7] - 7:13, 21:24, 45:14, 48:12, 63:21, 67:11, 70:24
**quick** [2] - 45:14, 54:8
**quite** [9] - 6:8, 7:16, 9:23, 23:15, 45:11, 52:11, 63:14, 72:14, 85:19
**quote** [4] - 24:15, 26:11, 33:9, 41:10
**quoted** [1] - 25:13
**quotes** [2] - 73:7, 77:20

**R**

**raise** [6] - 7:11, 27:24, 54:9, 63:4, 77:22, 88:6
**raised** [2] - 51:13, 69:19
**raises** [4] - 6:9, 62:20, 62:21, 82:12
**Ranieri** [1] - 47:12
**Ranieris** [1] - 47:17
**rate** [4] - 36:5, 36:23, 37:4
**rates** [3] - 36:6, 36:9, 36:19
**rationale** [1] - 20:3

**RCA** [1] - 48:15
**reaching** [1] - 20:12
**read** [13] - 7:24, 8:1, 11:22, 11:23, 13:9, 13:11, 19:17, 20:2, 22:11, 24:14, 45:9, 66:19, 67:16
**reading** [4] - 5:6, 16:15, 16:16, 22:6
**real** [2] - 54:7, 88:8
**reality** [1] - 68:9
**realize** [1] - 45:4
**realizing** [1] - 39:15
**really** [11] - 5:21, 7:15, 18:13, 20:19, 30:3, 30:21, 50:9, 52:22, 56:6, 66:7, 66:17
**reason** [6] - 28:2, 30:15, 43:1, 44:13, 81:2, 89:1
**reasons** [9] - 6:19, 33:8, 59:12, 59:16, 62:12, 65:6, 67:25, 80:7, 86:22
**receive** [1] - 44:1
**received** [7] - 27:2, 43:9, 43:10, 47:13, 68:14, 82:24, 84:1
**receiving** [1] - 77:7
**recent** [1] - 50:13
**recently** [1] - 17:20
**Recess** [1] - 60:9
**recipient** [3] - 85:5, 85:6, 85:12
**reckless** [2] - 38:15, 39:4
**recklessly** [1] - 34:4
**recognize** [2] - 8:8, 19:20
**recognized** [3] - 39:3, 53:7, 53:9
**recognizes** [1] - 14:8
**recollection** [3] - 35:15, 35:17, 37:14
**reconsideration** [1] - 6:2
**record** [19] - 1:15, 3:2, 19:5, 53:23, 66:21, 69:15, 74:3, 75:1, 77:21, 81:24, 82:3, 82:4, 82:5, 82:11, 82:18, 82:19, 83:16, 87:14, 88:7
**recoveries** [1] - 16:2
**recusal** [1] - 51:13
**redefine** [1] - 45:2
**reductio** [1] - 52:8
**Reed** [2] - 3:9, 3:11
**REED** [1] - 2:12
**reference** [2] - 13:14,
34:14
**referring** [4] - 4:12, 8:19, 37:7, 48:4
**reflected** [1] - 43:5
**reflects** [1] - 41:11
**refund** [6] - 26:14, 44:3, 77:14, 77:22, 78:9
**refunds** [4] - 76:25, 87:18, 87:19, 87:21
**regard** [6] - 24:18, 47:3, 55:25, 84:16, 85:10, 88:7
**regarding** [1] - 83:3
**regs** [1] - 63:25
**regular** [2] - 8:20, 51:23
**regulations** [2] - 68:8, 70:18
**Regulus** [3] - 34:14, 34:17, 35:6
**reimbursement** [1] - 67:3
**reimbursements** [1] - 36:22
**rejected** [1] - 53:5
**Relafen** [2] - 13:14, 13:17
**relevant** [2] - 61:25, 74:20
**relied** [7] - 17:18, 19:9, 23:21, 73:5, 77:23, 77:24, 77:25
**relies** [4] - 8:24, 80:14, 86:2, 86:21
**relive** [1] - 6:23
**rely** [6] - 8:12, 23:18, 24:25, 28:4, 48:22, 73:20
**relying** [1] - 24:4
**remainder** [1] - 14:22
**remains** [1] - 67:25
**remedies** [2] - 7:20
**remedy** [3] - 27:13, 31:6, 41:24
**remember** [5] - 12:12, 33:6, 58:1, 63:14, 77:18
**reminded** [1] - 28:18
**remittance** [2] - 8:17, 34:9
**remote** [3] - 15:11, 16:1
**renew** [1] - 5:7
**renewed** [3] - 4:20, 5:15, 5:19
**rep** [12] - 9:9, 24:11, 25:20, 27:19, 29:3, 47:25, 48:10, 48:14, 61:18, 64:10, 64:13,
64:22
**Repealer** [1] - 14:5
**Repealers** [2] - 14:2, 14:9
**repeatedly** [3] - 10:4, 23:16, 44:4
**reply** [3] - 25:14, 62:8, 66:23
**reported** [2] - 36:20, 67:2
**Reporter** [1] - 1:19
**REPORTER** [1] - 1:23
**representations** [1] - 45:11
**representative** [12] - 55:17, 58:20, 61:20, 62:23, 63:5, 65:3, 65:25, 68:20, 70:5, 70:12, 79:6, 79:7
**representatives** [2] - 47:9, 60:3
**reps** [2] - 47:17, 51:1
**requesting** [1] - 84:19
**require** [1] - 70:1
**required** [3] - 69:5, 70:17, 83:24
**requirement** [1] - 62:14
**requires** [4] - 29:13, 32:1, 59:4, 59:6
**requisite** [2] - 30:1, 31:3
**requisition** [2] - 24:17, 59:9
**requisitions** [2] - 73:16, 74:21
**resolved** [2] - 6:6, 6:7
**resolving** [1] - 72:18
**respect** [5] - 19:12, 19:14, 34:22, 79:8, 80:6
**respective** [1] - 32:17
**respects** [1] - 24:7
**responding** [1] - 67:13
**response** [2] - 45:5, 66:11
**responses** [1] - 67:14
**responsibility** [3] - 23:5, 43:4, 75:11
**responsible** [1] - 33:21
**responsive** [1] - 67:8
**rest** [3] - 21:23, 33:12, 61:15
**restatement** [1] - 21:2
**result** [4] - 30:22, 33:4, 37:22, 37:24
**resulted** [1] - 76:17
**results** [2] - 38:1,
42:14
**retain** [1] - 40:11
**retired** [2] - 9:12
**retirement** [1] - 9:14
**retread** [1] - 5:17
**return** [1] - 42:1
**rhyme** [1] - 30:15
**RICHARDS** [1] - 2:3
**RICO** [16] - 29:6, 29:7, 29:8, 29:9, 29:10, 31:5, 38:10, 38:13, 38:17, 39:20, 39:21, 39:23, 39:25, 58:12, 58:15, 71:14
**ridiculous** [1] - 74:3
**rights** [1] - 75:13
**ripped** [1] - 71:3
**rise** [1] - 77:8
**road** [1] - 5:6
**Rock** [1] - 2:18
**Rodriguez** [1] - 3:6
**RODRIGUEZ** [3] - 2:3, 2:4, 3:5
**rogue** [1] - 27:24
**Rosetta** [1] - 21:18
**rote** [1] - 50:9
**routine** [1] - 80:2
**routinely** [1] - 36:8
**rule** [3] - 32:8, 35:18, 66:10
**Rule** [4] - 27:21, 31:25, 35:22, 67:22
**ruled** [2] - 71:10, 77:15
**rules** [2] - 63:16, 89:1
**rulings** [1] - 70:25
**run** [1] - 12:15
**running** [1] - 24:10
**Russell** [2] - 2:20, 3:16

## S

**s/Jacqueline** [1] - 1:18
**sacrosanct** [1] - 73:4
**sales** [1] - 12:4
**Samsung** [1] - 9:22
**Saris'** [1] - 17:19
**satisfied** [1] - 23:24
**satisfies** [2] - 28:12, 61:19
**satisfy** [1] - 61:23
**save** [4] - 8:11, 32:2, 87:24
**saw** [3] - 58:2, 65:21, 79:24
**scenario** [14] - 25:18, 42:18, 44:1, 44:4,
49:16, 52:12, 52:17, 59:24, 59:25, 60:2, 74:13, 76:9, 76:14, 88:5
**scenarios** [1] - 60:5
**scheme** [18] - 20:4, 29:18, 29:20, 30:4, 30:5, 30:14, 31:2, 31:3, 32:15, 36:24, 38:1, 38:5, 38:7, 38:19, 48:19, 49:13, 51:25, 58:12
**schemes** [1] - 38:12
**scienter** [11] - 29:14, 30:1, 31:4, 31:7, 38:13, 39:4, 39:20, 39:24, 40:14, 58:12, 71:13
**scope** [1] - 30:4
**screw** [1] - 25:9
**search** [1] - 51:20
**seat** [1] - 60:11
**Seattle** [2] - 2:21, 3:17
**second** [10] - 6:18, 7:15, 31:21, 42:12, 43:11, 46:15, 53:22, 58:14, 80:14, 82:20
**secondary** [7] - 42:6, 42:10, 42:19, 43:2, 43:15, 43:17, 59:22
**secondly** [3] - 5:24, 61:12, 63:2
**section** [1] - 55:6
**Section** [1] - 1:14
**sections** [1] - 11:2
**see** [14] - 10:10, 12:14, 15:19, 25:17, 27:20, 27:22, 27:25, 30:13, 38:8, 44:4, 45:25, 57:21, 63:22, 84:15
**seeing** [1] - 29:19
**seek** [11] - 5:4, 7:19, 7:20, 8:21, 8:22, 12:19, 18:16, 39:22, 53:13, 53:14
**seeking** [1] - 7:18
**seeks** [1] - 8:23
**segue** [1] - 22:8
**self** [1] - 34:23
**self-described** [1] - 34:23
**send** [13] - 27:4, 34:15, 41:5, 41:9, 41:16, 41:17, 41:18, 68:11, 73:17, 77:11, 83:7, 86:7
**sending** [1] - 77:6
**sends** [4] - 30:16, 34:18, 73:16
**senior** [1] - 10:9

**sense** [1] - 20:22
**sent** [4] - 44:18, 74:4, 80:3, 88:10
**separate** [6] - 17:6, 17:7, 17:14, 18:1, 18:6, 24:5
**September** [2] - 1:9, 76:15
**seriously** [1] - 5:2
**service** [4] - 26:20, 32:3, 68:12, 76:15
**Service** [2] - 2:21, 3:17
**services** [1] - 54:15
**Services** [1] - 47:5
**set** [3] - 7:7, 26:23, 54:12
**setting** [2] - 35:8, 88:6
**settled** [1] - 14:25
**settlement** [7] - 12:7, 12:9, 12:21, 15:13, 16:4, 16:13, 18:8
**settlements** [1] - 15:21
**Seventh** [1] - 17:19
**several** [1] - 76:7
**shall** [2] - 54:20, 75:5
**Sheet** [1] - 48:23
**Sherman** [1] - 15:6
**Shield** [5] - 8:24, 9:1, 26:21, 53:25, 60:24
**shift** [1] - 78:5
**short** [10] - 31:12, 48:6, 53:21, 56:9, 67:14, 75:23, 78:8, 80:2, 81:10, 89:5
**shorting** [1] - 60:7
**shouldered** [1] - 12:18
**shoved** [1] - 27:13
**show** [1] - 12:20
**showed** [1] - 8:10
**showing** [1] - 82:3
**shown** [1] - 75:11
**sides** [1] - 13:10
**sign** [4] - 68:3, 68:4, 68:17, 69:10
**signature** [1] - 68:4
**signed** [2] - 68:5, 69:10
**significant** [1] - 88:22
**significantly** [1] - 31:10
**similar** [2] - 27:12, 38:23
**simple** [3] - 82:14, 83:9, 84:15
**simply** [4] - 74:15, 77:6, 80:17, 82:9
**simultaneously** [1] - 88:21

**single** [9] - 38:24, 38:25, 52:16, 71:5, 71:6, 75:3, 75:4, 88:24
**sitting** [3] - 30:19, 30:24, 38:1
**situation** [4] - 59:17, 63:3, 70:2, 80:19
**situations** [1] - 21:18
**six** [11] - 15:9, 50:4, 56:22, 57:6, 60:4, 73:10, 76:9, 76:12, 77:10, 81:25, 82:19
**six-year** [1] - 73:10
**slack** [1] - 34:20
**slate** [2] - 6:13, 17:17
**slightly** [1] - 11:10
**small** [3] - 8:9, 28:15, 48:22
**Smith** [2] - 3:9, 3:11
**SMITH** [1] - 2:12
**sole** [1] - 55:17
**solve** [3] - 58:6, 58:9, 58:10
**solved** [1] - 24:3
**solves** [1] - 58:7
**someone** [1] - 40:21
**sometime** [1] - 86:20
**somewhat** [10] - 5:14, 6:23, 17:18, 23:11, 35:23, 49:21, 53:4, 65:18, 66:1, 66:16
**somewhere** [1] - 34:19
**soon** [1] - 64:2
**sophisticated** [1] - 85:8
**sorry** [7] - 13:20, 36:3, 40:21, 42:7, 50:25, 55:5, 60:16
**sort** [10] - 5:12, 20:4, 22:8, 24:7, 26:16, 30:4, 49:1, 61:13, 75:25, 80:12
**sorts** [1] - 21:18
**sought** [1] - 28:8
**sounds** [2] - 14:2, 14:3
**source** [1] - 46:20
**South** [1] - 17:8
**spaced** [2] - 88:24
**speaking** [2] - 49:22, 49:23
**specific** [5] - 21:15, 40:18, 40:24, 79:10, 80:8
**specifically** [4] - 51:10, 77:20, 84:18, 86:15
**specificity** [1] - 57:11

**specifying** [1] - 84:22
**spend** [1] - 35:8
**spent** [1] - 5:3
**SSB** [1] - 48:15
**stand** [5] - 7:25, 9:18, 16:3, 20:24, 36:3
**standard** [4] - 39:3, 39:12, 85:9, 88:25
**standards** [2] - 9:19, 39:9
**standing** [7] - 48:5, 48:6, 48:7, 49:4, 49:7, 69:23, 78:9
**STANLEY** [1] - 1:12
**start** [6] - 5:13, 6:13, 22:16, 67:7, 67:17, 74:15
**starts** [1] - 5:13
**state** [46] - 8:23, 10:22, 10:24, 12:2, 12:8, 12:19, 13:21, 13:25, 14:1, 14:6, 14:7, 14:8, 14:13, 15:10, 16:24, 17:2, 17:7, 17:11, 18:6, 18:7, 18:14, 18:18, 18:22, 18:23, 24:5, 25:4, 26:7, 28:6, 40:19, 40:25, 41:7, 41:17, 44:6, 44:8, 48:8, 53:15, 54:3, 71:6, 71:11, 72:7, 72:16, 72:19, 75:4, 75:15
**state-by-state** [1] - 17:11
**statement** [2] - 23:9, 40:6
**statements** [8] - 21:5, 22:12, 22:13, 22:14, 22:22, 23:6, 24:14, 54:5
**states** [7] - 12:14, 12:15, 14:5, 15:10, 17:4, 17:11, 80:16
**STATES** [1] - 1:1
**States** [3] - 1:14, 9:14, 17:24
**states'** [2] - 17:14, 18:1
**stating** [1] - 28:3
**status** [1] - 10:9
**statute** [11] - 14:9, 14:10, 16:24, 17:6, 49:8, 50:1, 50:11, 72:8, 80:4, 84:11, 86:7
**statutes** [13] - 13:9, 17:1, 17:3, 17:4, 17:7, 17:14, 17:15,

18:1, 18:3, 18:15, 18:23, 40:25, 44:8
**statutory** [3] - 8:8, 72:8, 77:5
**stay** [1] - 4:8
**staying** [1] - 38:10
**stems** [1] - 84:11
**stenographically** [1] - 1:15
**step** [3] - 15:3, 64:7, 70:11
**stick** [1] - 18:10
**still** [17] - 7:1, 10:21, 16:4, 32:11, 43:1, 50:3, 52:8, 53:16, 57:6, 63:18, 66:25, 72:1, 73:2, 74:22, 78:10, 81:12, 87:18
**Stone** [1] - 21:18
**stop** [3] - 5:18, 53:22, 69:14
**straight** [1] - 75:22
**Street** [2] - 2:8, 2:13
**strict** [2] - 50:1, 50:11
**strong** [2] - 21:11, 21:13
**strongly** [1] - 10:11
**sub** [9] - 9:1, 9:3, 9:7, 9:10, 9:16, 54:6, 55:7
**sub-plan** [5] - 9:1, 9:7, 9:10, 9:16, 54:6
**sub-plans** [1] - 9:3
**subclass** [2] - 27:13, 27:17
**subdivision** [4] - 10:15, 10:20, 55:1, 55:4
**subject** [8] - 20:1, 20:13, 21:11, 52:25, 63:6, 63:7, 75:8, 78:5
**subjective** [2] - 83:4, 86:18
**submit** [1] - 32:1
**submitted** [5] - 17:22, 18:1, 31:24, 36:22, 88:21
**subsection** [1] - 21:4
**subsections** [1] - 21:3
**substance** [1] - 80:11
**substantive** [2] - 10:24, 80:11
**substantively** [1] - 32:5
**subtext** [1] - 20:3
**successful** [1] - 79:1
**succinct** [1] - 48:13
**suddenly** [2] - 62:1, 62:10

**sue** [4] - 28:16, 50:22, 51:17, 51:22
**sues** [2] - 28:19, 28:21
**sufficiently** [1] - 51:19
**suggest** [4] - 17:1, 30:15, 39:12, 84:21
**suggested** [2] - 17:1, 58:24
**suggesting** [5] - 37:23, 38:20, 38:21, 80:18, 80:24
**suggestion** [2] - 32:10, 32:12
**suggests** [2] - 80:16
**suit** [2] - 84:13, 84:17
**suitable** [1] - 79:6
**Suite** [2] - 2:13, 2:18
**Sullivan** [4] - 11:23, 11:24, 16:9, 16:16
**summarizes** [1] - 23:19
**summary** [4] - 47:3, 56:9, 80:20, 80:21
**superb** [1] - 67:13, 89:2
**superiority** [2] - 12:11, 28:13
**supervision** [1] - 52:14
**supplier** [1] - 64:1
**support** [2] - 62:8, 66:22
**supports** [1] - 52:20
**suppose** [9] - 15:5, 15:23, 16:1, 39:17, 49:10, 49:11, 51:5, 51:14, 75:3
**supposed** [1] - 40:2
**Supreme** [9] - 19:6, 20:10, 20:11, 20:22, 21:14, 38:7, 50:13, 53:2, 53:9
**surely** [1] - 29:1
**surprise** [1] - 65:18
**surprised** [2] - 68:15, 68:18
**surreplies** [2] - 88:20
**surreply** [5] - 62:5, 63:15, 66:11, 66:20, 66:24
**susceptible** [3] - 81:4, 83:12, 83:22
**suspenders** [2] - 7:22, 7:24
**swore** [1] - 65:5
**system** [2] - 41:15, 44:19
**systemic** [1] - 77:23
**systems** [1] - 73:19

# T

**table** [2] - 4:9, 73:1
**tack** [1] - 27:5
**tacked** [2] - 27:3, 78:19
**tacks** [1] - 51:21
**talks** [1] - 69:9
**task** [2] - 33:14, 69:16
**technical** [1] - 66:16
**technology** [1] - 25:12
**ten** [7] - 26:2, 27:3, 27:5, 28:14, 28:16, 28:20, 28:22
**tend** [2] - 83:18, 84:21
**tens** [4] - 23:11, 23:13, 30:10
**term** [2] - 8:19, 44:24
**terms** [4] - 38:8, 44:22, 72:23, 81:4
**territorial** [1] - 11:1
**territories** [1] - 17:25
**territory** [1] - 88:18
**test** [18] - 13:12, 14:18, 14:20, 15:5, 16:2, 19:20, 19:24, 20:14, 20:17, 37:15, 38:14, 65:7, 66:16, 66:18, 67:2, 68:5, 68:7
**testified** [3] - 73:13, 79:7, 79:8
**testimony** [5] - 34:18, 77:25, 86:14, 86:16
**testing** [1] - 37:11
**tests** [1] - 66:25
**THE** [161] - 3:1, 3:7, 3:19, 3:23, 3:25, 4:3, 4:7, 4:15, 4:18, 5:18, 7:3, 7:21, 9:24, 10:17, 10:24, 11:6, 11:12, 11:16, 13:1, 13:4, 13:16, 13:23, 14:11, 14:16, 15:1, 15:5, 15:9, 15:17, 15:23, 16:1, 16:10, 19:11, 19:14, 19:17, 20:9, 21:8, 21:13, 21:21, 21:23, 23:24, 28:25, 29:2, 29:5, 29:9, 29:13, 29:16, 29:22, 30:3, 31:21, 32:13, 32:22, 33:10, 35:13, 35:15, 36:4, 36:6, 36:14, 36:17, 37:9, 37:13, 37:18, 37:21, 38:21, 40:17, 40:23, 42:5, 42:9, 42:15, 42:21, 42:23,

44:7, 44:11, 45:7, 45:13, 45:19, 45:22, 46:2, 46:5, 46:8, 46:11, 46:15, 46:18, 46:23, 47:2, 47:7, 47:10, 47:13, 47:19, 47:21, 48:2, 48:5, 49:5, 49:17, 49:24, 50:22, 51:1, 51:5, 51:7, 51:10, 51:14, 52:4, 52:6, 53:21, 55:1, 55:4, 55:8, 55:10, 55:24, 56:6, 56:15, 57:16, 57:24, 58:4, 58:9, 58:13, 60:10, 60:6, 60:10, 60:16, 60:19, 60:22, 62:17, 65:11, 67:6, 67:9, 69:14, 69:16, 70:21, 71:1, 71:21, 71:23, 72:14, 75:3, 75:10, 75:19, 75:21, 76:6, 77:3, 77:18, 78:5, 78:16, 79:12, 79:25, 80:18, 80:24, 81:10, 82:15, 82:20, 83:14, 84:3, 84:24, 85:10, 85:18, 86:25, 87:24, 88:17, 88:25, 89:8, 89:10, 89:12, 89:15
**the-horse** [1] - 49:1
**theme** [1] - 35:21
**theoretically** [1] - 19:21
**theories** [1] - 77:9
**theory** [2] - 15:2, 36:25
**therefore** [8] - 18:20, 36:21, 37:5, 49:1, 70:11, 74:2, 74:14, 81:3
**they've** [7] - 3:19, 3:20, 20:1, 34:4, 38:6, 43:14, 56:22
**thinking** [1] - 70:25
**thinks** [2] - 60:25, 68:8
**Third** [14] - 6:7, 9:22, 10:1, 10:4, 11:10, 11:13, 11:23, 11:25, 36:1, 38:14, 39:3, 39:8, 53:8, 53:17
**third** [7] - 10:9, 54:9, 63:7, 71:19, 72:3, 75:14, 88:4
**third-party** [1] - 54:9, 71:19, 75:14
**thousands** [6] - 23:12, 23:13, 30:9, 30:10,

30:11, 40:10
**threat** [3] - 83:8, 85:7, 85:16
**threatening** [6] - 46:9, 46:11, 46:12, 84:5, 84:25, 85:13
**threats** [2] - 50:5, 84:7
**three** [15] - 4:21, 10:8, 19:2, 26:18, 26:19, 47:11, 47:20, 51:1, 60:5, 60:15, 60:17, 71:25, 74:10, 78:2, 87:8
**threshold** [1] - 20:13
**threw** [1] - 27:14
**thrust** [2] - 66:2, 85:19
**tie** [1] - 52:12
**tie-in** [1] - 52:12
**tied** [2] - 52:16, 52:22
**timely** [1] - 41:19
**Title** [1] - 1:14
**today** [11] - 6:3, 6:21, 7:8, 11:5, 22:3, 57:21, 60:4, 67:5, 68:1, 69:7, 73:7
**today's** [3] - 8:18, 55:15, 55:16
**toe** [1] - 11:10
**together** [1] - 16:12
**took** [9] - 5:1, 5:22, 17:13, 18:2, 33:14, 54:5, 64:17, 79:22, 86:11
**topics** [1] - 60:20
**total** [1] - 47:20
**touch** [2] - 12:10, 67:5
**touched** [2] - 9:17, 60:20
**tough** [1] - 67:11
**toughest** [2] - 71:5, 71:7
**towards** [1] - 15:12
**tracking** [1] - 74:25
**transaction** [2] - 73:17, 77:13
**transactions** [2] - 33:17, 74:7
**transcript** [2] - 1:15, 22:13
**transmitted** [1] - 78:22
**treat** [1] - 10:5
**treated** [1] - 81:4
**trial** [1] - 81:3
**tried** [5] - 5:10, 16:12, 32:8, 32:9, 86:17
**Trivino** [1] - 30:18
**true** [12] - 28:1, 36:25, 37:1, 46:14, 56:20, 56:21, 70:19, 73:12, 73:21, 74:1, 77:6

**TRUJILLO** [1] - 2:3
**truthfully** [1] - 83:15
**try** [8] - 7:22, 7:23, 9:18, 14:20, 15:10, 31:15, 48:12, 67:8
**trying** [12] - 12:12, 13:18, 14:11, 19:25, 29:16, 30:3, 30:13, 30:25, 37:18, 38:8, 69:16
**turn** [1] - 34:12
**turned** [1] - 57:13
**turning** [1] - 39:14
**turns** [1] - 68:10
**tusa** [3] - 59:21, 60:10, 67:11
**Tusa** [13] - 3:3, 4:3, 4:18, 54:13, 55:3, 66:22, 67:12, 68:8, 68:15, 70:9, 74:7, 75:1
**TUSA** [114] - 2:7, 2:9, 3:3, 4:2, 4:5, 4:8, 4:17, 4:19, 6:12, 7:5, 7:23, 10:16, 10:23, 11:3, 11:7, 11:15, 11:22, 13:3, 13:14, 13:17, 14:3, 14:15, 14:17, 15:4, 15:8, 15:14, 15:22, 15:25, 16:8, 16:14, 19:13, 19:16, 20:7, 20:10, 21:9, 21:20, 21:22, 22:1, 23:25, 29:1, 29:4, 29:7, 29:12, 29:15, 29:21, 30:2, 31:14, 31:23, 32:19, 32:24, 33:13, 35:14, 36:3, 36:13, 36:16, 37:7, 37:10, 37:17, 37:20, 38:10, 38:22, 40:21, 41:2, 42:7, 42:11, 42:17, 42:22, 43:1, 44:10, 44:13, 45:9, 45:17, 45:21, 46:1, 46:3, 46:7, 46:10, 46:14, 46:17, 46:21, 46:25, 47:9, 47:11, 47:15, 47:20, 47:24, 48:4, 48:11, 49:14, 49:21, 50:1, 50:25, 51:2, 51:6, 51:9, 51:12, 52:2, 52:5, 52:10, 53:24, 55:2, 55:5, 55:9, 56:4, 58:17, 60:15, 60:17, 60:20, 60:23, 63:21, 65:15, 85:23, 88:24, 89:11
**tusa's** [4] - 55:16,

56:25, 69:24, 74:8
**Tusa's** [1] - 59:12
**twice** [1] - 34:17
**two** [47] - 5:21, 9:25, 10:8, 10:15, 10:20, 17:1, 19:5, 19:8, 21:4, 22:10, 22:15, 22:21, 27:1, 32:20, 41:11, 42:5, 42:9, 42:13, 42:16, 43:13, 45:21, 46:5, 47:7, 47:15, 47:17, 47:21, 48:12, 49:20, 50:2, 50:3, 50:21, 59:18, 61:3, 61:14, 62:12, 62:15, 62:20, 66:25, 73:2, 76:14, 76:24, 77:20, 78:11, 78:23, 83:1, 87:18
**type** [1] - 13:8
**types** [1] - 87:6
**typical** [2] - 69:12, 70:7
**typicality** [2] - 12:22, 49:17
**typically** [1] - 15:17

# U

**UCR** [2] - 36:1, 36:4
**ultimately** [5] - 6:6, 20:3, 29:25, 33:3, 81:14
**unanimous** [1] - 20:21
**unapproved** [1] - 62:5
**unauthorized** [1] - 46:16
**uncommon** [1] - 84:18
**uncontradicted** [2] - 77:24, 77:25
**under** [24] - 8:23, 17:6, 38:7, 39:3, 40:14, 44:6, 48:8, 49:7, 52:14, 53:10, 53:11, 53:14, 53:15, 58:12, 62:14, 63:16, 69:5, 69:21, 72:6, 75:14, 77:9, 77:15, 79:15, 80:4
**underlying** [1] - 79:19
**undisputed** [4] - 78:20, 78:25, 79:2, 79:5
**undoubtedly** [1] - 61:20
**unduly** [1] - 74:25
**unfair** [1] - 53:10
**unified** [2] - 81:19, 82:1

**uniformly** [2] - 22:13, 22:23
**unifying** [3] - 35:21, 36:25, 37:1
**unintended** [1] - 83:8
**unique** [1] - 87:2
**uniquely** [1] - 66:7
**unit** [1] - 87:15
**unitary** [2] - 28:11
**UNITED** [1] - 1:1
**United** [3] - 1:14, 9:14, 17:24
**unjust** [4] - 18:20, 40:12, 40:17, 41:24
**unjustly** [1] - 42:3
**unlawful** [1] - 74:17
**unless** [1] - 38:6
**unpaid** [1] - 61:21
**unquote** [1] - 26:11
**unsophisticated** [3] - 85:5, 85:6, 85:12
**unwieldy** [2] - 41:15, 45:6
**up** [29] - 4:10, 4:13, 5:14, 7:10, 7:25, 8:14, 8:15, 9:18, 10:21, 20:24, 21:17, 25:9, 25:11, 30:17, 35:9, 35:11, 37:6, 41:14, 41:19, 43:21, 53:20, 59:17, 62:1, 71:3, 74:22, 74:24, 76:23, 80:7, 88:14
**updating** [1] - 32:2
**USDJ** [1] - 1:12
**uses** [2] - 35:5, 35:6
**usual** [6] - 36:4, 36:5, 36:6, 36:9, 36:18, 37:4
**utterly** [2] - 73:22, 73:25

## V

**vacated** [1] - 11:13
**vacating** [1] - 11:24
**vacation** [1] - 11:23
**vague** [1] - 37:14
**valid** [3] - 69:25, 70:11, 77:8
**validity** [1] - 70:15
**vanguard** [1] - 12:3
**variety** [1] - 33:8
**various** [4] - 37:3, 37:4, 59:13, 86:22
**Vegas** [1] - 87:16
**vendor** [4] - 34:13, 34:16, 34:17, 35:6
**verboten** [2] - 50:6,

50:7
**version** [2] - 8:19, 8:20
**versus** [1] - 57:3
**viable** [1] - 28:23
**victim** [1] - 38:19
**victimization** [1] - 35:22
**victimized** [3] - 31:12, 35:20, 37:6
**victims** [1] - 50:17
**view** [8] - 6:3, 15:12, 49:3, 52:7, 64:20, 64:22, 85:3, 87:2
**viewing** [1] - 85:11
**Village** [1] - 2:12
**violation** [6] - 8:8, 15:7, 31:4, 51:3, 52:23, 83:11
**Virgin** [1] - 17:25
**virtue** [1] - 31:11
**voice** [1] - 21:19
**void** [1] - 64:21
**voids** [2] - 66:14, 66:15
**vs** [2] - 1:5, 3:1

## W

**Wachtel** [4] - 37:8, 37:9, 37:13, 38:22
**Wachtel's** [1] - 38:24
**waive** [1] - 51:13
**wall** [1] - 26:3
**Warfarin** [3] - 12:6, 12:11, 12:12
**warnings** [1] - 83:24
**warranted** [1] - 10:17
**week** [1] - 19:9
**weeks** [1] - 25:10
**West** [1] - 2:8
**Whalen** [1] - 3:3
**WHALEN** [1] - 2:7
**whatsoever** [1] - 16:7
**whistles** [3] - 58:14, 58:16, 58:18
**whole** [2] - 44:18, 71:14
**wife** [1] - 26:1
**willing** [4] - 33:18, 39:13, 43:12, 52:8
**win** [2] - 80:20, 81:7
**wins** [1] - 81:6
**wire** [1] - 29:12
**wish** [1] - 60:13
**word** [2] - 35:16, 69:25
**wording** [1] - 82:21
**words** [3] - 7:21,

30:11, 53:24
**Workers** [1] - 48:23
**works** [1] - 9:14
**world** [6] - 33:12, 33:23, 34:21, 57:15
**World** [1] - 9:14
**worth** [1] - 28:23
**wrap** [1] - 53:20
**wrapped** [3] - 41:14, 41:19, 43:21
**write** [1] - 89:3
**writer** [1] - 86:19
**wrongful** [2] - 56:19, 70:20
**wrote** [1] - 5:5

## Y

**year** [5] - 4:22, 5:23, 62:10, 68:18, 73:10
**years** [10] - 4:21, 32:20, 56:22, 57:7, 60:4, 76:9, 76:12, 77:10, 81:25, 82:19
**York** [1] - 2:8
**Young** [1] - 13:18
**Young's** [1] - 15:15
**yourself** [1] - 20:7
**yourselves** [1] - 89:12

## Z

**zero** [1] - 43:6