## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|
DENISE AGOSTINO, et al.,                    |
                                            |
            Plaintiffs,                     |
                                            |
                                            |   **Civ. No. 04-4362 (SRC)**
        v.                                  |
                                            |   **OPINION**
QUEST DIAGNOSTICS INC., et al.,             |
                                            |
            Defendants.                     |
                                            |

---

**CHESLER**, District Judge

This matter comes before the Court on Plaintiffs' renewed motion for class certification pursuant to Federal Rule of Civil Procedure 23. The Court denied Plaintiffs' initial motion for class certification by Order of February 11, 2009, which was accompanied by an Opinion indicating deficiencies that prevented certification of the previously proposed class under Rule 23(b)(2) and four proposed subclasses.[1] The instant motion, which attempts to cure those deficiencies, differs in several material respects from the initial motion.[2] Plaintiffs have redefined four proposed classes: the Post-EOB Billing Class, the Medicare Part B Class, the

---

[1] The Court refers the reader to the February 11, 2009 Opinion for the factual background and description of the alleged wrongdoing in this case, as Plaintiffs rely on the same factual record in bringing this motion. That opinion is reported as *Agostino v. Quest Diagnostics, Inc.*, 256 F.R.D. 437 (D.N.J. 2009), and the Court will hereinafter refer to it as "Agostino I." Additional facts and evidence presented by Plaintiffs are discussed by the Court where pertinent to its legal analysis in this Opinion.

[2] Although the Court denied class certification upon Plaintiff's first motion, it may consider a successive motion for class certification to determine whether changes made by Plaintiffs now render some or all of the action certifiable for class treatment under Rule 23. *See* Fed.R.Civ.P. 23(c)(1)(C).

Anthem BCBS FEHB Class and the Debt Collection Victims Class.  Plaintiffs, moreover, no longer seek to certify a class for injunctive relief and/or equitable relief but rather seek certification of those four classes under Rule 23(b)(3) for money damages.  None of the classes assert an ERISA claim or a common law fraud claim.  Defendant Quest Diagnostics, Inc. ("Defendant" or "Quest"), which is targeted by three of the four classes, has opposed the motion. The Debt Collector Defendants ("DCDs")[3]  have filed their own joint opposition to the motion for class certification, which incorporates the arguments raised by Quest in its opposing papers.

Also before the Court is a motion filed by Plaintiffs for an order permitting the intervention of Katrina Camaj as a named Plaintiff in this action pursuant to Federal Rule of Civil Procedure 24 or to join her as a Plaintiff pursuant to Federal Rule of Civil Procedure 20 or 21.  Alternatively, they move to amend the Complaint pursuant to Federal Rule of Civil Procedure 15 to add her as a Plaintiff.  Plaintiffs propose to add Camaj so that she may serve as the representative for the Medicare Part B Class.  Quest has opposed this motion.

The Court heard oral argument on the motions on September 7, 2010.  The Court requested supplemental briefing following argument.  It has considered the arguments made by counsel at the proceedings of September 7 as well as the papers submitted by the parties.  For the reasons discussed below, the Court denies the class certification motion in its entirety.

_____

[3] The Debt Collection Defendants are: Retrieval Masters Credit Bureau d/b/a/ American Medical Collection Agency ("AMCA"), Quantum Collections ("Quantum"), Seattle Service Bureau, Inc. ("SSB"), Russell Collection Agency, Inc. ("RCA"), and Credit Bureau Central ("CBC") (collectively, "Debt Collection Defendants" or "DCDs").  A sixth debt collector, Credit Collection Services ("CCS"), had been named as a defendant, but all claims against CCS were disposed of on summary judgment by Order of July 7, 2010.

BACKGROUND

On this renewed motion, Plaintiffs seek certification under Rule 23(b)(3) of four classes of alleged victims of the billing practices employed by Quest, and as to one of the classes, of the debt collectors Quest employed to pursue unpaid bills.  The Court begins its analysis by setting forth the definition of each proposed class and the claims for which each class seeks to be certified, followed by the standard that each class must satisfy as to each claim it wishes to pursue as a Rule 23(b)(3) class.

I.      THE CLASSES

     A.      Post-EOB Billing Class

Plaintiffs define this class as:

All natural persons in the United States of America and its territories who are or were members, participants, subscribers or beneficiaries of a health insurance plan provided by an insurance provider or administered by a third party administrator ("TPA") with whom Quest Diagnostics, Inc ("Quest") had a participating provider contract, were billed by Quest or its agent and paid an amount in excess of the stated patient responsibility on an Explanation of Benefits ("EOB") or Electronic Remittance Advice ("ERA") provided to Quest prior to the date of the Quest bill.

This class asserts claims under the consumer fraud statutes of all fifty states and the District of Columbia, under the federal RICO statute and under a common law theory of unjust enrichment.  The claims are directed only against Defendant Quest.  The proposed class representative is Richard Grandalski, with alternative proposals of Elizabeth Cruthers and Aria McKenna.

### B.   Medicare Part B Class

Plaintiffs define this class as:

All natural persons in the United States of America and its territories who are or were

participants or beneficiaries of Medicare Part B, and who paid any portion of bills from Quest

Diagnostics, Inc. ("Quest"), when Quest did not have an Advanced Beneficiary Notice ("ABN")

completed on the form approved by the Centers for Medicare and Medicaid Services ("CMS")

and a determination of patient responsibility from Medicare Part B or its administrators.

This class asserts claims under the consumer fraud statutes of all fifty states and the

District of Columbia, under the federal Racketeer Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. § 1961, et seq. , and under a common law theory of unjust enrichment.  The

claims are directed only against Defendant Quest.  The proposed class representative is Katrina

Camaj.

### C.   Anthem BCBS FEHB Program Class

Plaintiffs define this class as:

All natural persons in the United States of America and its territories who are or were

members, participants, subscribers or beneficiaries of Anthem Blue Cross and Blue Shield and

the Federal Employees Health Benefits ("FEHB") Program and who were billed by and paid to

Quest Diagnostics, Inc. ("Quest") or its agent(s) an amount in excess of the stated patient

responsibility on an Explanation of Benefits ("EOB") or Electronic Remittance Advice ("ERA")

provided to Quest prior to the date of the Quest bill.

This class asserts claims for breach of contract, for violation of the consumer fraud

statutes of all fifty states and the District of Columbia, and for unjust enrichment.  The claims are

directed only against Defendant Quest.  The proposed class representative is Richard Grandalski.

     **D.**    **Debt Collection Victim Class**

Plaintiffs define this class as:

All natural persons in the United States of America and its territories who received written demands from debt collectors retained by Quest Diagnostics, Inc. ("Quest"), which demands: i) stated that the debt collector may engage in "additional" or "further" collection efforts or may report a delinquency to credit bureaus; or ii) added interest, charges or penalties in excess of the original amount billed by Quest.

This class asserts claims under the federal Fair Debt Collection Practices Act ("FDCPA"), the consumer fraud statutes of all fifty states and the District of Columbia, the federal RICO statute and the common law theory of unjust enrichment.  The claims are directed at the DCDs, but not at Quest.  The proposed class representatives are Richard Grandalski, Aria McKenna, Richard Ranieri, and Christine Ranieri.

## II.    STANDARD FOR CERTIFICATION UNDER RULE 23(B)(3)

 To obtain certification, Plaintiffs must demonstrate that each of the putative classes meets the threshold requirements of Rule 23(a) as well as one of the three Rule 23(b) categories under which they wish to proceed as a class.  *In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 308-09 (3d Cir. 1998). In moving for class certification, a movant has the burden of proving that all requirements of Rule 23 are met. *General Telephone Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982).   In this case, Plaintiffs have sought certification of four different classes under Rule 23(b)(3), which permits certification when

"questions of law or fact common to class members predominate over any questions affecting only individual members" and when "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). The Third Circuit recently reiterated the well-established standard for certification, holding as follows:

> Every putative class must satisfy the four requirements of Rule 23(a): (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests of the class" (adequacy of representation, or simply adequacy). Fed.R.Civ.P. 23(a)(1)-(4). If those requirements are met, a district court must then find that the class fits within one of the three categories of class actions in Rule 23(b).

*In re Community Bank of N.Va.*, — F.3d —, 2010 WL 3666673 at *12 (3d Cir. Sept. 22, 2010) ("*Community Bank II*").

In *Community Bank II*, the Third Circuit proceeded to specify that when certification under Rule 23(b)(3) was sought, the district court could not certify a class unless two additional requirements had been met: "(i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)." *Id.* Predominance is similar to Rule 23(a)(2)'s requirement of commonality in that both are concerned with ensuring that the putative class presents common questions of law of fact. Indeed, where Rule 23(b)(3) certification is sought, the commonality inquiry is subsumed into the predominance analysis. *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir.2008). Predominance, however, imposes a "far more demanding standard," as it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *In re Ins. Brokerage*

*Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009) (quoting *Amchem Prods., Inc. v. Windsor*, 521

U.S. 591, 623-24 (1997)).  The Third Circuit has emphasized the stringent nature of the

predominance requirement, explaining that it may be satisfied only when  "common issues

predominate over issues affecting only individual class members." *Id.* (quoting *In re Warfarin*

*Sodium Antitrust Litig.*, 391 F.3d 516, 527-28 (3d Cir. 2004)).  Rule 23(b)(3)'s superiority

requirement focuses the Court on manageability concerns.  It must consider whether a trial of the

claims by representation would pose difficulties such that some other method of adjudication

would be superior to class certification. *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 309 (3d Cir.

2005).   The rule lists four factors relevant to a court's evaluation of predominance and

superiority.  They are:

> (A) the class members' interests in individually controlling the prosecution
> or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy
> already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the
> claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3).  This list is not exhaustive, and courts may consider other pertinent factors

in deciding whether a case is suited to class certification.  *Amchem*, 521 U.S. at 615-16.

A court cannot satisfy itself that a class meets Rule 23's standard in some abstract,

theoretical way; instead, it must conduct a rigorous analysis based on the elements of the claim or

claims a named plaintiff seeks to pursue in a representative capacity on behalf of the putative

class.  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2009). "A class

certification decision requires a thorough examination of the factual and legal allegations." *Id.* (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166 (3d Cir. 2001)). The Rule 23 analysis indeed "may include a preliminary inquiry into the merits" insofar as the merits of the claim may be relevant to the class certification analysis. *Hohider v. United Parcel Svc., Inc.*, 574 F.3d 169, 176 (3d Cir. 2009); *Hydrogen Peroxide,* 552 F.3d at 307. If the Court finds that the action, or any portion thereof, warrants class certification, its order must "define the class and the class claims, issues, or defenses . . ." Fed.R.Civ.P. 23(c)(1)(B); *see also Wachtel v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 184 (3d Cir. 2006) (holding that rule "requires district courts to include in class certification orders a clear and complete summary of those claims, issues, or defenses subject to class treatment.").

**DISCUSSION**

**I.     POST-EOB BILLING CLASS**

   **A.     Consumer Fraud Act Claim**

The Court begins its class certification analysis with Plaintiffs' claim that Quest has violated the consumer fraud statutes of New Jersey as well as those of the 49 other states and the District of Columbia. Plaintiffs continue to argue that New Jersey's Consumer Fraud Act may apply to the claims of each nationwide member of the class, despite the conclusion reached by the Court on Plaintiffs' first motion for class certification that the consumer fraud statute of each class member's home state would apply to his or her claim. The Court notes that each of the four putative classes seeks to pursue this claim as a certified Rule 23(b)(3) class. The Court's choice of law analysis is central to the Court's evaluation of whether any of the classes can meet the

rule's predominance and superiority requirements as to the statutory consumer fraud claim, and its determination of which state's law applies to this claim will apply across all four classes.

       1.   <u>Choice of Law</u>

Plaintiffs urge the Court to re-visit the exhaustive choice of law analysis it conducted in Agostino I. They take the position that, as illustrated by Third Circuit and district court decisions issued after Agostino I, the appropriate framework for the choice of law analysis in this case is supplied by section 148(2) of the Second Restatement on Conflict of Laws ("Restatement") rather than section 148(1), which the Court had previously applied. *See* Restatement (Second) of Conflict of Laws § 148 (1971). They argue that had the correct standard been applied in the initial motion for class certification, the Court would have reached a different conclusion. It would have found, they contend, that New Jersey's Consumer Fraud Act applies to the entire putative class, regardless of the particular class member's state of origin.

Essentially, the choice of law argument presented in this second motion for class certification constitutes a motion for reconsideration, governed by Local Civil Rule 7.1(i). Local Civil Rule 7.1(i) creates a procedure by which a court may reconsider its decision upon a showing that dispositive factual matters or controlling decisions of law were overlooked by the court in reaching its prior decision. *See Bryan v. Shah*, 351 F.Supp.2d 295, 297 (D.N.J. 2005); *Bowers v. Nat'l Collegiate Athletic Assoc.*, 130 F.Supp.2d 610, 612 (D.N.J. 2001). The Court preliminarily notes that motions for reconsideration must be brought within 14 days of the date of the order challenged. L.Civ.R. 7.1(i). This motion was filed over one year after the Court's opinion and order in Agostino I. Apart from its unusually delayed and improper presentation to the Court, the "do-over" sought by Plaintiffs is unwarranted under both the stringent

reconsideration standard and under the alternative choice of law analysis Plaintiffs believe is correct.

First, as to Plaintiffs' failure to demonstrate that reconsideration is appropriate, the Court applies this district's well-established test for such motions. Third Circuit jurisprudence directs that a motion under Rule 7.1(i) may be granted only if: (1) there has been an intervening change in the controlling law; (2) evidence not available when the Court issued the subject order has become available; or (3) it is necessary to correct a clear error of law or fact or prevent manifest injustice. *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir.1999) (citing *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir 1995)). Here, because the crux of Plaintiff's argument is that the Court reached its choice of law conclusion after applying a legally incorrect test, the reconsideration sought could only be directed at the third of the recognized grounds. The Court, however, does not find that it committed a clear error of law in applying Restatement section 148(1) instead of section 148(2).

The Court discerns no error in applying the test prescribed by Restatement section 148(1). This test applies when the plaintiff's "action in reliance" on the alleged fraud took place in the same state in which the representations were "made and received." Restatement (Second) of Conflict of Laws § 148(1). In contrast, 148(2) applies when the action in reliance took place in a different state than the allegedly fraudulent representation was made. *Id.* § 148(2).[4] As Agostino

_____

[4] Section 148(1) reads as follows:

> (1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue,

I reflects, the Court concluded that the alleged misrepresentations by Quest (the demand for payment made in bills to patients) were made and received in the putative class members' home states and that they acted in reliance on those alleged misrepresentations in their home states. *Agostino*, 256 F.R.D. at 463. This finding places the consumer fraud claim choice of law analysis squarely within the purview of 148(1).

Nevertheless, in the instant motion, Plaintiffs argue that the challenged representations were made in New Jersey - a "different state from where Plaintiffs and the majority of putative class members received and relied on them." (Pl. Reply Br. at 20.) In support of this argument, Plaintiffs point to the following facts: the billing practices and policies were directed from Quest's New Jersey headquarters; Quest's centralized revenue services department, which was under the direction of New Jersey executives, sent outside billing vendors the billing information; and the primary billing vendor it used (Regulus) generated invoices and billing

---

some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

In contrast, section 148(2) provides, in relevant part:

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties . . .

The Court will set forth and apply the enumerated factors later in this Opinion.

letters from a location in the Midwest.  None of this alters the Court's determination that though

the "purportedly illegal billing practices may have emanated from Quest's home state of New

Jersey, they were directed at each plaintiff's home state" and thus the allegedly false

representations were made in each destination state.  *Agostino*, 256 F.R.D. at 463.  Plaintiffs may

disagree with the finding that underpins the Court's decision to apply section 148(1) and its

"strong presumption . . . that the consumer fraud law of each class plaintiff's home state should

apply to his respective claim," *id.*, but this disagreement clearly cannot justify the extraordinary

remedy of reconsideration. Plaintiffs simply fail to point to an error of law committed by the

Court. *G-69 v. Degnan*, 748 F.Supp. 274, 275 (D.N.J. 1990) (quoting *Carteret Savings Bank,*

*F.A. v. Shushan*, 721 F.Supp. 705, 709 (D.N.J.1989)); *NL Indus. Inc. v. Commercial Union Ins.*

*Co.*, 935 F. Supp. 513, 516 (D.N.J. 1996).

Plaintiffs' position that the Court erred in Agostino I is based in large part on an opinion

issued by another District of New Jersey judge on a class certification motion in the multidistrict

litigation known as *In re Mercedes-Benz Tele Aid Contract Litigation* ("*Mercedes*").  *See* 257

F.R.D. 46 (D.N.J. 2009).  In that opinion, filed approximately two-and-a-half months after

Agostino I, the Honorable Dickson R. Debevoise expresses his disagreement with this Court's

decision to conduct the choice of law analysis on Plaintiffs' consumer fraud claim under

Restatement section 148(1).   Judge Debevoise was faced with a similar conflict of laws issue

presented by the named plaintiff's assertion of a New Jersey Consumer Fraud Act claim on

behalf of a nationwide class of consumers of Mercedes vehicles who were allegedly defrauded by

the company's promotion of vehicles equipped with a soon-to-be obsolete emergency response

system known as "Tele Aid."  *Id.* at 48.  Mercedes, the target of the consumer fraud claims, is

and was at the relevant time headquartered in New Jersey. *Id.* Judge Debevoise determined that

the choice of law analysis should be conducted under the Restatement section 148(2) test because

the alleged misrepresentations were made in New Jersey but each plaintiff received and relied on

the misrepresentation by subscribing to Tele Aid or upgrading in his or her home state. *Id.* at 66.

The *Mercedes* court found that majority of factors applicable under section 148(2) actually

weighed in favor of applying the law of each plaintiff's home state rather than New Jersey's law

*en masse*. *Id.* at 67. It nevertheless held that the balance of the "most significant relationship"

test tipped in favor of New Jersey based what it concluded was New Jersey's very strong interest

in furthering the Consumer Fraud Act's policy of deterrence by making its home-state

companies, such as Mercedes, subject to the law, regardless of where the allegedly defrauded

consumer may live. *Id.* at 67-68.

In selecting Restatement section 148(2) as the appropriate rubric to apply in light of the

facts of that case, the *Mercedes* court rejected the approach taken in Agostino I, upon which

defendant Mercedes apparently relied. *Id.* at 65-66. It observed:

> While the Court in *Agostino* did apply a presumption in favor of the
> application of the law of each plaintiff's home state, it did so based on its
> implied ruling that the alleged misrepresentations underlying the claim in
> that case were both made and received in the plaintiffs' home states, and
> therefore Restatement § 148(1) - not the second subsection of that rule -
> applied to the plaintiffs' consumer fraud claim.

*Id.* Yet, the *Mercedes* court found this implication to be at odds with Agostino I's

acknowledgment that the "purportedly illegal billing practices . . . emanated from New Jersey"

but were received and relied upon elsewhere. *Id.* The *Mercedes* critique of Agostino I is flawed,

however, because it is premised in large part on a factual finding that the Court did not make -

-13-

that alleged misrepresentations by Quest were made in New Jersey, not in each class member's

home state.  As set forth above, however, this Court noted in Agostino I that no matter the state

of origin of the allegedly fraudulent billing communications, the statements were intended to be

read at their destination - the customer's home state - and thus concluded that the alleged

misrepresentations were made there.  *Agostino*, 256 F.R.D. at 463.  As the Court will further

discuss below, the factual scenario presented by the alleged wrongdoing in this case is unlike the

alleged conduct at issue in *Mercede*s, notwithstanding the *Mercedes* court's characterization of

the facts of both cases as analogous.  Allegedly deceptive bills sent deliberately to each Quest

customer's home address, in the state where the underlying laboratory service was most likely

obtained, is quite distinct from an automobile manufacturer's national promotion of its product

presumably directed from the company's headquarters.  As the Court found in Agostino I, the

billing transactions at issue in this case implicate section 148(1) and its presumption that the law

of each plaintiff's home state applies.

     Plaintiffs' position that the Court erred in its choice of law analysis is also based on

*Cooper v. Samsung Elec. N. Am.*, No. 08-47-36, 2010 U.S. App. LEXIS 6602 (3d Cir. Mar. 30,

2010).  Plaintiffs characterize the Third Circuit's decision in that case as definitively resolving

that Restatement section 148(2) applies to consumer fraud claims such as the one involved in this

case - that is, those involving alleged misrepresentations made by a defendant company

headquartered in New Jersey but sued by an out-of-state plaintiff based on an out-of-state

transaction. *Cooper*, an unpublished opinion, made no such sweeping pronouncements, nor is its approach to the choice of law question presented in that case particularly instructive to the case at bar.[5]

In *Cooper*, the plaintiff was an Arizona resident who had purchased from an Arizona retailer a television manufactured and sold by defendant Samsung, which was headquartered in New Jersey. *Cooper*, 2010 US App LEXIS 6602, at *1-2, *12. He purported to represent a nationwide class of consumers who had allegedly been defrauded by Samsung into buying its product based on marketing materials giving the impression that the television was capable of receiving and displaying a high-quality video signal known as 1080p. *Id.* at *3-4. The Third Circuit Court of Appeals affirmed the District Court's choice of law determination, though made according to the previously-applicable governmental interest analysis, because the Restatement section 148's most significant relationship test yielded the same result. *Id.* at *10 and n.4. The appeals court held that the inquiry set forth by subsection 2 of Restatement section 148 governed the analysis because "Samsung's representations were alleged to have been made in a different state (New Jersey) than they were received and relied upon (Arizona)." *Id.* at *11. The Cooper opinion is unavailing to the *Agostino* Plaintiffs' position on the Consumer Fraud Act choice of law issue in this case. First, the facts of Cooper are distinct because, as discussed above, the alleged misrepresentations made by Quest in its bills were not made in the defendant's New Jersey headquarters or, for that matter, in any state other than where the representations were received and relied upon. Second, despite applying the Restatement test Plaintiffs believe is the

---

[5] While litigants may cite to unpublished opinions for their persuasive effect, Fed. R. App. P. 32.1, the Third Circuit has made clear that such opinions are not binding precedent. Third Circuit I.O.P. 5.7.

correct one to apply in this case, the Cooper court nevertheless concluded that the law of the plaintiff's home should apply to the consumer fraud claim. *Id.* at *11-12.  It reasoned that "the transaction in question bears no relationship to New Jersey other than the location of Samsung's headquarters.  Cooper's claim bears the most significant relationship with Arizona, the state in which the television was marketed, purchased, and used." *Id.* at *12.

Likewise, in this case, it must be remembered that the transactions upon which the allegedly fraudulent bills are based are laboratory testing services provided locally to class members, that is, in or near the town where they live, work and/or obtain medical care.  Even assuming, as Plaintiffs argue, that for the vast majority of class members, the representations at issue were made in a state (New Jersey) other than where those class members acted in reliance, an analysis according to the section 148(2) framework would result in the same determination the Court reached in Agostino I.  That is, even without subsection 1's presumption that the law of the plaintiff's home state applies, the Court would conclude that the state in which each class member resides has the most significant relationship to the controversy and its law should apply to that putative class member's consumer fraud claims.

To illustrate, the Court applies the section 148(2) test.  That framework requires the Court to weigh the following contacts of the involved states to the case:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2).

The Court finds that factors a, b, e and f all weigh strongly in favor of applying the consumer fraud law of each class member's home state to that person's claim. Each one wrote a check or made a credit card payment in his or her home state in reliance on the Quest bill's statement of amount due (factor a), received Quest's bill in his or her home state (factor b), presumably obtained the underlying laboratory services in his or her home state (factor e) and was expected to render and did render performance (payment) upon receipt of the bill in his home state (factor f). Factor (d) is neutral, as the various parties and members of the putative class hale from all over the United States. Assuming *arguendo*, as it must in light of its application of section 148(2), that Quest made the representations in New Jersey (factor c), this connection alone to the case does not elevate New Jersey's relationship to the alleged consumer fraud offense above that of each allegedly victimized class member's home state. Comment h to section 148(2) states that factor (c) should be given the same level of importance as in a choice of law analysis under sections 146 and 147, which pertain to personal injury and harm to tangible things, respectively. Comment e to subsection 146 provides that when the offending conduct and injury occur in different states, "an important factor in determining which is the state of most significant relationship is the purpose sought to be achieved by the rule of tort law involved. If this purpose is to punish the tortfeasor and thus to deter others from following his example, there

-17-

is better reason to say that the state where the conduct occurred is the state of dominant interest and that its local law should control than if the tort rule is designed primarily to compensate the victim for his injuries." Restatement (Second) on Conflict of Laws § 146 cmt.e.   It is true that New Jersey's Consumer Fraud Act seeks to deter corporations doing business in the state from engaging in deceptive practices.  *See Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 21 (1994) (observing that the statute has both a remedial and deterrent purpose).  Parting ways, however, with Judge Debevoise's assessment in *Mercedes*, this Court does not consider that New Jersey's interest in deterring fraudulent conduct perpetrated by domestic companies necessarily trumps the interest of the victim's home state.  That state not only has an interest in providing its residents with adequate protection and compensation but also in striking the right balance between consumer protection and the creation of a hospitable environment where businesses can thrive.  Applying New Jersey's consumer fraud law nationwide would upset that balance and displace other states' policy interests in favor of New Jersey's policy of deterrence.  There may be a case where imposition of one state's approach to dealing with fraudulent business practices in states across the country is warranted, but Plaintiffs have not persuaded the Court that this controversy - rooted in the provision of laboratory services in each class member's home community - is such a case.

In short, the Court is not satisfied that New Jersey's interest in deterring certain conduct by its home state businesses, as reflected in the enactment of the Consumer Fraud Act, warrants a practically willy-nilly imposition of New Jersey's law nationwide in disregard of the laws of other jurisdictions and the potential consequences of that blanket application of one state's laws to individual claimants.  This case presents 51 different jurisdictions where class members were

domiciled and where their alleged injury - paying a Quest bill exceeding the insurer's determination of patient responsibility - occurred.  To make an intelligent determination of which state's law should apply to a consumer fraud claim under the Restatement analysis, the Court would have to conduct a state by state analysis of how the consumer fraud laws compare to New Jersey's. In this court's view, the New Jersey Consumer Fraud Act expresses one state's particular assessment of the correct amount of consumer protection to provide at the expense of promoting private enterprise.  Another state may well strike a different balance, preferring to encourage a business that offers employment, provides useful services and stimulates the local economy to operate in communities within that state.  This consideration indeed may come to the forefront in a situation such as the case at bar presents, where the dispute, stems not from some remote service provided by the defendant company for which it bills the customer from afar, but rather from an individual's receipt of laboratory services provided in his or her local community by Quest.  It strikes this Court that the state where the consumer was able to obtain such services would have the most substantial relationship to the controversy and a superior interest regarding the application of its law to its resident's consumer fraud claim.

Thus, even if the Court were to reconsider its choice of law analysis on the statutory consumer fraud claim asserted by each of the four redefined classes, an analysis under the various factors of Restatement section 148(2) would yield the same conclusion as the Court reached in Agostino I.  To reiterate: "The state in which each plaintiff resides has the most significant relationship with the parties and the issues related to each plaintiff's consumer fraud claims." *Agostino*, 256 F.R.D. at 463.

2.      Class Certification Analysis

As discussed above, the proper adjudication of the statutory consumer fraud claims in this action requires the claims to be proven according to the law of the individual class member's home state.  Clearly, the prospect of applying dozens of different consumer fraud statutes in one trial covering thousands of claims raises serious concerns as to whether the claims can feasibly be proven and defended against through the class action vehicle.  Where the laws of possibly all the states could apply, a class certification analysis requires that "the district court must determine whether variations in state law defeat predominance."  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 750 (5th Cir. 1996). Plaintiffs bear the burden of demonstrating that differences among the applicable state laws do not pose "insuperable obstacles" to the management of a class.  *In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir.), *cert. denied*, 479 U.S. 915 (1986)). Differences in state law must be identified as they threaten to "swamp any common issues and defeat predominance."  *Sanders v. Johnson & Johnson, Inc.*, No. 03-2663 (GEB), 2006 WL 1541033, at *4 (D.N.J. June 2, 2006) (quoting *Castano*, 84 F.3d at 741).

On Plaintiffs' prior motion for certification under Rule 23(b)(2), the Court found that the state consumer fraud statutes governing Plaintiffs' claims are sufficiently different to preclude any finding of cohesiveness among the class.  Similarly, the differences among the legal issues raised by the consumer fraud statutes preclude a finding that any of the four classes asserting a claim for violation of a consumer fraud statute satisfy Rule 23(b)(3)'s predominance requirement.   "Predominance 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Hydrogen Peroxide*, 552 F.3d at 310-11 (quoting *Amchem*, 521 U.S. at 623).  "Because the nature of the evidence that will suffice to resolve a

-20-

question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Id.* at 311 (quotations and internal citations omitted).

The consumer fraud claims asserted by the Post-EOB Billing Class, as well as the other three putative classes of individuals who utilized Quest services nationwide, implicate the statutes of dozens of jurisdictions. The laws, as the Court observed in Agostino I, "differ immensely from jurisdiction to jurisdiction." *Agostino*, 256 F.R.D. at 466. They vary as to elements (including the defendant's state of mind), burden of proof, allowable recovery, actionable wrongdoing and limitations periods. *Id.* at 461-62, 466-67. Even if it could be argued that the nationwide class meets the commonality requirement of Rule 23(a) insofar as all Plaintiffs allege that they were billed by Quest (or one of the DCDs) for an amount that they did not owe, the need to prove liability according to so many varying consumer fraud statutes and standards frustrates the more demanding class certification criterion of predominance. For class treatment of the consumer fraud claims to be justified, the common issues among the nationwide class would have to constitute significant part of the individual cases. *Chiang v. Veneman*, 385 F.3d 256, 273 (3d Cir. 2004). Plaintiffs have not demonstrated to the Court that such predominance of common issues over individual ones could be achieved when dealing with thousands of consumer fraud claims that must be evaluated according to the differing elements and burdens of proof associated with the many applicable statutes. *See Hydrogen Peroxide*, 552 F.3d at 311. Indeed, the sheer number of state laws which would apply to the class claims in and of itself minimizes the advantages that class treatment is meant to provide.

Apparently recognizing this hurdle, Plaintiffs propose grouping the consumer fraud statutes and applying them *en masse*.  In support of this proposal, Plaintiffs cite to *In re Pharmaceutical Industry Wholesale Price Litigation*, 252 F.R.D. 83, 85-86 (D.Mass. 2008) ("*AWP*").  The *AWP* action, a multi-district litigation, involved claims that two pharmaceutical manufacturers inflated the prices of various physician-administered drugs by misstating the drugs' Average Wholesale Prices and, as a result, caused the government, third-party payors and consumers to overpay for the drugs.  *Id.* at 86.  Prior to the certification motion addressed in the *AWP* opinion cited by Plaintiffs, the defendants had entered into multiple national settlements of identical claims, and the court had conducted a bellweather bench trial involving two classes which had received class certification to pursue their unfair trade practice claims under the laws of one state, Massachusetts.  *Id.* at 86-87.  According to the *AWP* court, the bellweather trial "gave the Court the opportunity to understand the complex factual and legal disputes in this difficult area of drug pricing."  *Id.* at 87.  At that time, the *AWP* court had denied the plaintiffs' motion to certify those two classes under the unfair and deceptive trade practice acts ("UDTPAs") of states other than Massachusetts, because plaintiffs' analysis of those other statutes was inadequate.  *Id.*  Later, as cited by Plaintiffs in support of their grouping proposal, the *AWP* court certified under Rule 23(b)(3) two nationwide classes pursuing claims under the UDTPAs of over 30 jurisdictions, solving manageability and predominance problems by organizing the applicable statutes into two groups according to similarity of the provisions.  *Id.* at 86, 94-95.

Following the example set by the District of Massachusetts in *AWP*,  Plaintiffs divide the various state laws into two groups: (1) states with statutes that track Section 5 of the Federal

Trade Commission Act, which proscribe unfair or deceptive acts or practices and (2) states with statutes that bar false, misleading and/or deceptive (but not unfair) acts and practices. *Id.* at 109-111. Plaintiffs' request that the Court group claims, however, consists solely of citation to and brief discussion of the *AWP* opinion and an exhibit providing the National Consumer Law Center's 2009 analysis of the various state consumer fraud statutes. No effort has been made to demonstrate how Plaintiffs' claims of deception through overbilling could be proven under the statutes' varying elements of reliance, state of mind, and causation, to name a few. In other words, Plaintiffs have proposed two groups, but have not demonstrated how this grouping would apply to the facts and issues presented by this case, such that a trial involving dozens of statutes would be rendered manageable. In contrast, the *AWP* court relied heavily on the experience and information regarding facts, legal theories, and proof developed in the bellwether trial. It observed that "[t]he bellwether trial, together with seven years of presiding over this multi-district litigation permits the Court to take a searching look at the critical fact disputes, to make fact-findings for purposes of class certification and to make grounded predictions as to how the key contested issues will play out." *Id.* at 92. This Court does not have nearly the same amount of information, nor have Plaintiffs provided a concrete and practical plan of how grouping would allow them to try the consumer fraud claims without deterioration of the trial into a state-by-state examination of the claims, undermining the superiority of the class action vehicle as a method of resolving disputes. They have given no indication that the jury may be charged in some intelligent and intelligible manner when called upon to evaluate class members' right to recovery, whether the consumer fraud laws are grouped or not. In other words, Plaintiffs have not demonstrated that grouping what they characterize as relatively similar state laws together and

-23-

applying them as a unit would overcome the manageability obstacles posed by having to apply the laws of 51 jurisdictions separately.

Before reaching the result that Plaintiffs urge the Court to follow here, the AWP court stated that "[i]n proposing to certify a class requiring the application of the laws of numerous jurisdictions, plaintiffs must shoulder the herculean burden of conducting an extensive review of state law variances to demonstrate how grouping would work." *Id.* at 94.  The Plaintiffs in this action have simply not met that burden.[6]

The Court notes, that unlike the Third Circuit precedent cited by Plaintiffs in support of certifying a multi-state class, certification is not being sought here for purposes of settlement. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 283, 315 (3d Cir. 2004) (holding, in context of reviewing district court's certification of settlement class and approval of settlement, that variation in state consumer fraud and antitrust laws applicable to nationwide class does not necessarily run afoul of predominance and commonality requirements of Rule 23); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 315 (3d Cir. 1998) (affirming

---

[6] The alternative proposal that the Court consider certifying exemplar classes is completely undeveloped.  Plaintiffs' argument consists of two sentences, in which they cite to two antitrust cases that certified classes to pursue state antitrust claims under the laws of certain states with indirect purchaser causes of action and suggest that this Court could similar certify a class using the the Washington, Nevada and/or New Jersey consumer fraud statutes as exemplars. *See In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326 (E.D. Mich. 2001).  There is no further explanation of how the reasoning of *Relafen* or *Cardizem* applies to this case nor of how a trial using one or more of the exemplar statutes assuages any of the predominance and management concerns that the Court has identified as hindering class treatment of the consumer fraud claims.  Indeed, a trial according to an exemplar class would almost certainly lead to de-certification of the class if Plaintiffs prevailed, for the Court would still be left with nationwide claims under the substantially different statutes of 51 jurisdictions.

district court's certification of class under Rule 23(b)(3) for settlement and holding that
predominance requirement not necessarily defeated because class claims subject to laws of 50
states).  "Confronted with a request for a settlement-only class certification, a district court need
not inquire whether the case, if tried, would present intractable management problems, for the
proposal is that there be no trial." *Amchem*, 521 U.S. at 620 (internal citation omitted).  This
case, however, is poised to go to trial, and the Court takes very seriously the difficulty it would
face presiding over a trial in which the proofs required of Plaintiffs to obtain recovery would
hardly be capable of any uniform organized presentation. *See, e.g., Castano*, 84 F.3d at 744
(holding that district court is required to consider how claims would be tried in its determination
of whether predominance requirement met).

Class treatment of the statutory consumer fraud claims is simply impracticable.  As
Plaintiffs' have not met their burden of demonstrating that those claims meet Rule 23(b)(3)'s
predominance requirement, the Court will deny class certification of the consumer fraud claims
as to all four classes.

**B.      RICO Claim**

The theory of the RICO claim asserted by the Post-EOB Billing Class is that by billing
customers in excess of the financial responsibility listed on the EOB or ERA,[7] Quest defrauded
the customers into paying more than they owed.  Plaintiffs take the position that by limiting the
class to only those customers who paid a bill sent after the EOB issued they have presented a

---

[7] An "ERA," or "Electronic Remittance Advice" is simply an electronic notification of
the insurer's determination of patient responsibility for a service.  It is functionally the same as an
EOB.  Dyckman Rep. at 11 [docket entry 151-2].  The Court will collectively refer to the
communications known as EOB and ERA simply as "EOB" throughout this Opinion.

cohesive class claim for a RICO violation because, they maintain, upon the issuance of the EOB, Quest knew or should have known that it was overbilling a customer.  The Court finds, however, that in spite of this limitation, the Post-EOB Billing Class cannot satisfy the Rule 23(b)(3) requirements of commonality and predominance with respect to its RICO claim.  The impediment continues to be posed by scienter, an essential element of Plaintiffs' RICO claim.

As the Court reviewed in Agostino I, the predicate criminal acts of Plaintiffs' RICO claims are mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, respectively. Plaintiffs have not, however, demonstrated that such predicate wrongdoing is susceptible of class-wide proof.   Proving the underlying acts of racketeering requires Plaintiffs to demonstrate that Quest participated in a scheme with specific intent to defraud.  *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995) (establishing mail fraud violation requires proof of a participation in a scheme with specific intent to defraud); *United States v. Veksler*, 62 F.3d 544 (3d Cir. 1995) (establishing a wire fraud violation requires proof of a participation in a scheme with specific intent to defraud).  Proof of specific intent "'may be found from a material misstatement of fact made with reckless disregard for the truth.'" *Coyle*, 63 F.3d at 1243 (quoting *United States v. Hannigan*, 27 F.3d 890, 892 n.1 3d Cir 1994)).  Additionally, as the Court observed in Agostino I, it "may deny certification where proof of an essential element of a cause of action requires individualized inquiry into the facts underlying the plaintiff's claim." *Agostino*, 256 F.R.D. at 457 (citing *Newton*, 259 F.3d at 172.)   The Court discerns two flaws in Plaintiffs' attempt to satisfy the predominance requirement with respect to scienter.

First, the claim that Quest overbilled intentionally or with reckless disregard for the actual amount owed by a customer presupposes that billing for an amount other than what the EOB

states is the customer's financial responsibility is necessarily improper.  As Quest argues,

however, billing transactions are sufficiently complex and disparate so as to cast doubt, at the

very least, on this assumption.  Quest relies on the analysis of the billing transactions at issue in

this lawsuit conducted by Dr. Zachary Dyckman, its expert on health care economics and, in

particular, on billing practices for clinical laboratory services.  (*See, generally*, Dyckman Report,

at 21-28.)  Quest points to factual scenarios in which customers may be billed in excess of an

EOB for arguably legitimate reasons. One such scenario arises when the customer has primary

and secondary insurance coverage, as the situation presented by proposed alternative class

representative Elizabeth Cruthers exemplifies. In Cruther's case, Quest billed $11.08, the amount

stated on the EOB issued by her primary insurer, for an August 30, 2000 service.  (Dyckman

Report, Attachment D, at D-8.)   After she paid that bill, she submitted a claim to her secondary

insurer, which issued its own EOB stating that Cruthers' financial responsibility was zero.  (*Id.*)

Quest, in fact, refunded the earlier-made payment.  (*Id.*)  Another example of billing that is not

necessarily improper, much less fraudulent, in spite of its discrepancy with an EOB is posed by

situations in which Quest bills according to an initially issued EOB but the same insurer

subsequently re-adjudicates the claim to issue a second EOB stating a lower patient

responsibility.  This scenario is exemplified by the billing transaction associated with named

Plaintiff Jennifer Haley's August 13, 2001 date of service. (*Id.* at D-15.)  The need to sort out

situations in which Quest billing was proper according to one EOB but "improper" according to

another, whether issued by the same insurer after re-adjudicating a claim or by a secondary

insurer reaching its own determination of patient responsibility, negates the factual commonality

which Plaintiffs believe exists across the group of  customers allegedly defrauded by Quest's

post-EOB billing.  The fact-in-common that must underpin Plaintiffs' class-wide theory of

scienter, that is, that all instances of billing deviating from an EOB amount to improper

overbilling, is simply not evident.

Plaintiffs attempt to salvage their theory by underscoring that Quest itself has admitted

that it bills based on the EOB's statement of what a patient owes.  They argues that Quest's own

expert report describes what an EOB signifies to Quest in its billing practices as follows:

> The EOB is of critical importance in instructing the provider: a) whether to
> bill the patient and b) the amount to be billed, based on the health plan's
> determination of patient liability on the claim.

* * *

> In addition to the requisition, the EOB is of critical importance in regard to
> laboratory patient billing.  It instructs the laboratory whether to bill the
> patient and how much to bill, based on the patient's benefit coverage and
> the pricing provisions of the payer's contract with the laboratory.  Absent
> receipt of an EOB, in paper or electronic format, the laboratory may not
> know if the patient has insurance coverage, who the insurer is and whether
> it is Par with the laboratory, whether or not the laboratory test is a covered
> service, and the amount, if any, of patient financial responsibility for the
> claim.

(Dyckman Report at 11, 14.)  Quest's reliance on the EOB in billing patients is not in dispute.

Plaintiffs argue that the corollary to this admission is that billing in excess of the EOB amount,

after the insurer has advised of its determination of patient responsibility through issuance of the

EOB, constitutes knowingly or at least recklessly improper billing by Quest.  As Defendants'

examples demonstrate, transactions involving more than one EOB could give rise to billing that

both complies with one EOB and is in excess of patient responsibility according to another, for

the same patient and same date of service.  Plaintiffs rely on post-EOB billing as a proxy for

-28-

Quest's uniform act of improper overbilling with specific intent to defraud patients.  However, as the Court has discussed, this conclusion cannot be reached without a claim by claim analysis.

Second, and perhaps more fundamentally, the class-wide approach to scienter is flawed for failure to articulate what fraudulent scheme was allegedly perpetrated by Quest.  Even if the Court were to accept the proposition that billing in excess of an EOB necessarily constitutes wrongdoing, Plaintiffs do not contend that Quest engaged in systematic overbilling in excess of all EOBs.  Had that been the case, Plaintiffs would perhaps have articulated a colorable fraudulent scheme existing apart from the results of the scheme.  As the Court observed at oral argument, the Complaint alleges an improper result - some patients were billed over the EOB amount after the EOB issued -  but does not allege how Quest created that result as part of a scheme to defraud customers.  The parties acknowledge that Quest processed millions of claims for patients insured by carriers in a preferred provider agreement with Quest. Admittedly, many times Quest billed patients for the EOB amount.  The wrongdoing on which the Post-EOB Billing Class bases its RICO claims apparently consists of excessive post-EOB billing in *some* instances.  Neither the Complaint nor Plaintiffs' class certification motion describe how Quest may have differentiated between instances of billing according to the EOB and instances of billing a greater amount than the insurer's adjudication of patient responsibility as stated in the EOB.  In other words, the class's RICO claims are expressed in terms of victimization, not in terms of a scheme undertaken by Quest to *sometimes* overbill with intent to defraud.  Without a unifying theory of misconduct, Plaintiffs are left without a way to establish class-wide RICO liability.  Plaintiffs' arguments that Quest should not be permitted to retain proceeds from

millions of instances of excessive Post-EOB billing do not assuage this Court's concerns about the manageability of trying this proposed class's RICO claim without any cohesive, class-wide plan for proving scienter.

Moreover, the Court is concerned that determining membership in the Post-EOB Billing Class would depend on an ultimate determination of liability.  In other words, identifying which Quest customers were harmed by Quest's post-EOB billing for an amount greater than the EOB statement of patient responsibility would be impossible prior to individualized fact-finding and litigation. It is a fundamental requirement that a Rule 23 class be defined in such a way as to allow a court to ascertain its membership in some objective manner.  *McGee v. East Ohio Gas Co.*, 200 F.R.D. 382, 387 (S.D. Ohio 2001) (citing *Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986)); *see also see also* Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice and Procedure § 1760 at 139-140 (3d ed. 2005) ("the requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."). Superficially, the Post-EOB Billing Class's definition satisfies this requirement. Those customers who were covered by insurance that designated Quest as a preferred provider and who paid a Quest bill in excess of the EOB for the service comprise the class.  Clearly, this group could be objectively and feasibly ascertained.  However, implicit in the class definition must be the fact of harm, that is, the class must consist of those above-mentioned Quest patients who *wrongfully* sustained a loss by paying the bill.  Otherwise, a class of persons seeking relief simply does not exist.  As the Court has discussed, Plaintiffs have not persuaded the Court that simply paying a bill that charged an amount above an EOB's statement of patient responsibility

necessarily corresponds to a wrongful act by Quest.  For the reasons discussed, if the class

definition were viewed through the lens of the RICO claim, determining membership in the class

would depend upon a determination of victimization, which would depend upon separate

adjudications as to the circumstances of each customer's billing transaction. "[T]he

ascertainability of a class depends on whether there will be a definitive membership in the class

once judgment is rendered."  *In re Methyl Tertiary Butyl Ether (MBTE) Products Liability Litig.*,

241 F.R.D. 185, 196 (S.D.N.Y. 2007).  A hypothetical judgment in favor of Plaintiffs on the

RICO claim would not illuminate class membership in the slightest.  A transaction by transaction

inquiry would still need to be performed as to all customers who paid Quest more than the EOB

amount to determine whether a customer had been defrauded, that is, whether Quest acted with

scienter as to him or her.  The leading treatise in this area of the law, Newberg on Class Actions,

comments that "[c]are should be taken to define the class in objective terms capable of

membership ascertainment when appropriate, without regard to the merits of the claim or the

seeking of particular relief."  2 Newberg on Class Actions at § 6.14.  As the Court's example

illustrates, however, membership of any particular individual in the Post-EOB Billing Class

would require a determination on the merits of the RICO claim.

Accordingly, the Court concludes the putative Post-EOB Billing Class may not pursue the

federal RICO claim as a Rule 23(b)(3) class.

### C.   Unjust Enrichment

Similarly, the failure to demonstrate that there is a predominance of common questions of

law and fact as well as the unascertainable nature of the class prevent certification of the Post-

EOB Billing Class as to the claim of unjust enrichment.  A claim for unjust enrichment provides

an equitable remedy to a plaintiff who has conferred a benefit on the defendant when the defendant's retention of that benefit without payment would be unjust.[8]  *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994).  Plaintiffs have not demonstrated that they could prove liability on such a claim on a class-wide basis.  Again, whether Quest billed a customer incorrectly and unjustly simply because it collected an amount exceeding the EOB amount involves too many questions individual to the customer, the service date and the billing transaction, as illustrated by the examples reviewed above.

In short, Plaintiffs have failed to prove that the Post-EOB Billing Class meets all of Rule 23's requirements, with regard to any of the claims the class wishes to pursue.  In this regard, the motion for class certification will be denied.

## II.   MEDICARE PART B CLASS

In Agostino I, the Court denied certification of this class on grounds that it lacked a class representative whose claims were typical of the class's claim, as the proffered representative had not paid any portion of her Quest bill.  *Agostino*, 256 F.R.D. at 477-78.  In pursuit of curing the defect, Plaintiffs proffer a new plaintiff to represent the Medicare Part B Class - Katrina Camaj.  They have, contemporaneous with this renewed motion for class certification, filed a separate motion to add her to this lawsuit as a named plaintiff, styled by Plaintiffs as a motion to intervene, join, or amend the Complaint.

---

[8] In Agostino I, the Court determined that application of New Jersey law to the unjust enrichment claim of class members from all states would be appropriate, as the unjust enrichment laws of other states were not in conflict with New Jersey's.  *Agostino*, 256 F.R.D. at 464.

The parties presented the following facts about Camaj's experience in paying a Quest bill allegedly violating Medicare billing rules. Camaj paid an $18.72 bill issued by Quest on December 28, 2007 in connection with her December 1, 2007 date of service.  (3/12/10 Tusa Decl., ¶¶ 7, 9, 10.)  She was insured under Medicare Part B at the time and had informed Quest of this insurance prior to the service. (*Id.*, ¶ 6.)  Initially, Plaintiffs asserted that no ABN existed for the December 1, 2007 service, which was consistent with the results of their initial investigation.  (*Id.*, ¶¶ 11-13.)  In opposition to Plaintiff's motion to add Camaj as a party to this suit, Quest produced an ABN signed by Camaj on December 1, 2007.  (4/13/10 Diffley Cert., Ex. 3.)  With regard to the service sought by Camaj on that date, the ABN warned that "Medicare does not pay for this test for your condition."  (*Id.*)  In spite of this warning, the signed ABN bears a checked box next to "Option 1.  YES.  I want to receive these laboratory tests."  (*Id.*)  Quest also produced a December 27, 2007 communication by Medicare denying the claim for the lipid panel test Quest performed for Camaj on the date in question and stating that Camaj was responsible for the associated $18.27 charge.  (*Id.*, Ex. 4.)

According to these facts, Camaj is simply not a member of the Medicare Part B Class. The class is limited to those persons for whom Quest did not have a completed ABN and a determination of patient responsibility from Medicare at the time of billing.  In Camaj's case, Quest was in possession of both when it billed her for the December 1, 2007 service.  She fails Rule 23(a)(3)'s typicality prong, which requires Plaintiffs to demonstrate that the proposed class representative's interests are aligned with those of the absent class members.  *Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir. 2001).  If the named plaintiffs' claims "[arise] from the same event or practice or course of conduct that gives rise to the claims of the class members"

and are "based on the same legal theory," the typicality requirement will be met, even if there are factual differences between the named plaintiffs' claims and those of the absent members. *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994). The facts underlying Camaj's purported claim against Quest are not different from those of the class as described in a mere trivial sense. Rather, Quest's alleged practice of billing without an ABN goes to the crux of the class claim. Camaj's situation is distinct in a significant manner. As such, she is ineligible to represent the class.

In an effort to salvage their selection of a new individual to represent the class, Plaintiffs argue that Camaj's ABN for December 1, 2007 is invalid. They maintain that the ABN is ineffective because it identifies the service to be provided to Camaj as a "Lipid Panel Clarification" test, coded as 968C, whereas the claim submitted to Medicare by Quest identified the service as "968T," which is the code that corresponds to a "Lipid Panel" test. (Diffley Decl., Ex. 3 and 4; Tusa Reply Decl., Ex. E,F; Camaj Decl., Ex. 1.) This discrepancy, they contend, nullifies Camaj's December 1, 2007 ABN, and therefore, they argue, Camaj does fall within the bounds of the class definition. The problem with this argument is two-fold.

First, and most apparent, the class - as defined by Plaintiffs - includes customers billed without an ABN, not without a *valid* ABN. The validity or invalidity of Camaj's ABN is irrelevant for purposes of determining whether her individual claims would be typical of the class claims, as required by Rule 23(a)(3). Clearly, Camaj's claims would differ significantly from the class claims because Quest had both a completed ABN and determination of patient responsibility for her service when it billed her.

-34-

Second, Plaintiffs' fall-back position, of urging the Court to exercise its power to "clarify" that the class includes both Medicare Part B beneficiaries who received no ABN and those who were presented with an invalid ABN, does not get them to certification. Rule 23(c)(1) authorizes the Court to redefine a class so that the action may be maintained as a class action. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 185 (1974); *In re MTBE Prods. Liability Litig.*, 241 F.R.D. at 438. If the class definition were revised pursuant to Rule 23(c)(1) to conform to Camaj's situation, for example, by inclusion of the word "valid" to qualify the kind of ABN that Quest lacked at the time it billed the customer, the proposed class's typicality problem might be solved, but it would nevertheless fail for lack of predominance of legal and factual issues. As the Camaj example demonstrates, determining whether an ABN is valid or not is not amenable to a one-size-fits-all set of proofs. In her case, the ABN is allegedly defective because the identified kind of lipid panel test does not match the lipid panel test code stated by Quest in its claim to Medicare and its bill to Camaj.[9] The inquiry, however, does not end there. Plaintiffs further argue that Quest's non-compliance with other Medicare rules requiring that the patient be furnished with a copy of the ABN render Camaj's December 1, 2007 ABN defective and null. Quest counters by arguing that under Medicare rules, it may bill a patient if he has actual knowledge that Medicare coverage would be denied. The Court makes no findings as to this dispute regarding Camaj's ABN. It simply reviews these arguments to illustrate the point that once the validity of the ABN is introduced into the class definition, litigation of the Medicare

---

[9] Plaintiffs point to the Medicare Claim Processing Manual, which states that ABNs failing to meet certain standards "may be ruled defective and may not serve to protect the interests of the notifier." CMS, Medicare Claims Processing Manual, ch. 30, § 40.3 (2008). One of these standards is the express disclosure of the particular items or service for which payment will likely be denied. *Id.*, § 40.3.1.2.

Part B class's claims becomes completely unmanageable, with individual issues overwhelming those that apply across the class. Liability issues specific to Camaj, or any other putative class member would differ significantly, and the Court would be forced to conduct a discrete and individualized analysis to resolve the claim of every class member contending his or her ABN is defective. Indeed, whether a particular Quest customer was a member of the Medicare Part B Class could not be ascertained without such a fact-intensive and searching exploration. Apart from failing to meet Rule 23(b)'s predominance requirement, the hypothetically revised class would also face the insurmountable obstacle posed by the inability to determine membership without first deciding the merits of the class claims that Quest improperly billed for a service. As the Court has already discussed, a class that does not objectively define itself cannot be maintained under Rule 23.

The Court accordingly denies certification to the Medicare Part B Billing Class for lack of a class representative who meets Rule 23(a)(3)'s typicality requirement. Plaintiffs have not demonstrated that their proposed substitute representative, Camaj, is even a member of the class, much less has interests aligned with those of the absent class members, who - unlike Camaj - were allegedly billed by Quest without prior notice that they would be financially responsible for the Quest service they sought and obtained. Moreover, for the reasons discussed, the Court will not revise the class definition, so that the Medicare Part B Billing Class can encompass Camaj, because such a revision would be futile. As the Court has evaluated the certifiability of the Medicare Part B Class assuming Camaj had been added to the case as a named plaintiff, and nevertheless found that she and the class fall short of Rule 23, the Court will dismiss Plaintiffs' companion motion to intervene, join or amend the complaint as moot.

### III.     Anthem BCBS FEHB Class

This class pursues three claims: breach of consumer fraud statutory law (New Jersey's Consumer Fraud Act and the comparable statutes of all states), breach of contract and unjust enrichment.  For the same reasons discussed above in the section concerning the Post-EOB Billing Class, the Anthem BCBS FEHB Class may not be certified as to the statutory consumer fraud claim.  New Jersey law cannot apply to the claims of all class members nationwide, and the necessity of conducting a trial as to dozens' of jurisdictions disparate consumer fraud laws would frustrate both the predominance and superiority a class must demonstrate to maintain the case as a Rule 23(b)(3) action.  The Court will thus proceed to analyze whether certification as to the other two claims is warranted.

#### A.     Breach of Contract Claim

Much like the Post-EOB Billing Class's claims, the Anthem BCBS FEHB Class's claims seek redress for Quest's billing of customers in excess of the patient responsibility stated in the EOB. The Anthem BCBS FEHB Class, which essentially amounts to a subset of the Post-EOB Billing Class, asserts the unique claim that such billing activity violated the preferred provider agreement between Quest and Anthem BCBS, the purported insurer of members of this class.  In particular, Plaintiffs base the breach of contract claim on the hold harmless provision in Section II.B.4 of the agreement, appearing under the title "Compensation and Billing."  That provision reads in relevant part as follows:

> Laboratory hereby agrees that in no event, including but not limited to non-payment by Payor, Anthem BC&BS's insolvency or breach of this Agreement, shall Laboratory bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Members or persons acting on their behalf, other than Payor, for

> Covered Services provided pursuant to this Agreement.  This provision
> shall not prohibit collection of any Copayment or Deductible or other
> charge that the Member is obligated to pay pursuant to the applicable Plan.

(3/12/10 Tusa Decl., Ex. 10 at QD1011.)  This provision appears in what Plaintiffs consistently

refer to as the "Anthem BCBS / Quest Provider Agreement," which they submit to the Court as

Exhibit 10 to the Tusa Declaration.  That agreement, they point out, contains a choice of law

provision selecting Connecticut as the governing law, and thus they contend the nationwide class

claims for breach of contract would be adjudicated according to a uniform legal standard.

(3/12/10 Tusa Decl., Ex. 10 at QD1018.)  Plaintiffs further explain that the Anthem BCBS /

Quest agreement is made applicable to those insureds covered by the FEHB Program, such as

proposed class representative Richard Grandalski, by operation of an Amendment between Quest

and the insurer, which revises the definition of "Member" to include any person eligible to

receive covered services through his or her enrollment in the "Point-Of-Service Product offered

to federal employees as part of the Federal Employee Program (FEP), which FEP POS Product is

underwritten and administered by Anthem BC&BS . . . ."  (*Id.*, Ex. 11 at QD 1021.)

Plaintiffs acknowledge that in Agostino I, the Court denied certification to a class of

private insureds on claims involving contractual breaches, such as violations of the hold harmless

provisions in provider agreements governing Quest, on the grounds that considerable variation

among the many provider agreements that would apply to the class claims frustrated classwide

proof of liability and rendered a class action unmanageable.  *Agostino*, 256 F.R.D. at 452-53,

458-59.  They maintain, however, that their revised approach to pursuing a breach of contract

claim cures the predominance and manageability problems because (1) the wrongdoing

complained of consists solely of post-EOB Billing and (2) the Court need only look to one

agreement - the "Anthem BCBS / Quest Provider Agreement" - to determine whether this conduct gives rise to liability.  Plaintiffs contend their circumscription of the Anthem BCBS FEHB Class to insureds nationwide covered by one plan (the Anthem BCBS plan) and moreover by one subplan (the FEHB program under which federal employees obtain coverage) eliminates impediments that might otherwise be posed by the need to prove liability for breach of contract according to varying Quest contracts with numerous benefit plans under the laws of potentially dozens of jurisdictions.  They argue that because the Anthem BCBS FEHB Class is a single contract, single state law class, establishing Quest's liability for breach of contract based on billing Anthem BCBS insureds in excess of EOB amounts will be amenable to a common set of proofs.

In opposition, Quest exposes the fallacy of the single insurer known as "Anthem BCBS" and thus undercuts the core of Plaintiffs' argument, that is, that they are dealing with one preferred provider agreement between Quest and "Anthem BCBS."  In point of fact, Quest states, a single entity known as "Blue Cross Blue Shield" or "BCBS" does not exist.  Instead, according to the website of the Blue Cross Blue Shield Association, there are dozens of independent Blue Cross Blue Shield Companies.  *See* Blue Cross Blue Shield Assoc., Federal Employee Program, http://www.bcbs.com/coverage/fep (last visited Dec. 17, 2010); *see also* Blue Cross Blue Shield Association, Find Your Local Blue Cross and Blue Shield Health Insurance Company, http://www.bcbs.com/coverage/find/plan (last visited Dec. 17, 2010).  Fourteen of the various Blue Cross Blue Shield companies are "Anthem BCBS" entities, and they operate independently in multiple states. *See* Anthem, Plans & Benefits, http://www.anthem.com/ health-insurance/ plans-and-benefits/pb-overview.  Quest contracts separately with the Anthem BCBS entities, and

it does not have contracts with three of them: the Anthem BCBS entities in Nevada, Georgia and Colorado. (*See* Quest Supp. Br. at 13 n.8 (citing http://www.questdiagnostics.com/brand/business_health_plan/insurancelists.html)).  Quest argues that the contracts that do exist between Anthem BCBS companies and Quest are not uniform, and importantly do not share a common choice of law provision.  Plaintiffs have relied on only one of these contracts in support of their motion for class certification.  Quest points out that the contract proffered by Plaintiffs as the Anthem BCBS / Quest provider agreement is actually between Quest and the entity known as BCBS of Connecticut.  Indeed, it reads: "THIS AGREEMENT is made and entered into between ANTHEM HEALTH PLANS, INC. doing business as ANTHEM BLUE CROSS BLUE SHIELD OF CONNECTICUT . . .  and Quest Diagnostics, Inc. . . ."  (3/12/10 Tusa Decl., Ex. 10 at QD 1009.)  Whereas this contract contains a Connecticut choice of law provision, other provider agreements may not.  Quest raises in its brief the Empire BCBS of New York contract as an example of the variation among provider agreements between Quest and Anthem BCBS companies; it represents to the Court that the Empire BCBS contract contains a New York choice of law provision. Neither party has submitted all 11 of the Quest agreements with Anthem BCBS entities, and the Court cannot independently reach any conclusion about what provisions those contracts contain and what state's law would govern claims arising thereunder.

It remains, however, that the burden is on Plaintiffs to satisfy that all requirements of Rule 23(a) and (b)(3) are met, and they have not done so.  In light of the many contracts that would apply to the breach of contract claims of Anthem BCBS FEHB class members, and moreover Plaintiffs' failure to demonstrate any uniformity among those contracts with respect to either the allegedly offensive conduct of Quest - billing in excess of EOB amounts - or the law

applicable to claims for breach, the Court concludes that Plaintiffs have not shown that common questions of law or fact predominate.  The breach of contract claim asserted by the putative Anthem BCBS FEHB class could not be tried without examination of the claim under the terms of multiple different Anthem contracts according to the laws of possibly as many jurisdictions.

Alternatively, narrowing the class to fit the single state, single contract scenario would not permit the Court to grant Rule 23 certification because Rule 23(a)'s requirements of typicality and adequacy would not be met.  There is no evidence that Richard Grandalski, the proposed class representative, was covered by Anthem BCBS of Connecticut at any of the times relevant to the four dates of service on which his breach of contract claims are based.[10]  If the class were limited to members of the FEHB program with Anthem BCBS of Connecticut, Grandalski would neither be pursuing claims typical of the class claims nor would he serve as an adequate representative whose interest were aligned with those of the absent class members. Indeed, he would not even be a member of that narrowed class.

Plaintiffs, in short, have not met Rule 23's standard for certification of the Anthem BCBS FEHB Class on the breach of contract claim.

    **B.    Unjust Enrichment**

Though Plaintiff makes no argument specific to certification of the Anthem BCBS FEHB Class for purposes of pursuing an unjust enrichment claim, the Court will address it for purposes of completeness.  Plaintiffs have not demonstrated that as to the entire class of individuals insured by one of the many Anthem BCBS plans, through the federal employee program, they

---

[10] It appears, rather, that he was covered under the FEHB program with Anthem BCBS of Nevada.  (11/30/07 Tusa Reply Decl., Ex. 1 at PLF 3176; *see also* Quest Supp. Br. at n.10, citing to Grandalski insurance card at QD 130.)

-41-

can prove in a cohesive and manageable manner that Quest improperly retained a benefit to which they were not entitled.  Simply put, no effort has been made to establish that the Rule 23(b) requirements of predominance and superiority can be met.

 The Court will accordingly deny class certification to this proposed class.


**IV.** **DEBT COLLECTION VICTIMS CLASS**

 Unlike the other three classes, the Debt Collection Victims Class does not sue Quest for its allegedly unlawful billing practices.  Rather, it targets several debt collectors that, in attempting to collect Quest bills for laboratory services, engaged in at least one of the following activities: (1) made a written demand for payment which stated that the debt collector may engage in "additional" or "further" collection efforts, or (2) made a written demand for payment that added interest, charges, or other penalties in excess of the original amount billed by Quest.  One violation concerns allegedly making unauthorized or otherwise improper threats in the form of dunning letters and the other concerns adding penalties to a debt.  Each of the five debt collectors who remain in the case - SSB, RCA, CBC, AMCA and Quantum - are alleged to have committed one or both types of misconduct.  Plaintiffs have argued that the unauthorized threats in dunning letters and the addition of penalties not only support claims for relief under the Fair Debt Collection Practices Act, but also under the New Jersey Consumer Fraud Act, RICO and unjust enrichment.

 **A.** **Claims Against SSB and RCA**

 Before turning to a claim-by-claim class certification analysis, the Court must examine an issue raised by the Debt Collector Defendants in their joint brief in opposition to Plaintiffs' class

certification motion - the lack of any class representative as to two of the five debt collectors named in the Complaint.  Plaintiffs acknowledge that no named Plaintiff has asserted that he or she was injured by SSB or RCA but argue that the Debt Collector Defendants' argument is essentially one involving Article III standing, or the lack thereof, and is thus appropriately deferred until after class certification is decided.  Plaintiffs rely on the Supreme Court's decision in *Ortiz v. Fibreboard Corp.*, which holds that where class certification is "logically antecedent to Article III concerns," class certification should be decided before reaching the question of Article III standing.  *Ortiz v. Fibreboard*, 527 U.S. 815, 831 (1999).

Normally, Article III standing is a threshold question of jurisdiction.  *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007).  Article III empowers the Court to hear only "cases or controversies," which means that a plaintiff has suffered an injury-in-fact which is fairly traceable to some action of the defendant and which is capable of redress by the court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Under the *Ortiz* rule, however, where the question of a plaintiff's standing to sue would not exist but for class certification, a court should first determine whether the class meets Rule 23's certification requirements.  *Ortiz*, 527 U.S. at 831; *Amchem*, 521 U.S. at 612.

The *Ortiz* rule is wholly inapplicable to Plaintiffs' motion for class certification.  First, class certification did not create the jurisdictional issue. The question of whether Article III's basic requirements have been met as to the action against SSB and RCA would exist whether the named Plaintiffs filed this action alone or as part of a class.  *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315 (5th Cir.2002) (distinguishing situations in which Ortiz exception of deferring standing issues does not apply). Those who seek to represent the class must themselves meet the essential

standing requirement of having personally sustained the injury for which redress is sought. "[T]he fact that 'a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' " *Gratz v. Bollinger*, 539 U.S. 244, 289 (2003) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n. 20 (1976)); *see also Lewis v. Casey*, 518 U.S. 343, 347 (1996) (holding same).  Not one of the named Plaintiffs alleges that he or she personally sustained an injury fairly traceable to the actions of SSB and/or RCA.  Second, Plaintiffs' argument that the Ortiz rule salvages their attempt to certify a class to pursue claims against SSB and RCA, even though no named Plaintiff has asserted a claim against these defendants, is nothing more than a red herring.  The Court is not dealing with a situation in which it has been asked to defer deciding whether there is a case or controversy against SSB and/or RCA until after the class certification motion.  The class certification motion is presently before the Court.  The Debt Collection Defendants have opposed it by arguing, among other things, that as to SSB and RCA, Rule 23's requirements cannot be met because the proposed class representatives - Richard Grandalski, Aria McKenna, and Richard and Christine Ranieri - lack typicality and adequacy.  Indeed, none of the alleged misconduct claimed by those proposed representatives has anything at all to do with SSB or RCA.  Ortiz does not stand for the proposition that Rule 23's requirements can be overlooked because some unnamed, absent member of a putative class has been harmed by a defendant.

 To reiterate, a class cannot be certified under Rule 23 unless, among other requirements, the named parties' claims or defenses are typical of the class and the class representatives will

adequately protect the interests of the class.  *Amchem*, 521 U.S. at 613.  The Supreme Court has

held that Rule 23's requirements "must be interpreted in keeping with Article III constraints."  *Id.*

Again, none of the proposed representatives of the Debt Collection Victims Class even allege

that they were injured by the actions of SSB and/or RCA.  Plaintiffs have not satisfied the Court

that the claims of certain named Plaintiffs against three particular debt collection companies

(CBC, AMCA and Quantum) can be typical of absent class members' claims against two other

companies (SSB and RCA) simply because all of the debt collectors allegedly acted in similarly

improper ways.  Nor have they persuaded the Court that the proposed class representatives'

interests are aligned with those of absent class members whose rights may have been violated by

debt collectors with whom the representatives claim absolutely no connection.

    For these reasons, the Debt Collection Victims Class cannot be certified as to any claim

against SSB or RCA.  The Court will proceed to analyze whether the Debt Collection Victims

Class may be certified under Rule 23(b)(3) to pursue the claims against the other three Debt

Collector Defendants, that is, AMCA, CBC, and Quantum.

### B.    Consumer Fraud Act

    As to the claim for violation of the New Jersey Consumer Fraud Act and/or the deceptive

practices statute of some other state, the Debt Collection Victims Class faces the same

insurmountable predominance and manageability problems as the other three classes.  The

members of the Debt Collection Victims Class hale from states nationwide, yet Plaintiffs do not

make any attempt to demonstrate either that the law of one state could apply to the claims of all

members or, alternatively, that common issues of law and fact would predominate even if the

claims had to be tried under the laws of various states.  Plaintiffs do not present a choice of law

argument specific to the consumer fraud claim of Debt Collection Victims Class.   Instead, they appear to rely on the choice of law analysis presented with regard to the consumer fraud claims asserted by the classes against Quest.  The case for blanket application of New Jersey's Consumer Fraud Act to the claims of the entire class, already rejected for the reasons discussed above, turns even more unpersuasive in the context of Plaintiffs' assertion of those claims against the Debt Collector Defendants.  Unlike Quest, none of the Debt Collector Defendants are headquartered in New Jersey.  Plaintiffs do not even attempt to make a connection between New Jersey, or any other particular jurisdiction, and the sending of dunning letters and/or tacking on of additional penalties, such that these alleged bases for the consumer fraud claims against the Debt Collector Defendants could be evaluated according to the law of one state.

In short, certification of the Debt Collection Victims Class under Rule 23(b)(3) is not warranted insofar as it seeks to pursue statutory consumer fraud claims.

### C.      RICO Claim

Plaintiffs provide no analysis at all to demonstrate that the Debt Collection Victims Class meets the requirements of Rule 23(a) and 23(b)(3) with regard to the RICO claim.   The Court denies certification for failure by Plaintiffs to meet their burden.

### D.      Fair Debt Collection Practices Act

Plaintiffs allege that the named Debt Collector Defendants engaged in two distinct kinds of conduct prohibited by the Fair Debt Collection Practices Act ("FDCPA"): (1) making unauthorized and/or abusive threats in a dunning letter, in violation of 15 U.S.C. § 1692e and (2) tacking on penalties or fees to debts owed by customers to Quest, in violation of 15 U.S.C. § 1692f.  The dunning letter claim is directed only at defendants AMCA and CBC, whereas the

additional fees claim is directed only at defendant Quantum.  The Court will review them

separately for purposes of determining whether certification under Rule 23(b)(3) may be granted.

        1.    <u>Dunning Letter Claim</u>

       Under the Fair Debt Collection Practices Act, a debt collector may not "threat[en] to take

any action that cannot legally be taken or that is not intended to be taken" or "use . . . any false

representation or deceptive means to collect or attempt to collect any debt."  16 U.S.C. §

1692e(5) and (10).  Plaintiffs base this claim on language in dunning letters sent by AMCA and

CBC that the debt collectors will engage in "additional collection efforts," or some variation of

that statement, if payment was not made within the time provided.  Proposed class

representatives McKenna and Christine Ranieri claim that they received unlawful dunning letters

from AMCA for the collection of debts purportedly owed to Quest.[11]  The first AMCA letter to

McKenna, dated June 8, 2005, states that a failure to respond would "subject [her] to additional

collection efforts."  (3/12/10 Tusa Decl., Ex. 18.)  A second letter, dated July 11, 2005, stated

that McKenna's deadline for payment in full of the $11.41 debt was July 25, 2005 and warned:

"[i]f we do not receive payment by the above date, our client has authorized us to continue our

collection efforts."  (*Id.*)  The April 18, 2005 letter to Christine Ranieri states that failure to

make payment of a $20.00 debt owed to Quest would result in review of her account "for

additional collection steps that are available to us."  Proposed class representative Richard

Grandalski bases his claim on a dunning letter sent by CBC to his wife, Janet, which stated that

"a negative credit report reflecting on your credit record  may be submitted to all credit reporting

---

[11] The Court notes that Richard Ranieri, also named as a proposed class representative,
has not submitted any dunning letter directed at him.  His adequacy as a class representative will
not, therefore, be considered.

agencies" if the debt was not paid.  (*Id.*, Ex. 21.)

The Court first holds, that as to the claim against CBC, the class cannot be certified for failure to meet the typicality and adequacy requirements of Rule 23(a)(3) and (4).  Once again, the Court has been presented with a proposed class representative, Richard Grandalski, who is simply not a member of the class as defined by Plaintiffs.  He is not the person who received a written demand for payment from CBC.  Indeed, Plaintiffs have not demonstrated that any of the proposed representatives of the Debt Collection Victims Class even alleges that he or she personally sustained an injury attributable to the alleged misconduct of CBC.

As to the claim against AMCA, AMCA argues, among other things, that the class cannot be certified for failure of the Plaintiffs to establish the commonality and typicality requirements of Rule 23(a)(2) and (3).  In particular, AMCA maintains that Plaintiffs have made no demonstration that AMCA engaged in some common practice of making the allegedly unlawful threats contained in the two McKenna letters and one Ranieri letter on which the class representatives' claims are based, or that AMCA used form dunning letters, that were identical or substantially similar to the McKenna and Ranieri letters.  In other words, they argue that Plaintiffs have presented no evidence that the putative class members share common circumstances involving the allegedly unauthorized threats made by AMCA in collecting Quest debt (commonality), or that the dunning letter claims made by the proposed class representatives arise from the same practice or course of conduct as those of the absent class members (typicality).  *Baby Neal*, 43 F.3d at 56-58.

Plaintiffs, who bear the burden of establishing that this action may be certified as a class action under Rule 23, have not pointed to any evidence of record that would support their

-48-

assertion that AMCA used form dunning letters.  Nor is there any indication in the record that the manner in which AMCA attempted to collect the Quest debt from proposed representatives McKenna and Ranieri, and more specifically the content of the communication directed at them, are typical of AMCA's conduct as to the class.  The absence of any proof that putative class members received a common debt collection letter frustrates commonality and typicality in an action pursuing relief under the Fair Debt Collection Practices Act for a debt collector's communication that it will take action that it is illegal or otherwise unauthorized. *Reese v. Arrow Fin. Svcs., LLC*, 202 F.R.D. 83, 92-93 (D.Conn. 2001); *cf. McCall v. Drive Fin. Svcs., L.P.*, 236 F.R.D. 246, 249-50 (E.D.Pa. 2006) (finding commonality and typicality met in a FDCPA class action suit because class consisted of persons who received substantially identical form letter and named plaintiff received substantially identical letter as the entire class he sought to represent); *Still v. JBC Assoc., P.C.*, No. 02-3550, 2005 WL 1334715, at *5 (D.N.J.  June 3, 2005) (finding that form collection letter received by plaintiff and entire putative class established commonality and typicality in FDCPA case).

A similar conclusion was reached by the district court in *Reese*, an FDCPA case brought as a putative class action by a debtor.  *Reese*, 202 F.R.D. at 93. The debtor in *Reese* sought relief under the same provision of the FDCPA as invoked in the instant action, alleging that the debt collector had violated it by failing to advise in its debt collection letter that the statute of limitations had run on the debt and payment of the debt would waive the statute of limitations defense.  *Id.* at 85.  The *Reese* court denied the plaintiff's motion for class certification for lack of commonality because plaintiff had not demonstrated that the debt collector sent a similar communication to all class members.  *Id.* at 93.  It reasoned as follows:

> [P]laintiff's allegations are insufficiently specific to permit the conclusion that defendant acted with a single, unitary course of conduct to meet the commonality requirement. Although plaintiff alleges that defendant had a "policy and practice" of purchasing charged-off debts and intentionally deceiving consumers into making payment on such debts by not disclosing information about the effects of making payment on a time-barred debt, plaintiff does not describe the means by which such a practice was carried out. If plaintiff can show that a common or similar letter was sent to each class member, or another similar single course of conduct, then commonality might be established. If, in contrast, the various proposed class members received different communications from defendant regarding their time-barred debt, the individualized assessment required to determine liability under the FDCPA would counsel against certifying either class one or three.

*Id.*

This Court cannot conclude that the threshold class certification requirements of Rule 23(a)(2) and (3) have been satisfied based on assertions by Plaintiffs which amount to no more than speculation. If AMCA did not employ standard language in its dunning letters, identical or at least substantially similar to statements made in the McKenna and Ranieri letters, liability for making allegedly unauthorized threats would necessarily depend on an individualized review of each letter received by a member of the putative class. In this Court's view, the need to perform such a letter-by-letter inquiry prevents it from finding that there are common issues of fact or law among the class (and, moreover, that the class meets the more stringent but related requirement of predominance under Rule 23(b)(3)) and that the claims of McKenna and Ranieri are typical of the class.

### 2.    Additional Fees Claim

Plaintiffs claim that debt collectors employed by Quest added fees to the debt, in violation of the FDCPA's prohibition of "the collection of any amount (including any interest, fee, charge,

or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."  15 U.S.C. § 1692f(1). They also claim that sending class members demands for payment that included such additional fees also constituted a "false representation of the character, amount, or legal status of any debt."  15 U.S.C. § 1692e(2)(A).  In the specific case of named plaintiff Richard Grandalski, the only proposed class representative with an "additional fees" claim under the FDCPA, the claim is based on the alleged addition by debt collector Quantum of a $10 fee to the $20 Quest bill which it was attempting to collect from Grandalski.

Plaintiffs have failed to establish that Grandalski is an adequate class representative or that his alleged claims are typical of the class claims.  The class that Richard Grandalski is supposed to represent must, by definition, have received a *written* demand for payment; Mr. Grandalski, however, admitted that he "never received anything in written communications from Quantum . . . ."  (Grandalski Dep. Tr. at 216:5-10, attached to DCDs' Supp. Br. at Ex. B.) Plaintiffs present no evidence that Richard Grandalski received a written demand from Quantum, in which it sought to collect an amount including a fee additional to the purported Quest debt. Rather, Grandalski's deposition testimony indicates that Quantum contacted him by telephone. (*Id.* at 215:6 - 216:10.)[12]  It is not, moreover, necessarily evident that these phone calls even pertained to a debt owed to Quest by him, as opposed to his wife, Janet.  Of course, without a

_____

[12] Besides this flaw, the Court incidentally notes that the evidence in the record appears to demonstrate that, in general, additional fees were not tacked on by Quantum but rather added by Quest before turning the account over to Quantum for collection.  (Billman Dep. Tr. at 24:2-5, 91:1-4.)  Nevertheless, the Court is not at this time tasked with evaluating the ultimate merits of the Fair Debt Collection Act claim but rather limits its consideration of the merits only as they may be pertinent to class certification.

written demand for payment, tracing the origin of the debt which was purportedly augmented by a debt collector's fee becomes problematic.

In any event, it remains that Grandalski's claim is simply unlike the claim of the Debt Collection Victims Class he proposes to represent.  This dissimilarity leads the Court to conclude that class may not be certified for failure to meet the threshold requirements of Rule 23(a)(3) and (4).

### E.      Unjust Enrichment

Plaintiffs' argument for certification of the Debt Collection Victims Class to pursue this claim is completely undeveloped.  While they assert that the same conduct that allegedly violates the FDCPA, as discussed above, could also give rise to an unjust enrichment claim, they have not demonstrated that Rule 23's requirements are met.  In light of this lack of analysis by the movant, and further in light of the inadequate demonstration that the class could be certified for purposes of trying any of the other legal claims, the Court denies certification.

## CONCLUSION

For the foregoing reasons, the Court finds that as to all four newly-proposed classes, Plaintiffs have failed to satisfy the class certification requirements of Rule 23(a) and Rule 23(b)(3).  The motion will therefore be denied in its entirety.  An appropriate form of Order will be filed.

                                  s/Stanley R. Chesler      
                                 STANLEY R. CHESLER
                                 United States District Judge

DATED: December 22, 2010